UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:19-CR-00669 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| GREGG SMITH, | ) | |
| MICHAEL NOWAK, | ) | |
| JEFFREY RUFFO, and | ) | |
| CHRISTOPHER JORDAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This prosecution arises out of an alleged commodities-spoofing conspiracy perpetrated by precious-metals traders. The superseding indictment charges a conspiracy to commit racketeering activity, as well as substantive counts of fraud, spoofing, and attempted price manipulation. R. 52[1] (for convenience's sake, the superseding indictment will be referred to as the indictment from now on). The Defendants have moved to dismiss much of the indictment.[2] R. 113. For the reasons set forth in this Opinion, the motion is denied for the most part, and granted as to the bank fraud counts.

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]One aspect of the dismissal motion has already been denied, specifically, the request to strike surplusage. The Court denied that aspect of the motion in deciding the government's motion to disqualify Nowak's proposed expert witness. R. 270.

## I. Background

In analyzing a pretrial motion to dismiss, the government's factual allegations are accepted as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). The indictment alleges that, between March 2008 and August 2016, the Defendants participated in a racketeering conspiracy to manipulate the market for precious-metals futures. R. 52, Sup. Indict. ¶¶ 22, 26. At various points during that stretch of time, each of the Defendants was employed by (or associated with) the Precious Metals Desk at Bank A. *Id.* ¶ 18. They served in the following job positions:

- Gregg Smith was a "precious-metals trader at Bank B from May 2007 until its acquisition by Bank A in May 2008." *Id.* ¶ 18(a). For the rest of the relevant time, Smith was "an Executive Director and trader at the Precious Metals Desk at Bank A." *Id.*
- During the relevant time, Michael Nowak was a "Managing Director and trader on the Precious Metals Desk at Bank A." *Id.* ¶ 18(b).
- Jeffrey Ruffo was "a salesperson at Bank B from May 2007 until its acquisition by Bank A in May 2008." *Id.* ¶ 18(c). For the rest of the time, Ruffo was "an Executive Director and salesperson on the Precious Metals Desk at Bank A." *Id.* Ruffo specialized in hedge fund sales and his clients included Hedge Funds E and F. *Id.* Ruffo left Bank A in August 2017. *Id.*
- Christopher Jordan worked at Bank A from March 2006 until December 2009. *Id.* ¶ 18(d). At the time of his departure, Jordan was an Executive Director. *Id.* After leaving Bank A, Jordan joined Bank C as a precious-metals trader and

> worked there from March 2010 to August 2010. *Id.* Then, from June 2011 to October 2011, "Jordan traded precious-metals futures contracts as an employee of Company D." *Id.*

The alleged purposes of the conspiracy were to illegally maximize profits and minimize losses (for themselves and Bank A), as well as to conceal the crimes. *Id.* ¶ 24. The alleged scheme involved two kinds of financial derivatives: futures and barrier-options. A brief background on these financial instruments is helpful here.

**A. Futures**

A futures contract is an agreement to buy or to sell a commodity at a fixed price on a future date. Futures are traded on markets designated and regulated by the Commodity Futures Trading Commission (CFTC). CME Group Inc. is a commodities marketplace comprising several exchanges, including the Commodity Exchange, Inc. (better known as COMEX) and the New York Mercantile Exchange, Inc. (NYMEX). Sup. Indict. ¶ 11. COMEX and NYMEX use the "Globex" electronic trading system, which allows market participants to trade in futures contracts from anywhere in the world. *Id.* ¶ 12. Commodities traders can place an order on Globex to either buy or sell futures contracts at a particular price. *Id.* ¶ 13. An order is "filled" or "executed" when the offer is accepted by a buyer or seller in the marketplace. *Id.*

**B. Barrier Options**

The holder of an options contract, on the other hand, has the right (but not the obligation) to buy or sell an underlying asset at an agreed-on price at any time before an agreed-on expiration date. Sup. Indict. ¶ 15. The rights under an option contract

can be bought and sold at a price (known as the premium) set by the market. A barrier option is a type of options contract whose value depends on whether the underlying asset reaches or exceeds a predetermined price before its expiration. Sup. Indict. ¶ 16. Barrier-running refers to market manipulation of the underlying asset so that it deliberately *reaches* the trigger price. *Id.* Barrier-defending, on the other hand, manipulates the market price of the underlying asset so that it *avoids* the trigger price. *Id.*

**C. The Alleged Conspiracy**

At bottom, the gist of the alleged conspiracy was that the Defendants placed orders to buy and to sell precious-metals futures contracts, but did so with the intent to cancel those orders before execution.[3] *Id.* ¶ 26. The government labels these the "Deceptive Orders." These orders were placed solely to move the metals' market price in a desired direction by manipulating the commodity's perceived supply and demand. *Id.* ¶¶ 26(h)–(j). The "layering" of Deceptive Orders in rapid succession made detection and execution more difficult. *Id.* ¶ 26(e). In contrast, on the opposite side of the Deceptive Orders, the Defendants would place one or more "Genuine Orders" that they intended to be filled. *Id.* ¶ 26(a). Sometimes, these Genuine Orders were "iceberg" orders, meaning that the true order size was unknown to other market participants. *Id.* ¶¶ 14, 26(a). In those instances, Deceptive Orders would be much larger than the visible portion of the opposite-side Genuine Order. *Id.* ¶ 26(d). By manipulating the price movement for a given commodity, the Defendants increased the like-

[3]The indictment describes dozens of specific trading sequences executed by the Defendants. Sup. Indict. ¶¶ 29–34.

lihood that the market would fill Genuine Orders, which in turn allowed the Defendants to generate profits and avoid losses. *Id.* ¶ 26(j). After the Genuine Orders were filled, either in full or in part, the Defendants would quickly cancel the Deceptive Orders to avoid execution of them. *Id.* ¶ 26(k). But Deceptive Orders occasionally did end up being executed before the Defendants could cancel them. *Id.*

The barrier-option part of the alleged scheme also relied on the market manipulation of precious metals futures. Sup. Indict. ¶ 27. The Defendants would trade in a manner that would move the price of the underlying asset (the futures contract) either towards the trigger-price to earn money (barrier-running), or away from the trigger-price to avoid losing money (barrier-defending), on barrier options held by Bank A. *Id.*

The Defendants also allegedly kept the conspiracy going by concealing the illegal trading practices. Sup. Indict. ¶ 28. Throughout the relevant time, the Defendants completed annual compliance certifications with their employer (Bank A), certifying that the Defendants had complied with all applicable policies and that they had reported any known or suspected violations of Bank A's policies, as well as violations of laws and regulations. *Id.* ¶¶ 28(a)–(d), 43. Jordan and Nowak also made allegedly false statements to the CFTC during a separate inquiry into the manipulation of silver prices. *Id.* ¶¶ 40–42. Specifically, Jordan represented to the CFTC that, during his employment with Bank A, he never engaged in trading "for the purpose of influencing the price on COMEX" and did not "show a bid or offer on Globex that he didn't intend to execute" unless he changed his mind or made it in error. *Id.* ¶ 41. Similarly,

Nowak represented that he had no knowledge of any precious-metal traders at Bank A placing orders that they did not intend to execute. *Id.* ¶ 40. And during a CME Group inquiry in October 2013, Smith represented to the CME Group that certain allegedly Deceptive Orders were placed with the intent that they be filled. *Id.* ¶¶ 42, 30(o).

