# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

      v.

GREGG SMITH,
MICHAEL NOWAK,
JEFFREY RUFFO, and
CHRISTOPHER JORDAN,

          Defendants.

Case No. 19-cr-00669

Hon. Edmond E. Chang

## DEFENDANT GREGG SMITH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER ORDER ADMITTING OPINION TESTIMONY OF ARMAND NAKKAB AND BRIAN WIKA

Jonathan D. Cogan
Matthew I. Menchel
Sean S. Buckley
Leanne A. Bortner
Christopher S. Cogburn
Michael Brasky
KOBRE & KIM LLP
111 West Jackson Boulevard
Chicago, IL 60604
(212) 488-1206

*Counsel for Gregg Smith*

## PRELIMINARY STATEMENT

If the government has its way, Brian Wika and Armand Nakkab will be two of *six* different witnesses (along with another expert, Professor Kumar Venkataraman, and three cooperating witnesses, John Edmonds, Christiaan Trunz, and Corey Flaum) to testify that, in their opinion, Mr. Smith spoofed. Wika's and Nakkab's Smith-was-spoofing opinions should be excluded on this basis alone. Indeed, as the Court noted in its June 2 order on the admissibility of Mr. Smith's opinion testimony (the "Order," Dkt. No. 524), Rule 403 generally requires that expert testimony be permitted "without duplication, unless" there is "a specific explanation why duplication is warranted." (Order at 8.)

The same standard must be applied to the government's opinion witnesses. Here, the opinions to be offered by both witnesses simply duplicate Professor Venkataraman's proffered opinion on the same issue (whether Mr. Smith spoofed) and, indeed, use the very same approach (a retrospective analysis of historical trading data). Permitting both witnesses to testify in addition to Professor Venkataraman would run afoul of Rule 403 and this District's precedents, which prohibit serial recitations of the same opinion by multiple witnesses. In addition to ensuring orderly and efficient trials, this rule guards against "the unfair possibility that the jurors will resolve competing expert testimony by 'counting heads' rather than valuating the quality and credibility of the testimony." *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004).

It would be manifestly unfair to allow the government to turn the trial into this kind of numbers game by calling multiple experts to opine on the same conclusion while, at the same time, ordering Mr. Smith to limit his defense to a single expert opinion on any one issue. (Order at 8.)

The testimony further should be excluded because:

1

- Wika's opinion is based on an after-the-fact review of trading data—just like the one conducted by the government's retained expert, Professor Kumar Venkataraman—and thus cannot be admitted as lay opinion, which must be "rationally based on the witness's perception" and may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

- As Wika's own report detailing his methodology makes clear, his opinion is infected by confirmation bias and therefore inadmissible under Rule 702 and *Daubert*.

- Nakkab's "expert" opinion—which the government wants to use not to "help the trier of fact" (*see* Fed. R. Evid. 702(a)) but to render useless the exculpatory force of Nakkab's starkly different real-time conclusions—must likewise be excluded under Rule 702 and *Daubert*, both because it is supported by no discernible methodology at all and because it purports to identify "patterns" across statistically unrepresentative trading data cherry-picked by the government.

On these grounds, Mr. Smith respectfully urges the Court to reconsider its ruling on the admissibility of Wika's and Nakkab's retrospective analyses of Mr. Smith's trading data. At a minimum, the Court should permit counsel for Mr. Smith to *voir dire* those witnesses outside the presence of the jury before their opinions are offered into evidence.

## BACKGROUND

***Brian Wika.*** If the Court allows Wika, an analyst in the market regulation division of the Chicago Mercantile Exchange (the "CME"), to testify on the grounds set forth in the Court's June 2 Order, it will do something no other court presiding over a spoofing trial has done: admit testimony about the intent with which a trader placed particular orders, based solely on a ***years-later, after-the-fact review*** of trading data, as "lay opinions." (Order at 5.) In another spoofing trial conducted last year, Judge Lee ruled that "such testimony crosses the line between lay opinion testimony under Rule 701 and [into] expert opinion testimony under Rule 702." Order (Dkt. No. 602, cited as "*Bases* Pretr. Order"), *United States v. Bases*, 18-CR-48 (N.D. Ill. July 15, 2021).

