**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGG SMITH, and<br>MICHAEL NOWAK<br><br>Defendants. | Case No. 19-cr-00669<br><br>Hon. Edmond E. Chang |

## REPLY IN SUPPORT OF DEFENDANTS' RULE 33 MOTION FOR A NEW TRIAL

**TABLE OF CONTENTS**

1.  THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE..........1

2.  ERRONEOUS EVIDENTIARY RULINGS HAD A PREJUDICIAL EFFECT
    ON THE JURY'S VERDICT ...........................................................................4

    (a)  Lay Opinion Testimony Was Improper and Would Not Have Been Cured
         by a Limiting Instruction ........................................................................4

    (b)  Denying Mr. Smith's Request to Preclude GX 228 Was Erroneous and
         Unfairly Prejudicial................................................................................7

    (c)  Denying Defendants' Motions to Preclude Corey Flaum's Testimony and
         Related Exhibits Was Erroneous and Unfairly Prejudicial.....................8

    (d)  Admission of Statements of Defendants' Alleged Co-Conspirators Under
         Fed. R. Evid. 801(d)(2)(E) Was Erroneous and Unfairly Prejudicial.....................8

    (e)  The Exclusion of DX 1037, 1039 and Related Testimony Concerning Mr.
         Smith's Fill of a Client Order on June 19, 2008 Was Erroneous and
         Prejudicial .............................................................................................11

    (f)  David Pettey's Testimony Was Not Probative of Materiality ...............12

    (g)  The Government's Trading Charts Were Argumentative and Improper
         Under Rule 1006....................................................................................13

    (h)  The Admission of Prof. Venkataraman's Flawed Expert Testimony Was
         Not Cured by Cross-Examination and Requires a New Trial................14

    (i)  Robert Sniegowski's Opinion Was Not Grounded in the CME's Rules and
         Defendants Were Improperly Denied an Adequate Opportunity to Rebut It ........15

    (j)  The Government Fails to Address the Prejudice Resulting from Its
         Baseless Claim that Mr. Nowak Was Under Investigation by the CFTC..............17

    (k)  Admission of JPMorgan Compliance Documents Containing
         Misstatements of Law Unfairly Prejudiced Defendants ........................18

    (l)  Exclusion of Mr. Smith's Demonstrative Exhibits DX 621–623 as
         Untimely Was Erroneous and Unfairly Prejudicial ..............................19

    (m)  Ari Nakkab's Exculpatory Statements Were Unambiguous And Should
         Have Been Admitted Through An Alternate Witness ...........................20

i

3.      AT A MINIMUM, DEFENDANTS ARE ENTITLED TO AN EVIDENTIARY
        HEARING ON WHETHER THE GOVERNMENT UNLAWFULLY
        INTERFERED WITH ARMAND NAKKAB AS A DEFENSE WITNESS...................22

4.      THE COURT ERRED IN UPHOLDING PRIVILEGE ASSERTIONS BY THE
        CFTC AND JPMORGAN ...............................................................................................25

        (a)     The CFTC Failed to Meet Its Burden of Establishing that the
                Bessembinder Analysis is Privileged......................................................25

        (b)     The Court Erred in Upholding JPMorgan's Assertion of Privilege......................26

5.      DEFENDANTS WERE ENTITLED TO THEIR PROPOSED JURY
        INSTRUCTIONS...........................................................................................................27

6.      THE COURT'S ORDER TO THE DEADLOCKED JURY TO KEEP
        DELIBERATING AND ITS AFFIRMATIVE INSTRUCTION AFTER THE
        JURY IDENTIFIED A DEFENSE HOLDOUT JUROR WERE UNDULY
        COERCIVE.....................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ..................................................................... 14

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin. Inc.*,
  326 F.R.D. 176 (N.D. Ill. 2018) ................................................................ 27

*Blackledge v. Allison*,
  431 U.S. 63 (1977) ..................................................................................... 25

*Goldberg v. 401 North Wabash Venture LLC*,
  755 F.3d 456 (7th Cir. 2014) ..................................................................... 16

*Hicks v. United States*,
  866 F.3d (7th Cir. 2018) ............................................................................... 9

*Holmes v. Hernandez*,
  221 F. Supp. 3d 1011 (N.D. Ill. 2016) ...................................................... 25

*K.L. v. Edgar*,
  964 F. Supp. 1206 (N.D. Ill. 1997) ........................................................... 26

*Lowenfield v. Phelps*,
  484 U.S. 231 (1988) ................................................................................... 29

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
  559 F.2d 894 (3d Cir. 1977) ...................................................................... 19

*Pulinario v. Goord*,
  291 F. Supp. 2d 154 (E.D.N.Y. 2003) ....................................................... 19

*Pulinario v. Goord*,
  118 F. App'x 554 (2d Cir. 2004) ............................................................... 19

*Rojas v. Fed. Aviation Admin.*,
  927 F.3d 1046 (9th Cir. 2019) ................................................................... 26

*Sawyer v. United States*,
  874 F.3d 276 (7th Cir. 2017) ..................................................................... 25

*Slaven v. Great Am. Ins. Co.*,
  83 F. Supp. 3d 789 (N.D. Ill. 2015) .......................................................... 26

*United States v. Alexandre*,
  No. 22 Cr. 326, 2022 WL 16798756 (S.D.N.Y. Nov. 8, 2022) ............... 22

*United States v. Beck*,
  615 F.2d 441 (7th Cir. 1980) ....................................................................... 9

*United States v. Betts-Gaston*,
  142 F. Supp. 3d 716 (N.D. Ill. 2015) .......................................................... 1

*United States v. Blitch*,
  622 F.3d 658 (7th Cir. 2010) ............................................................... 29, 30

*United States v. Boyd*,
  55 F.3d 667 (D.C. Cir. 1995) ....................................................................... 8

*United States v. Buenrostro*,
  No. 02 CR 551, 2003 WL 145421 (N.D. Ill. Jan. 16, 2003) ...................... 1

*United States v. Cruse,*
   85 F.3d 795 (7th Cir. 2015) .................................................................... 28

*United States v. Dish Network LLC,*
   75 F. Supp. 3d 916 (C.D. Ill. 2014) ....................................................... 14

*United States v. Eaden,*
   37 F.4th 1307 (7th Cir. 2022) .................................................................. 4

*United States v. Falcon,*
   347 F.3d 1000 (7th Cir. 2003) ................................................................ 23

*United States v. Georgiou,*
   742 F. Supp. 2d 613 (E.D. Pa. 2010) ...................................................... 6

*United States v. Gomez,*
   763 F.3d 845 (7th Cir. 2014) .................................................................... 8

*United States v. Gorman,*
   613 F.3d 711 (7th Cir. 2010) .................................................................... 8

*United States v. Johnson,*
   26 F.3d 669 (7th Cir. 1994) ...................................................................... 2

*United States v. Jones,*
   739 F.3d 364 (7th Cir. 2014) .................................................................... 7

*United States v. Long,*
   748 F.3d 322 (7th Cir. 2014) .................................................................... 9

*United States v. McMillan,*
   600 F.3d 434 (5th Cir. 2010) .................................................................... 6

*United States v. Morales,*
   910 F.2d 467 (7th Cir. 1990) .................................................................... 4

*United States v. Paneras,*
   222 F.3d 406 (7th Cir. 2000) .................................................................... 1

*United States v. Reed,*
   875 F.2d 107 (7th Cir. 1989) .................................................................... 1

*United States v. Saulter,*
   60 F.3d 270 (7th Cir. 1995) ...................................................................... 4

*United States v. Swanquist,*
   161 F.3d 1064 (7th Cir. 1998) ................................................................ 13

*United States v. Tomkins,*
   No. 07 CR 227, 2012 WL 1357701 (N.D. Ill. Apr. 19, 2012) ................. 6

*United States v. Washington,*
   184 F.3d 653 (7th Cir. 1999) .................................................................... 1

*Van v. Ford Motor Co.,*
   332 F.R.D. 249 (N.D. Ill. 2019) ............................................................ 14

*Washington v. Texas,*
   388 U.S. 14 (1967) ................................................................................... 2

*Wendler & Ezra, P.C. v. Am. Int'l Grp.,*
   521 F.3d 790 (7th Cir. 2008) .................................................................. 15

*Wierciszewski v. Granite City Ill. Hosp. Co.,*
   No. 11-cv-120, 2011 WL 5374114 (S.D. Ill. Nov. 7, 2011) .................. 27

**Statutes**

18 U.S.C. § 2255(b) ................................................................................................................... 25

**Rules**

Fed. R. Crim. P. 33(a) ........................................................................................................... 1, 31
Fed. R. Evid. 801(d)(2)(E) ..................................................................................................... 8, 11
Federal Rule of Evidence 404(b) ................................................................................................. 8

Defendants Gregg Smith and Michael Nowak respectfully submit this reply in support of their motion for a new trial pursuant to Fed. R. Crim. P. 33(a) ("Motion" or "Mot.," ECF No. 711) and in response to the government's opposition brief ("Opp. Br.," ECF No. 758).

