# Appendix A

Memorandum

United States Department of
Justice, Criminal Division



| Subject | Date |
|---|---|
| *United States v. Gregg Smith*, 19 CR 669 | September 21, 2022 |

To:  U.S. Probation Office          From:   Lucy Jennings
                                            Matthew Sullivan
                                            Christopher Fenton
                                            Avi Perry
                                            U.S. Department of Justice
                                            Fraud Section

## GOVERNMENT'S VERSION OF THE OFFENSE: GREGG SMITH

Defendant Gregg Smith was the head gold trader on the precious metals desk at JPMorgan Chase Bank ("JPMorgan") in New York. He was charged in a second superseding indictment with the following counts: one count of conspiracy to conduct or participate in an enterprise engaged in a pattern of racketeering activity (Count One); one count of conspiracy to commit price manipulation, wire fraud affecting a financial institution, commodities fraud, and spoofing (Count Two); one count of attempted price manipulation (Count Three); eight counts of wire fraud affecting a financial institution (Counts Five through Twelve); one count of commodities fraud (Count Twenty-Four); and one count of spoofing (Count Twenty-Six). On August 10, 2022, a jury convicted Smith of all substantive counts (Counts 3, 5-12, 24, and 26) and acquitted him on the two conspiracy counts (Counts One and Two).

Sentencing for Smith is scheduled for February 22, 2023. Smith's co-defendant, Michael Nowak, is addressed in a separate version of the offense.

### I.     THE OFFENSE

####    A.     Overview of Scheme Conduct

The offenses of conviction involve a multiyear scheme to manipulate commodities prices and defraud other commodities traders. Defendant Gregg Smith was a precious metals trader in the New York office of a global financial institution, JPMorgan, between mid-2008 and 2016. In early 2008, Smith worked as a metals trader at Bear Sterns before it was acquired by JPMorgan. As part of his job, Smith electronically traded precious metals futures contracts on commodities

marketplaces (or "exchanges") that were owned and operated by the CME Group, Inc ("CME").[1] Between 2008 and 2015, Smith routinely engaged in an unlawful trading practice that was designed to, and did, defraud other precious metals futures traders and manipulate prices for his own, and JPMorgan's, benefit. The scheme involved the placement of thousands of orders that Smith did not intend to execute, a practice commonly referred to as "spoofing." *See* 7 U.S.C. § 6c(a)(5)(C). The purpose of these spoof orders was to deceive other traders about the existence of genuine supply and demand, so that Smith could profit off other traders' reactions to the false and misleading information that Smith inserted into the market. The scheme involved Smith, Michael Nowak (Smith's co-defendant and the head of JPMorgan's precious metals desk), and other traders at JPMorgan, including two traders who pleaded guilty, cooperated, and testified during Smith's trial: John Edmonds and Christian Trunz.[2]

The scheme worked as follows: if Smith wanted to purchase a gold futures contract (for example), he placed an order to buy, which he sometimes placed as an "iceberg" order.[3] To facilitate the execution of his buy order, Smith placed on the opposite side of the market multiple fully visible orders to *sell* at different price levels. The purpose of the sell orders was to create the illusion of supply—*i.e.*, to make other market participants believe (falsely) that there was genuine, sizable selling interest in the market. Other market participants reacted to Smith's sell orders by also placing sell orders, which had the effect of pushing prices down, toward where Smith's buy order was waiting to be executed. Once Smith's buy order was filled, he quickly canceled his sell orders to avoid them being filled.

---

[1] The CME, which is based in Chicago, is the world's largest financial derivatives exchange. A "futures contract" (or "future") is a legally binding agreement to buy or sell something at a later date. Precious metals futures contracts are futures contracts for the purchase and sale of certain metals, including gold, silver, platinum, and palladium. These precious metals futures contracts are considered commodities.

[2] *See United States v. John Edmonds*, 18 CR 239 (D. Conn.); *United States v. Christian Trunz*, 19 CR 375 (E.D.N.Y.).

[3] An iceberg order is a type of order that displays only a portion of the order's true size at any given time. For instance, a trader could place an iceberg order to sell 20 futures contracts, but choose to display only one contract to the market at a time. Once that one contract is executed, the next contract becomes visible, and so forth until the entire order is filled. The trial testimony established that an iceberg is a legitimate order type that traders routinely used to avoid moving market prices when they had large orders to execute.

