# Appendix B

Memorandum

United States Department of
Justice, Criminal Division



| **Subject** | **Date** |
|---|---|
| *United States v. Michael Nowak*, 19 CR 669 | September 21, 2022 |

To:   U.S. Probation Office       From:   Lucy Jennings
                                          Matthew Sullivan
                                          Christopher Fenton
                                          Avi Perry
                                          U.S. Department of Justice
                                          Fraud Section

## GOVERNMENT'S VERSION OF THE OFFENSE: MICHAEL NOWAK

Defendant Michael Nowak was the head of the global precious metals trading desk at JPMorgan Chase Bank ("JPMorgan"). He was charged in a second superseding indictment with the following counts: one count of conspiracy to conduct or participate in an enterprise engaged in a pattern of racketeering activity (Count One); one count of conspiracy to commit price manipulation, wire fraud affecting a financial institution, commodities fraud, and spoofing (Count Two); one count of attempted price manipulation (Count Four); ten counts of wire fraud affecting a financial institution (Counts 13 through 22); one count of commodities fraud (Count 25); and one count of spoofing (Count 27). On August 10, 2022, a jury convicted Nowak of all substantive counts (Counts 4, 13-22, 25, and 27) and acquitted him on the two conspiracy counts (Counts One and Two).

Sentencing for Nowak is scheduled for February 24, 2023. Nowak's co-defendant, Gregg Smith, is addressed in a separate version of the offense.

### I.   THE OFFENSE

#### A.   Overview of Scheme Conduct

The offenses of conviction involve a multiyear scheme to manipulate commodities prices and defraud other commodities traders. Defendant Michael Nowak was a Managing Director and head of the precious metals trading desk of a global financial institution, JPMorgan, between 2008 and 2016, with Nowak working on the desk in New York (2008-2014) and London (2014-2016). As part of his job, Nowak electronically traded precious metals futures contracts on commodities

marketplaces (or "exchanges") that were owned and operated by the CME Group, Inc ("CME").[1] Between 2009 and 2014, Nowak routinely engaged in an unlawful trading practice that was designed to, and did, defraud other precious metals futures traders and to manipulate prices for his own, and JPMorgan's, benefit. The scheme involved the placement of orders that Nowak did not intend to execute, a practice commonly referred to as "spoofing." *See* 7 U.S.C. § 6c(a)(5)(C). The purpose of these spoof orders was to deceive other traders about the existence of genuine supply and demand, so that Nowak could profit off other traders' reactions to the false and misleading information that Nowak inserted into the market. The scheme involved Nowak, Gregg Smith (Nowak's co-defendant and the head gold trader on the desk), and other traders at JPMorgan, including two traders who pleaded guilty, cooperated, and testified during Nowak's trial: John Edmonds and Christian Trunz.[2]

The scheme worked as follows: if Nowak wanted to sell a gold future (for example), he placed an order to sell, which he sometimes placed as an "iceberg" order.[3] To facilitate the execution of his sell order, Nowak placed on the opposite side of the market multiple, fully visible orders to *buy* at different price levels. The purpose of the buy orders was to create the illusion of demand—*i.e.*, to make other market participants believe (falsely) that there was genuine, sizable buying interest in the market. Other market participants reacted to Nowak's buy orders by also placing buy orders, which had the effect of pushing prices up, toward where Nowak's sell order was waiting to be executed. Once Nowak's sell order was filled, he quickly canceled his buy orders to avoid them being filled.

---

[1] The CME, which is based in Chicago, is the world's largest financial derivatives exchange. A "futures contract" (or "future") is a legally binding agreement to buy or sell something at a later date. Precious metals futures contracts are futures contracts for the purchase and sale of certain metals, including gold, silver, platinum, and palladium. These precious metals futures contracts are considered commodities.

[2] *See United States v. John Edmonds*, 18 CR 239 (D. Conn.); *United States v. Christian Trunz*, 19 CR 375 (E.D.N.Y.).

