UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | No. 19 CR 669 |
| GREGG SMITH and | : | |
| MICHAEL NOWAK, | : | Hon. Edmond E. Chang |
| | : | |
| Defendants. | : | |

**United States' Sentencing Memorandum**

## **Table of Contents**

I.  **Sentencing Guidelines Calculations** ............................................................ 3

    A.  Scope of Criminal Conduct and Loss Calculations ............................ 5

    B.  Relevant Conduct Includes Deceptive Trading by the Defendants, Edmonds, and Trunz ............................................................ 5

    C.  The Court Should Adopt Prof. Venkataraman's Analysis Regarding the Scope of the Relevant Conduct Because It Is Consistent with and Supported by the Evidence at Trial ...................................... 8

    D.  The Court Should Adopt Prof. Venkataraman's Loss Calculation Because It Is Reliable and Supported by the Trial Evidence .......... 12

    E.  The Loss Figures in the PSRs Are Not Based on the Appropriate Metric ............................................................................... 20

    F.  The Court Should Apply the Sophisticated Means Enhancement for Both Defendants .................................................................. 21

    G.  The Court Should Apply a Leadership Enhancement to Defendant Nowak ................................................................................ 25

    H.  Probation Correctly Applied a "Special Skill" Enhancement for Defendant Smith ................................................................. 27

    I.  The Court Should Apply an Obstruction Enhancement for Defendant Smith ................................................................................ 27

    J.  Probation Correctly Applied an Obstruction Enhancement for Defendant Nowak .............................................................. 29

II.  **The Court Should Impose a Significant Term of Imprisonment for Each Defendant** ............................................................... 30

    A.  The Nature and Circumstances of the Offense Warrant a Significant Term of Imprisonment ........................................................ 30

    B.  A Significant Sentence Will Promote Respect for the Law, and Provide Just Punishment .................................................. 35

    C.  A Serious Sentence is Necessary to Afford Adequate General Deterrence ............................................................................. 36

    D.  A Significant Sentence is Necessary to Avoid Unwarranted

Sentencing Disparities ....................................................................... 38

**III.** **Differentiating Between the Defendants** ............................................ **41**

**IV.** **Restitution is Satisfied** ................................................................... **42**

**V.** **Conclusion** .......................................................................................... **43**

Defendants Gregg Smith and Michael Nowak were fixtures of the precious metals industry. As the top gold trader and head of JPMorgan's precious metals desk, respectively, together they commanded one of the world's largest and most successful precious metals businesses that handled billions of dollars of transactions daily. From these positions of power, the defendants engaged in a criminal scheme to manipulate the precious metals futures markets to their benefit and to the detriment of other market participants, resulting in over $55 million in calculable losses. To boost their own trading profits, they flooded the CME with over a trillion dollars of false orders for gold and silver futures contracts. Their intent was to deceive other traders about the existence of genuine supply and demand, and push market prices in whatever direction benefited the defendants. Their conduct was deliberate, persistent, and harmful.

The defendants engaged in this scheme willfully for years—into 2014 for defendant Nowak and into 2015 for defendant Smith. They did so despite knowing that members of the precious metals desk, including defendant Smith himself, were under scrutiny by regulators, the exchange, and the bank's compliance department. Defendant Nowak lied to the CFTC in 2010 when asked under oath whether traders under his supervision placed orders with no intent to execute. He continued spoofing for nearly four more years after providing this false testimony to the CFTC. Likewise, when confronted by the CME in 2013 with specific instances of his own deceptive trading, defendant Smith lied, denying any wrongdoing, and continued his manipulative trading for two more years.

Both defendants also abused their senior positions on the desk to normalize their market manipulation and indoctrinate younger traders, especially Christian Trunz and John Edmonds. Defendant Nowak even coached Trunz to lie to JPMorgan's Compliance Department after it flagged Trunz for spoofing, and later pressured Trunz not to plead guilty and cooperate with the government's investigation.

These aggravating factors—the seriousness, duration, and repetitive nature of the offense conduct, the persistence of their scheme for years after coming under scrutiny (and well after Dodd-Frank's July 2011 effective date), the high loss amount, the defendants' abuse of their positions at JPMorgan and within the global precious metals markets, their lies to the CFTC and CME, and defendant Nowak's coercion of Trunz—together with the need for general deterrence—warrant a significant sentence. At the same time, the government acknowledges the existence of mitigating factors, including the defendants' personal histories and characteristics and the minimal (if any) need for specific deterrence here. Taking all these factors into account, as well as the sentences imposed in analogous cases on other defendants (all of whom, the government submits, were less culpable than these defendants), the government respectfully recommends that the Court impose a below-Guidelines sentence of 72 months of imprisonment for defendant Smith and 60 months of imprisonment for defendant Nowak.

## I.      Sentencing Guidelines Calculations

The United States Probation Office issued Presentence Investigation Reports for both defendants on February 15, 2023. For defendant Smith, Probation determined that the base offense level was 7 pursuant to U.S.S.G. § 2B1.1(a)(1). With respect to the applicable loss figure, Probation tethered its calculation to the deferred prosecution agreement ("DPA") between JPMorgan and the government that arose, in part, from the defendants' unlawful trading activity. *See* DPA, *United States v. JPMorgan Chase & Co.*, 3:20-CR-174, ECF No. 2 (D. Conn. Sept. 29, 2020). Specifically, Probation concluded that defendant Smith's spoofing episodes resulted in JPMorgan compensating victim traders in amounts totaling $20.4 million, which corresponds to a 20-level enhancement for loss pursuant to U.S.S.G. § 2B1.1(b)(1)(K). On specific offense characteristics, Probation applied a two-level enhancement for more than 10 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A), and did not apply any enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). With respect to role adjustments, Probation declined to apply a three-level increase based on defendant Smith's position as a manager or supervisor pursuant to U.S.S.G. § 3B1.1(b), but applied a two-level increase under U.S.S.G. § 3B1.3 because defendant Smith used a special skill to commit his crimes. Finally, Probation did not apply any offense level increase for obstruction of justice under U.S.S.G. § 3C1.1. As a result, Probation calculated a total offense level of 31, which for Criminal History Category I results in a guideline imprisonment range of 108 to 135 months.

For defendant Nowak, Probation determined that the base offense level was 7 pursuant to U.S.S.G. § 2B1.1(a)(1). With respect to the applicable loss figure, Probation again tethered its calculation to the figures in the DPA—specifically, that defendant Nowak's spoofing episodes resulted in JPMorgan compensating victim traders in amounts totaling $1,088,600, which corresponds to a 14-level enhancement for loss pursuant to U.S.S.G. § 2B1.1(b)(1)(H). On specific offense characteristics, Probation applied a two-level enhancement for more than 10 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A), and did not apply any enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). With respect to role adjustments, Probation declined to apply a four-level increase based on his position as a leader or organizer pursuant to U.S.S.G. § 3B1.1(a), but applied a two-level increase under U.S.S.G. § 3B1.3 because defendant Nowak used a special skill to commit his crimes. Finally, Probation applied a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1. As a result, Probation calculated a total offense level of 27, which for Criminal History Category I results in a guideline imprisonment range of 70 to 87 months.

For the reasons stated below, the government objects to the following aspects of the PSR: (1) the overall loss calculation for both defendants and the methodology used to calculate loss; (2) Probation's rejection of the sophisticated means enhancement for both defendants; (3) the finding that defendant Nowak was not a leader, organizer, manager, or supervisor in the criminal activity; and (4) the finding that defendant Smith did not obstruct justice when he lied to the CME.

4

### A.     Scope of Criminal Conduct and Loss Calculations

Professor Venkataraman's declaration (attached as Exhibit A) sets forth the scope of the defendants' unlawful trading activity as well as the associated harm to the precious metals futures market—the loss calculation. As discussed below, the Court should adopt the analysis in Prof. Venkatraman's declaration as the Court calculates loss under the Sentencing Guidelines and considers the appropriate sentence in this case. In the *Bases* and *Vorley* cases in this District, which involved substantially similar unlawful trading activity, both courts found that Prof. Venkataraman's methodology for calculating loss was appropriate. *See* Order at 35, *United States v. Bases*, 18 CR 48, ECF No. 734 (N.D. Ill. Mar. 6, 2023) (the "*Bases* Order") (attached as Exhibit B) (concluding that "Venkataraman's calculations are accurate, reliable, and a reasonable estimate of the loss inflicted by the Defendants' fraudulent conduct"); Sentencing Tr. 16:02-03, 21:09-10, *United States v. Vorley*, 18 CR 35, ECF No. 400 (N.D. Ill. June 21, 2021) (the "*Vorley* Sentencing Tr.") (finding Prof. Venkataraman's loss analysis provided "a reasonable estimate of intended loss from the spoofing scheme" and his methodology was "sufficiently reliable to support an estimate of the losses caused or intended by the defendants"). Nothing about the defendants' offense conduct in this case warrants a different result.