Altogether, the indictment charges a RICO conspiracy, 18 U.S.C. § 1962(d) (Count 1), Sup. Indict. ¶¶ 17–42; substantive counts of attempted price manipulation, 7 U.S.C. § 13(a)(2) (Counts 3–4), *id.* ¶¶ 52–57; bank fraud, 18 U.S.C. § 1344(1) (Counts 5–7), *id.* ¶¶ 58–63; wire fraud, 18 U.S.C. § 1343 (Counts 8–10), *id.* ¶¶ 64–69; commodities fraud, 18 U.S.C. § 1348(1) (Counts 11–12), *id.* ¶¶ 70–73; spoofing, 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2) (Counts 13–14), *id.* ¶¶ 74–77; and conspiracy to commit all of the substantive charges, 18 U.S.C. § 371 (Count 2), *id.* ¶¶ 45–51. In the dismissal motion, the Defendants target most of the charges.

## II. Standard of Review

The vehicle for the dismissal motion is Federal Rule of Criminal Procedure 12(b)(3)(B), which provides that a defendant may move to dismiss an indictment as defective. Fed. R. Crim. P. 12(b)(3)(B). In determining whether an indictment is defective, courts first look to the Sixth Amendment, which sets out that defendants "shall enjoy ... the right to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Also, Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment or information include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

"An indictment is constitutionally sufficient and satisfies Fed. R. Crim. P. 7(c)(1) if it states the elements of the crime charged, informs the defendant of the nature of the charge so she may prepare a defense, and enables the defendant to plead the judgment as a bar against future prosecutions for the same offense." *United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). What a motion to dismiss does *not* do is challenge the strength of the government's case or the sufficiency of the evidence. *Moore*, 563 F.3d at 586. Rather, when deciding a motion to dismiss, the Court must determine "whether it's possible to view the conduct alleged" as constituting the crime charged. *Id*. "Indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (cleaned up).[4]

## III. Analysis

### A. Spoofing Theory of Fraud

First, the Defendants seek dismissal of the fraud-based charges (Counts 5–12) because, as they argue, the charged conduct does not amount to a fraud at all. R. 114, Defs.' Br. at 10. They argue first that, as a matter of law, placing open-market orders that carry a genuine risk of execution does not qualify as a scheme to defraud. *Id.* Relatedly, they also argue that orders like that do not amount to false statements nor do they qualify as material omissions. *Id.*

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

**1. Spoofing as a Scheme to Defraud**

"Scheme to defraud" is a legal term of art littered throughout federal criminal laws. A scheme to defraud requires the "the making of a false statement or material misrepresentation, or the concealment of a material fact." *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (cleaned up). And "[a]s its ordinary meaning suggests, the term 'scheme to defraud' describes a broad range of conduct, some which involve false statements or misrepresentations of fact, and others which do not." *United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) (cleaned up). The term has the same meaning across the wire fraud, bank fraud, and commodities-fraud statutes. *See* 18 U.S.C. §§ 1343, 1344(1), 1348(1); *Id.* (noting that "scheme to defraud" has the same meaning under the wire-fraud and bank-fraud statutes, §§ 1343 and 1344); *United States v. Coscia*, 866 F.3d 782, 799 (7th Cir. 2017) (affirming the adaptation of mail and wire fraud jury instructions to commodities fraud "[b]ecause section 1348 was modeled on the federal mail and wire fraud statutes").

The Seventh Circuit's holding in *United States v. Coscia* refutes the defense that spoofing cannot, as a matter of law, constitute fraud. 866 F.3d 782 (7th Cir. 2017). *Coscia* held that spoofing—that is, bidding on or offering to sell commodities with the intent to cancel the bid or offer before execution—can qualify as a form of commodities fraud. *Coscia*, 866 F.3d at 797–98. In that case, the defendant created "the *illusion* of market movement"—that is, created fraudulent market movement—by "pumping the market" through a system of large orders designed to manipulate

prices while avoiding execution of the orders. *Id.* at 797 (emphasis in original). Relying on *Coscia,* two recent decisions in this District have held that spoofing allegations adequately support an indictment for wire fraud. *See United States v. Vorley*, 420 F. Supp.3d 784, 802 (N.D. Ill. 2019); *United States v. Bases*, 2020 WL 2557342, at *9 (N.D. Ill. May 20, 2020). Those cases are right: in this Circuit, under *Coscia*, spoofing can be prosecuted as a fraud.

Against this general principle, the Defendants argue that *Coscia* is distinguishable. The defense points out that the trader in *Coscia* used pre-programmed algorithms to ensure that deceptive orders were not executed; to the Defendants' way of thinking, that means that a scheme to defraud requires more than just placing open-market orders with the intent to cancel them. Defs.' Br. at 13–14. It requires, according to the defense, additional measures to virtually ensure that orders would not be filled. *Id.* But *Coscia* mentions no requirement like that at all. Rather, the Seventh Circuit simply relied on the computer program's design as part of the "substantial" quantum of "evidence supporting the existence of a fraudulent intent." *Coscia*, 866 F.3d at 797. In other words, the Seventh Circuit treated the computer program as relevant—but not necessary—evidence of the intent to cancel trades. *Id.*; *Bases*, 2020 WL 2557342, at *6 ("*Coscia* did not require the use of a computer algorithm for a conviction under the commodities fraud statute."). The *intent* to cancel—not the specific means (nor even the success of cancellation)—is what matters. *See Coscia*, 866 F.3d at 797 (explaining that the defendant's "scheme was deceitful because, at the time placed the large orders, he intended to cancel the orders"). It is also

well established that a scheme to defraud need not actually succeed to warrant a conviction. *See*, *e.g., United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988); *United States v. Cherif*, 943 F.2d 692, 698 (7th Cir. 1991); *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002); *United States v. Bach*, 172 F.3d 520, 522 (7th Cir. 1999). The Defendants' proposed requirement would wrongly condition an adequately alleged scheme to defraud on the likelihood of its success.

It is worth noting that the fraud charges would overcome this challenge even if the Defendants' proposed pleading requirement were right. The government alleges that the Defendants adopted a "new style of layering multiple Deceptive Orders," which made those orders more difficult to "execute and detect." Sup. Indict. ¶ 26(e). So, in fact, the indictment does plead that the Defendants "took … other action at the time that they placed their purported spoof orders to ensure that the orders would not be executed." Defs.' Br. at 15. Either way, the spoofing charges adequately allege a scheme to defraud.

**2. Misrepresentation**

Next, the Defendants contend that the indictment fails to allege any false statements or material omissions. But again *Coscia* says otherwise. Spoofing can constitute misrepresentation by creating illusory market movement through the injection of false information into the market. *See Coscia*, 866 F.3d at 797; *Bases*, 2020 WL 2557342 at *3–5; *Vorley*, 420 F.Supp. at 802. And the indictment alleges that, by placing large Deceptive Orders, the Defendants "intended to inject false and mislead-

ing information about the genuine supply and demand" into the marketplace to "deceive other participants in those markets into believing … that the visible order book accurately reflected market-based forces of supply and demand." Sup. Indict. ¶ 26(f). The Defendants' alleged goal was to create a false impression of supply and demand in order to move the market price in a desired direction and "increase the likelihood that one or more of their own opposite-side Genuine Orders would be filled." *Id.* ¶¶ 26(g)–(h). This is "an active misrepresentation of the true supply and demand … that renders the market price of the commodity less accurate." *Vorley*, 420 F. Supp at 802.