Judge Lee's approach is consistent with scholarship on the statistical analysis of market manipulation, which has long recognized the inherent difficulty and complexity in drawing

inferences of subjective intent based entirely on trading data. *See* Eun Jung Lee, et al.,
*Microstructure-based manipulation: Strategic behavior and performance of spoofing traders*, 16
J. of Fin. Mkts. 227, 232 (2013) ("In empirical analysis, it is impossible to know with certainty a
trader's intent in placing any given order."). This is even more problematic in the case of spoofing,
where "[t]he inherent difficulty in proving [criminal] intent" is compounded by the high incidence
of legitimate trade cancellations. Catriona Coppler, *The Anti-Spoofing Statute: Vague as Applied
to the "Hypothetically Legitimate Trader"*, 5 Am. U. Bus. L. Rev. 261, 264 (2016); *see also* Xuan
Tao, et al., *On detecting spoofing strategies in high-frequency trading*, Quantitative Finance
(2022) at 1–2 ("[I]t is unclear how a spoofing strategy differs quantitatively from other strategies
. . . thus, the complexity of quantifying and discriminating spoofing strategies from legitimate
ones."). The Court should not entrust this complex task to a lay witness.

Although the Court has indicated that Wika may testify in a lay capacity about his
"perceptions of" Defendant Gregg Smith's "trading activity" (Order at 5), Wika's knowledge of
Mr. Smith's trading is no more percipient than that of various retained experts who will opine on
the same issue. (Defs.' Mem. of Law in Supp. of Joint Mot. to Exclude Expert Test. (Dkt. No. 334,
cited as "Defs.' Br.") at 5–6.) Like those experts, Wika conducted a retrospective analysis of
trading activity long after that activity happened, relying on historical data recorded by COMEX,
the CME's electronic trading platform. He is no more competent to testify about that trading in a
lay capacity than the experts who reviewed the same data for purposes of this case—which,
presumably, is why the government first disclosed him as an expert witness, only to change course
when Defendants challenged the reliability of his methodology under Rule 702 and *Daubert v.
Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*See* Gov't Expert Disclosures (Dkt.
No. 331-2) at 6–7; Defs.' Reply Mem. of Law in Supp. of Joint Mot. to Exclude Test. (Dkt. No.

427) at 1, 9–10.) And because Wika's methodology is demonstrably unreliable, his opinions on Mr. Smith's trading are not admissible under that framework, either.

***Armand Nakkab.*** While Nakkab was at JPMorgan, he oversaw a thorough compliance-department review that found no issues with Smith's trading and came to the conclusion that he did not spoof. (Nakkab 302 (Dkt. No. 330-1) at 10–11.) Moreover, shortly after the CME interview, Eugene Ferrara—whom Nakkab describes as his "second in command" (*id.* at 6)—touted the compliance department's satisfaction with Mr. Smith's trading at a groupwide compliance meeting, announcing to the entire Global Commodities Group that the department had concluded that Mr. Smith's trading was acceptable because his "intention was to trade every single bid and offer." (*See* GX 165 at 3.)

Six years later—and only after the government told Nakkab that he was also a subject of its spoofing investigation—he abruptly changed his tune. It was not until then that, for the first time, Nakkab came to the view that certain trading sequences, all of which were cherry-picked and presented to Nakkab by the government, demonstrated a "pattern" which he found "extremely problematic." (Nakkab Grand Jury Test. (Dkt. No. 330-2) at 64–65.) It is this retrospective analysis that the government now intends to introduce as Nakkab's "expert" opinion on those trading sequences.

But Nakkab's "analysis" does not pass *Daubert* muster. Although the Order mentions Nakkab's credentials, "possessing requisite credentials alone is not enough to render expert testimony admissible." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005), *vacated on other grounds*, 448 F.3d 936 (7th Cir. 2006). "The district court must also, in keeping with its gatekeeper's duty, assess the reliability of the *methodology* the expert has employed in arriving at his opinion." *Id.* (emphasis in original). Nakkab's opinions are not based on ***any*** identifiable

methodology; according to the materials disclosed by the government, his analysis apparently consisted of nothing more than reviewing the government's hand-selected episodes and concluding that they exhibit a "pattern" which he found "problematic." Worse yet, the data set across which Nakkab claims to have observed this troubling "pattern" was the product of gross selection bias. Thus, Nakkab's retrospective opinions on Mr. Smith's trading are not admissible as expert testimony and must be excluded. If the government is permitted to present this sort of retrospective analysis at all, it should be required to do so through Professor Venkataraman alone.