## 1.    THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

The government's response to Defendants' argument about the weight of the evidence is predicated on two misstatements of the Rule 33 standard. *First*, the government incorrectly states that the Court may "not reweigh the evidence." Opp. Br. at 2. The Court is in fact *required* to reweigh the evidence. *See, e.g.*, *United States v. Betts-Gaston*, 142 F. Supp. 3d 716, 730 (N.D. Ill. 2015) ("*The Court reweighs the evidence* and may grant a new trial if the jury's verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." (emphasis added) (quoting *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999)).[1] *Second*, the government asserts, without any citation, that "assessing credibility is the province of the jury." Opp. Br. at 3. Again, the Court is *required*, in deciding a motion for a new trial, to reassess the credibility of the witnesses. *See, e.g.*, *Washington*, 184 F.3d at 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses.").

When viewing the evidence under the correct standard, Defendants are entitled to a new trial for the reasons articulated in the motions for judgments of acquittal—most notably because

---

[1]    The government misleadingly quotes from cases to support its assertion that the Court may not reweigh the evidence. Opp. Br. at 2 (quoting *United States v. Reed*, 875 F.2d 107 (7th Cir. 1989); *United States v. Buenrostro*, No. 02 CR 551, 2003 WL 145421 (N.D. Ill. Jan. 16, 2003), *aff'd*, 109 F. App'x 117 (7th Cir. 2004)). *Reed* stands for the proposition that the court may not use its ability to reweigh the evidence to "set aside the verdict simply because it feels some other result would be more reasonable." 875 F.2d at 113 (citation omitted). It does not contain a prohibition on reweighing evidence. While the *Buenrostro* court does reference a "requirement that the trial court not reweigh the evidence," this is in reference to the Rule 29 standard, not the Rule 33 standard. *Buenrostro*, 2003 WL 145421, at *2 (citing in support the Rule 29 analysis from *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)).

the government's evidence of unlawful intent rests largely on the uncorroborated opinions of various witnesses who inferred Defendants' intent from their own intent. In other words, as each cooperator opined, if *he* had unlawful intent when *he* placed orders in an otherwise legitimate four-step pattern, then the Defendants must have as well. Such inferences are legally impermissible and are entitled to no weight. *See, e.g.*, *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir. 1994) (a co-conspirator's admission of guilt "may not be used as substantive evidence of another defendant's guilt"). Yet this is the inference the government asked the jury to draw and on which it now relies in arguing that the evidence was sufficient to support the verdict. *See, e.g.*, Gov't Rule 29 Opp'n at 4, ECF No. 759 ("Each of the government's cooperating witnesses testified that they engaged in the four-step pattern when they were spoofing . . . . That testimony alone . . . is sufficient for a jury to conclude the defendants were spoofing when they engaged in the four-step pattern.").

Even if those inferences were proper, which they are not, the cooperators' testimony was non-credible and deserves little, if any, weight. As an initial matter, the government tacitly concedes that it did, in fact, tell Mr. Trunz that he would be prosecuted in a harsher jurisdiction if he refused to plead guilty and cooperate, arguing instead that this could not possibly have "coerced, bullied, or threatened" Mr. Trunz into providing false, pro-government testimony because he "was represented by experienced counsel from a nationally renowned law firm" and "took nearly nine months to decide to plead guilty." Opp. Br. at 4 & n.4. This is absurd. *First*, under the government's rationale, a defendant with reputable counsel would never provide false testimony, a position which the government surely does not espouse. *Second*, as the Supreme Court has recognized, it is "[c]ommon sense" that an accomplice or co-conspirator "has a greater interest in lying in favor of the prosecution rather than against it." *Washington v. Texas*, 388 U.S. 14, 22 (1967). And here, Mr. Trunz and his "experienced counsel" originally told the government that he was innocent.

Cogan Supp. Decl. Ex. N, DOJ-0021718676 (email from Mr. Trunz's counsel to the government in response to a request for an interview, stating: "Mr. Trunz does have a legitimate, non-criminal explanation for his trading practices."). *Finally*, the government's suggestion that innocent defendants with reputable counsel do not plead guilty ignores the power imbalance between the prosecution and the defense and the fact that innocent people do, sometimes, plead guilty. In reassessing Mr. Trunz's credibility, as the Court must in reviewing a motion under Rule 33, the government's threat,[2] coupled with Mr. Trunz's testimony that, before being approached by the government, he did not believe that the trading strategy at issue in this case was in any way improper and he believed that Mr. Edmonds had been "bullied" by the government into pleading guilty, supports giving little, if any, weight to his testimony.

The government further argues that the cooperators are credible witnesses because: (i) they were "consistent" in describing the pattern they saw Defendants use when trading, (ii) their testimony was corroborated by Professor Venkataraman and Brian Wika; and (iii) their testimony was consistent with contemporaneous e-communications. Opp. Br. at 3. None of the evidence to which the government points, however, in fact corroborates the cooperators' testimony that Defendants were spoofing. As explained in the briefing in support of Defendants' Rule 29 motions, the government's four-step pattern is not unlawful and is not evidence of unlawful intent. Smith Rule 29 Br. at 5–6. Professor Venkataraman's opinions relied largely on comparing the cooperators' trading to Defendants' trading and were, like Mr. Wika's opinion, otherwise unsubstantiated. *Id.* at 10–11. And, finally, the government fails to identify which "contemporaneous e-communications" it is referencing; regardless, Mr. Smith explained in his

---

[2] The government also takes issue with the characterization of this statement as a threat. This is addressed in more detail below. *See infra* at pp. 23–24 & n.13.

Rule 29 brief why none of the e-communications offered at trial support an inference of unlawful intent, *id.* at 8 n.2, and the government had no response to this as well.

Where, as here, "the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal," a new trial is warranted. *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990).

## 2. ERRONEOUS EVIDENTIARY RULINGS HAD A PREJUDICIAL EFFECT ON THE JURY'S VERDICT

### (1) Lay Opinion Testimony Was Improper and Would Not Have Been Cured by a Limiting Instruction

The government first claims that Defendants' complaints about improper lay opinion should be rejected because Defendants declined a limiting instruction before the cooperating witnesses offered their opinions about trading in which they never participated. Opp. Br. at 5–6. But the proposed instruction, which stated that the jury should judge opinion testimony the same as other testimony, would not have cured anything. The unfair prejudice lies with the testimony itself—which should not have been allowed—and not whether it would be treated appropriately compared to other testimony. Defendants' decision to avoid highlighting the improper "opinion" testimony with a judicial instruction is beside the point.

The government otherwise fails to justify the admission of lay testimony that drew improper legal conclusions, including speculation about Defendants' mental states, and lacked grounding in the witnesses' personal knowledge. Neither *United States v. Saulter*, 60 F.3d 270 (7th Cir. 1995), nor *United States v. Eaden*, 37 F.4th 1307 (7th Cir. 2022), supports the admission of lay opinion here. Those cases—which mark the outer bounds of Rule 701—involved lay testimony grounded in specific personal knowledge formed from interactions with the defendant. *See Saulter*, 60 F.3d at 276 (finding witness could properly opine as to "the meaning of certain words" where he had "knowledge of the relevant terms," and "personal knowledge of [a

4

coconspirator's] behavior and speech"). They do not justify dispensing with Rule 701's requirement that testimony be "rationally based on the witnesses' perception." In pretrial briefing and arguments before the Court, the government argued the cooperators had the requisite perception in part because they "learned" to spoof from the Defendants. *See* Trial Tr. 220:24–221:2; U.S. Opp. Mot. Preclude Improper Lay Op. at 4, ECF No. 346. But their testimony revealed that Defendants never said a word about spoofing to the cooperators (except for Mr. Nowak's instructions *not* to spoof) and the cooperators "learned" simply by watching Defendants place orders on a screen (which tells nothing about their intent). From that thin reed, three cooperators were allowed to offer "opinions," based on a post-hoc review of government-created charts, that certain snippets of trading constituted "spoofing," the very crime with which Defendants were charged.[3] In doing so, the cooperators necessarily opined on Defendants' intent (as intent is the sole distinguishing characteristic of a spoof order). To make matters worse, the government doubled down and elicited testimony on Defendants' intent during particular trading episodes. The government makes no effort to explain how Defendants' state of mind during those particular trading episodes could conceivably fall within the cooperators' perception. This goes far beyond the strictures of Rule 701.[4]

---

[3]  Describing actions as "fraudulent" (a commonly used lay term), as in *Eaden*, is also far different from stating, as the government's witnesses did here, that particular activity constitutes spoofing, which draws a specific legal conclusion.