The figure below is an example of Smith's unlawful trading for one of the counts of conviction (Count Seven):



In this figure, the blue shaded line shows the movement of the market price during the time period depicted. The trading sequence begins with Smith placing an order to buy one contract. This order, which is shown in green, is Smith's genuine order; he actually wants to buy one contract. For approximately the first half of this sequence, Smith is unable to buy his order; this is shown by the green line continuing without interruption. This is because the prevailing market price (depicted by the blue line) is above where Smith wants to buy; he wants to buy at a lower price than where the market is trading. Then, on the top of the chart (above the blue line), Smith places 23 orders to *sell* a total of 230 total contracts at seven different prices. These orders, which are in red, are Smith's spoof orders; he does not actually want to sell and is using these orders to convey false information to the market about the existence of supply. Because of the collective size of these orders (which together comprise approximately 61.7% of the entire market), other traders respond by also placing sell orders—which causes the market price to move lower, and ultimately for another trader to fill Smith's buy order at his desired price. That trade is shown by the green triangle. After Smith's buy order is fully executed, he cancels all of his sell orders; those cancelations are shown by the red Xs in the top right quadrant. Significantly, Smith was only able to fill his (green) buy order while he had his layered spoof orders to sell (red) active in

the market. Consistent with Smith's intent *not* to actually sell, he canceled his sell orders very quickly—in as little as 616 milliseconds—before any of his sell orders were filled.

### B. Evidence at Trial

### 1. Evidence of Smith's Manipulative Trading

The trial evidence showed that Smith's manipulative trading scheme involved thousands of spoof orders that were designed to defraud other precious metals futures market participants. The government introduced charts (like the one shown above) depicting hundreds of trading episodes by Smith, Nowak, Trunz, and Edmonds.[4] Edmonds and Trunz testified that all of these episodes were consistent with the fraudulent trading practices described above and inconsistent with any legitimate trading practice.

For Smith specifically, the government introduced 100 examples of such trading episodes, which spanned from January 2008 to April 2015. *See* Gov't Ex. ("GX") 450.[5] With respect to these 100 episodes, Professor Kumar Venkataraman, an economist at Southern Methodist University, testified that these episodes were not consistent with a trader actually trying to fill the spoof orders. Trial Tr. at 2735-2736. He testified that consistent with finance theory, "when you place a very large order which is made visible and you cancel the orders quickly after submission, those orders are not likely to fill" and "so it seems to be not consistent with an economically rational way to get the [spoof] orders filled." *Id.* at 2765. In fact, Professor Venkataraman testified that the characteristics of the large orders in these 100 episodes were consistent with a trader using those orders for the purpose of moving market prices and filling orders on the opposite side. In Professor Venkataraman's words, Smith's spoof orders resulted in "a significant shock to the market, a significant change in the visible contracts seen in the market, and other market participants respond to that signal." *Id* at 2750. Consistent with that view, Smith was able to fill his smaller orders 600 times faster when he had large orders active on the opposite side. *Id* at 2755.

The evidence at trial showed that Smith's unlawful trading practice was *not* limited to the 100 episodes presented at trial; instead, Smith engaged in manipulative trading on a frequent basis for over seven years. In support of this, both Edmonds and Trunz testified that the unlawful trading practice at the heart of the scheme was not limited to the episodes presented at trial. In addition, Professor Venkataraman testified that he conducted a broader analysis of Smith's trading between January 2008 and April 2015 to see whether the characteristics of these 100 episodes were seen more broadly across Smith's trading during this time period. Professor Venkataraman testified that the 100 episodes for Smith fairly represented the broader patterns seen in Smith's

---

[4] Although the jury acquitted on the conspiracy charge, the government respectfully submits that the Court should take all of the conspiracy conduct into account as relevant conduct that was proven, at a minimum, by a preponderance of the evidence. *See United States v. Shamah*, 624 F.3d 449, 459–60 (7th Cir. 2010) ("A sentencing court may consider conduct of which a defendant has been acquitted, as long as that conduct is proved by a preponderance of the evidence.").

[5] In addition to these 100 episodes, the government also introduced a number of trading sequences that were connected to contemporaneous e-communications ("chats"). *See* GX 463-467, 470-471, 473-476, 478-479, 482.

trading activity across hundreds of thousands of orders. *Id* at 2757; *see also* GX 499. This evidence shows a comfort and familiarity with this unlawful trading practice that is consistent with regular, repeated executions of the scheme for over seven years.