[3] An iceberg order is a type of order that displays only a portion of the order's true size at any given time. For instance, a trader could place an iceberg order to sell 20 futures contracts, but choose to display only one contract to the market at a time. Once that one contract is executed, the next contract becomes visible, and so forth until the entire order is filled. The trial testimony established that an iceberg is a legitimate order type that traders routinely used to avoid moving market prices when they had large orders to execute.

The figure below is an example of Nowak's unlawful trading for one of the counts of conviction (Count 14):



In this figure, the blue shaded line shows the movement of the market price during the time period depicted. The trading sequence begins with Nowak placing an iceberg order to sell five contracts. This order, which is shown in green, is Nowak's genuine order; he actually wants to sell five contracts. For approximately the first third of this sequence, Nowak is unable to sell his order; this is shown by the green line continuing without interruption. This is because the prevailing market price (depicted by the blue line) is below where Nowak wants to sell; he wants to sell at a higher price than where the market is trading. Then, on the bottom of the chart (below the blue line), Nowak places 11 orders to *buy* a total of 55 total contracts at eight different prices. These orders, which are in red, are Nowak's spoof orders; he does not actually want to buy and is using these orders to convey false information to the market about the existence of demand. Because of the collective size of these orders (which together comprise approximately 55% of the entire market), other traders respond by also placing buy orders—which causes the market to move higher, and other traders to fill Nowak's sell order at his desired price. That trade is shown by the green triangle. After Nowak's sell order is fully executed, he cancels all of his buy orders; those cancelations are shown by the red Xs in the bottom right quadrant. Significantly, Nowak was only able to fill his (green) sell order while he had his layered spoof orders to buy (red) active in

the market. Consistent with Nowak's intent *not* to actually buy, he canceled his buy orders very quickly—in as little as 651 milliseconds—before any of his buy orders were filled.

B.  **Evidence at Trial**

1.  **Evidence of Nowak's Manipulative Trading**

The trial evidence showed that Nowak's manipulative trading scheme involved thousands of spoof orders that were designed to defraud other precious metals futures market participants. The government introduced charts (like the one shown above) depicting hundreds of trading episodes by Nowak, Smith, Trunz, and Edmonds.[4] Edmonds and Trunz testified that all of these episodes were consistent with the fraudulent trading practices described above and inconsistent with any legitimate trading practice.

For Nowak, specifically, the government introduced 100 examples of such trading episodes, which spanned from June 2009 to February 2014. *See* Gov't Ex. ("GX") 451.[5] With respect to these 100 episodes, Professor Kumar Venkataraman, an economist at Southern Methodist University, testified that these episodes were not consistent with a trader actually trying to fill the spoof orders. Trial Tr. at 2738-2740. He testified that consistent with finance theory, "submitting such very large orders that are visible that push the price away and then canceling them quickly after submission, which is what you see here as a strategy, once again to me appears to be inconsistent with a design that will fill the [spoof] orders." Professor Venkataraman testified that it is not economically rational to keep trading this way if you actually wanted those visible orders to be filled; therefore, in his opinion, the purpose of those large, visible orders was not to be filled but instead, to push the price so that Nowak can execute his orders on the opposite side of the market. *Id.* at 2739-40. In fact, Professor Venkataraman testified that the characteristics of the large orders in these 100 episodes were consistent with a trader using those orders for the purpose of moving market prices and filling orders on the opposite side. In Professor Venkataraman's words, Nowak's spoof orders resulted in "a significant shock to the market, a significant change in the visible contracts seen in the market, and other market participants respond to that signal." *Id* at 2750.

The evidence at trial showed that Nowak's unlawful trading practice was *not* limited to the 100 episodes presented at trial; instead, Nowak engaged in manipulative trading on a frequent basis for approximately five years. In support of this, both Edmonds and Trunz testified that the unlawful trading practice at the heart of the scheme was *not* limited to the episodes presented at trial. In addition, Professor Venkataraman testified that he conducted a broader analysis of Nowak's trading between June 2009 and February 2014 to see whether the characteristics of these 100 episodes were seen more broadly across Nowak's trading during this time period. Professor

---

[4] Although the jury acquitted on the conspiracy charges, the government respectfully submits that the Court should take all of the conspiracy conduct into account as relevant conduct that was proven, at a minimum, by a preponderance of the evidence. *See United States v. Shamah*, 624 F.3d 449, 459–60 (7th Cir. 2010) ("A sentencing court may consider conduct of which a defendant has been acquitted, as long as that conduct is proved by a preponderance of the evidence.").