### B.     Relevant Conduct Includes Deceptive Trading by the Defendants, Edmonds, and Trunz

As a threshold matter, the evidence at trial clearly established by a preponderance of the evidence that both defendants were part of a single scheme carried out by members of JPMorgan's precious metals desk. The full extent of

spoofing carried out on JPMorgan's precious metals traders was both reasonably foreseeable to both defendants and in furtherance of their jointly undertaken criminal activity. *See United States v. Aslan*, 644 F.3d 526, 536-37 (7th Cir. 2011) ("With respect to the loss amount that can be attributed to a defendant, the court must determine (1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant in connection with that criminal activity."). Both defendants, therefore, should be responsible for losses attributable to spoofing by participants in that same scheme, including each other, Edmonds, and Trunz.[1]

For example, Trunz explained that for years it was routine for the JPMorgan precious metals desk to conduct the business of the desk through spoofing. Tr. 2293. When asked if there was an agreement and an understanding between Trunz and the defendants to do exactly that, Trunz testified, "We all traded that way, yes. Yes, there was." *Id.* Moreover, the trial evidence showed that the defendants employed strikingly similar spoofing methods, *see generally* GX 450-454, discussed and joked about spoofing with others, *see, e.g.*, Tr. 2275, and had a shared interest in the desk's profitability and wanted to keep their clients happy by spoofing, *see* Tr. 2282.[2] The government thus objects to the loss calculations in the PSRs because they do not

---

[1] The Court is aware of additional spoofing activity by other members of the desk, including Michel Simonian and Christopher Jordan. For purposes of the defendants' sentencing, the government is not seeking to include losses attributable to these other traders.

[2] The government's responses to the defendants' post-trial motions describe in detail the extensive trial evidence concerning jointly undertaken criminal activity. In the interest of brevity, the government incorporates those descriptions here.

reflect the substantial trial evidence regarding jointly undertaken criminal activity and hence do not impute to each defendant the losses caused by the other defendant, Edmonds, or Trunz. *See, e.g.*, Nowak PSR ¶ 59 (describing a purported "absence of any specific evidence establishing Mr. Nowak's involvement in the spoofing practice of other traders.").

Moreover, although the jury acquitted the defendants of the two conspiracy counts, the government respectfully submits that the existence of a conspiracy was proved at trial by a preponderance of the evidence, including through electronic "chat" communications and the testimony of Edmonds and Trunz. *See United States v. Shamah*, 624 F.3d 449, 459-60 (7th Cir. 2010) ("A sentencing court may consider conduct of which a defendant has been acquitted, as long as that conduct is proved by a preponderance of the evidence."); *see also United States v. Mesa*, No. 19-2243 (7th Cir. Dec. 23, 2020) (wire fraud case). Here, the existence of a conspiracy was shown by, *inter alia*, chats about spoofing, *see, e.g.*, GX 37, 62; the fact that junior traders on the desk were trained to spoof by watching defendant Smith; the similar spoofing tactics used by both defendants, Edmonds, and Trunz; the fact that Edmonds and Trunz were expected to engage in spoofing when filling in for defendant Smith while he was off the desk; the fact that traders on the desk engaged in spoofing to get better fills and prices for the precious metals desk's lucrative hedge fund clients; and Nowak's efforts to help Trunz avoid discipline and "protect the narrative," Tr. 2418:1-14. There also was testimony that traders' discretionary compensation (*i.e.*, annual bonus) was based in part on the success of the desk as a whole, such that traders

collectively benefitted from better fills and prices resulting from each other's spoofing. As such, manipulative trading by others on the JPMorgan Precious Metals Desk should be considered for purposes of relevant conduct for both defendants.

### C. The Court Should Adopt Prof. Venkataraman's Analysis Regarding the Scope of the Relevant Conduct Because It Is Consistent with and Supported by the Evidence at Trial

As set forth in his declaration, Prof. Venkataraman calculated the "market loss attributable to the Defendants' spoofing activity using the four-step pattern described at trial." Ex. A at 6; *see also id.* at 8-9 (describing the parameters for the Spoofing Sequences). Prof. Venkataraman's analysis included spoofing episodes that were both "successful" and "unsuccessful"—namely, spoofing that did not result in any executions of the defendants' orders placed on the opposite side of the market from the spoof order. *Id.* at 7; *see Bases* Order at 13-14 (finding it reasonable for Prof. Venkataraman to include "unsuccessful" spoofing episodes in his loss analysis); *see also United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011) ("The wire fraud statute punishes the scheme, not its success."). In that analysis, Prof. Venkataraman's "identified 132,265 Spoofing Sequences comprising over 1,383,712 individual Spoof Orders whose aggregate notional value at placement equals approximately $1.52 trillion." *Id.* at 9. Those numbers break down by trader as follows, with defendant Smith spoofing nearly 18 times more often than defendant Nowak (and over 40 times more frequently than Edmonds).

| Trader | Spoofing Sequences | Spoof Orders | Notional Value (Billions) |
|---|---|---|---|
| Gregg Smith | 105,890 | 1,027,910 | $1,227.60 |
| Christian Trunz | 17,753 | 219,797 | $175.42 |
| Michael Nowak | 5,950 | 85,873 | $91.20 |
| John Edmonds | 2,504 | 45,216 | $24.86 |
| Gregg Smith & Michael Nowak[3] | 94 | 2,808 | $3.32 |
| Gregg Smith & Christian Trunz | 49 | 1,246 | $1.45 |
| Michael Nowak & Christian Trunz | 15 | 569 | $0.49 |
| Gregg Smith & John Edmonds | 4 | 126 | $0.11 |
| Michael Nowak & John Edmonds | 4 | 111 | $0.08 |
| John Edmonds & Christian Trunz | 2 | 56 | $0.04 |
| **Total** | **132,265** | **1,383,712** | **$1,524.58** |

*Id.* at 10. The Spoof Orders in the Spoofing Sequences all exhibit certain characteristics such as "large aggregate visible quantity, short duration, and resulting low fill ratios that are inconsistent with a strategy aimed at executing trades on these orders." *Id.* at 11. Both individually and collectively, therefore, the defendants knowingly and intentionally engaged in thousands—if not, tens of thousands—of separate criminal acts.

The parameters that Prof. Venkataraman used to identify the relevant trading activity are fully consistent with the substantial evidence from multiple witnesses regarding the defendants' spoofing pattern and activity. Each of the government's cooperating witnesses testified that they engaged in the four-step pattern when they were spoofing—that is, when they placed orders with the unconditional intent to cancel them before execution. *See, e.g.*, Tr. 916:05-919:01 (Edmonds); Tr. 2426:17-

---

[3] Entries with two names denote Spoofing Sequences where Spoof Orders from more than one trader (*e.g.*, Smith and Nowak) were active on the same side of the market at the same time. When this occurred, the Spoof Orders from multiple traders overlapping in time with each other were treated as a single Spoofing Sequence. *See* Ex. A at 9.

2427:13 (Trunz); 1803:12-1807:14 (Flaum). Edmonds and Trunz testified that they personally observed defendants Smith and Nowak engage in spoofing repeatedly for years. Edmonds saw Smith spoof multiple times a day, *see* Tr. 931:05-11, and Trunz also saw Smith spoof "very often," most likely on a daily basis, *see* Tr. 2291:15-21. Likewise, Flaum explained that he saw Smith spoof "several times per week on average, some days more, some days less." Tr. 1860:16-18. Regarding Nowak, Edmonds testified saw him use the same spoofing strategy that he, Smith, and Trunz used, *see* Tr. 1147:10-24, and similarly, Trunz saw Nowak spoof at least "weekly," *see* Tr. 2291:22-2292:01. Both witnesses testified there was no legitimate, non-spoofing reason for trading in that four-step pattern. *See, e.g.*, Tr. 1172:13-25, 2366:01-04, 2398:19-21.