Indeed, there is nothing particularly new about classifying the manipulation of markets with fraud. In similar contexts, courts have described the deceit that is inherent in the artificial manipulation of markets. "Manipulation [of commodities markets], broadly stated, is an intentional exaction of a price determined by forces other than supply and demand ... punishable under the CEA." *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991). "Just as price artificiality implies misinformation, a specific intent to create an artificial price implies fraud or deceit." *United States v. Reliant Energy Servs., Inc.*, 420 F.Supp. 2d 1043, 1058 (N.D. Cal. 2006) (interpreting the term "manipulation" in indictment charging scheme to fraudulently manipulate the California electricity market); *see also*, *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12 (1985) (holding that "the term 'manipulative' as used in § 14(e) [of the Securities Exchange Act of 1934] requires misrepresentation or nondisclosure"); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199

(1976) (explaining that the term "manipulative" as used in Rule 10b-5 "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."). Spoofing is just another way to artificially and deceitfully manipulate market prices.

Nor is there anything new about prosecuting "implied misrepresentations" via federal fraud statutes. *See Vorley*, 420 F. Supp.3d at 790. In *United States v. Dial,* the Seventh Circuit upheld mail fraud and wire fraud convictions against a precious-metals broker who "traded ahead" of his clients by buying futures on his personal account before placing large blocks of his client's orders. 757 F.2d 163, 165–67 (7th Cir. 1985). The block orders were intended to create "a big surge" in demand and raise the market price of the commodity. *Id.* at 165. If the block order successfully raised the market price, then the broker would sell his own position for a profit. *Id.* The broker placed these large orders without putting up any "margin"—a percentage of a contract price in cash or cash equivalent that guarantees solvency for a brokerage. *Id.* at 166, 169. *Dial* explained that, by failing to disclose his unmargined trading, the broker made an "active misrepresentation" to the futures market that was "actionable" even though he owed no duty to disclose such information to the futures market. *Id.* at 169. In a similar way, the Defendants allegedly made implied representations to the market. By placing Deceptive Orders with the intent to cancel, Sup. Indict. ¶ 26, the Defendants "falsely implied that [they] intended to trade in the quantities and the prices reflected by those orders," *Vorley*, 420 F. Supp. 3d at 801.

The spoofing scheme also sufficiently alleges a scheme to defraud based on a theory of material omissions. To start, the "concept of misrepresentation … can also include the omission or concealment of material information, *even absent an affirmative duty to disclose*, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *United States v. Weimert,* 819 F.3d 351, 355 (7th Cir. 2016) (emphasis added). And by holding that a spoofing scheme, much like the one alleged here, can constitute commodities fraud, *Coscia* rejected the argument that an affirmative misrepresentation is needed to convict under 18 U.S.C. § 1348(1). *Coscia*, 866 F.3d at 799 n.70 (approving adaptation of Pattern Jury Instructions for mail and wire fraud to spoofing, including the instruction that "a scheme to defraud need not involve any false statement or misrepresentation of fact.").[5] Given this, the indictment adequately alleges that the Defendants actively concealed, through layering, material information from the marketplace; namely, that the perceived market movement was in fact caused by large orders placed with the intent to cancel them. Sup. Indict. ¶ 26.

At bottom, whether or not a jury will find that the proffered facts have been proven beyond a reasonable doubt is not the issue for evaluating the dismissal motion. The point is that the alleged spoofing scheme adequately pleads a scheme to defraud, relying on theories within the ambit of the fraud statutes.

[5]Of course materiality of the omission (just like an explicit misrepresentation) is still a required element for the run-of-the-mill federal fraud statutes. *See Neder v. United States*, 527 U.S. 1, 25 (1999).

### 3. Materiality

In a related argument, the Defendants also contend that the Superseding Indictment fails to explicitly allege that Deceptive Orders qualify as *material* misrepresentations. R. 183, Defs.' Reply at 5–6 & n.1. But as the government rightly points out, the "clear thrust of the Superseding Indictment" is that the Deceptive Orders were material. R. 166, Gov.'s Resp. at 17. This is inferred, for example, from the allegation that the Defendants injected "false and misleading information" into the marketplace that "was intended to, and at times did, trick other market participants … into reacting to the apparent change … by buying and selling metals futures contracts at quantities, prices, and times that they would otherwise likely would not have traded." Sup. Indict. ¶ 26(g). Also, the allegations under each fraud count track the relevant statutory language, which is an acceptable way to plead the requisite elements. *Smith*, 230 F.3d at 305. What's more, the term "scheme to defraud" itself incorporates the well-settled understanding that falsehoods must be material. *Neder v. United States*, 527 U.S. 1, 22–25 (1999) (holding that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes). The lack of an explicit use of the word "material" is not a ground for dismissal. Naturally, the jury will be instructed on the requirement of materiality. So this argument too is no reason to dismiss the spoofing theory.

## B. Barrier Options

On barrier options, the Defendants offer a similar set of arguments, namely, that the alleged conduct involves no misrepresentation, omission, or any other form

of deception. Defs.' Br. at 32. For the same reasons that the spoofing allegations adequately plead a scheme to defraud, so too do the barrier-running and barrier-defending allegations. The premise of the allegations remains the same, because precious-metals futures contracts were the underlying asset for the options. Sup. Indict. ¶ 27. And the Defendants allegedly placed deceptive orders for those contracts in a way that was intended to move the price to where Bank A would either profit or avoid losses on barrier options that it held. *Id*. The main difference is merely in the intended mechanism of "gain." In essence, the indictment alleges that Defendants used the same conduct—placing deceptive orders with the intent to move the price of futures—to achieve two achieve outcomes: filling their opposite side Genuine Orders and favorably positioning the barrier options. So really, the barrier-options misconduct and the spoofing misconduct rely on the same misrepresentations to the market: the injection of false and misleading information about the genuine supply and demand of precious-metals futures. *Id.* ¶ 26(f). The barrier-options theory also adequately pleads a scheme to defraud.

**C. Vagueness**

Next, the Defendants seek dismissal of the spoofing-based fraud allegations on the grounds that charging spoofing as fraud deprives them of due process. Defs.' Br. at 27. Their argument is two-fold: first, statutory text and other governing law failed to provide sufficient notice that spoofing could be prosecuted as fraud. *Id.* Second, spoofing has only been recently prosecuted as fraud. *Id.*

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws should "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "must provide explicit standards for those who apply them." *Id.* The "touchstone" of constitutional fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). To satisfy due process, a criminal statute must define the offense "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402–03 (2010). "A vagueness challenge not premised on the First Amendment is evaluated as-applied, rather than facially." *United States v. Calimlim*, 538 F.3d 706, 710 (7th Cir. 2008).