## ARGUMENT

**I.    Allowing the government to call multiple witnesses to provide the same opinion violates Federal Rule of Evidence 403 and established precedent in this District.**

The Government has indicated its intention to call *six* separate witness to offer the exact same opinion: that Mr. Smith was engaged in spoofing[1]—*i.e.*, that he placed orders with an unconditional intent to cancel them before execution:

- *John Edmonds* is a former precious metals trader who worked with Mr. Smith and is expected to opine, as a lay witness, that Mr. Smith spoofed.

- *Christiaan Trunz* is a former precious metals trader who worked with Mr. Smith and is expected to opine, as a lay witness, that Mr. Smith spoofed.

- *Corey Flaum* is a former precious metals trader who worked with Mr. Smith and is expected to opine, as a lay witness, that Mr. Smith spoofed.

- *Brian Wika*, a CME analyst, will be allowed to testify as a lay witness that "Mr. Smith spoofed many times," and that his trading activity was "clearly" in violation of CME rules that prohibited spoofing and market manipulation. (Gov't Expert Disclosures at 4; *see also* Order at 5.)

---

[1] The government has proffered that these witnesses will testify that, in their opinions, Mr. Smith spoofed. This plainly violates Rule 704(b), which makes clear that whether a criminal defendant "ha[d] a mental state or condition that constitutes an element of the crime charged" is a matter "for the trier of fact alone." At most, a witness that is permitted to opine on the intent with which Mr. Smith placed certain orders should be limited to testifying about whether Mr. Smith's trading is consistent with an intent to cancel particular orders before execution—or, conversely, with some other motive or strategy.

- ***Armand Nakkab***, a former JPMorgan compliance officer, will be allowed to testify as an expert witness that Mr. Smith's trading in certain data he reviewed with the Government "does not reflect an intent to trade all the orders he placed"—in other words, that Mr. Smith spoofed. (Gov't Expert Disclosures at 14; *see also* Order at 4.)

- ***Kumar Venkataraman***, the government's retained expert, will be allowed to testify that Defendants' activity "is inconsistent with an intent to execute and consistent with an intent to cancel [before execution]"—in other words, that Mr. Smith spoofed. (Order at 6; *see also* Gov't Expert Disclosures at 12.)

The unfair prejudice caused by this needlessly cumulative evidence is reason alone to exclude Nakkab's and Wika's opinions under Federal Rule of Evidence 403.[2]

As this Court has recognized, it is well established in this district that parties are generally prohibited under Rule 403 from "present[ing] more than one expert to testify on the same topics." Order at 8; *see also, e.g.*, *Sunstar*, 2004 WL 1899927, at *25; *Hall v. Hall*, No. 14 C 6308, 2018 WL 1695365, at *4–5 (N.D. Ill. Apr. 7, 2018); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordination Pretrial Proceedings*, No. 14 C 1748, 2018 WL 1316724, at *2 (N.D. Ill. Mar. 14, 2018). Not only is it "a waste of time and needlessly cumulative" to have multiple witnesses offer uniform opinions on the same subject; it also "raises the unfair possibility that the jurors will resolve competing expert testimony by 'counting heads' rather than valuating the quality and credibility of the testimony." *Sunstar*, 2004 WL 1899927, at *25; *see also Kaepplinger v. Michelotti*, No. 17 CV 5847, 2022 WL 267886, at *4 (N.D. Ill. Jan. 28, 2022). Nor does it matter that some of the cumulative opinions to be offered are from lay witnesses. *See, e.g.*, *Hall*, 2018 WL 1695365, at *5 (noting that, in assessing cumulativeness of expert witness opinions, court

---

[2] As of the date of this filing, both the Government's Motion for Preliminary Admission of Co-Conspirator Statements (Dkt. No. 294) and the Government's Motion to Admit Lay Opinion Testimony (Dkt. No. 317) are still pending. The arguments raised here apply with equal force to these cooperators in addition to the reasons stated in Defendants' opposition briefs (Dkt. Nos. 358, 363, 364, 369). As such, these cooperators should be precluded from offering their opinions about Mr. Smith's trading.

must also consider whether party intends to offer lay witness opinion on same issue). The risk of prejudice is particularly acute here, where the Court has ordered Mr. Smith to present just one opinion on the same issue. (Order at 8.)