[4]  Contrary to the government's argument, the cooperators' testimony established that they understood "spoofing" to be a legal term that was not part of their regular vernacular during the relevant period. None of the cooperators claimed to have used that term to discuss the desk's trading. Mr. Trunz testified that he had not understood his own conduct (or the conduct of others who traded similarly) to constitute spoofing. *See, e.g.*, Trial Tr. at 2502–04, 2558–61, 2564–65; *see also id.* at 2490:6–10 (Mr. Trunz stated that "[w]e didn't use th[e] term [spoofing] very often" from 2008 to 2016). The evidence that the government points to—a 2013 compliance training in which a compliance officer referred to "spoofing," Trial Tr. at 1031:22-1032:03—does not prove otherwise. *See* Opp. Br. at 7 n.6. That a compliance officer tasked with educating the desk about the legal and regulatory landscape used the term "spoofing" does not establish that the cooperating witnesses understood the term beyond its legal meaning.

As to Mr. Wika, the government suggests that because he opined only on trading that fell outside the limitations period for spoofing, his testimony did not constitute an impermissible legal conclusion. Opp. Br. at 9 n.9. But this technicality ignores the broader evidence at trial and the government's arguments. For the counts of conviction, the government's evidence consisted almost entirely of trading data, which the government argued showed a pattern that was consistent only with spoofing and therefore a basis to convict on spoofing, wire fraud, commodities fraud, and attempted price manipulation. Mr. Wika's testimony that certain examples of the trading pattern were, in fact, spoofing amounted to a legal conclusion that bolstered the government's theory for all counts of conviction.[5] Moreover, the government argued to the jury that Mr. Wika's testimony corroborated that of the government's cooperators and "demolishe[d]" any non-spoofing explanation of Defendants' trading, thereby urging the jury to apply his testimony without regard to the statute of limitations. *See* Trial Tr. 3908:15–25, 4192:4–4193:7.

In response to Defendants' argument on cumulativeness, the government makes the unfounded claim that lay and expert testimony concerning the same trading are not cumulative. Opp. Br. at 14. But the government does nothing to justify the introduction of basically the exact same opinion testimony from four lay witnesses. The lay opinion testimony was improper, and

---

[5] The government's reliance on *United States v. Tomkins*, No. 07 CR 227, 2012 WL 1357701 (N.D. Ill. Apr. 19, 2012), and two out-of-circuit cases is misplaced. In *Tomkins*, the court held that the lay opinion testimony "cannot extend to connections made for the jury based on [any] specialized knowledge," which Mr. Wika did in characterizing Mr. Smith's trading as spoofing. *Id.* at *11 (alterations in original) (citation omitted). In *United States v. Georgiou*, 742 F. Supp. 2d 613 (E.D. Pa. 2010), the court found no reversible error where the "opinion" testimony that the defendant challenged had been elicited by defense counsel itself—for example, by asking for the witness's opinion on "whether manipulations had occurred"—and had "only [been] explored by the Government after the defense had 'opened the door.'" *Id.* at 632. And in *United States v. McMillan*, 600 F.3d 434 (5th Cir. 2010), the court merely approved admitting two fact witnesses' "observations and perceptions" from examining documents at the defendant's own request, and expressly noted that certain testimony may have constituted (harmless) error in potentially "implicat[ing] specialized knowledge by defining certain accounting terms and discussing standardized accounting guidelines." *Id.* at 456–57.

6

unfairly prejudicial, and accordingly warrants a new trial.

### (2) Denying Mr. Smith's Request to Preclude GX 228 Was Erroneous and Unfairly Prejudicial

As explained in Defendants' opening brief, there are at least four separate reasons why GX 228, an "Investigation Report" written by Mr. Wika, should have been excluded. The government ignores the first and most significant of these—that Mr. Wika's "analysis" contains expert opinions not based on any reliable methodology—by asserting without argument that "Wika did *not* provide expert testimony." Opp. Br. at 11 n.13. As Defendants have explained, there is no principled distinction between the analysis conducted by the government's expert, Prof. Venkataraman, and that set forth in GX 228 that justifies treating the former as expert testimony but the latter as admissible lay opinion. Both Prof. Venkataraman and Mr. Wika analyzed Mr. Smith's trading years after it took place, and, as the government concedes—and emphasized to the jury in its closing—both drew conclusions about whether particular orders were placed "without the intent to trade." *Id.* at 11. The Seventh Circuit has made clear that an opinion based on "technical, specialized knowledge"—even where that knowledge, as in the case of Mr. Wika, is "obtained in the course of [the witness's] position" in the workplace—is an expert opinion, and its admissibility must be evaluated accordingly. *United States v. Jones*, 739 F.3d 364, 369 (7th Cir. 2014).

The government's responses to Defendants' other arguments are equally unavailing. *First*, the government fails altogether to address the needlessly cumulative impact of GX 228, which duplicated the testimony of Mr. Wika and four other witnesses (albeit with the additional unfairly prejudicial imprimatur of an official "Investigation Report" issued by the CME). *Second*, the Court's instruction to the jury distinguishing CME rules from federal law did not, as the government claims, cure the prejudice created by the admission of GX 228; it is not GX 228's conclusion that Mr. Smith may have violated CME rules that unfairly prejudiced the jury, but its

characterization of certain orders placed by Mr. Smith as "spoofs" (or as fitting a "spoofing pattern") implemented as part of "a trading strategy that appeared to consist of entering and canceling large orders without the intent to trade." *See* GX 228 at 2–3, 9. Where, as here, one of the charged offenses was "spoofing"—which, as the Court correctly instructed the jury, consists of placing orders with an unconditional intent to cancel them before execution—these statements in GX 228 are tantamount to a mere "declar[ation]" of "the defendant's guilt" by a seemingly impartial and expert observer. *See United States v. Boyd*, 55 F.3d 667, 672 (D.C. Cir. 1995).

### (3) Denying Defendants' Motions to Preclude Corey Flaum's Testimony and Related Exhibits Was Erroneous and Unfairly Prejudicial

The government summarily asserts that the Court's ruling admitting Corey Flaum's testimony about Mr. Smith's trading before his employment at JPMorgan, along with several associated exhibits, was correct. As noted above, this evidence consists of improper lay opinion and was needlessly and unfairly cumulative of other evidence admitted at trial.

As Defendants explained in their opening brief, however, the Court should have excluded Mr. Flaum's testimony and the corresponding exhibits for an additional and independent reason: they pertained exclusively to conduct that predated the offenses alleged in the indictment and are therefore improper evidence of "other crime[s], wrong[s], or act[s]" not admissible under any of the grounds enumerated in Federal Rule of Evidence 404(b). Because the jury could only have considered this evidence as proof of Mr. Smith's propensity to engage in the conduct alleged in the indictment, its admission was error. *See, e.g.*, *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014); *United States v. Gorman*, 613 F.3d 711, 718–19 (7th Cir. 2010).

### (4) Admission of Statements of Defendants' Alleged Co-Conspirators Under Fed. R. Evid. 801(d)(2)(E) Was Erroneous and Unfairly Prejudicial

In response to Defendants' arguments that the Court should have excluded the statements of their alleged co-conspirators, the government contends that, despite the jury's acquittal of all

8

three defendants on both conspiracy charges, the government carried its burden to prove the existence of a conspiracy by a preponderance of the evidence. But none of the evidence cited by the government supports an inference that Defendants entered into "an express or implied agreement . . . to commit a crime." Jury Instrs. at 26, ECF No. 654.