The testimony of the cooperators and Professor Venkataraman's analysis was further corroborated by the fact that in 2012-2015, the CME independently investigated Smith's trading and found that his trading style was consistent with spoofing. As discussed further below, in terms of the volume of Smith's spoofing specifically, the CME's investigation determined that Smith's trading for the month of July 2013 *alone* involved the placement of approximately 4,000 spoof orders.

### 2. Testimony of John Edmonds and Christian Trunz

At trial, two former traders on JPMorgan's precious metals desk both testified that they learned to spoof from watching Smith and saw Smith trade this way on a daily basis for years.

Edmonds explained that he learned to spoof from Smith, noting "showing size moves the market. It's the first thing that Gregg told me." Trial Tr. at 1585. Edmonds testified that he saw Smith spoof approximately three or four times a day, if not more. *Id.* at 931. Edmonds explained that the purpose of spoofing "is to manipulate the price, is to make people think that there's real supply and demand out there." *Id.* 1043. He testified that spoofing was a "lie" and "deceit" because it is "showing one thing and providing information that was false." *Id.* at 912.

Trunz testified that he saw Smith spoof "very often," most likely on a daily basis. *Id.* at 2291. Trunz testified that spoofing was a strategy "to deceive and place false volume into the marketplace" and that it was designed to deceive and manipulate others in the market "to execute of prices that we wanted to try to get them to execute on, that they necessarily wouldn't have executed on if we didn't." *Id.* at 2323, 2297.

### 3. Testimony of Corey Flaum

In addition to the testimony from Edmonds and Trunz, the trial also included testimony from a third trader, Corey Flaum, who worked with Smith in 2007-2008 while both were precious metals traders at Bear Sterns (which was later acquired by JPMorgan). *Id.* at 1796-97. Flaum testified that he observed Smith trade in the pattern that he now knows to be spoofing and that during this time, Flaum saw Smith spoof "several times per week on average, some days more, some days less." *Id.* at 1860. Flaum testified that spoofing is manipulative "because the process, when successful, moves the price artificially higher or lower." *Id.* at 1855. In addition, Flaum explained that spoofing "essentially sends signals to the market of fictitious supply or demand with the hopes that the market will respond accordingly and move against those orders to hopefully fill a genuine order." *Id.* at 1801.

### 4. CME's Investigation into Smith

As noted above, the evidence at trial showed that the CME investigated Smith between 2012 and 2015 for the exact type of trading at issue in this case. CME Investigator Brian Wika testified that the CME's investigation focused on an "order pattern of entering and cancelling 10 lot orders very rapidly," which "was akin to spoofing." *Id.* at 2022. Specifically, the CME found

that Smith "would place an iceberg order on one side of the market and subsequently place layers of exposed 10 lot orders on the opposite side of the market (the exposed side) in an apparent attempt to induce other market participants to trade opposite the iceberg order." *Id.* at 2022-23. Wika testified that an expanded review of Smith's trading activity "revealed similar patterns of activity in July and August 2013." *Id.* Wika testified that for the month of July 2013 alone, the CME identified 3,093 "successful spoof orders," (when Smith's genuine order on the opposite side of the market from his spoof orders were executed) and 1,001 "unsuccessful spoofs" (when Smith's genuine orders were not executed notwithstanding his spoofing on the opposite side of the market). The CME calculated that Smith's financial gain from spoofing in the month of July 2013 alone was approximately $62,450. *See* GX 228 at 9.

Moreover, as shown during trial, Smith lied to the CME investigators when asked about this type of trading during an interview in October 2013. In the interview, Smith was asked about a specific trading sequence and a layered group of orders on the sell side (similar to the red orders in the chart on page 3 above):

> Q: *Now those sell orders, do you want to trade those?*
>
> A: *Absolutely, and absolutely the answer is yes.*

As the testimony and evidence at trial showed, however, when Smith engaged in this trading pattern he was spoofing and did *not* want to trade his spoof orders.