[5] In addition to these 100 episodes, the government also introduced a number of trading sequences that were connected to contemporaneous e-communications ("chats"). *See* GX 472, 477.

Venkataraman testified that the 100 episodes for Nowak fairly represented the broader patterns seen in Nowak's trading activity across tens of thousands of orders. *Id* at 2757; *see also* GX 499. This evidence shows a comfort and familiarity with this unlawful trading practice that is consistent with regular, repeated executions of the scheme for over five years.

**2.   Testimony of John Edmonds and Christian Trunz**

At trial, two former traders on JPMorgan's precious metals desk—both of whom were junior traders supervised by Nowak—testified that they saw Nowak engage in this unlawful trading practice (spoofing) during their time working on the trading desk.

Edmonds testified that he saw Nowak use the same spoofing strategy that he, Smith, and Trunz used. Trial Tr. At 1147. Edmonds explained that the purpose of spoofing "is to manipulate the price, is to make people think that there's real supply and demand out there." *Id.* 1043. He testified that spoofing was a "lie" and "deceit" because it is "showing one thing and providing information that was false." *Id.* at 912.

Trunz testified that he saw Nowak spoof while he worked with him at JPMorgan. Trial Tr. at 2291. Trunz explained that for years it was routine for the JPMorgan precious metals desk to conduct the business of the desk through spoofing. *Id.* at 2293. When asked if there was an agreement and an understanding between Trunz and the defendants to do exactly that, Trunz testified, "We all traded that way, yes. Yes, there was." *Id.* Trunz testified that spoofing was a strategy "to deceive and place false volume into the marketplace" and that it was designed to deceive and manipulate others in the market "to execute of prices that we wanted to try to get them to execute on, that they necessarily wouldn't have executed on if we didn't." *Id.* at 2323, 2297.

In addition, Trunz testified that Nowak coached him in connection with an inquiry into Trunz's trading by JPMorgan's Compliance department. Specifically, Trunz testified that he had a discussion with Nowak about the compliance review and Nowak "said two things to me before I went into my initial interview with surveillance and compliance. He said, 'Remember, be humble, kind, and forgiving; and *every order you put into the market, you intended to trade on.*'" Trial Tr. at 2415 (emphasis added). When asked if that was a question or a directive from Nowak, Trunz stated, "This was not an ask. It was a, 'Remember, every order we put in, you intend to trade on.'" *Id.* at 2415. That is, Nowak coached Trunz on what to tell Compliance and to not tell Compliance that Trunz was spoofing—placing orders he did not intend to trade. As Trunz testified at trial, he understood Nowak was coaching him to lie to JPMorgan's compliance officers to protect the common interest of the traders on the precious metals desk.

**3.   Nowak's Statements Under Oath**

At trial, the government also introduced a transcript from an August 2010 deposition in which Nowak was questioned by investigators at the CFTC during a civil proceeding and denied knowing that spoofing was taking place on JPMorgan's precious metals desk. Specifically, during the deposition, Nowak was asked the following:

> Q:   *To your knowledge, have traders at J.P. Morgan in the metals group put up bids or offers to the market which they didn't intend to execute and then pulled them before*

> *they got hit or lifted?*
>
> *A: No.*
>
> *Q: If you came to find out that someone had done that, is there a policy against that at J.P. Morgan?*
>
> *A: I don't know if there is a specific policy. I would have to check into that, but if I found out that somebody was deliberately showing very big bids and very big offers for no other reason or without the intention of trading on it, I don't think that would be appropriate, no*

As the testimony and evidence at trial showed, however, traders on JPMorgan's precious metals desk, including Nowak, engaged in spoofing—placing orders they did not intend to execute. Nowak's denial that spoofing occurred at JPMorgan thus was a lie.