When Edmonds testified that he reviewed charts of Smith's trading activity, Edmonds explained it was consistent with the same technique that Edmonds used to spoof. Tr. 1070:11-1071:04. Similarly, when Trunz reviewed Smith's trading charts, he testified that it was "the exact same strategy that I just described" and explained that "as soon as he's able to execute [the small order], you can see he cancels [the large-side order]." Tr. 2323:01-11. The same is true of Edmonds's and Trunz's testimony concerning Nowak's trading charts. *See, e.g.*, Tr. 2388:23-25. This testimony is unsurprising since Edmonds and Trunz testified that they learned to spoof from Smith and Nowak. Tr. 930:21-24; Tr. 2277:20-2278:11; *see also* Tr. 1043:03-04 (Edmonds explaining that he learned to spoof from Smith, saying "showing size moves the market. It's the first thing that Gregg told me"); Tr. 2278:06-

2279:23. (Trunz describing how he picked up spoofing "by leaning over, watching [Smith's] screen, understanding when a call came in" and knowing which direction Smith needed to trade to hedge the client order, but seeing him place trades on the other side of the market).

In addition to testimony from the cooperating witnesses, Prof. Venkataraman testified that he found the same four-step pattern when analyzing the defendants' broader trading patterns during the relevant time period. *See* GX 499; Tr. 2724:21-25; 2725:01-07; 2725:15-25. Prof. Venkataraman also determined that the defendants' trading mirrored the trading of Edmonds and Trunz when they were engaged in the four-step spoofing pattern. Tr. 2789:14-2793:20. Additionally, Brian Wika, the CME investigator, explained how the CME's analysis of Smith's trading activity had identified over 3,000 successful spoof orders, consisting of approximately 600 to 700 episodes, in just one month (July 2013). Tr. 2040:14-2042:07. The CME's investigation report incorporated substantially the same four-step pattern that the government relied on during trial and that is the basis of Prof. Venkataraman's analysis. *See* GX 228.

Finally, Prof. Venkataraman's analysis applies parameters that are consistent with the approach applied to identify the scope of the relevant conduct in the *Vorley* and *Bases* cases. *See Bases* Order at 35 (finding that Prof. Venkataraman's "calculations are accurate, reliable, and a reasonable estimate of the loss inflicted by Defendants' fraudulent conduct"). And even Nowak's own expert, Jeremy Cusimano, acknowledged at trial that this was an approach that he used while serving as an

11

economist at the CFTC in connection with the *Moncada* case. *See* Tr. 3669:02-13; Complaint ¶¶ 28-36, *C.F.T.C. v. Moncada*, 12 CV 8791, 2012 WL 6015895 (S.D.N.Y. Dec. 4, 2012) (describing a manipulative scheme that included placing and cancelling large orders with the intent to create a misleading impression of increased liquidity for other market participants); *see also C.F.T.C. v. Oystacher*, 15 CV 9196, 2016 WL 3693429, at \*22-\*23 (N.D. Ill. July 12, 2016) (finding the application of "narrowing criteria" to filter trading activity in support of a "spoofing hypothesis" was "well supported and based on sound factual underpinnings and analysis").

Accordingly, the United States has shown by a preponderance of the evidence that there is more than a sufficient basis for the Court to adopt Prof. Venkataraman's analysis regarding the scope of the relevant conduct, consistent with the decisions in *Bases* and *Vorley*.

### D. The Court Should Adopt Prof. Venkataraman's Loss Calculation Because It Is Reliable and Supported by the Trial Evidence

In his declaration, Prof. Venkataraman calculates the loss suffered by other market participants from the defendants' trading activity that followed the four-step spoofing pattern. Ex. A at 4; *see United States v. Coscia*, 866 F.3d 782, 801 n.84 (7th Cir. 2017) (noting that "any trade executed in Mr. Coscia's artificial market involved a transaction at a skewed price—*i.e.*, any party trading on the opposite side of the market from his small orders necessarily lost money"). To begin his loss analysis, Professor Venkataraman first identified "transactions that occurred while the Spoof Orders were active in the visible order book." Ex. A at 13. His objective was "to calculate losses incurred by market participants who bought while the Defendants'

12

Spoof Orders to buy were active (which increased the perception of buying interest) and participants who sold while Defendants' Spoof Orders to sell were active (which increased the perception of selling interest)." *Id.* at 13-14; *see also id.* at 14 (explaining that "Spoof Orders distort the visible buying and selling interest in the market" and thereby "can induce other traders to raise/lower their bid/offer price quotes or to cross the bid-offer spread when they otherwise would not have").

### 1. Unadjusted Market Loss Calculation

To calculate losses, using CME trade data, Prof. Venkataraman compared the prices at which other market participants traded while the defendants' spoof orders were in the market, to the prices "at which they would have been able to trade in the absence of the Defendants' Spoof Orders," which Prof. Venkataraman calls the "But-For Trade Prices." *Id.* at 14-15. As explained in his declaration, the best available indication of the "But-For Trade Prices" are the "last observed bid and ask prices immediately before the placement of the first Spoof Order in each Spoofing Sequence." *Id.* at 15. The But-For Trade Price, therefore, is the "last observed best bid price for buy-side Spoof Orders and the last observed best ask price for sell-side Spoof Orders." *Id.* at 13; *see also Bases* Order at 29 (finding Prof. Venkataraman provided "reasonable explanations" for using the best bid or offer price immediately prior to a spoofing sequence).

Prof. Venkataraman's methodology allowed him to measure with precision at least some of the concrete effects of the defendants' unlawful activity:

> For each transaction that occurred while the Spoof Orders were active, I calculate the difference between the price at

13

which the execution actually occurred ("Actual Trade Price") and the corresponding But-For Trade Price. This price difference is a measure of the additional mark-up, or the higher cost (or potentially, benefit) of trading for market participants on the Spoof Order side of the transaction while the Spoof Orders were active. Specifically, when the Actual Trade Price is "worse" (*i.e.*, higher for buyers and lower for sellers) than the But-For Trade Price, the participants incurred a higher cost relative to the state of the market before the Spoof Order was placed. Conversely, when the Actual Trade Price is "better" (*i.e.*, lower for buyers and higher for sellers) than the But-For Trade Price, the participants recognized a benefit. To arrive at the "Unadjusted Market Loss" associated with an individual transaction, I multiply the price differential by the transacted quantity. I aggregate this measure across all transactions executed by market participants while Spoof Orders are active to arrive at a total Unadjusted Market Loss estimate across all Spoofing Sequences.

Ex. A at 15-16. Applying this methodology, Prof. Venkataraman concluded that the total Unadjusted Market Loss for "market participants on the Spoof Order side based on all transactions observed while the Spoof Orders are active is over $119,609,715," which included market participants consisting of 53,338 unique traders trading through 808 unique firms.[4] *Id*. at 18.

To account for the potential impact of external factors on the market loss amount, Prof. Venkataraman modeled two approaches: (1) using a "Matched Control Period" to "account for the fact that some participants may have been willing to increase/decrease their order's limit price," and (2) calculating the "Rate of Spread-

---

[4] The number of unique traders and firms was determined using the "tag 50" and "firm" codes in the CME trade data.

Crossing" to identify market participants who would "cross the bid-offer spread to trade at a worse price even in the absence of Spoof Orders." *Id*. at 19.

### 2. Adjustment for But-For Cost of Trading Matched Control Period

The first method "identifies a matched control period of trading and estimates a But-For cost of trading for market participants on the Spoof Order side for trades observed in the control period." *Id*. at 20. Then, the "But-For cost of trading in the matched control period is deducted from the Unadjusted Market Loss" and then the "remaining amount is the 'Adjusted Market Loss' and represents the abnormal cost of trading that is attributable to the Defendants' Spoof Orders." *Id*. This approach provides an "an estimate of the 'normal' cost of trading of market participants around the time of a Spoofing Sequence, absent the placement of the Spoof Orders," and then "calculate[s] the difference between the total Unadjusted Market Loss of the Spoofing Sequences and the total But-For cost of trading during the control period," to obtain an "Adjusted Market Loss" estimate. *Id*. at 22. Under this first method, the Adjusted Market Loss amount is $94,774,94. *Id*. at 23.