In support of their argument, the Defendants point to Congress's bifurcation of the CEA's anti-spoofing provision, 7 U.S.C. § 6c, from the Act's fraud provision, 7 U.S.C. § 6b. Defs.' Br. at 28. According to the defense, Congress would not have created a category of separate conduct if it intended that spoofing be "synonymous with fraud." *Id.* The Defendants also point to the CFTC's delay in issuing interpretive guidance on spoofing, which came more than 2½ years after enactment of the CEA's anti-spoofing provision. *Id.* at 29. Without the primary commodities regulator weighing in, the defense argues, the industry purportedly lacked the understanding that spoofing can be prosecuted as fraud. *Id.*

*Vorley* and *Bases* persuasively rejected this same argument. *Vorley*, 420 F. Supp. 3d at 807; *Bases*, 2020 WL 2557342, at *12–*13. In *Bases*, the overlap with spoofing was "of little moment" to commodities and wire fraud charges because the "alleged conduct describe[d] a scheme defraud as defined by the … fraud statute[s] and construed by ample case law at the time the conduct took place." 2020 WL 2557342, at *12. Although spoofing is its own prosecutable offense under 7 U.S.C. § 6c(a)(5)(C), it may also be part of a broader scheme to defraud, *see id*. at *9, as is alleged here. So the mere fact that spoofing and fraud can be categorized as distinct crimes does not carry the day. Federal fraud statutes are regularly deployed—without vagueness concerns—to prosecute conduct that could also be prosecuted under other criminal statutes. An obvious example is the set of charges in *Coscia*, in which the Seventh Circuit affirmed convictions for both spoofing and commodities fraud. 866 F.3d at 785 (7th Cir. 2017). "[Another] pertinent example [is] the application of the mail fraud statute to insider trading in securities before the promulgation of the SEC's Rule 10b–5." *Dial*, 757 F.2d at 169; *see also United States v. Offill*, 666 F.3d 168, 171–72 (4th Cir. 2011) (affirming convictions for both securities-registration violations and wire fraud in "pump-and-dump" scheme). And even after the issuance of Rule 10b–5, it is permissible to prosecute insider trading under the mail fraud statute (so long, of course, as the mail fraud elements are satisfied). *See*, *e.g.*, *United States v. Chestman,* 947 F.2d 551, 554 (2d Cir. 1991) (defendant charged with insider trading and mail fraud). Lastly, the CFTC's delay in issuing interpretive guidance was ad-

dressed by the Seventh Circuit in *Coscia*, which explained that the CEA's anti-spoofing provision from the start contained a parenthetical definition, rendering any industry interpretation unimportant because Congress had already weighed in.[6] *Coscia*, 866 F.3d at 791; 7 U.S.C. § 6c(a)(5)(C) ("bidding or offering with the intent to cancel the bid or offer before execution").

Next, the relative recency of spoofing prosecutions (or, put another way, the delay in bringing spoofing cases) does not justify dismissal. *Vorley*, 420 F. Supp. 3d at 806–07; *Bases*, 2020 WL 2557342, at *12–*13. Although "due process bars courts from applying a novel *construction* of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," *Lanier,* 520 U.S. at 266 (emphasis added), it permits a statute's application to novel *conduct* so long as it within the statute's plain language, *see Bases*, 2020 WL 2557342 at *12–13; *Vorley*, 420 F.Supp.3d at 806–7 ("[t]he novelty of this prosecution, however, is in larger measure a function of the novelty of the scheme"). The purported novelty of the charged fraud statutes' application to spoofing can be explained in large part by the relatively recent onset of high-frequency trading. *See Vorley*, 420 F.Supp.3d at 807. Recognizing this, the district court in *Coscia* "decline[d] to conclude" that the Commodities Fraud statute was impermissibly vague as applied to spoofing "based solely on the scarcity of cases interpreting [it]." *United States v. Coscia*, 100 F.Supp.3d 653, 661 (N.D. Ill. 2015). As explained earlier, federal fraud statutes have long been used to prosecute implied misrepresentations, which are at

[6]*Coscia* involved a facial challenge to the anti-spoofing provision as unconstitutionally vague. 866 F.3d at 790–91.

the heart of spoofing charges. *Vorley*, 420 F. Supp. 3d at 807; *see Dial*, 757 F.2d at 169. This is nothing new, at least in terms of a surprise interpretation of a statute. The Defendants had fair notice that federal fraud statutes could criminalize their alleged conduct.[7]

**D. Bank Fraud**

Moving on to the bank fraud charges (Counts 5–7), the Defendants challenge these charges on different grounds. First, the Defendants complain of the threadbare allegations of intent to defraud financial institutions as participants in the futures market. Defs.' Br. at 19–20. This concern is mooted by the government's stipulation to proceed on the bank fraud charges solely on the theory that the Defendants defrauded the bank employing them: Bank A. Gov.'s Resp. at 21.

Against the Bank-A-as-victim theory, the Defendants contend that the indictment still fails to allege any specific intent to defraud Bank A. Defs.' Br. at 26. According to the Bank A theory, the Defendants filled out employee-compliance attestations in which they falsely represented that the Defendants were in compliance with laws, regulations, and bank policies. Gov.'s Resp. at 19. This purportedly deceived Bank A into keeping the Defendants in its employ and on its payroll, so the Defendants reaped their salary (amongst other compensation) via the fraud. *Id.* at

[7]In a footnote, the Defendants also argue that they received no fair notice that barrier-options conduct could be prosecuted under fraud statutes. Defs.' Br. at 32 n.26. The government does not respond to this argument directly. But given the factual overlap in the alleged barrier-options conduct with the spoofing allegations (manipulating the market for precious-metals futures contract), and the long-standing prosecution of implied misrepresentations as fraud, the fraud statutes are not void as applied to alleged barrier-options conduct for the same reasons that they are not void as applied to spoofing.

19–20. At the same time, the government says, the Defendants also exposed Bank A to the risk of loss by placing large Deceptive Orders in the market that carried the risk of execution. *Id.* at 19.

The government's salary theory of bank fraud comes bolt out of blue. Indeed, the bank fraud counts do not even incorporate the key paragraphs that present the allegation on the false compliance. Specifically, Paragraph 28 and its subparagraphs contain the alleged false compliance attestations to Bank A, Sup. Indict. ¶ 28, and then Paragraphs 43 and 44 repeat the allegations with specific dates of attestation, *id.* ¶¶ 43–44. But those paragraphs (28, 43, and 44) are *not* incorporated into the bank fraud counts. *See id.* ¶¶ 58, 60, 62. The defense rightly complains that this salary theory expands what is alleged in the indictment. Defs.' Reply at 8. The salary theory fails on this deficiency and cannot support the bank fraud charges.[8] (The defense also argues that the salary theory is not a viable species of bank fraud as a matter of law, but the Court need not decide that issue.)

Moving on from the salary theory, the government also proposes a risk-of-loss theory. It is *generally* true that exposing a bank to a risk of loss might very well qualify as bank fraud under § 1344(1), so long as the defendant intended to defraud the bank and schemed to do so. *Shaw v. United States*, 137 S. Ct. 462, 467 (2016). But in *this* case, this theory is presented in all of one sentence in the government's response

[8]The salary theory also would not support the bank fraud charge with Bank C as one of the victims under Count 7 against Jordan. Sup. Indict. ¶¶ 63. The indictment alleges that the Defendants made the false compliance statements only to Bank A. *See id.* ¶ 28.

brief, Gov.'s Resp. at 19—and, more importantly, is not alleged at all in the indictment. In the one sentence proffering this theory, the government's response does not actually cite to a specific allegation in the indictment. *See id.* There is simply no way that the defense could have been on notice of this theory of bank fraud.