In addition to his experts, Mr. Smith is aware of—but thus far has been denied access to—at least two other witnesses whose opinions would rebut the false impression of unanimity conveyed by the government's litany of opinion witnesses. First, one or more witnesses from JPMorgan conducted their own contemporaneous analyses of Mr. Smith's trading that caused it to conclude that he was not spoofing. Second, an economist retained by the CFTC, Professor Henrik Bessembinder, also concluded that Mr. Smith's trading was inconsistent with spoofing. (Order at 8; Smith Mot. to Compel (Dkt. No. 518); Order Granting Mot. to Quash (Dkt. No. 191).) Yet both JPMorgan and the CFTC have asserted privilege over these analyses, and, in the case of Professor Bessembinder, the Court has upheld the CFTC's claim. Against this backdrop, it would be fundamentally unfair to allow the Government to offer the inverse opinion from six different witnesses. The risk of harm when the number of opinion witnesses is so lopsided—especially where, as here, that imbalance conceals a genuine lack of consensus among experts who have looked at the issue—"significantly outweighs the probative value of the duplicative or cumulative evidence." *In re Testosterone*, 2018 WL 1316724, at *2.

That some of the Government's anticipated witnesses may have arrived at their ultimate conclusion that Mr. Smith was spoofing "in different ways and from different perspectives" is irrelevant, because "whether or not the [witnesses] have different perspectives does not diminish the fact that [the Government] propose[s] to call [multiple] experts who will render essentially the same opinions." *Kaepplinger*, 2022 WL 267886, at *6 (prohibiting two doctors with different credentials, perspectives, and specialties from testifying about the standard of care in a medical

7

malpractice case). For example, in *In re Testosterone Replacement Therapy*, the court prohibited a party from offering cumulative expert testimony on the issue of causation, even where those opinions came from the very different perspectives of a cardiologist, a urologist, an FDA scientist, and a statistician. 2018 WL 1316724, at *1. The court, recognizing that "as a matter of trial strategy, it is more advantageous to have two experts from different fields interpret and assess a body of evidence," nonetheless held that this many witnesses providing testimony on the subject of general causation "amounts to the needless presentation of cumulative evidence." *Id.* at *2–3. Similarly here, though some of the Government's witnesses may have arrived at their respective opinions in different ways, their opinions still needlessly cumulate to the unfair prejudice of Mr. Smith, who has been limited to just one witness on the issue, both by the Order and by the fact that the exculpatory opinions of other witnesses are being hidden behind claims of privilege.

This alone is grounds to exclude the proffered opinions of Nakkab and Wika. And by doing so, the Court can avoid a number of other significant problems with their testimony, all of which would unfairly prejudice Mr. Smith and violate his rights to due process and a fair trial.

## II. Wika's opinion testimony is inadmissible.

### A. Wika's opinions about Mr. Smith's trading, like Nakkab's, are not admissible as lay opinion testimony.

Federal Rule of Evidence 701 sets forth three requirements, all of which must be satisfied for testimony to be admissible as lay opinion and therefore exempt from the heightened scrutiny applied to expert testimony. In its Order, the Court focuses on the last of those three requirements—that the testimony not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"—the application of which, as the Court correctly noted, is "not always crystal clear." (Order at 3 (analyzing Fed. R. Evid. 701(c).) But Rule 701's first requirement—that lay opinion testimony be "rationally based on the witness's perception"—is

8

equally important. Fed R. Evid. 701(a). By requiring that lay opinions be "tethered to perception, to what the witness saw or heard," Rule 701(a) ensures that only "expert witnesses . . . are permitted to testify to matters of which they lack personal knowledge." *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000).