Instead, the government points to evidence that, at most, suggests that some members of the trading desk engaged in spoofing. For example, the government cites Mr. Trunz's testimony that "spoofing was not a hidden strategy" and he "learned spoofing while he was a junior trader . . . by watching and learning how the more senior traders, including defendants Smith and Nowak, traded." Opp. Br. at 13. The government likewise touts "the patterns observable in the trade data itself," *id.* at 14, obliterating the important distinction between similar but unconcerted criminal conduct and criminal conspiracy. Even assuming spoofing was widespread on the desk (which, of course, we do not concede), that would not establish a conspiracy. As the Seventh Circuit has long recognized, a "'community of unlawful intent' does not rise to the level of [an] agreement." *United States v. Beck*, 615 F.2d 441, 449 (7th Cir. 1980) (distinguishing proof of aiding-and-abetting liability from more exacting requirements for proof of conspiracy); *see also United States v. Long*, 748 F.3d 322, 325–26 (7th Cir. 2014) (explaining that a conspiracy requires that defendants "knowingly and intentionally agree[] with at least one other person to commit an unlawful act"), *aff'd sub nom. Hicks v. United States*, 866 F.3d 648 (7th Cir. 2018).

The government's contention that "Trunz and Edmonds both explained how the defendants brought them into their conspiracy and trained them to engage in spoofing," Opp. Br. at 14, grossly overstates the evidence. Neither Mr. Trunz nor Mr. Edmonds testified that Defendants trained him to spoof—and their testimony that they were junior members of the desk who learned to *trade* from senior members like Defendants is not tantamount to testimony that Defendants trained them

to *spoof*. The government points to Mr. Edmonds' testimony of a single comment Mr. Smith made to him that Mr. Edmonds understood to be in reference to spoofing, *id.* ("if you enter a large order, you'll move the market"), but this does not establish that Mr. Smith trained Mr. Edmonds to spoof, and neither Mr. Trunz nor Mr. Edmonds testified that Mr. Nowak ever spoke about spoofing— except to tell them not to do it. Instead, Mr. Trunz and Mr. Edmonds merely testified that they learned to spoof by watching Defendants enter orders, which told them nothing about the intent with which Defendants placed orders and certainly does not amount to training them to spoof.

What is more, ample evidence presented at trial—including testimony from the government's own witnesses—affirmatively refutes the government's conspiracy allegations. The testimony of Mr. Edmonds shows that he did not believe that he and Defendants were part of a criminal conspiracy. When asked directly whether he and Mr. Smith ever entered into an agreement to spoof, Mr. Edmonds responded, "I'm not really sure I understand . . . agreement." Trial Tr. 1483:11–20; *see also id.* at 1780:23–25 (Mr. Edmonds resisting use of word "conspirator" to characterize Defendants and other traders). Further, Defendants introduced substantial unrebutted evidence that their conduct was inconsistent with a conspiracy in several respects. For example, the evidence showed that Mr. Smith asked the bank's compliance department to review his own (allegedly illegal) trading to determine whether another alleged co-conspirator was front-running his orders, complained repeatedly to compliance about algorithmic traders' front-running his orders—the very conduct on which the government claims the conspiracy relied to profit from spoofing—and never disclosed to his alleged co-conspirators that his trading was investigated by the CME so that they could halt or alter their own trading to avoid detection. *See* Mot. at 16–17. Even more tellingly, Mr. Edmonds testified that Mr. Nowak called a meeting in which he asked the other traders on the desk if they were spoofing. *Id.* at 17. The government attempts to explain

10

away this meeting as "an example of defendant Nowak—the head of the desk—needing to take a public action after one of his subordinates was fired for spoofing and the conspiracy began to unravel." Opp. Br. at 15–16. But Mr. Edmonds testified that this was not a public action, but rather a meeting attended solely by himself and members of the alleged conspiracy. Trial Tr. 1481:13–15. The government does not, because it cannot, explain why Mr. Nowak would have called a meeting exclusive to his supposed co-conspirators only to ask them whether they were engaged in the conspiracy's core conduct. This conduct is flatly inconsistent with the existence of a conspiracy, and the government introduced no evidence to the contrary.[6]

Because the government did not establish at trial the existence of a conspiracy by a preponderance of the evidence, the admission of conspirator statements under Rule 801(d)(2)(E) was error. Due to the substantial likelihood that the jury relied on this evidence in rendering its verdict, its admission resulted in manifest injustice, which necessitates a new trial.

**(5)    The Exclusion of DX 1037, 1039 and Related Testimony Concerning Mr. Smith's Fill of a Client Order on June 19, 2008 Was Erroneous and Prejudicial**

In addressing Mr. Smith's argument that the Court erred in excluding DX 1037 and DX 1039 (a chat message in which Mr. Ruffo received a client order and a summary exhibit showing Mr. Smith's trading to fill that order, respectively), the government ignores the authority cited in Defendants' opening brief, which states that evidence of a defendant's specific acts is admissible under Rule 404(b) where used to "rebut allegations of criminality or criminal intent." Mot. at 19–

---

[6]    The government claims "countervailing evidence, including that defendant Nowak pressured Mr. Trunz to lie to JPMorgan Compliance" established the existence of a conspiracy, Opp. Br. at 16 n.17 but this misstates the record. Mr. Trunz testified that prior to Mr. Trunz's disciplinary interview, Mr. Nowak asked if Mr. Trunz had intended to trade every order he put into the market. Trial Tr. 2699:7-21. Although Mr. Trunz testified that he interpreted Mr. Nowak's question as a directive that he should tell Compliance that Mr. Trunz intended to trade all his orders, Trial Tr. 2699:22-2700:4, he also testified he did not tell Mr. Nowak that he had *not* intended to trade all his orders. Trial Tr. 2416:18–23. The government's argument that Mr. Nowak's question amounted to pressuring Mr. Trunz to lie to Compliance stretches the record beyond credulity.

20 (collecting cases). Instead, the government cites cases that stand for the unremarkable proposition that a defendant may not introduce evidence of prior good conduct solely for the purpose of proving that he lacks the propensity to commit a crime. Opp. Br. at 17–18. But that is not the reason for which DX 1037 and 1039 should have been admitted; rather, those exhibits show an instance in which Mr. Smith's trading to fill a large client order was irrefutably inconsistent with the government's alleged scheme, in which it urged the jury to conclude—aided by the testimony of Mr. Edmonds—that Mr. Smith spoofed "literally every time" he traded to hedge an order from one of Mr. Ruffo's clients. *See* Trial Tr. 958:24; Mot. at 20–21. The Court's exclusion of this evidence unfairly hamstrung Mr. Smith's ability to rebut the central theory of the government's case: that the primary impetus for Mr. Smith's alleged spoofing was to enable the bank to buy gold from, or sell it to, Mr. Ruffo's hedge-fund clients at superior prices.

### (6)    David Pettey's Testimony Was Not Probative of Materiality

The government argues that Mr. Pettey's testimony was relevant to establish materiality because his algorithm implicitly assumed that all orders in the market were placed with the intent to execute. Opp. Br. at 19. That assumption, however, is not probative of materiality because of other testimony given by Mr. Pettey that the government chooses to ignore. Namely, that his algorithm did *not* seek to determine whether orders were placed with the intent to trade. *See* Trial Tr. at 3007:8–9. If, as Mr. Pettey explained, the algorithm did not even try to assess intent, it plainly could not have relied on Defendants' alleged misrepresentation of intent. Nor could that intent have had a natural tendency to influence the algorithm's decision to trade.[7] The algorithm's

---

[7]   The Court instructed the jury that a misrepresentation is material if "it has a natural tendency to influence the decision of the alleged victim." Jury Instrs., ECF No. 654, at 47. However, in its brief, the government incorrectly asserts that Defendants' orders were material if they were merely "capable of influencing the algorithm's decision to trade." Opp. Br. at 19.

assumption about intent pressed by the Government is equivalent to the algorithm's unremarkable understanding that all limit orders can be executed, i.e., that the algorithm could have traded with any of the orders in the market, including Defendants' orders, while they were active. Because the algorithm merely assumed (rather than assessed and relied on) intent, Mr. Pettey's testimony was unfairly prejudicial and not probative of materiality, and therefore should have been excluded.