**5.    Smith's Statements Under Oath**

At trial, the government also introduced a transcript from a February 2017 deposition in which Smith was questioned by investigators at the CFTC during a civil proceeding and acknowledged that he knew spoofing—that is, placing orders with the intent to cancel—was never permitted. Specifically, during the deposition, Smith was asked the following:

> Q: *When do you recall gaining an understanding that it was in violation of the rules and regulations to enter a trade without the intent to execute, when did you first learn that?*
>
> A: *I think it was always, you know, it was always an understanding that every trade you enter you are supposed to have an intent to execute.*

**6.    Evidence of Impact from Trading**

Robert Sniegowski, a representative from the CME, testified about the importance of honest trading for the market as a whole. He explained that if you want markets to have integrity, "you need to ensure that everybody is participating in the market on a level playing field." Trial Tr. at 637. With respect to market integrity, Sniegowski explained that this refers to "trust by the people that are using the market that people are observing the rules and trading in a way that's consistent with those rules so that the prices they you're obtaining are legitimately bona fide or good faith prices and they reflect the actual market at the time." *Id.* at 638.

Professor Venkataraman also testified about the impact of spoofing. He explained that

false information on demand and supply hurt market integrity because market participants are less confident that they are observing accurate prices. *Id* at 2717. In addition, those participants also factor in the risk of being cheated, which reduces trust in financial markets and such a reduction in trust would lead some investors to withdraw from the market entirely or reduce their participation. *Id*. Professor Venkataraman explained that if false interest is allowed to remain in the market for an extended period of time, it hurts investors who withdraw from the market, but it also hurts other investors because they have fewer counterparties to trade with. *Id*. Overall, misleading information that is allowed to stay in the markets affects the two essential functions of financial markets: price discovery (that the market is showing accurate prices) and liquidity (the ability to trade quickly or buy/sell quickly at a low cost) because there are fewer people participating in the market. *Id.*

In addition to these market-wide harms, the government has identified hundreds of victims who were affected by the defendant's spoofing; these victims include counterparties who traded with Smith's genuine orders while Smith had spoof orders active in the market. One of those victims testified at trial.

Specifically, David Pettey testified that his employer, Susquehanna International Group ("SIG"), used an "automated trading strategy" or "algorithm," to trade precious metals futures in the relevant time period. Pettey also testified that the strategy was designed to trade based on "a buy versus sell imbalance in the [order] book, so seeing how many contracts were bid versus how many contracts are offered." *Id.* at 2995. Pettey testified that the main input on the trading strategy was "whether or not there was an excessive number of buyers or contracts being bid versus contracts being offered." *Id*. at 2997. Pettey discussed one example from 2010 when SIG's trading strategy was a counterparty to Smith's genuine order while Smith had placed spoof orders on the opposite side of the market. *Id.* at 3004-05. For this example in which SIG sold a gold futures contract to Smith, Pettey testified that Smith's sell orders (the spoof orders) were very capable of influencing SIG's decision to sell because Smith's spoof orders "were the vast majority of the contracts being offered" and that if Smith's spoof orders were removed from the order book, he did not believe that SIG would have traded. *Id.* at 3005-06. Pettey also testified that spoofing practices affected his trading based on the evidence presented to him in this case. *Id.* at 3007.

## II.     SENTENCING GUIDELINES CALCULATIONS

### A.     Applicable Guidelines

The November 2018 Guidelines Manual applies to this case.[6]

### B.     Government's Offense Level Calculation

The base offense level is 7, pursuant to Guidelines § 2B1.1(a)(1).

Pursuant to Guideline § 2B1.1(b)(1)(K), the offense level is increased by at least 20 levels because the preliminary loss calculations show an actual loss amount that resulted from the scheme

---

[6] Using the Guidelines manual in effect at the time of the offense would produce a higher sentencing range.

to defraud of at least $9,500,000. The government will provide a declaration of Professor Kumar Venkataraman with the calculations that support this loss calculation. If the final figure places the defendant into a different loss band (*e.g.*, if it is more than $25,000,000), the government will provide a revised Guidelines calculation.

Pursuant to Guideline § 2B1.1(b)(2)(A), the offense level is increased by 2 levels because the offense involved 10 or more victims. Support for the inclusion of this enhancement will be included in the forthcoming declaration of Professor Venkataraman.