### 4. Evidence of Impact from Trading

Robert Sniegowski, a representative from the CME, testified about the importance of honest trading for the market as a whole. He explained that if you want markets to have integrity, "you need to ensure that everybody is participating in the market on a level playing field." Trial Tr. at 637. With respect to market integrity, Sniegowski explained that this refers to "trust by the people that are using the market that people are observing the rules and trading in a way that's consistent with those rules so that the prices they you're obtaining are legitimately bona fide or good faith prices and they reflect the actual market at the time." *Id.* at 638.

Professor Venkataraman also testified about the impact of spoofing. He explained that false information on demand and supply hurt market integrity because market participants are less confident that they are observing accurate prices. *Id* at 2717. In addition, those participants also factor in the risk of being cheated, which reduces trust in financial markets and such a reduction in trust would lead some investors to withdraw from the market entirely or reduce their participation. *Id*. Professor Venkataraman explained that if false interest is allowed to remain in the market for an extended period of time, it hurts investors who withdraw from the market, but it also hurts other investors because they have fewer counterparties to trade with. *Id.* Overall, misleading information that is allowed to stay in the markets affects the two essential functions of financial markets: price discovery (that the market is showing accurate prices) and liquidity (the ability to trade quickly or buy/sell quickly at a low cost) because there are fewer people participating in the market. *Id.*

In addition to these market-wide harms, the government has identified hundreds of victims who were affected by the defendant's spoofing; these victims include counterparties who traded with Nowak's genuine orders while Nowak had spoof orders active in the market. One of those victims testified at trial. Specifically, David Pettey testified that his employer, Susquehanna International Group ("SIG"), used an "automated trading strategy" or "algorithm," to trade precious metals futures in the relevant time period. Pettey also testified that the strategy was designed to trade based on "a buy versus sell imbalance in the [order] book, so seeing how many contracts were bid versus how many contracts are offered." *Id.* at 2995. Pettey testified that the

main input on the trading strategy was "whether or not there was an excessive number of buyers or contracts being bid versus contracts being offered." *Id*. at 2997. Pettey discussed one example when SIG's trading strategy was a counterparty to Nowak's genuine order while Nowak had placed spoof orders on the opposite side of the market. *Id.* at 3001-02. For one example from February 2010 in which SIG bought one gold futures contract from Nowak, Pettey testified that Nowak's buy orders (the spoof orders) were certainly capable of influencing SIG's decision to buy because Nowak's spoof orders represented at least half of the contracts bids at each of his respective price levels. *Id.* at 3002-03. Pettey testified that Nowak's spoof orders triggered SIG's decision to trade and that if Nowak's spoof orders were removed from the order book, he did not believe that SIG would have traded. *Id.* at 3003. Pettey also testified that spoofing practices affected his trading based on the evidence presented to him in this case. *Id.* at 3007.

## II.  SENTENCING GUIDELINES CALCULATIONS

### A.  Applicable Guidelines

The November 2018 Guidelines Manual applies to this case.[6]

### B.  Government's Offense Level Calculation

The base offense level is 7, pursuant to Guidelines § 2B1.1(a)(1).

Pursuant to Guideline § 2B1.1(b)(1)(K), the offense level is increased by at least 20 levels because the preliminary loss calculations show an actual loss amount that resulted from the scheme to defraud of at least $9,500,000 (including losses resulting from Smith's unlawful trading). The government will provide a declaration of Professor Kumar Venkataraman with the calculations that support this loss calculation. If the final figure places the defendant into a different loss band (*e.g.*, if it is more than $25,000,000), the government will provide a revised Guidelines calculation.

Pursuant to Guideline § 2B1.1(b)(2)(A), the offense level is increased by 2 levels because the offense involved 10 or more victims. Support for the inclusion of this enhancement will be included in the forthcoming declaration of Professor Venkataraman.

Pursuant to Guideline § 2B1.1(b)(10), the offense level is increased by 2 levels because the offense involved sophisticated means, including a layering strategy that was designed to trick algorithmic traders, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

Pursuant to Guideline § 3B1.1(a), the offense level is increased by 4 levels because Nowak was an organizer and leader of criminal activity that involved five or more participants.[7] Specifically, the evidence at trial showed that Nowak – as the head of JPMorgan's precious metals

---

[6] Using the Guidelines manual in effect at the time of the offense would produce a higher sentencing range.