### 3. Alternative Adjustment Method: Rate of Spread-Crossing

The second method compares the "the rate at which market participants on the same side as the Defendants' spoof orders crossed the bid-offer spread while the spoof orders were active to the rate of spread crossing in a control period immediately before the spoof orders were placed." *Id*. at 6. This change in the rate of spread-crossing indicates the "the impact of the spoofing pressure on the trading activities of other market participants." *Id*. In his declaration, Prof. Venkataraman explains:

> Market participants incur trading costs primarily when they cross the bid-offer spread to trade. For example, a market participant who intends to buy gold futures contracts could place a resting limit order at the best bid. By crossing the spread to trade at the best offer, which is at a higher price, this market participant incurs a cost. . . . [S]poofing, and the misleading appearance of supply/demand it introduces, can induce market participants to cross the spread and incur the associated costs.

*Id*. at 24-25. To measure the impact of the defendants' spoof orders under this method, Prof. Venkataraman "calculate[s] the 'rate of spread-crossing' as the per-second number of contracts traded by market participants on the Spoof Order side who crossed the spread" and then compares that to the "spread-crossing rate during a control period immediately prior to the Spoofing Sequence" in order to "measure the impact of the Spoof Orders on spread crossing activity." *Id*. at 25. The results of these calculations show that, when "compared to the control period before the placement of the Spoof Orders, the rate of spread-crossing for orders on the Spoof Order side during the duration of Spoofing Sequences is almost twice as large." *Id*. at 27. Prof. Venkataraman attributes the "difference between the elevated rate of spread-crossing during the Spoofing Sequences and the normal rate of spread-crossing observed during the control period" to the defendants' spoof orders. *Id*. at 28. Then removing from the Unadjusted Market Loss the normal rate of spread-crossing, Prof. Venkataraman calculates an "Alternative Adjusted Market Loss" of $55,544,600. *Id*. at 28-29.

### 4. The Adjusted Market Loss Calculations Are Reasonable and Conservative Estimates of Loss

The two approaches that Prof. Venkataraman modeled yielded results between $55,544,600 and $94,774,945, as set forth below:

| Trader | Unadjusted Market Loss | Adjusted Market Loss (Matched Control Period) | Adjusted Market Loss (Rate of Spread Crossing) |
|---|---|---|---|
| Gregg Smith | $102,930,710 | $81,153,519 | $47,799,170 |
| Christian Trunz | $7,869,665 | $6,434,245 | $3,654,531 |
| Michael Nowak | $7,668,640 | $6,234,010 | $3,561,178 |
| John Edmonds | $680,615 | $509,160 | $316,065 |
| Gregg Smith & Michael Nowak | $319,560 | $270,427 | $148,398 |
| Gregg Smith & Christian Trunz | $90,765 | $190,210 | $42,150 |
| Gregg Smith & John Edmonds | $3,730 | $3,158 | $1,732 |
| Michael Nowak & Christian Trunz | $33,800 | $1,937 | $15,696 |
| Michael Nowak & John Edmonds | $2,430 | -$10,670 | $1,128 |
| John Edmonds & Christian Trunz | $9,800 | -$11,050 | $4,551 |
| **Total** | **$119,609,715** | **$94,774,945** | **$55,544,600** |

Ex. A at 30. The United States respectfully submits that this calculation, at a minimum, provides the Court with a "reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(c); *see also United States v. Natour*, 700 F.3d 962, 976 (7th Cir. 2012) ("The district court's loss calculation . . . need only be a reasonable estimate of the loss." (quotation marks omitted)). Prof. Venkataraman's methodology to identify the relevant spoofing sequences is fully consistent with the trial evidence and approach used in other cases, and his loss calculation is amply documented, *see* Ex. A at 6-13, grounded in methodology that is common in the field of economics, *see* Ex. A at 3-4, consistent with the Seventh Circuit's view of market loss in *Coscia*, *see* 866 F.3d at 801 & n.84, was found to be reasonable by the District Courts in *Vorley* and *Bases*,

17

and logically accounts for external factors and variables that could impact the results. *See Bases* Order at 12 ("All that is required is that the government establish it is more likely than not that the additional trades were unlawful and that [Prof.] Venkataraman's estimate is a reasonable approximation of the loss.")

In addition, Prof. Venkataraman's analysis is based on conservative assumptions that "likely understate total market harm" for several reasons. Ex. A at 31. First, Prof. Venkataraman only calculated losses to other market participants while the defendants' spoof orders were active in the market and "did not attempt to capture the potential lingering effect of the Spoof Orders after they are canceled, when market participants may still be responding to the pressure created by the Spoof Orders." *Id.* Next, he also only calculated losses "incurred by market participants on the Spoof Order side for their orders that were executed," but did not "account for orders that were resting on the Spoof Order side before the Spoof Orders were placed and that subsequently lost the opportunity to get fills due to the pressure created by the Spoof Orders." *Id.* at 32. Finally, Prof. Venkataraman's analysis did not consider "other non-futures markets where prices correlate with precious metals futures, such as exchange-traded funds ('ETFs'), options, or individual stocks whose performance is directly tied to precious metals," nor did he quantify the long-term effects of spoofing that degrades the liquidity and price discovery functions of the financial markets. *Id.* at 33.

To be clear, these are not speculative harms. Indeed, the high-frequency trader whose complaint launched the CME's investigation of defendant Smith in 2012,

complained to the CME in 2013 about rampant spoofing activity in the precious metals markets. *See* Ex. C. The trader wrote that his firm would be "scaling down our metals activity on CME in general. . . . A lot of participants (including us) already completely left Palladium market (you can see this very clearly in the daily volume stats relative to, say Platinum) and same thing will happen to the rest of the market if this blatant market manipulation is not stopped decisively." *Id.*[5] The fact that spoofing caused traders to leave the precious metals markets is *exactly* the sort of unquantifiable harm that Prof. Venkataraman references in his declaration as a reason why his loss calculation is conservative.

As between the Adjusted Market Loss and Alternative Adjusted Market Loss amounts, the United States respectfully submits that the Court should find the loss amount to be the lower of these sums, *i.e.*, $55,544,600. *See United States v. Gumila*, 879 F.3d 831, 836 (7th Cir. 2018) (approving district court's loss calculation when more conservative option of loss estimates was used). Further, given the nature of the defendants' criminal conduct—whether characterized as a conspiracy or a scheme—both defendants should be liable for the entire loss amount. As discussed above, the trial evidence showed, among other things, that the defendants employed markedly similar spoofing methods, had a shared interest in the desk's profitability, and spoofed in order to get good prices and keep their clients happy. As such, the full extent of each defendant's spoofing was both reasonably foreseeable to the other

---

[5] Prefiguring the need for the sentence imposed in this case to serve a crucial general deterrence function, the trader also wrote: "With probability of being 'caught' so low for these guys what they are doing brings highly positive risk adjusted return, so this activity will never stop and instead continue escalating." Ex. C.

defendant and in furtherance of their jointly undertaken criminal activity. *See United States v. Aslan*, 644 F.3d 526, 536-37 (7th Cir. 2011) ("With respect to the loss amount that can be attributed to a defendant, the court must determine (1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant in connection with that criminal activity."). For both defendants, 22 levels thus should be added for loss under U.S.S.G. § 2B1.1(b)(1)(L).

### E. The Loss Figures in the PSRs Are Not Based on the Appropriate Metric

In the PSRs, Probation acknowledges Prof. Venkataraman's declaration and does not take issue with the market loss analysis contained therein, but nevertheless concluded that it should not be the basis to calculate loss under § 2B1.1. *See* Smith PSR ¶¶ 24, 55; Nowak PSR ¶¶ 25, 59. Instead, Probation states that the victim compensation payments made in connection with JPMorgan's DPA are the "more direct and tangible metric for the actual losses inflicted on other market participants." *Id*. For the reasons discussed above, the United States respectfully disagrees with Probation's view and believes that Prof. Venkataraman's loss analysis is the more appropriate metric to determine the applicable loss amount in this case.[6]

---

[6] To the extent Probation believes that the amount JPMorgan paid as part of the victim compensation amount in its DPA is the more appropriate metric for actual losses inflicted on market participants in this case, the amount should not be limited to the approximately $23 million that has been paid out in victim compensation claims for two reasons. First, the process to submit claims for potential victim compensation is ongoing and will last through the expiration of the term of the DPA, which is currently scheduled for September 29, 2023. *See* DPA ¶ 3. The government, therefore, expects that the number of victims and total amount of victim compensation payments may continue to increase if additional claims are submitted and processed. Presently, approximately 63 individuals or entities have submitted claims

### F. The Court Should Apply the Sophisticated Means Enhancement for Both Defendants

An additional two-point enhancement should be applied pursuant to U.S.S.G. § 2B1.1(b)(10)(C) for both defendants' use of sophisticated means in furtherance of the fraudulent scheme. "Sophisticated means" includes "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). Here, the sophisticated means enhancement should apply for at least three reasons.