Indeed, the risk-of-loss theory as to Bank A is not only absent from the indictment, but the theory is actually inconsistent with the allegations in the indictment. Remember that the indictment charges the Defendants (three of them) under 18 U.S.C. § 1344(1), which—as opposed to § 1344(2)—requires the intent to defraud a bank. *See Loughrin v. United States,* 573 U.S. 351, 357 (2014) (holding that § 1344(1) requires the intent to defraud a bank, whereas § 1344(2) does not). But nothing about the risk-of-loss theory (as distinct from the salary theory) sets forth a misrepresentation (or omission) made to Bank A. Instead, the indictment alleges that that the purpose of the conspiracy was, in part, to maximize Bank A's profits and minimize its losses. *See* Sup. Indict. ¶¶ 24, 47.

This is *not* to say that bank fraud, under § 1344(1), requires that a bank actually suffer financial harm, nor is it to say that § 1344(1) even requires an *intent* to cause financial harm to a bank. For example, in *Shaw*, the defendant was charged under § 1344(1) after obtaining a bank customer's account information and using the information to transfer money out of the customer's account. 137 S. Ct. at 466. The defendant made false statements to the bank by posing as its customer, obviously knowing that the bank held the customer's money. *Id.* at 467. That was enough to comprise a scheme to defraud the bank. *Id.* To prove a § 1344(1) bank fraud scheme,

there is no need for the government to prove "that the victim bank ultimately suffer[ed] financial harm, or that the defendant intend[ed] that the victim bank suffer such harm." *Id.* at 467. This highlights the difference between the intent to cause *loss* (not needed) and the intent to *defraud* (required element). The defendant in *Shaw* did not care whether the bank suffered loss, but by falsely representing his identity to the bank, he did intend to defraud it out of funds in its possession. *Id.*

So a risk-of-loss theory—without an actual loss or without even an intent to cause a loss—might very well be, in the abstract, a viable bank fraud theory under § 1344(1). But this case is different from *Shaw*, where the defendant made false statements to the bank by posing as its customer. 137 S. Ct. at 466. Here, other than the allegedly false compliance attestations (underlying the now-rejected salary theory as already discussed), the indictment does not allege any false statements to Bank A made with the intent to defraud it. The risk-of-loss theory cannot support the bank fraud counts.

A few words on the barrier-options aspect of the alleged fraud: the indictment alleges that the Defendants defrauded Bank A's clients specifically. Sup. Indict. ¶ 27. Bank fraud indeed can cover schemes that expose a bank to civil liability to accountholders who are the primary targets of fraud. *See United States v. Briggs,* 965 F.2d 10, 13 (5th Cir. 1992). But the government did not mention this theoretical basis for bank fraud in the response brief. Nor does the indictment level any allegations advancing this theory in support of the bank fraud counts. Indeed, the indictment alleges that the Defendants' manipulation as to barrier options was again intended

to benefit Bank A. Sup. Indict. ¶ 27. Nor do the barrier-options allegations supply a theory of bank fraud against Bank C (mentioned in Count 7) because only the clients of Bank A are alleged to have been defrauded by barrier running and defending. *Id.*

For these reasons, the bank fraud counts (Counts 5 through 7) are dismissed. With the dismissal in place, those counts also cannot serve as predicate offenses for the RICO or conspiracy charges. *See* Sup. Indict. ¶¶ 22(b), 46(b).

**E. RICO Conspiracy**

Moving next to the RICO conspiracy, even without viable bank fraud predicates, the spoofing and barrier-options allegations survive as viable theories of fraud, so the charged RICO conspiracy (Count 1) also survives. The Defendants' argument for dismissing Count 1 was essentially contingent on the rejection of one of those two theories. Defs.' Br. at 38. The government stipulated that, if the Court rejected the spoofing theory, then the prosecution would not have proceeded with the RICO charge on the barrier-options allegations alone. Gov.'s Resp. at 34 n.20. So the defense's RICO challenge would have only applied had the spoofing-theory stood alone. It does not stand alone. And it would have sufficed by itself anyway.

At "the heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) (emphasis in original). A pattern "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). A pattern must satisfy the "continuity plus relationship" test, which requires (1) a relationship between the predicate acts and (2) a threat of continuing criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989)

(cleaned up). The continuity element requires "demonstrating a closed-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or … an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019).

Both parties agree that the alleged conspiracy is one of closed-ended continuity. Defs.' Br. at 39; Gov.'s Resp. at 33. (The defense does not dispute the relationship element. Defs.' Br. at 33 n.27.) Four factors are relevant in determining whether closed-ended continuity has been established: (i) the presence of separate schemes; (ii) the number and variety of predicate acts, and the length of time over which they were committed; (iii) the number of victims; and (iv) the occurrence of distinct injuries. *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir. 1986). No single factor is "necessarily determinative." *Id.* at 976. "The relationship prong is satisfied by acts of criminal conduct close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337.

The spoofing allegations alone adequately allege a pattern of racketeering activity under these factors.[9] On the number of schemes, the Defendants argue that the spoofing theory constitutes just a single scheme, so that weighs against continuity. Defs.' Br. at 17–18. But the number of schemes is only one consideration, and multiple

---

[9]The government alleges wire fraud and bank fraud as the predicates. Sup. Indict. ¶¶ 22(a)–(b). Because the bank fraud counts are dismissed, this Opinion only discusses the sufficiency of the spoofing-scheme allegations as it pertains to the wire fraud Counts.

schemes are not necessary to establish a pattern of racketeering. "[A]lthough proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." *H.J. Inc.,* 492 U.S. at 240 (emphasis in original); *see also United States v. Stodola,* 953 F.2d 266, 270 (7th Cir. 1992), *abrogated on other grounds by United States v. Jett*, 908 F.3d 252 (7th Cir. 2018); *United States v. Segal*, 248 F.Supp.2d 786, 793 (N.D. Ill. 2003). The cases cited by the Defendants are not on point: some of the cases involved only acts that culminated either in a single transaction or in a necessary completion of the scheme, sapping it of continuity.[10] Another simply cites the singularity of the scheme as a relevant, but not dispositive, factor. *See Inteliquent, Inc. v. Free Conferencing Corp.*, 2017 WL 1196957, at *9 (N.D. Ill. Mar. 30, 2017) (single scheme "cuts against a finding of close-ending continuity"). The fact that the spoofing allegations plead a single scheme is not dispositive, especially when considering the other factors.

The duration, number, and variety of the alleged predicate acts all weigh readily in favor of continuity. The spoofing scheme is alleged to have spanned over eight

[10] *Jennings v. Auto Meter Prods., Inc.,* 495 F.3d 466, 476 (7th Cir. 2007) (two patent applications over same product); *Miller v. Loucks*, 1992 WL 329313, at *10 (N.D. Ill. Nov. 5, 1992) ("one-shot effort" to remove a company's name from Arab League's boycott blacklist); *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 595 (7th Cir. 1989) (scheme covered only one transaction that came to fruition); *CIB Bank v. Esmail*, 2004 WL 3119027, at *5 (N.D. Ill. Dec. 28, 2004) (exhaustion of loan funds); *Saleh v. Merchant*, 2019 WL 1331788, at *15 (N.D. Ill. Mar. 25, 2019) (multiple communications containing false appraisals but culminating in single transaction); *Guaranteed Rate, Inc. v. Barr*, 912 F.Supp.2d 671, 691 (N.D. Ill. 2012) (eliminating personal liability of guarantor-defendants in connection with construction loan for a single real-estate development).

years, Sup. Indict. ¶ 22, which suggests an ongoing pattern of racketeering activity. Plus, the predicate acts were also, as alleged, numerous and various. The indictment alleges that the Defendants made thousands of trades in furtherance of the conspiracy. Sup. Indict. ¶ 26(a). And it describes dozens of specific trading sequences in detail. The sequences vary in who traded, how much was traded and for what price, what was traded, whether it was bought or sold, when the trade occurred, and whether the trade was layered. *Id.* ¶¶ 30–34. Adding to the variety of the predicate acts are the allegations that the Defendants made false statements to conceal the conspiracy.[11] *Id.* ¶¶ 24(c); 47(c). All of this weighs in favor of continuity.