Applying this first requirement, the Court drew a reasoned distinction between two types of anticipated testimony from Nakkab. The Order discusses at length Nakkab's capacity to testify about his "direct interaction with the Defendants and his knowledge of their trading activity (as reported to him), as well as his direct knowledge of JPMorgan's compliance policies." (Order at 3.) But as the Court recognized, none of this background knowledge enables Nakkab to offer as lay opinion his views on "approximately 50 examples" of Mr. Smith's trading activity that Nakkab claims **not** to have known about while working at JPMorgan. (Order at 4.) In addition to "requir[ing] his extensive experience and knowledge" (*id.*), Nakkab's retrospective analysis of Mr. Smith's trading expressly disclaims any grounding in his firsthand perception of the trading at issue. (*Id.*) The Court correctly concluded that this analysis, which it referred to as Nakkab's "post-events-review testimony," must be analyzed as expert opinion under Rule 702. (*Id.*)

There is no basis to treat Wika's "post-events-review testimony" any differently than Nakkab's. Both witnesses' anticipated testimony is based on a retrospective analysis of years-old trading data, not on firsthand or otherwise contemporaneous knowledge of Mr. Smith's trading. Both witnesses purport to analyze that trading data in a manner requiring highly specialized expertise. Thus, both witnesses must meet the requirements of Rule 702 and *Daubert*, just like Professor Venkataraman. In all cases, those witness's opinions flow entirely from an after-the-fact review of electronic orders that the witnesses did not observe or take part in placing.

9

Respectfully, the Court's comparison of Wika to "a business officer who is permitted to offer lay opinion testimony of the value of a business" (Order at 3) is misplaced. As the 2000 Advisory Committee's Note to Rule 701 explains, the basis for admission in that circumstance is the witness's "knowledge and participation in the day-to-day affairs of the business" he is valuing. Fed. R. Evid. 701 Advisory Comm. Note (2000 Amend.) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)). Wika has no analogous "knowledge" of or "participation" in Mr. Smith's trading that would allow him to characterize it as spoofing in the same way that a business owner might be able to intuitively value his own enterprise. Quite the opposite: the position from which Wika reviewed the trading on which he bases his Smith-was-spoofing opinions is more akin to that of an outside accountant or appraiser using specialized knowledge and methods to opine on the value of a business with which they are not personally familiar— which, as the Advisory Committee made clear, is expert testimony. *Id.*

What is more, even if Wika had personal knowledge of Smith's trading on which to ground his opinions, those opinions still would be inadmissible as lay testimony because they plainly require "technical" or "specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). There is no "process of reasoning familiar in everyday life" that would enable a person to understand and analyze records of trading data generated by an electronic futures market—much less to discern, based on that analysis, the intent with which certain orders were placed. *See* Fed. R. Evid. 701 Advisory Comm. Note (2000 Amend.) (comparing lay witness testimony "that a substance appeared to be blood" with expert witness testimony "that bruising around the eyes is indicative of skull trauma"). To the contrary, inferring intent from trading data alone is a highly technical undertaking. *See, e.g.*, Tao, *supra*, at 1–2 ("[I]t is unclear how a spoofing strategy differs

10

quantitatively from other strategies . . . thus, the complexity of quantifying and discriminating spoofing strategies from legitimate ones.").

This is precisely why, in a similar spoofing trial conducted last year, Judge Lee held that a cooperating witness could not review "trading episodes in which he was not personally involved" and then "confirm," under the guise of offering a lay opinion, that those episodes "are consistent with the trading practice" employed by the alleged conspiracy—or, more simply put, that they were examples of spoofing. *Bases* Pretr. Order at 9–10. As Judge Lee explained, this type of analysis is not remotely comparable to lay opinion testimony admitted in other cases, where the inferential leap between the observed facts and the witness's opinions are "well within the everyday capabilities of a layperson." *Id.* at 10. On that basis, Judge Lee concluded that "such testimony crosses the line between lay opinion testimony under Rule 701 and [into] expert opinion testimony under Rule 702." *Id.* (collecting cases). Judge Lee also noted that, "to the extent that such testimony . . . were admissible under Rule 701," he would nonetheless have excluded it "because (1) it would have minimally probative value (given that [the witness] has no personal knowledge of the trades), and (2) to the extent that it would have any probative value, its probative value would be substantially outweighed by the unfair prejudice to Defendants and, therefore, inadmissible under Rule 403." *Id.* at 10–11. This Court should do so for the same reasons.