### (7) The Government's Trading Charts Were Argumentative and Improper Under Rule 1006

Admission of GX 450–55 and 458 as Rule 1006 summaries unfairly prejudiced Defendants, and the government's opposition fails to establish otherwise. The lone case the government cites in support, *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998), is readily distinguishable here. There the court held "[a] party is not obligated . . . to include within its charts or summaries its opponent's version of the facts." *Id*. at 1072–73. Defendants make no claim that the charts should have included Defendants' "version of the facts." Rather, the charts should have been excluded because the government's color scheme and commentary turned what should have been objective data into an argumentative tool.

The government claims the jury could have found that the "red" orders in the chart were manipulative based on testimony, but the color scheme guided the testimony, exacerbating the charts' prejudicial effect. The government's contention that the numbers it imposed onto the charts "listed the annotations in chronologically *[sic]* order as the actions appeared," Opp. Br. at 26 n.22, is not accurate. In chart 4 of GX 451, for example, step two states, in part, "74 orders to sell 740 total contracts," step three states, "Buys 30 contracts (24 while sell orders active)," and step four states, "Cancels all 740 sell contracts." These notations suggest Mr. Nowak placed 74 orders to sell, then executed 30 orders to buy, then canceled all 74 orders to sell. But in reality these actions did not occur in this order. It is true that "multiple charts contained more than just numbers [1]

through [4] in the annotation boxes," Opp. Br. at 26, but many of those annotations were improper under Rule 1006 as well, Mot. at 24–25. In any event, the presence of that information does not render the government's numbering scheme less argumentative or misleading.

The color scheme and argumentative annotations—particularly in combination—push the charts well past "neutral compilation without opinion," such that they should never have been provided to the jury as Rule 1006 evidence. *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 933 (C.D. Ill. 2014) (noting "much of" a witness's work would not satisfy Rule 1006 on those grounds). That Defendants had the opportunity to argue the charts' infirmities does not neutralize the powerful impact of providing the charts—the cornerstone of the government's case—to the jury during its deliberations.[8] The interests of justice accordingly warrant a new trial.

### (8) The Admission of Prof. Venkataraman's Flawed Expert Testimony Was Not Cured by Cross-Examination and Requires a New Trial

The government offers no defense of the unreliable substance of Prof. Venkataraman's expert testimony. Rather, the government argues that because the Court denied Defendants' pretrial motion to exclude this testimony, cross-examination was an adequate remedy. But the opportunity to cross-examine was no cure because Prof. Venkataraman's testimony was "not merely shaky: it [was] unreliable," and "expert testimony that is not scientifically reliable should not be admitted." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818–19 (7th Cir. 2010). That principle carries maximum force in a criminal jury trial.

Indeed, rather than address the fact that cherry-picking and failure to consider alternative explanations are unscientific practices that disqualify testimony under *Daubert, see Van v. Ford*

---

[8] The government denies, without elaboration, that the jury's request for a "chart depicting 'normal trading activity'" reveals its focus on the contested exhibits. Opp. Br. at 25 n.21. But the fact that this was the *only substantive question* the jury posed makes clear that the jury placed great weight on the improperly admitted charts.

*Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019); *Wendler & Ezra, P.C. v. Am. Int'l Grp.*, 521 F.3d 790, 791 (7th Cir. 2008), the government contends that Defendants "incorrectly assert in their Motion that Professor Venkataraman conceded that he had cherry-picked the data he examined." Opp. Br. at 22 n.23. Defendants made no such claim, and that is entirely beside the point, because Prof. Venkataraman *did* concede that cherry-picked data cannot be relied on and that it is improper to rely on a data sample if the selection criteria used to generate the sample are unknown—issues that plagued his own analysis. *See* Mot. at 26.

The unfair prejudice to Defendants was substantial because the government succeeded in cloaking its theory of the case with supposed scholarly expertise based on nothing more than unscientific conjecture, and thereby bolstered the improper lay opinion of four other government witnesses. We respectfully urge the Court to look past its pretrial ruling and remedy this clear harm by ordering a new trial at which Prof. Venkataraman's expert opinion will be excluded.

### (9) Robert Sniegowski's Opinion Was Not Grounded in the CME's Rules and Defendants Were Improperly Denied an Adequate Opportunity to Rebut It

The government argues Mr. Sniegowski's opinion—that, throughout the period 2008–16, the CME required that orders be placed with an intent (i.e., a desire) to trade—was "grounded firmly in CME rules," Opp. Br. at 23, but does not (and cannot) point to any testimony that establishes this. The definition of a bona fide order as one that a trader wants to trade appears nowhere in the CME's rules, and certainly not in rules that were in effect in 2008, the beginning of the relevant period in this case. Mr. Sniegowski's testimony regarding CME Rule 575 does not demonstrate a basis for this opinion. Rule 575, which was not in effect until September 2014, prohibits placing orders with the intent to cancel them before execution (i.e., spoofing). But that is not equivalent to prohibiting the placement of orders without the desire to trade. *See* Mot. at 28 n.23. Mr. Sniegowski conflated those concepts and created a new definition of a bona fide or good-

faith order—one without basis in the CME's rules—and then read that flawed definition into various vague provisions of Rule 432 to bolster his opinion. This is not appropriate expert testimony and should have been excluded.

The Court also erred in curtailing Defendants' efforts to rebut Mr. Sniegowski's flawed opinion. *First*, the Court excluded the testimony of Scott Early, who would have squarely undercut Mr. Sniegowski. The government defends this extreme remedy by pointing out Mr. Early was not an active member of the futures industry. Opp. Br. at 24–25 (citing *Goldberg v. 401 North Wabash Venture LLC*, 755 F.3d 456 (7th Cir. 2014)). But *Goldberg* merely observed that an expert *was* an active member in approving his testimony; it by no means made active membership a requirement to testify as an industry expert. *See id*. at 462 (holding expert can "testify about the state of knowledge prevalent in a business that he has studied, and in [the expert's] case is also a member of."). Mr. Early has decades of relevant experience in the commodity futures industry (including following his time at CBOT), which provide a solid basis to opine on what orders in the futures market represent, particularly in a trial where the government's witnesses had free rein to offer opinions with little regard to their foundation. Indeed, the government's argument misses the point—the representations conveyed by an order did not change after Mr. Early stopped working in the futures industry, and Mr. Nowak should have been permitted to elicit Mr. Early's competing opinion.

*Second*, the Court excluded DX 493, the 2011 CME comment letter stating that orders do not create an appearance of "false market depth," which contradicted Mr. Sniegowski's opinion that, under the CME's rules, orders placed without the intent to trade carry false representations. The government dismisses the letter as an "advocacy paper" and "not an admission by the CME." But surely the CME was advocating to the CFTC a position it believed to be true, and, in any

event, there is no basis in the law for making such a distinction. Moreover, Mr. Sniegowski told the jury about his decades of experience at the CME and claimed his view about what an order represents was widely held. The jury should have been made aware that the CEO of Sniegowski's employer suggested otherwise in a letter to the CFTC. That Mr. Sniegowski may have been unaware of the letter is no reason to shield him from it. Opp. Br. at 25. Indeed, his lack of knowledge would have further undercut his testimony. Nor does the risk of confusion justify excluding the letter. That the jury may have been puzzled as to why Mr. Sniegowski offered an opinion at odds with a position the CME took during his tenure is precisely why the letter is relevant: It undermines the credibility of his testimony and should have been admitted.[9]

### (10)    The Government Fails to Address the Prejudice Resulting from Its Baseless Claim that Mr. Nowak Was Under Investigation by the CFTC

The government does not engage with Defendants' argument that they were unfairly prejudiced by Special Agent Bowden reading excerpts from Mr. Nowak's CFTC testimony that highlighted the fact that this testimony occurred during an "investigation" into "silver prices," which encouraged the jury to infer that Mr. Nowak was under investigation by the CFTC, when, in fact, he was not. The government similarly ignores the fact that it compounded the problem by falsely claiming in its closing argument that Mr. Nowak had been "under investigation by the federal agency that regulates the futures markets" at the time he gave his testimony, Trial Tr. at 3942:17–22, pressing on the jury one of the incorrect inferences the defense successfully litigated to avoid. Rather than trying to defend its conduct, the government faults Mr. Nowak's counsel for "wait[ing] until the next day" to object, and claims its improper comment at closing "did not create

---

[9]    We note that in *United States v. Bases*, Judge Lee ruled defendants could cross-examine Mr. Sniegowski about the same statement Defendants sought to admit. *See id*, Trial Tr. at 194:23–200:17, ECF No. 634.

any unfair prejudice." Opp. Br. at 26–27. That Mr. Nowak's counsel sought a curative instruction the next day rather than during the government's closing does not excuse the government's baseless comment—nor did the 80-minute length of the argument cure the error. The cumulative effect of reading portions of Mr. Nowak's CFTC testimony and then intentionally leading the jury to conclude he lied because he believed he was under investigation created a false and highly inflammatory impression that he was investigated by the CFTC regarding silver prices.