Pursuant to Guideline § 2B1.1(b)(10), the offense level is increased by 2 levels because the offense involved sophisticated means, including a layering strategy that was designed to trick algorithmic traders, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

Pursuant to Guideline § 3B1.1(b), the offense level is increased by 3 levels because Smith was a manager and supervisor of criminal activity that involved five or more participants. Specifically, the evidence at trial showed that JPMorgan's precious metals desk involved at least five or more individuals who were all engaged in the same scheme to manipulate the market. For purposes of this analysis, the evidence showed that the following traders were all involved in the same criminal activity: Nowak, Smith, Trunz, Edmonds, Michel Simonian, and Chris Jordan.[7] Smith acted as a supervisor because the evidence at trial showed that Smith was a senior member of the desk who taught others, including junior traders like Edmonds and Trunz, how to spoof.[8]

Pursuant to Guideline § 3C1.1, the offense level is increased by 2 levels because Smith willfully obstructed and impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offense and such obstruction related to Smith's offense of conviction and relevant conduct. Specifically, as noted above, Smith lied to the CME in 2013 when he was questioned by CME investigators as part of its spoofing investigation and told the CME that he "absolutely" intended to trade his spoof orders. As referenced in Application Note 4(B), this obstruction adjustment applies to "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."

### C. Government's Criminal History Calculation

Defendant has 0 criminal history points and is criminal history category I pursuant to Guidelines § 4A1.1(a).

---

[7] The evidence at trial showed that a London-based trader named Michel Simonian was fired from JPMorgan for spoofing. Chris Jordan is one of Smith's co-defendants who is scheduled for trial on November 30, 2022. Jordan was severed from the earlier 2022 trial because of space limitations related to the Court's COVID protocols.

[8] In the alternative, pursuant to Guideline § 3B1.3, the offense level should be increased by 2 levels because Smith used a special skill, mainly sophisticated trading in futures markets, in a manner that significantly facilitated the commission of the offense.

-8-

### D. Government's Guidelines Calculation

Based on the facts now known to the government, the anticipated offense level is 36, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 188 to 235 months' imprisonment.

## IV. RESTITUTION AND FORFEITURE

The government is not seeking forfeiture. Full restitution has been made available to victims through a corporate resolution between the United States and Smith's former employer, JPMorgan.

## V. INVESTIGATING AGENCIES AND AGENTS

The federal agency investigating this case is the Federal Bureau of Investigation. The FBI case agent is FBI Special Agent Marc Troiano, who can be reached at 212-384-2253.

## VI. VICTIM IMPACT STATEMENT

As Judge Tharp has recognized in another spoofing case, offenses that involve manipulation of the precious metals futures markets have a broad and "serious" impact on financial markets, even where the impact of any one trade is small. *See United States v. Zhao*, 18 CR 24 (N.D. Ill. Feb. 4, 2020) (sentencing hearing). This type of offense "threatens the integrity of the financial markets because it prompts people to question the lawfulness of the conduct and the good faith of the participants that operate the financial system and perpetuate the kind of thought process that says this system is rigged. It's rigged in favor of insiders and people who know how to manipulate it." *Id.* at 28. Further, because "so much of our economic welfare depends on capital markets and their efficient functioning…the economy suffers tremendously" when "people don't have confidence in the reliability of those markets." *Id.*; *see also* Sentencing Tr. 47:10-16, *United States v. Coscia*, 14 CR 551 (N.D. Ill. July 13. 2016) ("… well-functioning markets depend on accurate information, and that's the information concerning supply and demand. Inaccurate information skews the market. Now currently the traders not only use algorithms but they have direct lines to the market so that there's really nothing in between the trader and the market itself. That's a very serious crime and has serious consequences.").

In addition to the harm to the integrity of the precious metals futures markets, and the direct losses to the victims trading in those markets, Smith's conduct also was capable of affecting prices in correlated markets, including precious metals-based ETFs. *See, e.g.*, Trial Tr. at 1745–46, *United States v. Vorley*, 18 CR 35 (N.D. Ill.). Relatedly, while the government does not anticipate the need for any upward departures in this case, we would note that USSG § 2B1.1 Application Note 21(A) concerning "Upward Departure Considerations" states that "[t]here may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense" including in such cases where "[t]he offense created a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of a significant disruption of a national financial market." USSG § 2B1.1, Application Note 21(A)(iv).

cc: Jonathan Cogan, Matthew Menchel, and Sean Buckley (defense counsel)