[7] In the alternative, pursuant to Guideline § 3B1.3, the offense level should be increased by 2 levels because Nowak used a special skill, mainly sophisticated trading in futures markets, in a manner that significantly facilitated the commission of the offense.

desk – oversaw a team of at least five individuals who were all engaged in the same scheme to manipulate the market. For purposes of this analysis, the evidence at trial showed that the following traders were all involved in the same criminal activity as part of the precious metals desk run by Nowak: Smith, Trunz, Edmonds, Michel Simonian, and Chris Jordan.[8]

Pursuant to Guideline § 3C1.1, the offense level is increased by 2 levels because Nowak willfully obstructed and impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offense and such obstruction related to Nowak's offense of conviction and relevant conduct. Specifically, as noted above, Nowak committed perjury in 2010 when he was questioned under oath by the CFTC as part of a civil proceeding and denied that traders on JPMorgan's precious metals desk did not engage in spoofing. As referenced in Application Note 4(B), this obstruction adjustment applies to "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."

### C. Government's Criminal History Calculation

Defendant has 0 criminal history points and is criminal history category I pursuant to Guidelines § 4A1.1(a).

### D. Government's Guidelines Calculation

Based on the facts now known to the government, the anticipated offense level is 37, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 210 to 262 months' imprisonment.

## IV. RESTITUTION AND FORFEITURE

The government is not seeking forfeiture. Full restitution has been made available to victims through a corporate resolution between the United States and Nowak's former employer, JPMorgan.

## V. INVESTIGATING AGENCIES AND AGENTS

The federal agency investigating this case is the Federal Bureau of Investigation. The FBI case agent is FBI Special Agent Marc Troiano, who can be reached at 212-384-2253.

## VI. VICTIM IMPACT STATEMENT

As Judge Tharp has recognized in another spoofing case, offenses that involve manipulation of the precious metals futures markets have a broad and "serious" impact on financial markets, even where the impact of any one trade is small. *See United States v. Zhao*, 18 CR 24

---

[8] The evidence at trial showed that a London-based trader named Michel Simonian, who Nowak managed, was fired from JPMorgan for spoofing. Chris Jordan is one of Nowak's co-defendants who is scheduled for trial on November 30, 2022. Jordan was severed from the earlier 2022 trial because of space limitations related to the Court's COVID protocols.

(N.D. Ill. Feb. 4, 2020) (sentencing hearing).  This type of offense "threatens the integrity of the financial markets because it prompts people to question the lawfulness of the conduct and the good faith of the participants that operate the financial system and perpetuate the kind of thought process that says this system is rigged.  It's rigged in favor of insiders and people who know how to manipulate it." *Id.* at 28.  Further, because "so much of our economic welfare depends on capital markets and their efficient functioning…the economy suffers tremendously" when "people don't have confidence in the reliability of those markets." *Id.*; *see also* Sentencing Tr. 47:10-16, *United States v. Coscia*, 14 CR 551 (N.D. Ill. July 13, 2016) ("…well-functioning markets depend on accurate information, and that's the information concerning supply and demand.  Inaccurate information skews the market.  Now currently the traders not only use algorithms but they have direct lines to the market so that there's really nothing in between the trader and the market itself.  That's a very serious crime and has serious consequences.").

In addition to the harm to the integrity of the precious metals futures markets, and the direct losses to the victims trading in those markets, Nowak's conduct also was capable of affecting prices in correlated markets, including precious metals-based ETFs. *See, e.g.*, Trial Tr. at 1745–46, *United States v. Vorley*, 18 CR 35 (N.D. Ill.).  Relatedly, while the government does not anticipate the need for any upward departures in this case, we would note that USSG § 2B1.1 Application Note 21(A) concerning "Upward Departure Considerations" states that "[t]here may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense" including in such cases where "[t]he offense created a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of a significant disruption of a national financial market." USSG § 2B1.1, Application Note 21(A)(iv).

cc:     David Meister and Bill Ridgway (defense counsel)