First, in *Vorley*, when considering manipulative trading that was substantially similar to the defendants', Judge Tharp determined that it involved the use of sophisticated means because, among other reasons, "market manipulation scheme that itself required a sophisticated understanding of the markets and how they work. It involved techniques in order entry designed to disguise spoofing orders and making them more effective, such as layering ten-lot orders." *Vorley* Sentencing Tr. 22:25-23:09.

Second, the defendants' particular offense conduct—layered spoofing—was complex or especially intricate as it pertains to both the execution and concealment of the offense. Their manipulative trading technique involved a layering strategy that was especially intricate in its execution as compared to simply spoofing with one,

---

that were determined eligible for victim compensation payments under the DPA totaling over $30 million. But the amount JPMorgan paid in total victim compensation amount associated with the manipulative trading activity on its precious metals desk was far greater than $30 million. *See* DPA ¶¶ 7, 15 & Attach. A ¶ 32 ($200,847,102 relates to conduct by JPMorgan's precious metals desk). Accordingly, whether or not a market participant has submitted a claim for victim compensation under the DPA and that claim has been processed and paid out, is not the right metric because it is underinclusive.

large spoof order at one price point, which is a more obvious and thus detectable form of spoofing. *United States v. Kontny*, 238 F.3d 815, 820 (7th Cir. 2001) ("The more sophisticated the efforts that an offender employs to conceal his offense, the less likely he is to be detected, and so he should be given a heavier sentence to maintain the same expected punishment, and hence the same deterrence, that confronts the average offender.") Defendants Smith and Nowak layered their spoof orders across different price levels in the order book, creating the false impression that multiple traders were interested in trading at different price points on the "spoof" side of the market. This addition of volume at different price points was designed to trick other traders into reacting to the apparent volume in the market. It also concealed from the market the fact that one trader had placed all of these orders, and concealed the spoofing scheme from JPMorgan's Compliance Department and the government. According to Edmonds, this concealment function of the layering strategy was crucial to its success. *See, e.g.*, Tr. 923:19-925:20; *see also Konty*, 238 F.3d at 821 ("[T]he essence of the definition [of sophisticated means] is merely deliberate steps taken to make the offense . . . difficult to detect.") (quotations omitted).

Third, the defendants' manipulative trading scheme was designed to trick high frequency traders who used high-speed algorithms to process market data and trade thousands of times faster than human beings—and their scheme worked. *See, e.g.*, Tr. 601:16-602:01; 1358:10-25; 1569:08-16; 1600:03-05; 1937:16-1939:13; 1940:04-11; 1955:24-1956:09; 1957:21-02; 2213:21-24; 2851:24-2853:04; 2856:24-2857:08; 2927:07-18; 3017:05-13; 3025:16-3026:02. Deceiving such highly sophisticated

22

computer programs required extensive knowledge and mastery of market mechanics as well as specialized trading techniques. Seventh Circuit precedent supports applying the sophisticated means enhancement where, like here, the defendants employed "intricate maneuvers" to successfully defraud sophisticated victims. *See United States v. Rettenberger*, 344 F.3d 702, 708-09 (7th Cir. 2003) ("[f]ooling a skilled neurologist and 14 insurers requires intricate maneuvers"); *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) ("[defendant's] scheme required him to convince 21 lending institutions to extend grossly inflated mortgages to [his] buyers. We find that deceiving that many banks into financing over 150 fraudulent transactions to the tune of $7 million requires intricate maneuvers") (quotations omitted); *United States v. Redman*, 887 F.3d 789, 793 (7th Cir. 2018) ("[defendant's] conduct required planning and deception sophisticated enough to fool [owner of a medical clinic] and the clinic's patients"). Moreover, the duration of Smith and Nowak's scheme and the number of spoofing episodes further speaks to the sophistication of their fraud. *See, e.g., Rettenberger*, 344 F.3d at 708-09; *Knox*, 624 F.3d at 871. Nowak placed tens of thousands of deceptive orders over five years, and Smith placed hundreds of thousands of deceptive orders over seven years. *See* Tr. 2758:02-09, GX 499.

The PSRs state that the sophisticated means enhancement should not apply because the defendants traded manually as opposed to using an algorithm. Smith PSR ¶ 59; Nowak PSR ▯ 64. However, the Seventh Circuit has clearly instructed that "the fact that [defendants] could have used even more elaborate mechanisms to conceal the fraud does not defeat a finding of sophisticated means." *United States v.*

23

*Bickart*, 825 F.3d 832, 838 (7th Cir. 2016) (quotations omitted). To the contrary, "sophistication" refers "to the presence of efforts at concealment that go beyond (not necessarily far beyond, for it is only a two-level enhancement . . .) the concealment inherent in [the] fraud." *United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021). This accurately describes the intricate layering strategy that defendants Smith and Nowak used to execute and conceal their manipulative trading scheme. Moreover, as described above, their sophisticated manual trading successfully tricked algorithmic traders for years on end. Accordingly, the two-level sophisticated means enhancement is appropriate and should be applied.

The government recognizes that, in *Bases*, Judge Lee recently determined that the sophisticated means enhancement did not apply to traders who engaged in spoofing on the precious metals desk at Bank of America. *See Bases* Order at 41-45. As discussed above, the government believes that the weight of Seventh Circuit authority dictates that the enhancement is appropriate in this case given that, among other things, defendants Smith and Nowak engaged in an intricate layering pattern to hide their spoof orders such that they were able to deceive highly-sophisticated algorithmic traders over the course of a number of years. And unlike in *Bases*, there was direct evidence in this case that the layering scheme was designed to evade detection. *See, e.g.*, Tr. 923:19-925:20. That said, given the split between Judge Lee in *Bases* and Judge Tharp in *Vorley*, the government recognizes that the application of this enhancement is a closer call than the loss calculation or other aspects of the Guidelines calculation.

24

### G. The Court Should Apply a Leadership Enhancement to Defendant Nowak

The Court should apply a four-level leadership enhancement under § 3B1.1(a) to defendant Nowak because, as the Head of JPMorgan's Precious Metals business, he was the leader of the long-running criminal scheme to manipulate the precious metals markets. Specifically, defendant Nowak satisfies many of the factors to be considered when determining whether a defendant is in a leadership role under U.S.S.G. § 3B1.1's Application Note 4, including whether the person has decision-making authority, claimed a larger share of the fruits of the crime, the degree of participation in planning and organizing the offenses, and the degree of control and authority exercised over others.

At least five traders working under Nowak engaged in spoofing: defendant Smith, Edmonds, Trunz, Jordan, and Simonian. Nowak knew, from before Smith formally joined JPMorgan from Bear Stearns, that he spoofed. *See* GX 28 at 2. Edmonds and Trunz took comfort from the fact that their supervisors, including Nowak, spoofed. *See, e.g.*, Tr. 1035:02-04. In his leadership role, Nowak could have stopped the scheme at any point, but instead he used his position to perpetuate it.

In addition to Nowak's structural role overseeing these other traders who were engaged in spoofing, the evidence that best exemplifies why a leadership enhancement is appropriate for defendant Nowak is his efforts to cover-up the scheme and obstruct inquiries that could have uncovered it, including Trunz's testimony about defendant Nowak's efforts to coach him in connection with an inquiry into Trunz's trading by JPMorgan's Compliance Department. Trunz explained that he had

a discussion with defendant Nowak about the compliance review, and defendant Nowak "said two things to me before I went into my initial interview with surveillance and compliance. He said, 'Remember, be humble, kind, and forgiving; and *every order you put into the market, you intended to trade on.*'" Tr. 2415:13-16 (emphasis added). When asked if that was a question or a directive from defendant Nowak, Trunz stated, "This was not an ask. It was a, 'Remember, every order we put in, you intend to trade on.'" *Id.* at 2416:03-04. That is, defendant Nowak coached Trunz on what to say to Compliance and not to tell Compliance that Trunz was spoofing—placing orders he did not intend to trade. As Trunz testified, he understood defendant Nowak was coaching him to lie to Compliance to protect the common interest of the traders on the precious metals desk. *See* Tr. 2416:08 ("It was a coaching moment."); 2418:04-16 (explaining that the lie was to "protect the narrative" of JPMorgan's precious metals desk).