By nature, too, the alleged spoofing scheme resulted in a significant number of victims, because the fraud was committed on the commodities market as a whole. For similar reasons, the number and variety of trading sequences over several years allegedly resulted in distinct injuries to the market every time a Deceptive Order was placed. The injuries are distinct in the sense that each trading sequence "signaled, or

[11]The Defendants argue in a footnote that the allegations of false statements, on their own, are insufficient to sustain a RICO conspiracy because concealment activity is not defined by statute as a predicate activity. Defs.' Br. at 37 n.29. Insofar as this argument assumes the rejection of the spoofing and barrier-running theories, it fails because both those theories survive. Moreover, despite not being a *per se* predicate act by statute, concealment activity can be a RICO predicate in certain instances. *See, e.g., World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F.Supp.2d 486, 512 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2nd Cir. 2009) ("acts of concealment may sometimes constitute a predicate act for the purposes of RICO."); *Town of Kearny v. Hudson Meadows Urb. Renewal Corp.,* 829 F.2d 1263, 1269 (3rd Cir. 1987) (dicta) (perjury can be predicate under RICO); *C & W Const. Co. v. Bhd. of Carpenters & Joiners of Am.*, Loc., 687 F.Supp.1453, 1467 (D. Haw. 1988) (a "reasoned rule would allow perjury to be a predicate act"); *United States v. Coiro*, 922 F.2d 1008, 1017 (2nd Cir. 1991) ("activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern"); *Brooke v. Schlesinger*, 898 F.Supp. 1076, 1084 (S.D.N.Y. 1995)("repeated acts of concealing the invoicing fraud for a substantial period of time … adequately alleges continuity element.").

by itself constituted, a threat of 'continuing' criminal activity." *U.S. Textiles, Inc. v. Anheuser-Busch Companies, Inc.*, 911 F.2d 1261, 1269 (7th Cir. 1990). Put another way, each time one of the Defendants placed a Deceptive Order and created illusory market movement, market participants were deceived into making trading decisions on a false premise. Sup. Indict. ¶ 26. This "tricked" those other participants into "buying and selling precious metals futures contracts at quantities, prices, and times that they would otherwise likely would not have traded." *Id.* This also implies that the effect of the deception would have varied across the decisions of market participants. Some will have held when they would have traded; some will have traded in different quantities then they would have absent the Deceptive Orders; and still others will have traded earlier, or later, than when they would have otherwise traded. So the quantity and variety in victims and injuries favor continuity too. This will all be for a jury to decide, because the RICO count is adequately alleged.

**F. Specificity**

The Defendants also seek to dismiss the charges of attempted price manipulation (Counts 3–4), bank fraud (Counts 5–7), and spoofing (Counts 13–14) for lack of specificity. *See* Fed. R. Crim. P. 12(b)(3)(B)(iii); Defs.' Br. at 50. On the bank fraud counts, the Defendants object to the generic reference to "other financial institutions" as some of the victims. This issue has been mooted by the government's stipulation to label only Bank A and Bank C (for Count 7) as the victims. Gov.'s Resp. at 46–47. Even more to the point, the challenge to these counts is mooted by their dismissal in this Opinion.

On the counts of attempted price manipulation and spoofing, the Defendants contend that the government fails to identify particular trading sequences with adequate specificity. But each of the counts plainly incorporates by reference other allegations in the indictment that list out specific trading sequences. *See* Sup. Indict. ¶¶ 30, 31, 55, 58, 74, 76. In response, the Defendants object to the failure to limit trading sequences to those specifically listed. Defs.' Br. at 48–49. To cure this perceived deficiency, the Defendants seek to strike the phrases "among others" (Paragraphs 30 and 31) and "thousands of" (Paragraph 26), and to strike the references to barrier-running allegations[12] (Paragraphs 52 and 55). The government agrees that it will prove up the attempted price manipulation and spoofing counts only via the listed trading sequences. Gov.'s Resp. at 45. So there is no reason to dismiss the counts for lack of specificity, given the government's stipulation.[13] If any confusion arises, then a jury instruction will suffice. (This also will alleviate the Defendants' concerns that

[12]In a footnote, the Defendants argue that the barrier-options allegations lack "basic information, such as the relevant dates and times with respect to the barrier-options contracts, the contract terms, the underlying assets, the counterparties, and the specific trades underlying the allegations." Defs.' Br. at 48 n.36. To the extent that this is an argument to dismiss the spoofing counts, the government points out that the barrier-options allegations are not incorporated into the spoofing counts. Gov.'s Resp. at 45 n.29; *see* Sup. Indict. ¶¶ 74, 76. The Government also stipulates that the attempted price manipulation counts will be proved via the specific trading sequences alleged in Paragraphs 30 and 31. Gov.'s Resp. at 45 n.29.

[13]This should alleviate any concerns Defendants have about the incorporation of barrier-options allegations into the attempted price manipulations counts. *See* Sup. Indict. ¶¶ 27, 52, 55. And the indictment adequately alleges, with reasonable inferences, that an enumerated trading sequence could trigger barrier options. *See id.* ¶ 27. For these reasons, the Defendants' request to strike references to Paragraph 27 in Counts 3 and 4 is denied. Defs.' Reply, App'x A.

the jury would consider evidence beyond that presented to the grand jury for the substantive non-fraud counts. *See* Defs.' Br. at 48; *Stirone v. United States*, 361 U.S. 212, 218 (1960).)

**G. Duplicity**

Next, the Defendants target all 12 substantive counts as duplicitous. Defs.' Br. at 52. "Duplicity is the joining of two or more offenses in a single count." *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir.1996) (cleaned up). "The prohibition of duplicitous counts is embodied in Rule 8(a) of the Federal Rules of Criminal Procedure, which provides for 'a separate count for each offense.'" *United States v. Berardi*, 675 F.2d 894, 897 n.5 (7th Cir. 1982). "However, an indictment charging multiple acts in the same count, each of which could be charged as a separate offense, may not be duplicitous where these acts comprise a continuing course of conduct that constitutes a single offense." *United States v. Buchmeier*, 255 F.3d 415, 421 (7th Cir. 2001). The Criminal Rules allow a count to "allege … that the defendant committed [an offense] by one *or more* specified means." Fed. R. Crim. P. 7(c)(1) (emphasis added). "The line between multiple offenses and multiple means to the commission of a single continuing offense is often a difficult one to draw." *Berardi*, 675 F.2d at 898.

To draw that line, courts must engage in statutory interpretation (with the Due Process Clause as the outer boundary). *United States v. Miller*, 883 F.3d 998, 1003 (7th Cir. 2018). This is because Congress determines (within the confines of the Due Process Clause) the unit of prosecution for a particular statute. *United States v.*

*Cureton*, 739 F.3d 1032, 1041 (7th Cir. 2014). When statutory text presents "uncertainty as to the unit of prosecution intended by Congress," then the rule of lenity kicks in. *Miller*, 883 F.3d at 1003.