**B. Wika's opinions about Mr. Smith's trading are not admissible as expert testimony because they are grounded in an unreliable methodology.**

The standard set forth in Rule 702 and *Daubert* requires, among other things, that expert testimony be based on sound reasoning or methodology. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The methodology underlying Wika's retrospective analysis is set

11

forth in a June 2015 report memorializing his retrospective analysis of Mr. Smith's trading. (*See* GX 228.)[3]

Wika's report confirms that his analysis suffers from confirmation bias. Indeed, the report makes no effort to hide this: by his own admission, Wika starts with the assumption that certain orders placed by Mr. Smith were spoofs and then works backwards. After describing nothing except the order placement and timing in two "specific instances" of Mr. Smith's trading—both from the same day (July 1, 2013), and approximately 10 minutes apart from each other—Wika writes of these two examples that "the resting iceberg orders are considered intended orders while the 10-lot orders on the opposite side of the market are considered successful spoof orders." (*Id.* at 5.) Whatever the field of inquiry or object of analysis, it is axiomatic that a reliable methodology does not assume the truth of the conclusion it purports to prove. That Wika's report violates this basic principle of analytical rigor requires its exclusion under *Daubert*. *See, e.g.*, Barbara O'Brien*, Prime Suspect: An Examination of Factors That Aggravate and Counteract Confirmation Bias in Criminal Investigations*, 15 Psychol. Pub. Pol'y & L. 315, 316–17 (2009) (explaining that confirmation bias "can undermine accuracy" in criminal investigations by, among other things, causing relevant alternative explanations to be discarded); Richard A. Posner, *How Judges Think* (2008) at 110–11 (defining confirmation bias as the "well-documented tendency once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment.").

In addition, while Wika's report makes much of the speed with which Mr. Smith cancels his "large orders" (GX 228 at 5)—that is, those orders Wika begins his analysis by assuming to be

---

[3] As the Court is aware, the admissibility of this report is the subject of a separate dispute. The parties are due to file submissions on that issue by June 10.

spoofs—his report contains no data on marketwide cancellation speeds to which Mr. Smith's cancellations could be compared. Accordingly, while relying heavily on the intermediate conclusion that Mr. Smith's cancellations were "rapid[]" or "immediate[]" (*id.* at 2), Mr. Wika presents no basis on which to determine whether those cancellations are in fact "rapid" as measured against the entire market.

Wika's report also purports to analyze the economic impact of Mr. Smith's trading. (*Id.* at 8–9.) Even if this portion of his report were relevant (it is not), it too runs afoul of *Daubert* by relying on untested assumptions of causation. *See Ervin*, 492 F.3d 901, 904 (affirming exclusion of physician's diagnosis where based on "mere existence of a temporal relationship between" purported cause and effect, and where physician "was not able to articulate any scientifically physiological explanation" supporting diagnosis). Specifically, Wika's "market disruption" analysis simply presumes that, in every instance in which Mr. Smith had a "small" or "iceberg" order filled after placing a "large" order on the opposite side, the counterparty to his filled order would not have accepted Mr. Smith's bid or offer, thus crossing the bid-ask spread, but for the presence of Mr. Smith's orders on the opposite side. (GX 228 at 8–9.) Wika's analysis provides no justification for this bare assumption of causation; indeed, Wika himself describes this impact only as the "***potential*** disruptive value" of orders that "***may*** have resulted in some participants acting on [the] imbalance" created by Mr. Smith's trading. (*Id.* at 7, 8 (emphases added).) Taken together with the other flaws in Wika's methodology, this analytical shortcut renders his opinions inadmissible. If the Court is not inclined to exclude it altogether on that basis, it should at least permit counsel for Mr. Smith to test the reliability of Wika's methodology through a *voir dire*.