### (11) Admission of JPMorgan Compliance Documents Containing Misstatements of Law Unfairly Prejudiced Defendants

The government's strawman attacks do not address the substance of Defendants' argument—that Defendants were unfairly prejudiced by the reading of misstatements of law to the jury, and the Court's limiting instruction regarding the government's compliance-related exhibits was inadequate to address the substantial risk of unfair prejudice to Defendants.

The government notes that "defendants take issue with the limiting instruction regarding the JPMorgan compliance materials," Opp. Br. at 27, but fails to offer a meaningful response to Defendants' arguments, relying instead on the "general presumption that juries follow their instructions." *Id.* at 28. The government misses the point. Even if the jury followed the instruction that accompanied Messrs. Edmond's and Troiano's readings of the compliance-related exhibits to the letter, jurors still could have made improper and unfairly prejudicial use of the misstatements of federal law they heard, for the simple reason that the Court's limiting instruction did not comment on (let alone admonish the jury regarding) the misleading interpretations and summaries of federal law contained in the exhibits. Instead, the Court's instruction focused exclusively on how the jury should use evidence that a *JPMorgan Compliance policy* had been violated, and was silent on how the jury should consider the statements within the compliance policies that focused on the substance of relevant federal law. Thus, there was nothing to stop the jurors from misusing

the misstatements of law in the compliance-related exhibits to inform their understanding of the substantive law they would be asked to apply during their deliberations.

The government relies on this insufficient limiting instruction as a supposed catchall cure for the unfair prejudice that Defendants suffered as a result of this testimony. But as the Court's instruction did not address the concerns raised in the Motion, the result was unchecked prejudice resulting from the introduction of misstatements of fundamental legal principles, with no direction as to their appropriate use by the jury.

### (12) Exclusion of Mr. Smith's Demonstrative Exhibits DX 621–623 as Untimely Was Erroneous and Unfairly Prejudicial

DX 621, 622, and 623 are demonstrative exhibits compiled by Mr. Smith to show the jury specific respects in which the government's trading charts—perhaps the most significant category of evidence introduced by the government—are selective and misleading. *See* Mot. at 35. The Court's exclusion of these exhibits because they were disclosed three business days after an agreed date for the exchange of demonstrative exhibits, and more than three weeks before those exhibits would have been introduced at trial, was, as other courts have recognized, "an 'extreme' sanction" that should be reserved for circumstances in which a party "willful[ly] dece[ives]" its adversary or "flagrant[ly] disregard[s]" the Court's orders. *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977). In a criminal case, the exclusion of such material "distorts the record at the risk of misleading the jury into convicting an innocent person." *Pulinario v. Goord*, 291 F. Supp. 2d 154, 174 (E.D.N.Y. 2003), *aff'd*, 118 F. App'x 554 (2d Cir. 2004). Mr. Smith's brief delay in disclosure, along with the incidental prejudice, if any, visited upon the government by this delay, does not support their wholesale exclusion, and Mr. Smith respectfully requests that the Court grant a new trial so he can present this exculpatory material to the jury.

Here, a brief delay of three business days (or five calendar days) would not have deprived

the government of the ability to analyze these three demonstrative exhibits as to merit the extreme remedy of outright preclusion.[10] Crediting the government's claimed need for time to review such exhibits (as the Court did here), Mr. Smith's delay at most warranted a brief continuance of the trial between the government and the defense case to ameliorate any potential prejudice, not an outright deprivation of the opportunity to offer critical defense material.[11]

In its Opposition, the government argues that the exclusion of DX 621, 622, and 623 was not sufficiently prejudicial to warrant a new trial because, unlike the material at issue in the cases cited by Defendants, they are demonstrative exhibits that merely provide a different perspective on underlying evidence. Opp. Br. at 30–31. This disregards a reality with which both sides contended at trial: the underlying evidence depicted in the excluded demonstratives, like that depicted in the government's own trading charts, consists of digital spreadsheets containing millions of units of disparate data that, on their own, are indecipherable and meaningless. It was for this reason that the government itself encouraged the jury to eschew reviewing those spreadsheets and rely instead on the government's trading charts. Trial Tr. 3925:12–17. Mr. Smith was unfairly prejudiced by the Court's refusal to permit him to present counterevidence in a similarly accessible and digestible fashion.

**(13)    Ari Nakkab's Exculpatory Statements Were Unambiguous and Should Have Been Admitted Through an Alternate Witness**

The two-sentence statement at the end of Ari Nakkab's April 29, 2011, email to Kenneth Raisler was powerful, exculpatory evidence of communications between JPMorgan Compliance

---

[10]    Perhaps such a preclusion would have been justified if the defense sought to spring these exhibits on government witnesses during cross examination, depriving them of an opportunity to review the exhibits and confirm their accuracy and relevance. But that is not what Mr. Smith intended, and the Court could in any event have addressed that concern simply by constraining the use of those exhibits to the defense case.

[11]    Indeed, the Court was prepared to continue the trial for two trial days for administrative reasons.

and the JPMorgan precious metals desk regarding the need to place orders on the other side of the market to appropriately "counteract" the activity of algorithms that would "automatically and instantly" place bids or offers in front of one's own bids or offers. ECF No. 711-6. The government argues the email could only be introduced through Mr. Nakkab—the author—rather than Mr. Raisler—the recipient—because Mr. Raisler could not explain what Mr. Nakkab meant when he used "ambiguous terms" such as "sometimes," "necessary," "counteract," and "disrupt the normal trading day." Opp. Br. at 32.[12] But the government fails to explain where the ambiguity lies— because, respectfully, there is no meaningful ambiguity here. The email was clear enough on its face, and Mr. Raisler could have provided any additional context to support its introduction.

The email is strongly corroborative of the defense theory of the case, and one need not know precisely "what Nakkab meant" with each word, as the government argues, Opp. Br. at 32, to understand the statement. As the statement itself explains, "counteract" means "to put in orders on the other side of the market" so that the algorithms "do not jump in front of orders." The phrase "sometimes necessary," at an absolute minimum, conveys a perception of occasional need. And "disrupt[ion of] the normal trading day" results from algorithms "jump[ing] in front of orders," which is what gives rise to the "necess[ity]" of the described practice. The frequency of "sometimes" and the extent of the "disrupt[ion]" is entirely beside the point; and the government would have been free to cross-examine Mr. Raisler and to argue from any purported ambiguity. It also could have called Mr. Nakkab as a rebuttal witness if it believed Mr. Raisler had misconstrued his words. But in light of the plain meaning of the statement, and particularly given that Mr.

---

[12] In the email, under the headings "Spoofing" and "More controversial," Mr. Nakkab wrote: "When executing normal sized orders, there are existing electronic algos that will automatically and instantly b/o [bid or offer] by looking at size of volume on both sides of the mkt. In order to <u>counteract</u> this algo activity, it is <u>sometimes necessary</u> to put in orders on the other side of the market so they do not jump in front of orders and <u>disrupt the normal trading day.</u>" ECF No. 711-6 (emphasis added).

Nakkab was functionally unavailable to the defense as a result of the government's unconstitutionally coercive conduct, *see* Mot. at 39–44, it was error to preclude the defense from introducing this exculpatory evidence through Mr. Raisler, which warrants a new trial.

**3.      AT A MINIMUM, DEFENDANTS ARE ENTITLED TO AN EVIDENTIARY HEARING ON WHETHER THE GOVERNMENT UNLAWFULLY INTERFERED WITH ARMAND NAKKAB AS A DEFENSE WITNESS**

In response to the argument that the government unlawfully interfered with the testimony of Armand Nakkab as a prospective defense witness, the government alleges that "no actual evidence supports this specious allegation," stating that "the record establishes only the non-controversial fact that Nakkab's counsel was told that Nakkab was a subject, and Nakkab denied knowledge of that fact." Opp. Br. at 32–33. This mischaracterizes the record.