Similarly, Trunz also testified that defendant Nowak pressured him with respect to his decision to potentially plead guilty to criminal charges, noting "He said, and I remember specifically, we'd go over examples, that 'We've done a ton of work, you're not going to turn around and plea now, are you?'" Tr. 2436:19-21. Trunz explained that his impression at the time "was that he was trying to protect me, that he was trying to reinforce the fact whatever happened, we were going to win and to keep me on board," which Trunz interpreted to mean to keep him from doing "exactly what I did and tell the truth." Tr. 2437:18-21.

26

### H. Probation Correctly Applied a "Special Skill" Enhancement for Defendant Smith

The government agrees with Probation's application of a two-level enhancement under U.S.S.G. § 3B1.3 for defendant Smith's use of a special skill to commit the offenses. As noted in the PSR, defendant Smith "was educated in finance and was employed for years as a precious metals trader for a global financial institution" and his "skills in affecting market prices through layering and spoofing constitute special skills not possessed by members of the general public." Smith PSR ⁋ 64. Moreover, the testimony from the cooperating witnesses at trial showed how defendant Smith was especially skilled at his ability to quickly place and cancel orders. *See, e.g.,* Tr. 2275. Therefore, it is appropriate to apply the special skill enhancement under U.S.S.G. § 3B1.3 for defendant Smith.

### I. The Court Should Apply an Obstruction Enhancement for Defendant Smith

A two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 is warranted because defendant Smith's false statements to the CME about his trading activity obstructed and impeded the CME's investigation. Notwithstanding his assertions otherwise, Smith's statements during his CME interview were not truthful. Specifically, Smith was asked about a particular trading sequence on June 26, 2013, in which he placed a series of layered spoof orders on the sell side of the market, and whether he wanted to execute those orders. Smith responded that "absolutely, and absolutely is the answer, yes." *See* GX 531 (excerpt from the recording of Smith's interview); *see also* Tr. 2128:01-18; 2242:25-2243:24; GX 228 at 8 ⁋ 28. In truth and in fact, however, Smith placed these layered sells orders with the

27

intent to cancel them before execution and with the goal of pushing the market price down into his genuine iceberg order to buy that was resting on the other side of the market. Indeed, this specific sequence was alleged as an overt act in Paragraph 30(k) of the Second Superseding Indictment,[7] and the corresponding trading sequence was #89 in GX 450, which was a collection of Smith's spoofing episodes.

The government respectfully submits that Probation's basis for rejecting this enhancement was flawed. In rejecting this enhancement, the PSR specifically references U.S.S.G. § 3C1.1's Application Note 5(B), which provides that "making false statements, not under oath, to law enforcement officers" is not covered by this enhancement. On this basis, the PSR reasons that the obstruction enhancement should not apply because the CME's investigators "are not law enforcement agents" and because "the defendant was not under oath or making a statement in a deposition." Smith PSR ¶ 66. This analysis is flawed because Application Note 5(B) is not applicable here: defendant Smith's statements were during a civil, regulatory investigation by the CME, and were not statements to law enforcement. Therefore, Smith's false statements more appropriately fall within § 3C1.1 Application Note 4(B), which prohibits perjury during a civil proceeding.

While the record does not reflect that defendant Smith was under oath, he was required to provide truthful answers by the CME's rules. Specifically, the CME investigator who wrote the Investigation Report regarding defendant Smith's trading

---

[7] This trading sequence was also referenced in Paragraph 44 of the Second Superseding Indictment, which alleged that Smith gave false answers to questions during his CME interview, including with respect to the trading sequence identified in Paragraph 30(k).

(*see* GX 228), and who testified at trial, explained that all witnesses at CME interviews are expected to answer all questions truthfully. *See* Tr. 2125:24-2126:03 ("Q. And is there an expectation that individuals are truthful during these interviews? A. Yes. All -- all witnesses are expected to answer all questions and answer them truthfully, all subjects, I should say."). Further, the CME's rules make it an offense to "fail to fully answer all questions" or "to make false statements" in connection with an investigation. *See* GX 408 at 17 (CME Rule 432.L.1). Whether or not Smith was under oath during the interview, he had an obligation to answers the questions truthfully. He did not do so. And his lie to the CME allowed him to persist in the same manipulative conduct for over a year after his interview.

### J. Probation Correctly Applied an Obstruction Enhancement for Defendant Nowak

The government agrees with Probation's application of a two-level enhancement under U.S.S.G. § 3C1.1 for defendant Nowak's obstruction efforts. As noted in the PSR, defendant Nowak was deposed by the CFTC in 2010 and during that under-oath interview, he was asked, "To your knowledge, have traders at J.P. Morgan in the metals group put up bids or offers to the market which they didn't intend to execute and then pulled them before they got hit or lifted," and his response was "No." As proven at trial, defendant Nowak himself had engaged in spoofing when he made that statement. Therefore, it is appropriate to apply a two-level enhancement under U.S.S.G. § 3C1.1 for defendant Nowak.

Accordingly, the government submits that the correct Guidelines calculations for the defendants are as follows:

|  | **Smith** | **Nowak** |
|---|---|---|
| Base Offense Level | 7 | 7 |
| Loss Amount | +22 | +22 |
| 10 or More Victims | +2 | +2 |
| Sophisticated Means | +2 | +2 |
| Organizer/Leader Role | N/A | +4 |
| Specialized Skill | +2 | N/A |
| Obstruction | +2 | +2 |
| **Total** | **37** **(210-262 months)** | **39** **(262-327 months)** |

## II.  The Court Should Impose a Significant Term of Imprisonment for Each Defendant

### A.  The Nature and Circumstances of the Offense Warrant a Significant Term of Imprisonment

JPMorgan is a cornerstone of the financial world, and it operated one of the largest precious metals businesses in the world. To place the bank's metals operations in context, during the relevant period, JPMorgan ran the world's leading commercial vault, holding over $20 billion of metal. *See* GX 366 at 6. The bank also cleared 40% of the $20 billion of metal that moved through the market daily. *Id.* Defendant Smith, as an Executive Director, was the bank's top gold trader and, as a Managing Director, defendant Nowak oversaw the desk's operations that spanned the globe. Defendant Nowak also was on the Board of Directors of the powerful London Bullion Market Association. From this vantage point, the defendants were some of the most influential people in the precious metals markets. And yet the defendants manipulated the precious metals markets with impunity by distorting supply and demand for products at the center of the global economy. The defendants engaged in their scheme for years—both before and well after Dodd-Frank explicitly prohibited the practice of spoofing. The defendants continued to the manipulate the markets

even after they knew their style of deceptive trading had come under investigation.

By any measure, the defendants' crimes were serious. The losses resulting from their crimes are substantial. Conservatively, the defendants caused thousands of victims to lose, in total, $55 million. During trial, the Court heard from one of these victims, David Pettey, who testified that the defendants' spoofing clearly affected his trading activity. Tr. 3007:12-15. The loss amount in this case far outstrips the losses in comparable cases, including *Vorley* ($1 million) and *Bases* ($300,000). And the defendants caused these losses by injecting an astronomical volume of fake orders into the market—over 1.3 million spoof orders totaling approximately $1.5 *trillion* in notional value. Unlike in *Bases* or *Vorley*, the impact of at least defendant Smith's spoofing was appreciable even at the time, as reflected in the contemporaneous complaint that initiated the CME's investigation. *See* GX 228 at 2.

Beyond losses to individual victims, the defendants' crimes also undermined the integrity of core U.S. financial markets. This is a significant aggravating factor. As Judge Lee recently explained in the *Bases* sentencing, "[the] injection of false information into commodity futures trading markets undermined the very integrity of those markets. Such fraudulent activity, writ large, erodes the public's confidence and trust in our markets. Markets that undergird much of our nation's economy." Sentencing Tr. at 54:18-23, *United States v. Bases*, 18 CR 48, ECF No. 740 (N.D. Ill. Mar. 9, 2023) (the "*Bases* Sentencing Tr."). As Judge Tharp commented in another spoofing sentencing, this type of offense "threatens the integrity of the financial markets because it prompts people to question the lawfulness of the conduct and the

31

good faith of the participants that operate the financial system and perpetuate the kind of thought process that says this system is rigged. It's rigged in favor of insiders and people who know how to manipulate it. That's the kind of crime that calls -- you know, undermines confidence of the public in the integrity of the markets." *See* Sentencing Tr. 27-28, *United States v. Zhao*, No. 18 CR 24, ECF No. 74 (N.D. Ill. Feb. 4, 2020). Further, because "so much of our economic welfare depends on capital markets and their efficient functioning . . . the economy suffers tremendously" when "people don't have confidence in the reliability of those markets." *Id.* The sentencing court in *United States v. Coscia*—the first criminal spoofing case—emphasized the same point: "well-functioning markets depend on accurate information, and that's the information concerning supply and demand. Inaccurate information skews the market." Sentencing Tr. 47, No. 14 CR 551, ECF. No. 162 (N.D. Ill. July 13, 2016). And the sentencing court in *United States v. Sarao* also explained that the defendant's "actions contribute to abusing the integrity of the market, which is something that is essential to maintaining a healthy economy" and observed that the defendant's spoofing "has very significant economic impact. And, therefore, it's a serious offense." Sentencing. Tr. 35, No. 15 CR 75, ECF No. 121 (N.D. Ill. Jan. 28, 2020).