Here, the Defendants' duplicity argument is threefold. First, to the extent that Counts 3 through 12 (attempted price manipulation, wire fraud, bank fraud, and commodities fraud) combine allegations of both spoofing and barrier-options conduct, these counts impermissibly allege (to the defense's thinking) two separate schemes together as a single course of conduct. Gov.'s Br. at 54. Second, the attempted price manipulation and spoofing counts rely on multiple trading sequences that cannot, the defense argues, be charged in a single count. *Id.* at 56. And lastly, the bank fraud and wire fraud counts allege conduct with respect to more than one financial institution. *Id.* at 57.

**1. Spoofing and Barrier Options**

First, the alleged spoofing and barrier-options conduct can be properly charged together in singular counts. Schemes to defraud often (and unfortunately) comprise multiple ways of committing the fraud. *See United States v. Zeidman*, 540 F.2d 314, 318 (7th Cir. 1976) ("Schemes to defraud … are multi-faceted and therefore the various means used in committing the offense may be joined without duplicity."); *United States v. O'Brien*, 953 F.3d 449, 454–55 (7th Cir. 2020) (holding that it was proper to charge bank and wire fraud schemes involving four separate but related transactions); *United States v. Davis*, 471 F.3d 783, 791 (7th Cir. 2006) (approving the charging of three Medicaid reimbursement methods as a single count of health-care fraud).

The breadth of schemes to defraud refutes the purported duplicity of the substantive fraud counts (Counts 5–12) merely because they allege both spoofing and barrier-options conduct in furtherance of a single scheme to defraud. The difference in victims affected by the conduct (market participants versus clients of Bank A) does not compel a different outcome. *See Zeidman*, 540 F.2d at 316–17 (affirming a single fraud scheme even though the scheme covered frauds against both debtors and creditors, that is, two separate classes of victims). And, as discussed earlier, the barrier-options conduct is related to the spoofing conduct because both rely on manipulating markets for the same underlying asset-type: precious-metals futures contracts. *See* Sup. Indict. ¶¶ 27(a)–(b).

On the price-manipulation statute, 7 U.S.C. § 13(a)(2), it is true that the statute does not use the word "scheme." But this statute can be charged just like a scheme offense because its key statutory term is "to manipulate," as in making it a crime for any person "to manipulate or attempt to manipulate the price of any commodity." § 13(a)(2). The plain meaning of "manipulate" encompasses a continuous course of conduct or an ongoing plan—just like a scheme. One dictionary oft-cited by the Supreme Court, *e.g.*, *Brnovich v. Democratic Nat'l Committee*, 141 S. Ct. 2321, 2337 (2021), *Van Buren v. United States*, 141 S. Ct. 1648, 1655 (2021), defines "manipulate" as "to control, manage[,] or play upon by artful, unfair or insidious means[;] especially to one's own advantage," *Reliant Energy Servs., Inc.,* 420 F.Supp.2d at 1055 (citing *Webster's Third New Int'l Dictionary* 1376 (1981), and also citing *The Oxford American Dictionary and Language Guide* 604 (1999), which defines manipulate as to

"manage (a person, situation, etc.) to one's own advantage, esp. unfairly or unscrupulously"). To "manage" or "control" implies an ongoing course of conduct. *Id.* In *Reliant Energy*, the defendant was charged with a single count of price manipulation in a "scheme"—as the court described it—to artificially raise the price of electricity in California. *Id.* at 1054. In interpreting the term "manipulation," the district court highlighted the ongoing nature of the proscribed conduct. "[T]he criminal manipulation provision does not criminalize the selling of a product at an unreasonable price … [i]t is concerned less with the price itself than it is with *the process by* which the price is set." *Id.* at 1057 (emphasis added). Equating "manipulation" with scheme-like conduct also makes practical sense: Congress would have expected that manipulating a commodity's price often would often require an ongoing plan rather than a singular act or singular transaction. So there is nothing duplicitous about alleging both the spoofing conduct and the barrier-options conduct in one price-manipulation count.

**2. Multiple Trading Sequences**

The Defendants' second argument on duplicity is that the substantive counts impermissibly rely on multiple trading sequences, rather than just one trading sequence. Defs.' Br. at 56. This is in essence just a variation on the first argument, namely, that the statutes require that charges be premised only on a singular set of conduct. But the same principles apply and so does the same outcome. The substantive fraud counts and the price-manipulation count are not duplicitous in combining multiple trading sequences: ongoing conduct can be charged as schemes to defraud

and as manipulation. So the fraud and the price-manipulation counts may permissibly rely on multiple trading sequences without suffering from duplicity.

With regard to the spoofing counts (Counts 13–14), the CEA's anti-spoofing provision prohibits "Disruptive Practices," making it "unlawful for any person to engage in *any trading, practice, or conduct* on or subject to the rules of registered entity that … is, is of the character of, or is commonly known to the trade as, 'spoofing.'" 7 U.S.C. § 6c(a)(5)(C) (emphasis added). Here again the key terms—"trading, practice, or conduct"—readily cover ongoing and multiple trading sequences. What's more, the anti-spoofing provision employs the word "any" in modifying "trading, practice, or conduct," implying plurality, rather than targeting only singular conduct. 7 U.S.C. § 6c(a)(5)(C); *see also Miller*, 883 F.3d at 1003–04.[14] So the indictment properly charges multiple trading sequences in singular spoofing counts, rather than charging dozens of separate trading sequences in dozens of individual counts.

[14]Although *United States v. Pacillo*, (N.D. Ill. 2020) (R. 366 at 6–7), held otherwise, *Pacillo* relied on the absence of the term "scheme" as dispositive proof that Congress did not intend § 6c(a)(5)(C) be charged as continuing conduct. But Congress does not always use the term "scheme" when criminalizing ongoing conduct. In *United States v. Berardi*, for example, the Seventh Circuit interpreted the term "endeavor," in the obstruction of justice statute, 18 U.S.C. § 1503, to cover "a continuing course a conduct." 675 F.3d at 898. Also, the indictment in *Pacillo* suffered from deficiencies not applicable to the indictment here. There, the indictment alleged that the defendant committed spoofing during a given period of time, "including" a specific trade sequence. R. 216-1 at 5. Because the count at issue also incorporated five trading sequences alleged earlier in the indictment, it was not clear what transactions were included in the count. Here, the indictment fully incorporates the enumerated trading sequences into the spoofing counts. *See* Sup. Indict. ¶¶ 74, 76. What's more, the government has stipulated to proceeding with the spoofing counts only on the enumerated sequences. Gov.'s Resp. at 45.

As a final note on multiple trading sequences, across all of the counts, the Defendants' concern about the risk of non-unanimous verdicts can be alleviated by instructing the jury that each conviction must be premised on unanimous agreement on at least one sequence.