13

**III.     Nakkab's retrospective opinions on the 50 trading episodes selected by the government are inadmissible because the government has not disclosed the "methodology" that Nakkab used to form those opinions.**

The proponent of expert testimony has the burden of demonstrating that the prerequisites set forth by Rule 702 and *Daubert* are satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). But the government has not provided any description of the methodology employed by Nakkab in analyzing the roughly 50 new episodes of Smith's trading. Rather, Nakkab's interview with the FBI and grand jury testimony show that—after being confronted as a subject of the government's spoofing investigation—Nakkab simply reversed course, disavowing the previous stamp of approval he gave to Mr. Smith's trading after his department's thorough review in 2013, and claiming instead that episodes spoon-fed to him by the government displayed a "pattern" that was "extremely problematic." (Nakkab Grand Jury Test. at 64–65.) Neither the government nor Nakkab has described the salient characteristics of this supposed "pattern," the reasons Nakkab believes those characteristics matter, or the basis for his conclusions about trading sequences fitting that pattern. The government's failure to adequately articulate a methodology supporting Nakkab's expert opinions—much less one that is generally accepted or otherwise reliable—is fatal to the admissibility of those opinions under Rule 702 and *Daubert*.

Moreover, it is well recognized in statistical literature that observations of a "pattern" across a sample of data are only valid if the sample accurately represents the data as a whole. *See, e.g.*, Peter Bruce, et al., *Practical Statistics for Data Scientists* (2d ed. 2020) at 54 (distinguishing between statistically sound practice of "specify[ing] a hypothesis and conduct a well-designed experiment to test it" and unreliable practice of "look[ing] at available data and tr[ying] to discern patterns"). Indeed, Professor Venkataraman testified in a prior spoofing trial that his examination of trading episodes selectively provided to him by the government was only sound because he compared them with all trading by the Defendants "over [a] five-year period, and . . . looked at ***all***

14

the resting orders that were submitted at the top five levels and examined ***all*** the resting iceberg orders." Sept. 18, 2020 Trial Tr. at 1519, *United States v. Vorley*, No. 18 CR 35 (N.D. Ill.) (emphases added). Nakkab, by contrast, has done nothing to counteract the government's cherry-picking of data favorable to its case. Accordingly, his opinions about "patterns" that emerge from that nonrepresentative data set are unsound and should be excluded.

**IV.      At a minimum, the Court should permit Mr. Smith to test the foundation for Nakkab's and Wika's opinions about Mr. Smith's trading, before those opinions are offered into evidence, through a *voir dire* conducted outside the presence of the jury.**

In *United States v. Godinez*, 7 F.4th 628 (2021), the Seventh Circuit recently reaffirmed the principle that trial courts have discretion to determine the propriety of a *Daubert* hearing prior to the admission of expert testimony at trial. *Id.* at 637. *Godinez* makes equally clear, however, that this discretion is bounded, holding that the district court in that case abused its discretion in denying a *Daubert* hearing where "the evidence admitted at trial implicated" the "methodology" at issue, and "[c]riticism of that methodology formed part of the defense," meriting "a more thorough exploration by the district court." *Id.* at 638.

As discussed above, Mr. Smith intends to defend the charges against him in part by challenging the methodology employed by Nakkab, Wika, and other expert witnesses proffered by the government. If the Court will not exclude Nakkab's and Wika's opinions about Mr. Smith's trading outright, it should, at a minimum, permit Mr. Smith's counsel to conduct a *voir dire* of both witnesses outside the presence of the jury.

**CONCLUSION**

For the foregoing reasons, Defendant Gregg Smith respectfully requests that the Court reconsider its ruling on the admissibility of Nakkab's and Wika's retrospective analyses of Mr. Smith's trading and preclude Nakkab and Wika from presenting those analyses to the jury, whether as lay or expert opinion.

Dated: June 9, 2022

Respectfully submitted,


 /s/ Matthew I. Menchel
Jonathan D. Cogan
Matthew I. Menchel
Sean S. Buckley
Leanne A. Bortner
Christopher S. Cogburn
Michael Brasky
KOBRE & KIM LLP
111 West Jackson Boulevard
Chicago, IL 60604
(212) 488-1206

*Counsel for Gregg Smith*

16