As an initial matter, the record does not "establish" what Mr. Nakkab did or did not know about being a subject of the government's investigation, nor does it "establish" that the government did not exert undue influence on Mr. Nakkab and/or encourage false testimony. Mr. Nakkab did not testify under oath about whether he knew he was a subject or whether any threats or promises were made to him in exchange for testifying against Mr. Smith, nor did the government provide a sworn affidavit from Mr. Nakkab or his lawyers to this effect. Instead, the government relies solely on its own unsworn statement to the Court at sidebar that Mr. Nakkab told the government he was unaware he was a subject and unsworn statements in its brief that it did not unlawfully interfere with his testimony. This is insufficient. The government's word is not gospel, and it is not exempt from backing up its claims with actual proof, *see, e.g.*, *United States v. Alexandre*, No. 22 Cr. 326, 2022 WL 16798756, at *3–4 (S.D.N.Y. Nov. 8, 2022) (finding unsworn statements from the government in briefing and at oral argument insufficient), particularly where, as here, the government's story is not credible. It requires the Court to accept, among other things, that Mr. Nakkab's lawyers, whom the government alleges were aware of his status as a subject, arguably

22

violated ethical rules in withholding from him that status. *See, e.g.*, Model Rules of Prof'l Conduct r. 1.4, cmt. 7 (Am. Bar Ass'n 1983) (explaining how withholding information from a client is only warranted if mandated by a rule or court order or if immediate disclosure would cause the client to act imprudently). One of his lawyers is a former federal prosecutor who spent twenty years in the Fraud Section of the Criminal Division of the Department of Justice; for the government to suggest so casually that he arguably violated his ethical duties, without providing the Court with any proof from Mr. Nakkab or his lawyer (while simultaneously accusing the defense of making "spurious allegations" against the government's counsel) is, to use the government's own language, "absurd." Opp. Br. at 33–34 n.28.

What the record *does* establish is that Mr. Nakkab completely and unequivocally viewed Defendants' pattern of trading as lawful until an hours-long meeting with the government and before a pattern of conduct by the government that supports an inference that improper pressure was placed on Mr. Nakkab to change his narrative in several critical and damaging ways:

*First*, the record shows that the government has threatened another witness who failed to confirm the government's story. As explained above, the government does not dispute that it told Mr. Trunz that, if he cooperated, the government would allow him to plead guilty in a jurisdiction that it represented was more lenient, but if he continued to maintain his innocence, the government would indict him in what it perceived was a harsher jurisdiction.[13] Mot. at 4-5 (citing Trial Tr.

---

[13] The government opposes Defendants' characterization of its statement as a threat based solely on Mr. Trunz's testimony that he did not "feel" threatened. Opp. Br. at 4 n.4. Mr. Trunz's purported post-hoc feelings are beside the point. In any event, that an alleged coconspirator who has pleaded guilty pursuant to a cooperation agreement and is awaiting sentence testified that he did not believe the government's actions were improper is far from surprising. He had everything to lose if he testified against the government at that point. Regardless of whether Mr. Trunz's testimony is credible, retaliating against a defendant for exercising his constitutionally protected right to trial—which the government does not dispute it said it would do if Mr. Trunz failed to cooperate—is unlawful and a violation of due process. *See United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003).

23

2447:15–21). Notably, Mr. Smith and Mr. Nowak were indicted in the Northern District of Illinois, whereas Mr. Trunz pled guilty in the Eastern District of New York, despite all three working (and allegedly conspiring) together in New York. The government has provided no alternative explanation for the differential treatment of similarly situated defendants.

*Second*, the record shows that the government has a history in this case of leaving material information out of its disclosures. For example, the government never memorialized the "choice" it presented to Mr. Trunz (notably, the government also failed to disclose this to the court that presided over Mr. Trunz's guilty plea when asked if any promises or threats were made that were not reflected in his plea agreement, *see* Mot. at 4 n.4). Nor did the government memorialize a prep session with Mr. Edmonds in which he disclosed, for the first time, that Mr. Ruffo allegedly encouraged him to spoof, despite a prior FBI Report stating that Mr. Edmonds recalled no such encouragement. Trial Tr. 1648:10-1659:25. Thus, the fact that there is no direct evidence that the government put any improper pressure on Mr. Nakkab is not dispositive.

*Third*, the record shows that the government has misled the Court in this case. Specifically, as referenced in Defendants' moving brief, the government repeatedly assured the Court of its plans to call as a witness, Luisa Graziani, who resided overseas outside the Court's subpoena power, despite having already told Ms. Graziani's counsel that she would not testify. *See* Mot. at 44 n.37. In light of the government's previous lack of candor with the Court, its statements that it did not improperly interfere with Mr. Nakkab's testimony should not be credited.

*Finally*, there is no other plausible explanation for Mr. Nakkab's complete about-face. As detailed in Defendants' moving brief, Mr. Nakkab thoroughly reviewed more than a month of Mr. Smith's trade data, physically watched Mr. Smith execute the exact trading strategy at issue here, concluded (after consultation with JPMorgan's in-house counsel) that it was not unlawful, and

24

defended this conduct to the CME and even the government here. (Mot. at 40.) Mr. Nakkab told

the grand jury, however, that "new information" caused him to now conclude the exact opposite—

Mr. Smith was spoofing. *See, e.g.*, Cogan Decl. Ex. J, Nakkab Grand Jury Tr. 66-67, ECF No.

711-1. Yet there was no "new information" that he reviewed, just additional examples of trade

data that followed the same exact pattern as trade data that he previously reviewed and defended.

At a minimum, an evidentiary hearing is required, as the Court cannot assess the

government's or Mr. Nakkab's credibility without first hearing testimony. *Cf. Blackledge v.

Allison*, 431 U.S. 63, 82 n.25 (1977) ("When the issue is one of credibility, resolution on the basis

of affidavits can rarely be conclusive . . . ." (citation omitted)); *Sawyer v. United States*, 874 F.3d

276, 278 (7th Cir. 2017) (a district court is required to hold a hearing on a motion to vacate a

sentence "[u]nless the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief" (quoting 18 U.S.C. § 2255(b))).

## 4. THE COURT ERRED IN UPHOLDING PRIVILEGE ASSERTIONS BY THE CFTC AND JPMORGAN

### (1) The CFTC Failed to Meet Its Burden of Establishing that the Bessembinder Analysis is Privileged

In response to Defendants' contention that the Court erred in upholding the CFTC's claim

of deliberative-process privilege over an analysis conducted by Dr. Hendrik Bessembinder, the

government addresses only one of the four arguments raised by Defendants: that courts regularly

decline to extend the privilege to government agencies' discussions with third-party consultants.

But even if the privilege could properly be extended to the CFTC's communications with Dr.

Bessembinder, that only begins the inquiry. To rightly uphold the privilege claim, the Court would

have needed to further conclude that the withheld analysis was "deliberative—reflecting the give

and take of the consultative process." *Holmes v. Hernandez*, 221 F. Supp. 3d 1011, 1016 (N.D. Ill.

2016) (citation omitted). Yet in ruling on the CFTC's motion to quash Mr. Smith's subpoena

seeking this analysis, the Court found the opposite: that the analysis "do[es] not literally contain discussions about whether or not to bring an enforcement action against Smith." Order at 12, ECF No. 191. This observation alone should have defeated the CFTC's claim of deliberative-process privilege, especially insofar as that privilege "must be strictly confined within the narrowest possible limits consistent with the logic of [its] principles." *K.L. v. Edgar*, 964 F. Supp. 1206, 1208–09 (N.D. Ill. 1997) (alteration in original) (citations omitted). The Court's decision to nonetheless uphold the privilege because Mr. Smith had provided "no reason to doubt" that they were deliberative, Order at 12, ECF No. 191, was, respectfully, an erroneous inversion of the burden, which rests with the one invoking the privilege, not the party seeking disclosure. *See, e.g.*, *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 796 (N.D. Ill. 2015).