The government recognizes that the Guidelines provide that, in some cases involving "relatively small loss amounts suffered by a relatively large number of victims . . . . a downward departure may be warranted." U.S.S.G. § 2B1.1 comment, n.21(C). But nearly *every* market manipulation case involves diffuse losses. That is

precisely why criminal enforcement, and meaningful sentences, are necessary. The harms are diffuse, and because financial markets tend to be anonymous, victims typically lack the information and means to pursue redress themselves. And the Guidelines also provide for an upward departure where, as here, the "offense involved a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of a significant disruption of a national financial market." U.S.S.G. § 2B1.1 comment, n.21(A)(iv). The CME is the world's largest financial derivatives exchange and a critical part of the U.S. and global financial systems, which only underscores the seriousness of the defendants' crimes.

The defendants' spoofing also was profitable. The CME's investigation concluded that, for just the month of July 2013, defendant Smith gained $62,450 by spoofing. Moreover, the trial evidence showed that the defendants used spoofing to retain key hedge fund clients, who were profitable for the desk. As Trunz testified, spoofing was a profitable strategy, but some shared in the profits more than others. Tr. 2293:22-23. And in fact, the trial evidence showed clearly that the defendants' crimes were motivated by a desire to boost profits and keep their lucrative positions as highly paid JPMorgan traders and prominent members in the precious metals industry. In *Bases*, Judge Lee recognized that profits accruing from retaining client business can be a significant motivation for fraud. *See* Sentencing Tr. at 48, *United States v. Pacilio*, 18 CR 48, ECF No. 741 (N.D. Ill. Mar. 9, 2023) ("Although Mr. Pacilio may not have received direct monetary benefit from his illegal trading activity, the testimony at trial established that part of what made a good trader --

33

ones that clients would seek out time and time again -- were those traders that could execute trades on the client's terms, on favorable terms. By using spoof orders, Mr. Pacilio was able to do this, benefitting his clients and the trading desk as a whole, therefore benefitting himself in the process.").

Not only did the defendants personally engage in spoofing, but they also encouraged, taught, and normalized spoofing by junior traders who looked up to and emulated the defendants. Rather than serve as positive role models, the defendants took advantage of that trust and taught the junior traders how to manipulate the markets. They abused their leadership roles. Defendant Nowak also coached Trunz to lie when his trading was questioning, and pressured Trunz not to cooperate with the government's investigation. *See* Tr. 2415-2416, 2436-2437. And while Smith did not coach others to lie, he himself lied when investigated by the CME.

The seriousness of the defendants' crimes is compounded by their unequivocal statements that they knew spoofing was wrongful. Defendant Smith told the CFTC in 2017 that he *always* knew spoofing was prohibited. *See* GX 373 at 164:05-14. But after defendant Smith's spoofing came under scrutiny by the CME in 2013, he lied when asked about his trading, denied he was spoofing, and then continued to manipulate the market for another two years. Likewise, defendant Nowak told the CFTC in 2010 that he knew it was not appropriate to place orders without the intent to trade. *See* GX 370. But defendant Nowak was doing just that to manipulate the market and overseeing others who were doing the exact same thing. In 2012, defendant Nowak acknowledged that spoofing was "totally not allowed," *see* GX 69,

yet he himself was still spoofing at the time. In fact, he did not stop spoofing until early 2014—nearly three years after Dodd-Frank—when Simonian was fired for spoofing, and defendant Nowak moved to London to assume a non-trading, managerial role. But even though defendant Nowak stopped spoofing (because he stopped trading), he never put a stop to spoofing on the desk, as defendant Smith continued to spoof into 2015 and Trunz continued into 2016.

The fact that both defendants knew this type of trading was prohibited and knew it was a focus of the exchange and regulators, but still did not relent and lied to cover up their involvement, demonstrates the willfulness with which they manipulated the markets for their own benefit, lied to cover it up, and obstructed efforts to uncover their unlawful trading.

### B. A Significant Sentence Will Promote Respect for the Law, and Provide Just Punishment

In addition to reflecting the seriousness of the offense, a significant sentence of imprisonment is necessary to promote respect for the law and to provide just punishment. When compared to other recent cases involving spoofing at Wall Street banks, this case surpasses all of those in scope, duration, and impact. The scheme lasted over seven years (longer than *Bases* and *Vorley*), involved approximately 130,000 spoofing sequences comprising 1.3 million individual fake orders (far more than *Bases* or *Vorley*), and the defendants' crimes directly harmed other traders and caused (conservatively) over $55 dollars in calculable loss (again, far more than the $1 million and $300,000 losses in *Vorley* and *Bases*, respectively). Defendants Smith and Nowak were some of the most powerful and influential players in the world's gold

markets. When the defendants were manipulating the market to their benefit, JPMorgan was "one of the largest participants in the global precious metals markets" and "unrivaled in the spread and depth of its bullion market activities." GX 367 at 8 (signed by defendant Nowak); *see also* GX 366, GX 368. As head of JPMorgan's precious metals business, defendant Nowak has been called "the most powerful figure in the world's gold market." *See* "How the US Toppled the World's Most Powerful Gold Trader," *Bloomberg News* (Aug. 12, 2022), *available at* https://www.bloomberg.com/news/articles/2022-08-14/how-the-us-toppled-the-world-s-most-powerful-gold-trader. And the jobs that they spoofed to keep paid them handsomely: over $23 million in compensation for defendant Nowak and nearly $10 million for defendant Smith during the relevant period. *See* GX 414. For a scheme of this magnitude, a significant sentence is necessary to promote respect for the law, provide just punishment, and refute the perception of a two-tiered justice system in which wealthy, white-collar defendants fare better than others.

### C.   A Serious Sentence is Necessary to Afford Adequate General Deterrence

The government acknowledges that there is little need to specifically deter these defendants from future criminal conduct. General deterrence, however, is an especially significant consideration in a case like this. As Judge Lee explained in the *Bases* sentencing:

> The need for general deterrence is significant. The United States financial markets form one of the cornerstones of the domestic and international economies. It is imperative that participants in those markets, as well as the public at large, have confidence in the integrity and transparency of those markets.

36

Furthermore, violators and cheaters are often difficult to detect, and when they are and the violators are convicted, their sentences must be sufficient to deter others from trying similar schemes to defraud the market and gain an illegal and unfair advantage.

*Bases* Sentencing Tr. at 58.

The need for general deterrence was also made clear by the high-frequency trader whose 2012 complaint was the impetus for the CME's investigation into Smith's spoofing. *See* Tr. 2020:07-11. In 2013, the trader continued to complain to the CME about the constant spoofing that he witnessed—and was a victim of—in the precious metals markets. *See* Ex. C. The trader explained to the CME that many market participants, including himself, were losing confidence in the precious metals markets and choosing to leave them because of the "blatant market manipulation." *Id.* Th trader was not optimistic about the situation changing because "[w]ith the probability of being 'caught' so low for these guys what they are doing brings highly positive risk adjusted returns, so this activity will never stop and instead continue escalating." *Id.* A significant sentence in this case is needed to deter others who may seek to manipulate vital financial markets at the foundation of the nation's economy.