**3. Multiple Financial Institutions**

The final defense argument on duplicity is that the bank fraud counts and the wire fraud counts refer to more than one financial institution. Defs.' Br. at 57. As to bank fraud, the duplicity objection is neither here nor there given the dismissal of those counts (Counts 5–7). On the wire fraud charges, the objection fails. Wire fraud, like other forms of fraud, can be charged as a multi-faceted, multi-victim scheme. *See Zeidman*, 540 F.2d at 316–17 (approving, for analogous mail fraud statute, single charge for scheme that victimized two separate classes of victims). For example, in *United States v. O'Brien*, the Seventh Circuit rejected duplicity challenges to an indictment charging a multi-transactional mortgage fraud scheme. 953 F.3d 449 at 455. The indictment alleged one count of bank fraud and one count of mail fraud affecting a financial institution. *Id.* at 452–53. But the charges were not limited to just one bank: the indictment alleged that the defendant knew "that false information would be submitted to *lenders*, *including Citibank, N.A.*" *Id.* at 453 (emphasis added). At least three of the transactions did not involve Citibank. *Id.* at 455. Despite the targeting of multiple lenders, the Seventh Circuit held that the indictment properly charged a single scheme affecting multiple lenders. *Id.* at 455 (citing with approval a case involving 30 mortgage lenders).

This should not be surprising given the statutory text. Section 1343 broadly refers to "any scheme or artifice to defraud," 18 U.S.C. § 1343, and as explained earlier, schemes to defraud often involve multiple victims. Against this, the defense relies on the statute of limitations governing wire frauds against financial institutions. 18 U.S.C. § 3293(2). The defense points out that the statute of limitations refers to a wire fraud that affects "a" financial institution, § 3293(2), and infers from that singular reference that § 1343 cannot cover schemes targeting more than one bank. Defs.' Br. at 58. But that is an unprecedented importation of a statute of limitations provision as a way of interpreting a substantive liability provision. In context, § 3293(2) is saying that the statute of limitations is 10 years so long as *at least* one financial institution is affected, that is, so long as "a" financial institution is affected. (The same flaw would apply to an argument that the statutory-maximum-elevating provision in § 1343, which also refers to "a" financial institution, should influence the interpretation of the liability provision.) The wire fraud counts are not duplicitous for including multiple financial institutions in a single scheme. No count in the indictment suffers from duplicity.

**H. Timeliness**

Finally, the Defendants contend that the substantive counts (Counts 3–14) are, at least in part, time-barred as having been brought outside the applicable statute of limitations. The relevant statutes of limitations are: five years for attempted price manipulation and spoofing, 18 U.S.C. § 3282(a); six years for commodities fraud, 18 U.S.C. § 3301(b); and 10 years for bank fraud and wire fraud (affecting a financial

institution), 18 U.S.C. § 3293(2). Smith and Nowak reached an agreement with the government that tolled the limitations period starting on February 1, 2019. Defs.' Br. at 63. Jordan did not enter into a tolling agreement, so the pertinent date for him is August 22, 2019, which is the date the first indictment was returned. R. 1. As to the fraud counts, the parties have stipulated to instructing the jury that it must unanimously find one or more executions within the limitations in order to convict. Gov.'s Resp. at 61–62; Defs.' Reply at 32.

This leaves the spoofing and price-manipulation counts, both of which carry a five-year statute of limitations. 18 U.S.C. § 3282(a). The limitations clock typically starts to tick once an offense is completed, that is, when each element of the offense has happened. *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). There is an exception for a "continuing offense"—which is a "term of art" for limitations purposes and should not be confused with whether the crime is factually a continuous one. *Id.* at 875–77. But that exception applies only when "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115 (1970). "The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that each day brings a renewed threat of the evil Congress sought to prevent even after the elements necessary to establish the crime have occurred." *Yashar*, 166 F.3d at 875 (cleaned up). Classic examples of continuing offenses (for limitations purposes) are conspiracy and kidnapping. *See id.* For continuing offenses, the limitations clock

starts to tick *not* when the elements have been committed, but only when the "offense expires" entirely, such as (for conspiracy) when the *last* overt act is committed (or for conspiracies that do not require an overt act, when the conspiracy is abandoned or its purposes accomplished). *Id.* at 875–76 & n.1. "[T]he doctrine of continuing offenses should be applied in only limited circumstances," because it "for all practical purposes, extends the statute beyond its stated term." *Toussie*, 397 U.S. at 115 (cleaned up).

There is no reason to think that spoofing or price-manipulation are continuing offenses for limitations purposes. Nothing in the pertinent statutory text points that way. Nor are the offenses by *nature* ones that Congress must have intended to be continuing offenses. Each day does not bring a renewed threat of the targeted harm, *Yashar*, 166 F.3d at 875, unlike kidnapping, for example, for which "the length and condition of the confinement [during transportation] become the principal determinant in measuring the harm which forms the basis for the kidnapping charge," *United States v. Garcia*, 854 F.2d 340, 343 (9th Cir. 1988) (cleaned up). So spoofing and price-manipulation charges do not qualify as limitations-expansive continuing offenses.

Instead, the spoofing and price-manipulation are most akin to charges that are treated as a continuing course of conduct, that is, schemes. It is true that the word "scheme" does not appear in the pertinent spoofing and price-manipulation statutes, but as explained earlier, statutes may use other terms (like "any trading, practice, or conduct,' 7 U.S.C. § 6c(a)(5)(C), or "manipulate," 7 U.S.C. § 13(a)(2)) to cover scheme-

like conduct. There is no reason to treat those statutes in a different way for limitations purposes from scheme statutes. So if one instance of a spoofing or price-manipulation happens within the statute of limitations, then the defendant may be held "culpable for the entire scheme." *See United States v. Longfellow*, 43 F.3d 318, 325 (7th Cir. 1994); *see also O'Brien*, 953 F.3d at 460–61.

Against this, the Defendants propose that spoofing and price manipulation ought to be treated like embezzlement committed by employees of federally funded organizations or governmental units, which violates 18 U.S.C. § 666. Defs.' Br. at 32; *Yashar*, 166 F.3d at 875. But the definition of embezzlement under § 666 renders it quite different from spoofing and price manipulation. Specifically, § 666 requires not just that the defendant engage in embezzlement, but also that the stolen property be worth more at least $5,000 and that the organization or governmental unit receive more than $10,000 in federal funding in any one-year period. 18 U.S.C. § 666; *Yashar,* 166 F.3d at 875. In *Yashar*, the Seventh Circuit held that "the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." Yashar, 166 F.3d at 879–80. The Seventh Circuit remanded to the district court to determine whether—in the aggregate—$5,000 in property was taken and $10,000 was received before the pertinent limitations date. *Id.* at 880. If the property-value and federal-funding amounts were satisfied before the limitations date, then the case was brought too late. *Id.*

*Yashar* did not, however, deal with a statute—like spoofing or price manipulation—that covered schemes in which *executions* of those schemes independently qualify as crimes in and of themselves. Here, like mail, wire, and bank frauds, spoofing and price-manipulation charges may be premised on multiple acts (specifically in this case, the trading sequences) that could each independently constitute a single execution. There are no other cumulative elements (like property value or federal funding) implicated by spoofing or price manipulation, so the unique limitations conundrum in *Yashar* is not presented. Nor did *Yashar* purport to overrule *Longfellow*, which held that a bank fraud scheme is timely charged so long as one of the executions is within the limitations period. *Longfellow*, 43 F.3d at 325; *see also O'Brien*, 953 F.3d at 460–61. So the spoofing and price-manipulation charges are timely brought. Having said that, the jury must and will be instructed that, in order to convict on those charges (as well as the fraud charges), at least one within-limitations-period trading sequence must be proven.

## IV. Conclusion

For the reasons explained in this Opinion, the Defendants' motion to dismiss, R. 114, is denied except for the bank fraud counts (Counts 5–7). Those counts are dismissed. The remainder of the Superseding Indictment survives.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 17, 2021