In addition, the government fails to address two further arguments raised by Mr. Smith. *First*, the CFTC waived any privilege over the Bessembinder analysis when it offered to produce that analysis to the Department of Justice; the deliberative-process privilege applies only to "intra-agency communications," not to information shared freely *between* government agencies that may separately be engaged in their own internal deliberations. *Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1055 (9th Cir. 2019). And *second*, because the deliberative-process privilege is not absolute, the Court's failure to engage with Mr. Smith's showing of a particularized need for the Bessembinder analysis was also error. Mr. Smith respectfully submits that, had the Court engaged in this necessary inquiry, it could only have reached one conclusion: that disclosure of the Bessembinder analysis was warranted despite any claim of privilege. Accordingly, Defendants request a new trial at which Mr. Smith is permitted to present to the jury the results of Dr. Bessembinder's analysis of Mr. Smith's trading.

### (2) The Court Erred in Upholding JPMorgan's Assertion of Privilege

*First*, with respect to the CME Debrief Documents, the government asserts that they are

26

privileged because the Court held that they were "exactly the sort of communications a client would want to cc: counsel in order to ensure that counsel did not disagree from a legal-representation standpoint." Opp. Br. at 36. But this is not the standard. Rather, the documents are privileged only if the "primary or predominant purpose" of these documents was to "render or solicit legal advice," *BankDirect Cap. Fin., LLC v. Cap. Premium Fin. Inc.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018), and courts have rejected assertions of privilege where, as here, a lawyer is copied to be made "aware of the situation" and no legal advice is actually sought. *Wierciszewski v. Granite City Ill. Hosp. Co.*, No. 11-cv-120-GPM-SCW, 2011 WL 5374114, at *1–2 (S.D. Ill. Nov. 7, 2011). *Second*, with respect to the Trade Analysis Documents, the government states that they are privileged against Mr. Smith because his engagement letter with his and JPMorgan's joint counsel "made clear that JPMorgan—not defendant Smith—retained the right to invoke the privilege (which JPMorgan did) if a conflict arose between the bank and defendant (which it has)." Opp. Br. at 36. But that is factually incorrect. The engagement letter does not give JPMorgan the right to *invoke* the privilege against Mr. Smith; it gives JPMorgan the sole right to *waive* the privilege against third parties. JPMC Opp'n to Mot. to Compel Ex. A, ECF No. 528. Nothing in the engagement letter or the applicable law supported withholding these documents from Mr. Smith.

## 5. DEFENDANTS WERE ENTITLED TO THEIR PROPOSED JURY INSTRUCTIONS

The government dismisses offhand Defendants' argument that, unlike in other fraud cases, a good-faith instruction regarding the element of intent to defraud was necessary here given that Mr. Trunz's testimony introduced the idea that it is possible to have the intent to deceive but act in good faith. Mot. at 38 n.30. The government states that Defendants' "claim" regarding Mr. Trunz's testimony is not supported by the record. *Id.* But as explained in the Motion, Mr. Trunz, who did not plead guilty to fraud, testified that he was "trying to deceive other market participants"

27

yet did not believe his orders were "fake" or "deceptive," and instead thought of them as "fair game." Mot. at 50. This introduced the faulty premise that a person who allegedly engaged in the same conduct as Defendants could criminally intend to deceive other market participants without understanding the orders themselves to be deceptive or fraudulent. The proposed instruction was needed to inform the jury that such a person lacks the intent to defraud. The confusion injected by Mr. Trunz's testimony further warranted the proposed good-faith instruction.

The government also incorrectly claims that Defendants' proposed theory-of-defense instruction—that Defendants believed they were permitted to have orders on both sides of the market and to prefer one side over the other, and thus lacked the intent to defraud in placing the allegedly fraudulent orders—was neither supported by the evidence nor a correct statement of law. Opp. Br. at 39. Puzzlingly, in claiming that such a charge was unsupported by the evidence, the government acknowledges the opposite: there was no dispute that traders may place orders on both sides of the market and that they can prefer one side or the other. *Id*. Nor can the government explain how the proposed instruction misstates the law. If a trader places orders on both sides of the market while preferring one side over the other, and believes such behavior is permitted in the market, he necessarily lacks the intent to defraud with respect to the orders on the nonpreferred side. The jury should have been instructed on this theory. *See United States v. Cruse*, 85 F.3d 795, 814 (7th Cir. 2015) (setting forth factors for including theory-of-defense charges).

Finally, the government argues that Defendants' proposed materiality instruction—which stated that deception about negotiating positions is not material to wire fraud, and that schemes that do no more than cause purported victims to enter into transactions they otherwise would have avoided are insufficient to prove fraud—was unnecessary and would have been unhelpful to the jury. Opp. Br. at 40. To the contrary, the instruction was necessary because of the government's

constant conflation of Defendants' supposed *misrepresentations* with the *orders* that purportedly conveyed them. Indeed, in recent oral argument in another fraud case, the Supreme Court signaled skepticism with the premise that "a deprivation of economically valuable information is enough to prove fraud." Oral Arg. Tr. 52:9–19, *Ciminelli v. United States*, No. 21-1170 (S. Ct. Nov. 28, 2022). Yet the failure to give the requested instruction here invited the jury to convict precisely on that basis, without finding Defendants did anything more than place *orders* that led other market participants to make trades they otherwise would not have. If Defendants' purported *misrepresentations* did not result in anyone receiving less than they bargained for, then there was no fraud, and the jury should have been instructed accordingly. For this reason, and for the related reasons argued in Defendants' Rule 29 briefing, this was a proper and necessary instruction, the denial of which deprived Defendants of a fair trial.

6.  **THE COURT'S ORDER TO THE DEADLOCKED JURY TO KEEP DELIBERATING AND ITS AFFIRMATIVE INSTRUCTION AFTER THE JURY IDENTIFIED A DEFENSE HOLDOUT JUROR WERE UNDULY COERCIVE**

The Court's communications to the jury after it signaled it was deadlocked and after it identified a defense holdout juror unduly coerced the jury's verdict. While the government contends that the length of deliberations did not warrant a mistrial given the length of the trial, it cites no caselaw in support. Opp. Br. at 42. The timing of the deadlock note in this case—after more than a week of deliberations, following two-and-a-half weeks of testimony—is unlike that in other cases in which courts repeated the *Silvern* instruction. *See* Mot. at 53 (citing cases). The government further argues that instructions to continue deliberating are not coercive and that repeating a deadlock instruction is less coercive than first issuing the instruction in response to a deadlock note. Opp. Br. at 41–42. But these arguments fail to explain how the *Silvern* instruction— as repeated by the Court to this deadlocked jury—did not unduly coerce unanimity in the "context and under all the circumstances" of this case. *United States v. Blitch*, 622 F.3d 658, 669–70 (7th

Cir. 2010) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)) (cleaned up). When the jury reported that it was deadlocked, it had determined, after full deliberation, that it could not reach a consensus on any of the counts. *See* Juror Notes at 10, ECF No. 674. The Court should have declared a mistrial; repeating the *Silvern* instruction in that context coerced jurors into surrendering their honest opinions in order to reach a verdict.

Moreover, the Court's targeted instruction about a lawyer's statements not being evidence in response to the jury's report about a single holdout juror was unnecessary and led to an unduly coerced verdict. Contrary to the government's suggestion, the note did not state that the holdout juror "prematurely made up their mind" before hearing all of the evidence. *See* Opp. Br. at 43. Nor did it state that the holdout juror had determined how they would vote based on opening statements, or refused to consider countervailing evidence presented by the government. Indeed, the note reported that the holdout believed their were "taken out of context," Juror Notes at 14, ECF No. 674, suggesting that the "concerns" noted by certain jurors may have resulted from a misunderstanding. *Id.* As we noted at trial, any further communication by the Court singling out the attorney-statement instruction was unnecessary and not neutral. *See* Trial Tr. at 4250:14–4251:17. In this context, the Court's targeted instruction would have been interpreted by the jury as agreeing with the jurors' reporting concerns that it was improper to view evidence from a particular lens, and disapproving of the holdout juror's position. *Cf. Blitch*, 622 F.3d at 669–71.

The Court should have thus declared a mistrial rather than repeat the *Silvern* and attorney-statement instructions in response to the juror notes, and a new trial should be granted on that basis.

## CONCLUSION

For the reasons set forth above and in the Motion, the Court should order a new trial pursuant to Fed. R. Crim. P. 33(a).

Dated: December 6, 2022

Respectfully submitted,

/s/ David Meister
David Meister
Chad E. Silverman
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-2100

William E. Ridgway
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0449

*Counsel for Michael Nowak*

/s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola
Christopher S. Cogburn
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6108

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
(202) 664-1935

*Counsel for Gregg Smith*