Defendants Smith and Nowak were prominent figures in the precious metals markets. It is critical that the sentences imposed by the Court serve as a general deterrent to others who may manipulate, or are considering whether to manipulate, the nation's commodities markets. Market manipulation (whether by spoofing or otherwise), is difficult to detect, particularly where, like here, sophisticated trading strategies are employed. Would-be manipulators know this and likely consider the

37

low prospects of apprehension in deciding whether to engage in abusive trading practices. *See United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018), (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'"); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (observing that, where a crime is hard to detect, "others similarly situated to the defendant must therefore be made to understand that when you get caught, you go to jail"). Therefore, significant sentences for defendants Smith and Nowak are necessary to meaningfully alter the calculus for other traders in the industry. *See United States v. Fechete*, 497 Fed. Appx. 626 (7th Cir. 2012) (affirming 262-month sentence for wire fraud, recognizing that the "type of fraud committed by Fechete was difficult to detect and difficult to prosecute, necessitating a higher sentence for general deterrence purposes").

### D.    A Significant Sentence is Necessary to Avoid Unwarranted Sentencing Disparities

A significant sentence, like that proposed by the government, is necessary to reflect the scope and magnitude of the market manipulation scheme in this case and distinguish it from recent spoofing cases where defendants received sentences of one year and one day. To be sure, the six- and five-year sentences recommended by the government *would* result in disparities from the sentences imposed in other spoofing cases—but those disparities are entirely warranted.

In three spoofing cases in this District, five non-cooperating defendants—Michael Coscia, James Vorley, Cedric Chanu, Edward Bases, and John Pacilio—were convicted at trial and sentenced. In *Coscia*, the court determined the applicable

Guidelines range to be 70 to 87 months and sentenced Coscia to 36 months of imprisonment. *See* Sentencing Tr. 50, *United States v. Coscia*, No. 14 CR 551, ECF No. 162. In *Coscia*, the defendant engaged in spoofing over a 10-week period in 2011 (beginning just after Dodd-Frank's anti-spoofing provision became effective) for a gain of approximately $1.4 million.[8] *Coscia*, 866 F.3d 782, 802 (7th Cir. 2017). Because Coscia was a proprietary trader, those gains largely flowed directly to him, and the court also found that Coscia had lied when he testified during trial—those were aggravating factors.

The conduct at issue here is far worse than in *Coscia*. Defendants Smith and Nowak manipulated the market for *years*, not just 10 weeks. They did so into 2014 (Nowak) and 2015 (Smith), far later than Coscia. And they did so flagrantly, despite knowing that the CFTC and CME were examining their desk and, at least in defendant Smith's case, his own trading activity. They caused at least $55 million of loss, far exceeding the $1.4 million in *Coscia*. They recruited junior traders and, in defendant Nowak's case, coached Trunz to lie and pressured him not to plead guilty.[9] And defendants Smith and Nowak did all this from the highest perch in finance, all while making millions of dollars. Accordingly, a sentence that is meaningfully higher than the 36 months imposed in *Coscia* is warranted.

---

[8] In *Coscia*, the district court determined that loss was not reasonably calculable and used gain as a substitute for loss. 866 F.3d at 801-02.

[9] An obstruction enhancement was applied in *Coscia* arising from his testimony at trial, however, defendant Nowak's obstruction through his lies to the CFTC, coaching Trunz to lie to JPMorgan's Compliance Department, and pressuring Trunz not to cooperate is substantially more serious given its duration, abuse of power, and the attempt to cover up the scheme while it was occurring.

In *Vorley*, each defendant was sentenced to one year and one day. The two defendants in *Bases* received the same sentences of one year and one day. But again, the conduct here is far more egregious than in those cases. In *Vorley*, the loss attributable to the defendants was approximately $1 million, and in *Bases* it was $300,000. Here, it is $55 million. The volume of spoof orders was correspondingly lower in those cases, too. For instance, in *Bases*, the defendants' scheme embraced 9,000 false spoof orders with an aggregate notional value of approximately $28 billion. Here, the scheme involved over 1.3 million spoof orders with a notional value of $1.5 *trillion*. The conduct in *Vorley* and *Bases* also ended earlier (at least as to defendant Smith), and the vast majority of conduct in each case occurred prior to Dodd-Frank. Indeed, Judge Lee in *Bases* counted as a mitigating factor that after "Dodd-Frank became effective and spoofing was explicitly prohibited by statute, and as additional regulatory attention was directed at such activity, Mr. Bases did curtail his spoofing activity." *Bases* Sentencing Tr. at 55. By contrast, not only did defendants Nowak and Smith continue their conduct into 2014 and 2015, respectively, but they did so despite knowing of the CFTC's and the CME's investigations. Relatedly, there was no evidence in *Vorley* or *Bases* that any of the defendants lied to a regulator or the exchange about their trading,[10] whereas here, defendant Nowak lied to the CFTC in 2010 and defendant Smith lied to the CME in 2013 in a manner that allowed their ongoing scheme to evade detection for years. As noted above, defendant Nowak also coached Trunz to lie and sought to obstruct the government's investigation. Given the

---

[10] Vorley did lie when asked, after the fact, about his trading by his employer.

40

longer (and later) time period, the persistence and scope of the scheme, the significantly larger loss amount, the important positions held by the defendants in the precious metals industry, and the attempts to thwarts investigations into their conduct, a significant sentence that is substantially higher than the sentences in *Coscia*, *Vorley*, and *Bases* is warranted.

## III.    Differentiating Between the Defendants

The government recommends a below-Guidelines sentence of six years for defendant Smith and five years for defendant Nowak. That equates roughly to a 66% discount for defendant Smith and an 80% discount for defendant Nowak from the bottom of the Guidelines range as calculated by the government. For non-cooperating defendants who were convicted at trial in a $55 million fraud scheme, those are substantial discounts. Nevertheless, the government acknowledges the need for the sentences imposed to recognize the defendants' personal histories and characteristics, the absence of any apparent need for specific deterrence, and the fact that—while their egregious conduct deserves a higher sentence than that previously imposed on any defendant in a spoofing case—it should not be so much higher as to create an unwarranted disparity.

The government's recommendation also reflects that, while defendant Nowak occupied a more senior role on the trading desk and has a higher Guidelines range, defendant Smith's spoofing activity was substantially more pervasive. Defendant Smith engaged in approximately 17 times more spoofing sequences than defendant Nowak (105,890 vs. 5,950 episodes). *He is, by a wide margin, the most prolific spoofer*

41

*prosecuted by the government to date.*[11] Defendant Smith also was the progenitor of the charged scheme, bringing the layering technique to JPMorgan from Bear Stearns in mid-2008. Further, defendant Smith was more directly involved in teaching Trunz and Edmonds to spoof, and he lied to the CME in 2013 and then persisted in his market manipulation for another year and a half. All these facts warrant a higher sentence than defendant Nowak.

That said, defendant Nowak is not that much less culpable. As a Managing Director and the desk head, he was the senior trader and manager responsible for the actions of the other traders on the desk. Not only did he spoof himself, but five traders under defendant Nowak's supervision spoofed for years. He created and condoned a culture of criminality and disrespect for the law. He lied to the CFTC in 2010, and he abused his position of authority to coach Trunz to lie in 2016. These are significant aggravating factors that merit an equally significant punishment.

## IV.    Restitution is Satisfied

Restitution is mandatory in this case. *See* 18 U.S.C. § 3663A. However, pursuant to the corporate resolution between the JPMorgan and the government, the bank has already paid the full amount of money necessary to compensate any and all victims in this case. As such, and because victims cannot be made whole twice, the defendants' restitution obligations have been fully satisfied.

---

[11] Even Coscia, who used a computer algorithm to spoof, only was responsible for 450,000 spoof orders—less than half of defendant Smith's spoofs. *See Coscia*, 866 F.3d at 788.

## V.     Conclusion

For the foregoing reasons, the government respectfully submits that the Court impose the following sentences: (1) for defendant Smith, 72 months of imprisonment and a fine within or above the Guidelines range, and (2) for defendant Nowak, 60 months of imprisonment and a fine within or above the Guidelines range.


Dated: March 20, 2023                  Respectfully submitted,

                                       GLENN S. LEON
                                       Chief, Fraud Section
                                       Criminal Division
                                       U.S. Department of Justice

                        By:            _____*/s/ Lucy B. Jennings*_____
                                       Avi Perry, Deputy Chief
                                       Matthew F. Sullivan, Trial Attorney
                                       Christopher Fenton, Trial Attorney
                                       Lucy B. Jennings, Trial Attorney
                                       Criminal Division, Fraud Section
                                       U.S. Department of Justice
                                       (202) 305-9708
                                       Lucy.Jennings@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I, Lucy B. Jennings, hereby certify that on March 20, 2023, I caused the foregoing filing to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to the parties who have entered an appearance in this case.

<u>/s/ *Lucy B. Jennings*</u>
Lucy B. Jennings