# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Nos. 18 CR 48-1, 2 |
| | ) | |
| EDWARD BASES and JOHN PACILIO, | ) | Judge John Z. Lee |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants Edward Bases and John Pacilio were tried and found guilty by a jury on charges of wire fraud and conspiracy to commit wire fraud. Pacilio also was found guilty of commodities fraud. In anticipation of sentencing, the government requests that the Court impose the following enhancements in calculating the guideline range for each defendant under the United States Sentencing Guidelines ("U.S.S.G."): twelve levels for the loss amount, U.S.S.G. §2B.1.1(b)(1)(G); two levels because the offense involved ten or more victims, U.S.S.G. §2B1.1(b)(7); two levels for defendants' leadership role in the conspiracy, U.S.S.G. §3B1.1; and two levels for the use of sophisticated means, U.S.S.G. §2B1.1(b)(10). Defendants object to these enhancements.

As explained below, the Court finds that the government has satisfied its burden to prove the applicability of the twelve-level enhancement for loss amount and the two-level enhancement for ten or more victims. However, the Court agrees with Defendants that the government has failed to establish that the enhancements

for leadership role and use of sophisticated means apply here. All told, the total offense level for each Defendant is twenty-one, and each has a criminal history category of I, resulting in a guideline range of thirty-seven to forty-six months of custody.

## I.    Background[1]

After a two-week jury trial, Bases and Pacilio were convicted of conspiracy to commit wire fraud affecting a financial institution between 2010 and 2011. At that time, they traded precious metals futures at Bank of America Merrill Lynch. Harnaik Lakhan worked with them there. Bases also was convicted of nine counts of wire fraud affecting a financial institution between 2010 and 2012, but was acquitted of one count of commodities fraud relating to conduct in 2014. Similarly, Pacilio was convicted of seven counts of wire fraud affecting a financial institution between 2010 and 2011, as well as one count of commodities fraud that continued into 2014. He was acquitted of spoofing in a single transaction in 2014.

At trial, the government demonstrated that Defendants placed large orders in various commodity futures markets on the Chicago Mercantile Exchange ("CME") with the intent not to execute them, which induced other market participants to buy or sell futures contracts at prices that they otherwise would not have, in a way that benefited Defendants financially. This fraudulent practice is known as "spoofing." This scheme comprised of several steps. Tr. at 601:22–604:4.

---

[1]    The factual, procedural, and statutory background of this case are outlined in *United States v. Bases*, Nos. 18 CR 48-1, 2, 2022 WL 3586142, at *1–3 (N.D. Ill. Aug. 22, 2022).

First, Defendants placed bids or offers ("Intended Orders") that usually took the form of iceberg orders[2] that obscure the true extent of the supply or demand for a particular position. Tr. at 666:5–667:15. Second, Defendants placed either large or multiple small, visible bids or offers on the opposite side of the market ("Subject Orders").[3] Tr. at 669:23–672:1. Third, the Subject Orders created the illusion that the demand or supply in a particular market was greater than it actually was, which prompted other traders to react, causing the market price to move toward Defendants' Intended Orders. Tr. at 672:2–21. Fourth, Defendants canceled the Subject Orders before they were filled. Tr. at 673:6–21.

In its case-in-chief, the government presented approximately seventy episodes involving at least one Defendant, twenty-two of which were accompanied by recorded, contemporaneous online chat communications acknowledging that spoofing was occurring. This evidence demonstrated that Defendants and Lakhan had engaged in a pattern of spoofing, coordinated their spoofing efforts, and openly discussed spoofing with other traders. *See* GX1, GX13, GX47.

The government also presented other evidence that supported the convictions. This included testimony from two CME directors familiar with the CME's trading

---

[2]    An iceberg order is a large order that is split up into a series of smaller orders in order to "obscure the true extent of supply or demand" for a particular position. *United States v. Coscia*, 866 F.3d 782, 800 (7th Cir. 2017) (citation omitted), *cert. denied sub nom. Coscia v. United States*, 138 S. Ct. 1989 (2018).

[3]    For purposes of this opinion, the Court will refer to "Intended Orders" and "Subject Orders" regardless of whether they were presented at trial or as part of relevant conduct for the purposes of discussing loss amount. The government and its expert, Kumar Venkataraman, sometimes refers to "Subject Orders" as "Spoof Orders."

practices and rules; an econometrician who summarized Defendants' trading episode data; Lakhan, who recounted, among other things, that Bases and Pacilio had taught him how to execute the spoofing scheme and that he frequently saw them spoofing; compliance officers from Deutsche Bank and Bank of America Merrill Lynch; two victims of the scheme; and an FBI agent who specializes in investigating security and commodities fraud.

Lakhan also testified that, based on his understanding of futures trading, he knew that the scheme he learned from Bases and Pacilio was unlawful because large, visible orders were placed with the intent not to execute them, and these orders inserted false information into the market to the detriment of other traders. Tr. at 598:7–12, 599:23–600:8.[4] According to Lakhan, he and Defendants engaged in spoofing in order to earn bigger bonuses, retain customers, and ensure the continued profitability of Bank of America Merrill Lynch's precious metals desk. Tr. at 642:25–643:15, 682:15–684:10. And he confirmed that, when Defendants carried out the spoofing scheme, the sequence of trading generally exhibited the four characteristics mentioned above. Tr. at 664:7–13.

After the verdict, Defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial under Rule 33. *See Bases*, 2022 WL 3586142. Those motions were denied.

After the Presentence Investigation Reports ("PSRs") were filed and all parties had submitted their sentencing memoranda, the Court granted Defendants' request

---

[4]      Robert Sniegowski, the former Executive Director of CME's Rules and Regulatory Group, also spoke of prototypical spoofing episodes, among other things. Tr. at 221:13–227:9.

for supplemental disclosures related to the loss amount calculated by the government's expert for each spoofing incident upon which he relied for his loss calculations. *See* 1/17/23 Minute Entry, ECF No. 728. The Court, however, denied Defendants' request for an evidentiary hearing as unnecessary, given the nature of the disputed issues, the extensive affidavits and supporting materials submitted by the parties, and the supplemental disclosures. *See id.* Defendants then jointly filed a brief in response to the supplemental disclosures. Joint Supplemental Sentencing Mem., ECF No. 730. The parties presented oral argument limited to the appropriate Sentencing Guidelines range at a hearing designated for that purpose. 1/26/23 Hr'g Tr., ECF No. 733.[5]

The parties agree that the 2021 version of the United States Sentencing Guidelines applies, that the counts of conviction are grouped, that the base offense level is seven for each Defendant under U.S.S.G. § 2B1.1(a)(1), and that the criminal history category for each is I. *See* Bases PSR ¶¶ 29–30, 32; Pacilio PSR ¶¶ 30–32. Defendants also agree with the PSRs to the extent that they do not recommend the leadership or sophistication enhancements, but they object to the remainder of the offense level calculation and guidelines analysis.

The government proposes a twelve-level enhancement for the loss amount and a two-level increase each for the leadership role, sophisticated means, and victim

---

[5]      As an aside, the Court finds that the government credibly represented that the entire loss analysis was performed post-trial, and that, as of the September 27, 2022, hearing, it was unaware of the existence of the per-episode loss spreadsheet that it included in its supplemental disclosure. *See* 1/26/23 Hr'g Tr. at 60:18–61:1; Defs.' Joint Supplemental Sentencing Mem. Ex. A, Supplemental Gov't Disclosure (Native) ("Episode Loss Spreadsheet"), ECF No. 730-3.

enhancements, which would result in a total offense level of 25 for each Defendant. On the other hand, Defendants suggest a two-level enhancement for loss amount and no other enhancements, for a total offense level of 9. The Probation Office's recommendations in the PSRs adopt the government's proposed twelve-level enhancement for loss amount and two-level victim enhancement, but reject the proposed leadership and sophisticated-means enhancements, resulting in a total offense level of 21 for each Defendant. For the following reasons, the Court agrees with the Probation Office's analysis and conclusions.

## II.     Legal Standard

"The government bears the burden of proving by a preponderance of the evidence that [an] enhancement is warranted." *United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019). A district court may "consider a wide range of information" so long as it has "'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Robinson*, 164 F.3d 1068, 1070 (7th Cir. 1999) (quoting *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995)).

## III.     Loss Amount Enhancement

### A.     What Trading Sequences Count As Relevant Conduct?

In calculating the loss amount under U.S.S.G. § 2B1.1(b), the Court can consider relevant conduct as defined in U.S.S.G. §1B1.3(a). Here, the government contends that, in addition to the trading episodes presented at trial, Defendants engaged in a number of other trades that constituted illegal spoofing and that these instances are relevant conduct that the Court should consider in calculating the loss amount.

6

"Relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," U.S.S.G. § 1B1.3(a)(1)(A), as well as "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," U.S.S.G. § 1B1.3(a)(1)(B). And, while this may include conduct for which a defendant was never charged or convicted, "the relevant conduct must be unlawful." *United States v. Chube II*, 538 F.3d 693, 702 (7th Cir. 2008) (cleaned up).

### 1. Jointly Undertaken Criminal Activity

Defendants first contend as a blanket matter that trading episodes in which they did not participate directly cannot not qualify as relevant conduct. But this objection is mistaken.

The government has established by a preponderance of the evidence that, during their collective tenures at Bank of America Merrill Lynch, Defendants and Lakhan jointly agreed to place numerous Subject Orders with the goal of benefiting themselves and the precious metals desk. This agreement has been proven through various recorded chats accompanying spoofing episodes involving Bases, Pacilio, and/or Lakhan. *See* GX21. According to Lakhan, Defendants taught him how to execute the fraudulent scheme, and together, he, Bases, and Pacilio engaged in the scheme in order to fill their Intended Orders and make better margins on trades than would otherwise be possible.

7

Furthermore, Bases, Pacilio, and Lakhan used a computer platform to place their bids and offers. And Lakhan testified that he frequently observed Bases and Pacilio implementing the scheme on that platform. Lakhan also explained that the more money that he, Bases, and Pacilio made for the bank, the bigger their bonuses, which are gauged not only to an individual trader's success but also the success of all trades on the precious metals desk.

Indeed, the record is replete with such facts that demonstrate, by a preponderance of evidence, that Bases, Pacilio and Lakhan engaged in a joint endeavor to implement their spoofing scheme during the time in question. Accordingly, each may be held responsible for the acts of the others that are within the scope of the scheme, in furtherance of the scheme, and were reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(B).[6]

### 2. Episodes Not Presented at Trial

Defendants next argue that only the trading episodes actually presented at trial can be considered for calculating the loss amount for sentencing. They contend that it is improper for the government to take the indicia of the scheme proved at trial and apply them to Defendants' other trades in order to identify additional spoofing

---

[6] Pacilio asserts that episodes occurring between April 12 to June 11, 2011, should be excluded from the loss amount because, during that time, he was forbidden from trading and from communicating with his former colleagues, including Bases. According to Pacilio, these thirty-seven episodes amount to roughly $8,645 in loss amount. Ultimately, however, the deduction or inclusion of this amount would not affect his enhancement level under U.S.S.G. § 2B1.1(b)(1).

activity to use as relevant conduct. In support, they cite *United States v. Chube II*, 538 F.3d 693 (7th Cir. 2008).

In *Chube II*, two physicians were charged with unlawful distribution of controlled substances and conspiracy arising out of the illegitimate prescriptions of drugs. *Id.* at 694. After a two-week jury trial, one defendant was acquitted of thirty-two of the thirty-three counts in the indictment, the other was acquitted of twenty-seven of the thirty-three counts, and both were acquitted of the conspiracy count. *Id.* At sentencing, the district court only mentioned ten of the ninety-eight patient files, but found that every prescription in the ninety-eight files presented at trial was relevant conduct. *Id.* at 696. On appeal, the Seventh Circuit held that the "court's assumption of a lack of legitimate medical purpose for every prescription in 98 files after discussing only 10 files with any specificity was not enough to support its findings." *Id.* at 704. The *Chube II* court remanded for resentencing and explained that, on remand, the district court "must explain its findings with respect to each patient and make a reasoned determination whether or not the Government has carried its burden of establishing that each prescription was dispensed outside the scope of medical practice and without a legitimate medical purpose." *Id.* at 705–06.

This case stands in stark contrast to *Chube II*. Here, the jury convicted Bases of ten out of eleven counts and Pacilio of nine out of ten counts, including the charge of carrying out a conspiracy.[7] But more to the point, the government presents its

---

[7]    The jury acquitted Bases of commodities fraud from May 2009 to January 2014 (Count 18), and acquitted Pacilio of spoofing on April 17, 2014 (Count 20). But this does not preclude the Court from considering conduct associated with those counts as relevant conduct. *See United States v. Shamah*, 624 F.3d 449, 459–60 (7th Cir. 2010) ("A sentencing court may

9

expert, Kumar Venkataraman, to support its theory that numerous trading sequences, in addition to those presented at trial, were part of Defendants' spoofing conspiracy and should be considered relevant conduct. I now turn to Venkataraman's analysis and Defendants' critique of it.

### 3. Venkataraman's Methodology

Venkataraman has examined Defendants' trading activity from August 1, 2008, to October 31, 2014, and identified numerous trading episodes that closely fit the following characteristics of Defendants' fraudulent spoofing scheme as demonstrated at trial.[8]

- A spoofing sequence begins when a resting and fully displayed limit order or group of orders . . . is placed by Defendants opposite an active iceberg limit order[.]

- A Subject Order must be placed within the top five levels of the order book, canceled within five seconds of placement, and for at least ten contracts at placement. Furthermore, in a given spoofing episode, the Subject Order must comprise of at least twenty-five total contracts.

- An Intended Order must be active within the top five levels of the order book at the time that any Subject Order is placed.

---

consider conduct of which a defendant has been acquitted, as long as that conduct is proved by a preponderance of the evidence."); *compare* 3d Superseding Indictment, ECF No. 373, *with* Jury Verdicts, ECF No. 629, 630.

[8] Defendants' conduct described at trial was limited to instances where the Subject Orders directly benefited Defendants by successfully triggering executions on their Intended Orders. As explained below, for purposes of determining relevant conduct, Dr. Venkataraman also has considered instances where the strategy did not directly benefit Defendants, but where an analysis of the data shows that market participants were detrimentally impacted, nonetheless.

Gov. Ex. 1, Venkataraman Decl. ¶¶ 15–21, ECF No. 725-1.[9] In addition, he analyzed trading sequences that occurred in conjunction with recorded, contemporaneous chats acknowledging that spoofing was occurring. *Id.* ¶ 16.

### a.     Whether the Criteria Are Over-inclusive

First, Defendants offer various reasons why Venkataraman's methodology leads to over-inclusive results. Each argument is addressed in turn.

### (1)     Legitimate Trading

According to Defendants, Venkataraman's criteria casts too wide a net and captures episodes that *could* be consistent with legitimate trading strategies. In their view, more analysis is required to rule out other possible reasons for the placement of the trades, such as changes in market conditions, client requests for quotes, price discovery, other business mandates, or Defendants' legitimate trading strategies. *Id.* ¶ 34.

---

[9]     Sequences that met the above criteria but exhibited any of the following characteristics were excluded:

- Sequences with fully-displayed orders that are active on the same side as and within five ticks of the Intended Order.

- Sequences that involve self-trading between Defendant Bases, Defendant Pacilio, or Lakhan.

- Sequences where Defendants place marketable (i.e., spread crossing) orders on the same side as the Subject Orders.

- Sequences that overlap in time with sequences on the opposite side of the market.

- Sequences beginning on: 1) March 25, 2010 at 9:49:52.790 AM (Platinum), 2) July 21, 2010 at 12:36:01.739 PM (Gold), 3) September 14, 2010 at 2:57:21.004 PM (Gold), 4) December 10, 2010 at 9:47:55.054 AM (Gold), and 5) August 23, 2011 at 7:02:25.819 PM (Gold).

But this overstates the government's burden. All that is required is that the government establish it is more likely than not that the additional trades were unlawful and that Venkataraman's estimate is a reasonable approximation of the loss. To this end, Venkataraman explains that large orders that are made visible to the market and are canceled quickly after submission are inconsistent with an economically rational trading strategy aimed at executing those orders. This is confirmed in the data that show that these orders have low fill ratios and short durations. What is more, Venkataraman's methodology is consistent with the approach utilized in other cases. *See CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *22, 20–24 (N.D. Ill. July 12, 2016) (St. Eve, J.) (finding that expert's methodology of utilizing narrowing criteria to identify spoofing episodes was "well supported and based on sound factual underpinnings and analysis"); *CFTC v. Moncada*, No. 12 CV 8791, 2012 WL 6015895, ¶¶ 28–52 (S.D.N.Y. Dec. 4, 2012) (outlining similar hallmarks of a manipulative wheat futures scheme); *see also CFTC Files Complaint in Federal Court Against Eric Moncada, BES Capital LLC, and Serdika LLC Alleging Attempted Manipulation of Wheat Futures Contract Prices, Fictitious Sales, and Non-Competitive Transactions*, CFTC (Dec. 4, 2012), https://www.cftc.gov/PressRoom/PressReleases/6441-12 (including Bases's expert, Jerry Cusimano, among the CFTC staff responsible for the *Moncada* case).

Furthermore, Venkataraman states that it is implausible that legitimate reasons, such as price discovery, two clients with different strategies, and market making, could explain why, in well over a thousand instances, Defendants

systematically placed and quickly canceled their large, fully displayed orders while an iceberg order was active on the opposite side of the market. Gov't Ex. 2, Venkataraman Reply Decl. ¶ 6, ECF No. 725-2. And his conclusion finds support in the credible testimony and evidence presented at trial.

### (2)   Trade Surveillance Criteria

Defendants next argue that the criteria for selecting the episodes are similar to those used for trade surveillance, which are designed to be over-inclusive. *See* Bases Ex., Cusimano Decl. ¶ 9(a)(ii), ECF No. 716-2. But Venkataraman persuasively explains that his parameters consider more exacting characteristics than those used by standard trade-surveillance algorithms. *See* Venkataraman Reply Decl. ¶ 3a. For example, unlike standard trade-surveillance algorithms, his selection criteria identify the persistent pattern of Defendants' trading activity that exhibits certain scheme characteristics identified at trial, such as large aggregate visible quantity, short duration, and resulting low fill ratios of Subject Orders. *Id.*

### (3)   Lack of Execution of Subject Orders

The trading episodes the government relied upon at trial were limited to those that benefited Defendants by successfully triggering executions on their Intended Orders. Because Venkataraman's analysis included trading episodes that did not result in successful executions of Defendants' orders, Defendants argue, his analysis casts too wide a net.

But, as the Seventh Circuit held in *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011), "[t]he wire fraud statute punishes the scheme, not its success." *See also United States v. Coffman*, 94 F.3d 330, 337 (7th Cir. 1996) (describing wire fraud

13

as a "crime of attempting rather than attaining"). "The fraud is therefore complete once a defendant with the requisite intent has used the wires in furtherance of a scheme to defraud[.]" *Aslan*, 644 F.3d at 545.

As Venkataraman explains, a large visible order on one side of the market likely will impact the market price, even if the impact is not sufficient to result in the execution of an order on the opposite side of the market. Moreover, each of the trading sequences identified by Venkataraman exhibit the same characteristics of the fraudulent trading episodes presented at trial, such as a large visible Subject Order, the order's short duration, and low fill rates that are inconsistent with an intention to execute the Subject Orders. This, in conjunction with the trial testimony, provides a reasonable basis to conclude that Defendants placed these orders without the intent not to execute them, regardless of whether these spoofing attempts were successful.

### b.    Whether the Criteria Are Sufficiently Reliable

In a variation of the same theme, Defendants assert that certain criteria Venkataraman used do not reliably identify spoofing and are both over- and under-inclusive. For example, they contend that the criteria as to order size and duration are arbitrary and would capture legitimate orders. On the other hand, Venkataraman's criteria would not capture some of the trading episodes presented at trial that were accompanied by contemporaneous chats that indicate they were spoof orders.

### (1)    Large Orders of Short Duration

Defendants challenge the criterion that looks for large orders of short duration, arguing that merely placing a large, fully visible order for only a short period of time

does not indicate spoofing. According to Cusimano, Bases's expert, if one assumes that large, fully displayed orders of short duration *without* an iceberg order on the opposite side of the market are legitimate, this also must be true when such orders are placed *with* an iceberg order on the opposite side.

Venkataraman disagrees with Cusimano's premise, noting that even large, fully displayed orders of short duration placed *without* iceberg orders on the opposite side of the market are less consistent with a strategy aimed at executing the orders and are more consistent with other purposes, such as pushing the price in the desired direction. In both instances, the pressure created by these large, visible orders affects the market and induces market participants to trade at less favorable prices. In fact, the data indicate that Defendants' Intended Orders were ten times more likely to be filled when a Subject Order was on the other side of the market. Venkataraman Reply Decl. ¶ 10 n.18. That said, to the extent that a short-lived, large, visible order was not accompanied by an opposing iceberg order, Venkataraman included them only when they were accompanied by contemporaneous communications indicating that they were spoofing orders.

In much the same vein, Pacilio's expert, E. Emre Carr, contests Venkataraman's premise that, in order to be a spoofing episode, a Subject Order must consist of at least twenty-five contracts and be canceled within five seconds of placement. *See* Pacilio Ex., Carr Decl. ¶ 32, ECF No. 713-3. As for the twenty-five-contract threshold, Venkataraman points to trial exhibit indicating that the average visible market depth in the top five levels of the order book from August 1, 2008, to

15

October 31, 2014, was forty-seven contracts for the gold market and thirty-nine contracts for the silver market. Venkataraman Reply Decl. ¶ 8 (citing GX237). The twenty-five-contract threshold represents more than half the number of contracts typically visible from all other market participants combined, which Venkataraman views as "large" under any reasonable standard. *Id.* The Court finds this approach reliable based upon the trial evidence.

In defense of the five-second criterion, Venkataraman cites peer-reviewed academic literature that describes five seconds as a reasonable lower threshold for a manual human trader like each Defendant to process new information and make a trading decision. *Id.* (citing Bastian von Beschwitz et al., *First to "Read" the News: News Analytics and Algorithmic Trading*, 10 REV. OF ASSET PRICING STUD. 122, 132–33 (2020) ("5 seconds . . . is too short for a human trader to read an article, process it and make a trading decision based on it.")). He explains that, because less than five seconds is considered too short for a manual human trader to make trades based on new information, using a five-second threshold is actually quite conservative in identifying Subject Orders. *Id.* Defendants point out that these articles only discuss a person's ability to read an article of unknown length whereas traders need only react to an order on a screen. But, on balance, the Court finds Venkataraman's selection of five seconds reasonable given the evidence and Defendants' trading activity.

### (2) Length of Trading Episode

Next, Defendants note that, in some trading episodes Venkataraman believes are fraudulent, minutes or hours might pass between the placement of an Intended

Order and a Subject Order. For example, according to Carr, in roughly ten percent of the sequences Venkataraman included in his calculations, an Intended Order was placed more than five minutes before a Subject Order. In a market that moves in milliseconds, Carr opines, that span of time undermines any connection between the two orders. Pacilio Ex. C, Carr Decl. ¶ 34, ECF No. 713-3.

But, as Venkataraman notes, it is entirely reasonable that a trader that has trouble filling an order over time would place Subject Orders later to produce the desired effect. Venkataraman Reply Decl. ¶¶ 9–10. Indeed, he cites numerous episodes presented at trial with significant time intervals between Intended Orders and Subject Orders. *Id.* (citing episode 52 on January 28, 2009 (Bases), and episode 54 on November 20, 2009 (Pacilio), depicted in GX21). And, in one instance, the Intended Order gets some fills before the first Subject Order is placed and then another Subject Order is placed after the first one is cancelled. *Id.* (citing episode 1a on October 22, 2008, in GX1); *id.* n.19 (comparing episode 1a with sequence 1423 on March 8, 2011, shown in Appendix A of Venkataraman's Reply Decl.).

### (3)    Chat Episodes

Defendants also contend that Venkataraman's approach cannot be accurate, because it fails to capture the trading sequences that the government includes in its loss calculations based on statements Defendants made in contemporaneous chat communications. But this misses the mark. At trial, the government offered two independent, but not mutually exclusive ways to tell whether a large, visible order was a spoof order—when a trading sequence exhibits the indicia of Defendants' spoofing scheme, and when a trading sequence is accompanied by contemporaneous

communications indicating that a particular order was a spoof order. Venkataraman's use of both approaches is entirely consistent with the trial evidence.

### (4) Non-Chat Episodes

Lastly, Defendants points to eighty-seven episodes included in Venkataraman's loss calculation that, in their view, do not satisfy his scheme criteria. For example, Cusimano cites an example where the Intended Order was not in the top five levels of the book when the first Subject Order was placed. But Venkataraman counters that a subsequent Subject Order during the same trading episode was placed when the Intended Order was in the top five levels of the book. Cusimano points to another example where the Subject Order consisted of less than twenty-five contracts. But Venkataraman notes that the sequence involved two Subject Contracts, one with twenty contracts and the other with sixty, thereby meeting the volume threshold.[10]

In sum, the Court finds that the methodology Venkataraman used to identity trading sequences to arrive at his loss calculation is reliable and firmly rooted in the evidence that the government presented at trial. When his analysis is considered in conjunction with the trial evidence, the Court finds that the government has established by a preponderance of the evidence that the trading sequences Venkataraman includes in his loss calculation were within the scope of Defendants' jointly undertaken criminal activity, in furtherance of that criminal activity, and

---

[10] Cusimano also refers to a number of episodes with accompanying chats that do not fit the criteria but, as discussed, this objection is meritless. Nonetheless, even if Cusimano's theory were correct, it would reduce the government's proposed loss amount by only $20,000, which would not alter the enhancement under § 2B1.1(b)(1).

reasonably foreseeable to each Defendant, and thus constitute relevant conduct under U.S.S.G. §1B1.3(a). This then brings us to the loss amount.

### B. Loss Amount Calculation

As an initial matter, Defendants insist that the government has not established that *any* loss is attributable to them. Alternatively, Bases argues that the appropriate loss amount as applied to him is between $6,501 and $15,000, resulting in a two-level increase under § 2B1.1(b)(1)(B), while Pacilio contends that the loss amount for him is between $15,001 and $40,000, resulting in a four-level increase under § 2B1.1(b)(1)(D). The Probation Office and the government take the position that the loss attributable to each Defendant is between $250,001 and $550,000, resulting in a twelve-level increase under § 2B1.1(b)(1)(G). Bases PSR ¶¶ 33–37; Pacilio PSR ¶¶ 33–36. As explained below, the Court finds that the loss amount as to each Defendant is between $250,001 and $550,000.

The Sentencing Guidelines provide for an increase in offense level based on the greater of the actual or intended loss resulting from an offense. *United States v. Durham*, 766 F.3d 672, 686 (7th Cir. 2014); U.S.S.G. § 2B1.1 cmt. n.3(A).

"Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). In turn, "[t]he phrase 'result[] from' imposes a requirement of but-for causation." *United States v. Yihao Pu*, 814 F.3d 818, 824 (7th Cir. 2016) (citing *Burrage v. United States*, 571 U.S. 204, 216–17 (2014) (finding that, when a criminal statute does not define the phrase "result from," a court should give it its ordinary meaning, which is but-for causation)).

19

"Intended loss" means "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). "To calculate the intended loss, the district court look[s] to the amount placed at risk by the scheme." *Durham*, 766 F.3d at 687. "The analysis starts there 'because the purpose of fraud statutes . . . is to punish the scheme, not simply the unlawful taking of money or property." *United States v. Stochel*, 901 F.3d 883, 890 (7th Cir. 2018) (quoting *United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003)).

When determining the loss amount, the Court "need only make a reasonable estimate of the loss, not one rendered with scientific precision." *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007); *see* U.S.S.G. § 2B1.1 cmt. n.3(C). Moreover, at sentencing, a "district court is not bound by the Federal Rules of Evidence" and "may rely on any information presented . . . so long as this information 'has sufficient indicia of reliability to support its probable accuracy." *United States v. Sunmola*, 887 F.3d 830, 839 (7th Cir. 2018) (quoting *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000)).

At sentencing, the government has the burden to prove "by a preponderance of the evidence that the loss amount is attributable to th[e] criminal or unlawful conduct [of conviction]." *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013). This includes the loss derived from any relevant conduct under U.S.S.G. § 1.B1.3(a).

When the government provides explicit proof of loss, the defendant must provide substantiated evidence to counter it. *Durham*, 766 F.3d at 686 (quoting *Gordon*, 495 F.3d at 432). And, when a district court relies on information contained

20

in the PSR in sentencing a defendant, "the defendant bears the burden of showing the presentence report is inaccurate or unreliable." *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009) (quoting *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004)). The defendant cannot simply "attack the information in the PSR by making a 'bare denial' of its accuracy." *Id.* (quoting *United States v. Mustread,* 42 F.3d 1097, 1101–02 (7th Cir. 1994)). Only when the defendant's evidence "creates real doubt as to the reliability of the information in the PSR does the government have the burden of independently demonstrating the accuracy of the information." *Id.* at 795–96.

The government relies heavily on Venkataraman's loss calculations, and so the Court starts with that.

### 1.   Venkataraman's Analysis

According to Venkataraman, the Subject Orders in the trading sequences he identified created artificial pressure on the market. And, to the extent that the Subject Orders induced market participants to accept orders at less-advantageous prices but for the placement of the Subject Orders, they suffered financial harm. Venkataraman then proceeded to offer the following methodology to provide a reasonable estimate of this loss.

#### a.   Unadjusted Market Loss

First, Venkataraman analyzed "transactions that occurred while the Spoof Orders were active in the visible order book." Venkataraman Decl. ¶ 22. For example, he "identified losses incurred by market participants who bought while Defendants' Spoof Orders to buy were active (which increased the perception of buying interest)

and participants who sold while Defendants' Subject Orders to sell were active (which
increased the perception of selling interest)." *Id.*

Then, to calculate the corresponding losses, Venkataraman compared the
prices at which market participants traded while Defendants' Subject Orders were in
the market, to the prices at which market participants would have been able to trade
absent the Subject Orders. He labeled the latter price as the "But-For Trade Price."
*Id.* ¶ 24.

To calculate the But-For Trade Price, Venkataraman looked to "the last
observed bid and ask prices immediately before the placement of the first Spoof Order
in each Spoofing Sequence. The But-For Trade Price is therefore the last observed
best bid price for buy-side Spoof Orders and the last observed best ask price for sell-
side Spoof Orders." *Id.*

As Venkataraman explains:

> For each transaction that occurred while a Spoof Order was
> active, I calculate the difference between the price at which
> the execution actually occurred ("Actual Trade Price") and
> the corresponding But-For Trade Price. This price
> difference is a measure of the additional mark-up, or the
> higher cost (or potentially, benefit) of trading for market
> participants on the Spoof Order side of the transaction
> while the Spoof Orders were active. Specifically, when the
> Actual Trade Price is "worse" (*i.e.*, higher for buyers and
> lower for sellers) than the But-For Trade Price, the
> participants incurred a higher cost relative to the state of
> the market before the Spoof Order was placed. Conversely,
> when the Actual Trade Price is "better" (i.e., lower for
> buyers and higher for sellers) than the But-For Trade Price,
> the participants recognized a benefit. To arrive at the
> "Unadjusted Market Loss" associated with an individual
> transaction, I multiply the price differential by the
> transacted quantity. I aggregate this measure across all

22

transactions executed by market participants while Spoof
Orders are active to arrive at a total Unadjusted Market
Loss estimate across all Spoofing Sequences.

*Id.* ¶ 25; *see, e.g.*, *id.* ¶ 26.

Using this methodology, Venkataraman concludes that, across all of the
identified Spoofing Sequences, the total unadjusted market loss on the Spoof Order
side based on all transactions observed while the Spoof Orders were active is over
$383,940, and the Spoof Orders affected 18,729 contracts. *Id.* ¶ 27. He posits that
approximately 99% of affected trades and 99% of the unadjusted market loss occurs
within the first five seconds after the placement of the Spoof Order in the Spoofing
Sequence, and practically all of the unadjusted market loss occurs within the first
thirty seconds. *Id.*

> ### b. Accounting for Trades That Would Have Occurred During Spoofing Episodes Absent Spoofing

After determining the unadjusted market loss, Venkataraman then provides
two ways to account for circumstances when a market participant may have been
willing to trade at a worse price anyway (*i.e.*, "cross the spread") in order to achieve
immediate execution of an order.

> #### 1) Adjusted Market Loss Calculation

In the first approach, Venkataraman employed an event study methodology to
compare the period pre- and post-placement of Spoof Order. For each Spoofing
Sequence, he identified a period of trading immediately preceding the Subject Order
that matched the duration of the Subject Order. He called this the "matched control

period."[11] He then estimated the "But-For cost of trading" for market participants on the Spoof Order side for trades observed during the matched control period[12] and deducted that from the unadjusted market loss calculation to arrive at the adjusted market loss estimate. *Id.* at 32-33. Because the control period immediately precedes the placement of the Spoof Orders in a Spoofing Sequence, the methodology accounts for idiosyncratic market conditions that may differ across Spoofing Sequences and provides an estimate of the "normal" cost of trading of market participants around the time of a Spoofing Sequence, absent the placement of the Spoof Orders. *Id.* ¶ 33; *see, e.g.*, *id.* ¶ 34 (providing Episode #17 as an example).

Using this method, Venkataraman estimates the total unadjusted market loss to be $316,111. *Id.* ¶ 35. And, when Venkataraman shortened the time period to trades within five seconds of placement of the Spoof Orders (rather the entire period), the adjusted market loss totals $311,059. *Id.*

### 2) Alternative Adjusted Market Loss Calculation

Venkataraman offers a second way to account for circumstances when a market participant may have been willing to cross the spread for reasons that have nothing to do with an active Spoof Order—comparing the rates at which market

---

[11] A Spoof Order remains visible in the order book until it is either canceled, fully filled, or the market price moves such that the resting Spoof Order is no longer in the first ten levels of the order book. *Id.* ¶ 31, nn.21–22.

[12] Venkataraman calculated the "But-For costs of trading" by taking the difference between the prices at which a trade actually occurred during the matched control period and the best bid (or offer) price immediately prior to the control period. *Id.* ¶ 32.

participants cross the spread immediately before and after a Spoof Order is placed during each Spoofing Sequence. *Id.* ¶¶ 37–38.

To make this comparison, Venkataraman calculated the spread-crossing rate, *i.e.*, the number of contracts traded per second by market participants on the Spoof Order side who crossed the spread. *Id.* ¶ 39. Next, he compared the spread-crossing rate immediately prior to the placement of the Spoof Order to the spread-crossing rate immediately after the placement of the Spoof Orders to measure the impact of the Spoof Order on spread-crossing activity. *Id.* When doing so, he considered the spread-crossing rate for the five seconds immediately preceding the placement of the Spoof Orders and the rate for the entire duration of the Spoofing Sequence. *Id.* ¶ 40.[13] Furthermore, Venkataraman limited his evaluation to periods where the best market price on the opposite side of the Spoof Orders remained unchanged in order to keep market conditions as comparable as possible and to isolate the impact of the Spoof Order. *Id.* n.25. Finally, he aggregated the results for each period and compared them. *Id.* (comparison chart).

According to Venkataraman, the difference between the spread-crossing rates for the pre-Spoof Order periods and the time that a Spoof Orders are in effect can be reasonably attributed to the placement of the Spoof Orders. The balance would indicate those instances where market participants would have crossed the spread

---

[13]     Venkataraman states that the duration of the pre-Spoof Order period did not materially impact his analysis. In other words, whether he used the rate of spread-crossing one second or ten seconds before the Spoof Order yielded similar results. When the five-second pre-Spoof Order period overlaps with a preceding Spoof Order, he only analyzed the spread-crossing rate for the non-overlapping period (which is less than five seconds).

during a Spoofing Sequence regardless of the Spoof Order. Determining this to be 22.2% of the spread-crossing contracts traded by participants on the Spoof Order side while the Spoof Orders were active, Venkataraman discounted the unadjusted market loss by 22.2%, resulting in an alternative adjusted loss amount of approximately $298,882. *Id.* ¶¶ 41–42.

### 2. Defendants' Objections to Loss Amount

Defendants offer myriad objections to the government's loss amount calculation. First, they attack the evidentiary value of the calculations in general. Next, they highlight particular shortcomings in Venkataraman's methodology of estimating Unadjusted Market Loss, Adjusted Market Loss Calculation, and Alternate Market Loss.

### a. General Critiques

### 1) Intent

Defendants argue that the government has not shown by a preponderance of the evidence that they intended to affect the market with their Subject Orders, and that Venkataraman's methodology affirms this assertion. According to Defendants, Venkataraman's analysis shows that there was an appreciable risk that a Subject Order would not move the market in the direction of the Intended Order at all and that, at times, the market might move *against* the direction of the Intended Order. To wit, under the adjusted market loss method, Subject Orders did not move the market 23% of the time and the market moved against them 12% of the time. *See* Episode Loss Spreadsheet. Under the alternative market loss method, Subject Orders

26

did not move the market 27% of the time and the market moved against them 1% of the time. *See id.*[14]

But Defendants' argument throws to the side all of the evidence presented at trial demonstrating that they repeatedly placed orders with the intent not to execute them in an effort to move the market their way. This evidence is only bolstered by Venkataraman's conclusion that Defendants' Subject Orders successfully move the market in the intended direction at least 64% or 72% of the time. Thus, the Court finds that the government has met its burden to prove by a preponderance of the evidence that Defendants placed the Subject Orders with intent to defraud.

### 2) Causation

Next, Defendants argue there is no proof of causation. As they see it, Venkataraman assumes without basis that the trading that occurs during a Spoofing Sequences is directly in response to their Subject Orders. This is incorrect. The whole point of Venkataraman's two adjusted market loss calculations is to account for that portion of the trading that would have occurred anyway.[15]

---

[14]    Defendants also contend that an evidentiary hearing is necessary to test Venkataraman's methodology and conclusions. But the Court does not believe that an evidentiary hearing is necessary. The Court not only has the benefit of the entire two-week trial record, but the parties have submitted comprehensive declarations and supporting materials to advance their respective positions. Moreover, there are no factual disputes as to underlying trading data material to the Court's determination, nor are there any disputes as to how Venkataraman treated the data. Rather, the dispute centers around whether Venkataraman's analysis is methodologically reliable and grounded in the facts proved at trial. These are matters that the Court can decide without an evidentiary hearing given the fulsome record before it.

[15]    Defendants also claim that they did not cause harm to (1) traders that might have entered and exited the market while a Subject Order remained open ("round-trip traders"); (2) traders that might have traded in the direction opposite to a Subject Order ("opposite-side traders"); or (3) traders that might have traded on the execution side but placed their orders

### 3) Trial vs. Non-Trial Episodes

Additionally, Cusimano asserts that the differences in estimated harm between trial episodes and non-trial episodes are economically and statistically significant for the calculations of Unadjusted Market Loss, Adjusted Market Loss Calculation, and Alternate Market Loss. But this is not surprising. For obvious reasons, at trial, the government presented its best examples of spoofing episodes to establish beyond a reasonable doubt that Defendants engaged in their fraudulent scheme. In any event, this comparison does nothing to call into question the reliability of Venkataraman's loss calculations.

### 4) Offsetting a Market Participant's Losses with Gains

Defendants also criticize Venkataraman's methodology for failing to account for situations in which the same market participant who traded on the opposite side of the spoof also benefited from the spoofing activity, which could potentially offset any losses. The Court need not consider whether any particular offset is appropriate because Defendants have not presented any facts on which to make that determination. And, in any event, the Court agrees with the government that, given a spoof order's tendency to spur trading on the opposite side of market, any trading on the spoof side is likely not to be material, nor would it significantly undermine Venkataraman's conclusions.

---

prior to the placement of a Subject Order ("early crossers"). But Defendants state these as theoretical possibilities without providing any examples in the record.

### b. Critiques of Unadjusted Market Loss Methodology

Defendants question some of the metrics Venkataraman employed in calculating the unadjusted market loss.

#### 1) But-For Trade Prices

Defendants first criticize Venkataraman's reliance on the prevailing best bid or offer price ("BBO") immediately prior to a Spoof Sequence in order to determine But-For Trade Prices. In their view, Venkataraman should have used either the last-traded price or the midpoint of the BBO instead. But, as the government notes, Venkataraman's adjusted market loss calculations considers the tendencies of markets to trade at the best bid and best offer prior to the placement of the Spoof Order.

Additionally, in the government's view, the last-traded price, which may have occurred seconds or minutes ago, is less accurate than the BBO immediately preceding the Spoof Order. And, in the futures market, trades happen at the BBO, not the midpoint. These are reasonable explanations for Venkataraman's use of the BBO in his analysis.

#### 2) Trading During Pre-ARMADA Period

Defendants also argue that Venkataraman's market analysis regarding trading sequences prior to March 23, 2009, is unreliable due to the unavailability of ARMADA data (which show market price and depth information). It is undisputed, however, that, even before ARMADA existed, order-level trading data were available ("RAPID data"). And, for the effected trading episodes, Venkataraman used RAPID

data to calculate the last-added prices to provide a conservative measure of market loss.

Defendants also contend that the prices Venkataraman inferred from the RAPID data are inaccurate because he gave insufficient consideration to cancelations, assumed the market is always one-tick wide, and failed to recognize that RAPID data are insufficient to determine which side is the aggressor in special cases where messages have the same time stamp. Cusimano Decl. ¶ 45. However, as the government notes, had Venkataraman accounted for cancelations or assumed the spread could be more than one tick wide, the resulting adjusted market loss would have been higher, not lower. [16] Venkataraman Reply Decl. ¶ 26. At any rate, Defendants have offered no particular facts to support this theory.

Cusimano did sample a period when both RAPID and ARMADA data were available and, after comparing the BBOs, determined that the BBO Venkataraman used deviated from the BBO from the ARMADA data 40% of the time. Cusimano Decl. ¶ 44. This argument is unpersuasive for several reasons. First, Cusimano only analyzed only 5% of all of the Spoofing Sequences in Venkataraman's study. Furthermore, Venkataraman did not try to "reconstruct the order book," as Cusimano

---

[16]     As Venkataraman explains, the purpose of his calculation was to determine a simplified proxy of the BBO that would result in a conservative measure of market loss—one that would underestimate the adjusted market loss in those occasional instances it does not perfectly match the BBO. Venkataraman Reply Decl. ¶ 26. He states that he accomplished this by ensuring that the proxy bid/ask spread was no wider than the actual bid/ask spread (had it been directly observable in the data). *Id.* Had he attempted to account for the impact of cancelations or assumed a spread wider than one tick, as Cusimano suggests, he would have captured more Spoofing Sequences (because more orders would be within the top five levels of the order book), and his estimate of market loss for a given Spoofing Sequence would have been higher (because the spread that each market fill lost would have been wider). *Id.*

contends. Rather, Venkataraman tried to take a conservative approach to calculate a BBO where the derived bid/ask spread was no wider than the actual bid/ask spread. Venkataraman Reply Decl. ¶¶ 26–27. Accordingly, rather than checking to see how frequently Venkataraman's derived But-For Trade Prices deviated from the actual But-For cost of trading, Cusimano should have looked in the post-ARMADA data for instances where the derived BBO price was more conservative than the observed but-for price, which would have verified Venkataraman's work.

Defendants also assert that there are no peer-reviewed articles or industry-tested methods for conducting such an analysis without ARMADA data. But Venkataraman persuasively responds that he implemented a similar approach in a paper published in the *Journal of Finance Economics*, a peer-reviewed journal. *See* Hendrik Bessembinder & Kumar Venkataraman, *Does an Electronic Stock Exchange Need an Upstairs Market?*, 73 J. FIN. ECON. 3–36 (2004).

Having considered the above, the Court finds that Venkataraman's use of RAPID data for pre-ARMADA trading sequences is sufficiently reliable to result in a reasonable estimation of loss caused by them.

### 3) Inclusion of Trades for Full Duration of Spoof Order

Defendants argue that there is no basis for Venkataraman to include trades up to the full duration of the Spoof Order in calculating market harm. Cusimano has identified certain market level imbalances in the order book using ARMADA data for the dates on which Bases was actively trading. Cusimano Decl. ¶ 74. During those times, he concludes, the imbalances only lasted two seconds, the market traded

almost equally on both sides of the market and any assumed response had dissipated. *Id.* ¶ 75.

In response, the government persuasively argues that, by analyzing all market level order book imbalances in the way that he did, Cusimano's two-second estimate understates the duration of market imbalances caused by the type of large Spoof Orders Defendants placed in this case. *See* Venkataraman's Reply Decl. ¶ 44. This is bolstered by Venkataraman's analysis indicating that over 98% of the calculated market loss results from trades within five seconds of the placement of the Subject Order. *See* Venkataraman's Decl. ¶ 35. Thus, the Court agrees that Cusimano's two-second benchmark tends to underestimate the imbalances caused by Defendants' Spoof Orders and that Venkataraman' analysis provides a more reasonable measure.

### c. Critiques of Adjusted Market Loss Methodology

Defendants also object to the manner in which Venkataraman arrived at his adjusted market loss amount.

### 1) Improper Control Period

In Defendants' view, Venkataraman's method of estimating the But-For cost of trading erroneously assumes that the trading volume (or the rate of spread crossing under the Alternate Adjusted Market Loss Methodology) in the short time period prior to the Spoofing Sequences is an appropriate predictor of trading volume during the Spoofing Sequence. *See* Cusimano Decl. ¶ 49; Carr Decl. ¶ 71. According to Defendants' experts, volume in futures markets is highly variable from one period to the next, and Venkataraman fails to assess the suitability of comparing trading

volume from one brief time interval with the trading volume in the next period of equal duration. Cusimano Decl. ¶ 49; Carr Decl. ¶ 71.

If trading volume were as volatile as Defendants' experts say, one would expect to find no pattern at all across the Spoofing Sequences. Instead, Venkataraman found that a great majority of Subject Orders were followed by an increase in trading behavior in the direction opposite of the Subject Order relative to the trading patterns observed immediately preceding the placement of a Subject Order. *See* Venkataraman Decl. ¶¶ 29–36; *see also* Episode Loss Spreadsheet. Furthermore, such analytical methods are widely used in finance research to evaluate trading patterns immediately before and after an event to measure the impact of the event. Venkataraman Reply Decl. ¶ 33.[17] As such, the Court finds that Venkataraman's use of a control period immediately before the placement of a Subject Order is a reasonable way of determining the market conditions in the absence of a Subject Order.

### 2) Control Periods Includes Resting Icebergs

Next, Defendants argue that, because the placement of an Intended Order opposite the Subject Order is part of the spoofing scheme, Venkataraman's event study is not reliable because the control period includes part of the event. *See* Carr

---

[17] For example, Venkataraman cites peer-reviewed articles that discuss similar event study methodologies for analyzing trading patterns. *See* Asani Sarkar & Robert A. Schwartz, *Market Sidedness: Insights into Motives for Trade Initiation*, 64 J. FIN. 375 (2009); Shmuel Baruch et al., *Informed Trading and Price Discovery Before Corporate Events*, 125 J. FIN. ECON. 561 (2017). He also cites Beschwitz et al., *supra*, at 16, as an example of intraday implementation, showing that the market reacts to false information signals, with the reaction concentrated in the first five seconds after the false signal.

Decl. ¶ 72. But, as the government explains, the presence of an active Intended Order (typically a resting iceberg order) during the control period does not taint the analysis, because the Subject Order, not the Intended Order, is the event being studied. Venkataraman Reply Decl. ¶ 35. Furthermore, Venkataraman removed any portion of the control period that overlapped with an active Subject Order.

### d.   Critiques of Alternate Adjusted Market Loss Methodology

Defendants pose additional objections to Venkataraman's method for calculating the alternate adjusted market loss.

First, according to Carr, Venkataraman cannot conclude from the mere fact that a substantial portion of the harm comes from market participants crossing the bid-ask spread that Defendants' Subject Orders caused the increased rate in spread crossing. Carr Decl. ¶ 70. But, again, Venkataraman's methodology isolated any abnormal trading activity because the only market condition that changed from the matched control period to the Spoofing Sequences is the placement of the Subject Order. *See* Venkataraman Reply Decl. ¶ 31.

Carr also notes that, during hundreds of sequences, the bid-ask spread did not change. Carr Decl. ¶ 70. He does not explain, however, why the bid-ask spread would need to change in order for there to be market harm.

### e.   Comparison of Per-Episode Loss Amounts

Based on the government's disclosures regarding the loss amounts for each individual episode, Defendants argue that the per-episode loss amounts under Venkataraman's adjusted market loss methodology and the per-episode loss amounts

under his alternative market loss methodology are vastly different. Based on this, they contend that Venkataraman's results are wholly unreliable. This objection is not well-taken.

As the government explained, Venkataraman's adjusted market loss analysis produces more variability between the loss amount of each episode but averages the losses over time, concluding that, on average, Defendants' spoofing was profitable and caused loss to other market participants. 1/26/23 Hr'g Tr. at 56:7–57:11. On the other hand, Venkataraman's alternative market loss methodology produces less variability between the loss amount of each episode and focuses on each individual episode by comparing the spread-crossing rate before and after each episode. *Id.* at 57:12–58:16. Venkataraman's two methodologies incorporate different metrics, and, so, one would not expect that a side-by-side comparison of the individual per-episode loss amounts under each methodology would necessarily correlate with one another. *Id.* at 56:7–58:16. As such, Defendants' argument is unpersuasive.

## C. Summary

For the above reasons, the Court rejects Defendants' objections regarding the accuracy and reliability of Venkataraman's loss-amount analysis. Based on the record before it, the Court finds that the government has established that Venkataraman's calculations are accurate, reliable, and a reasonable estimate of the loss inflicted by Defendants' fraudulent conduct. By relying on Venkataraman's analysis and the facts proven at trial, the government has proved by the preponderance of the evidence that the loss amount for each Defendant is greater than $250,000, but not more than

$550,000, triggering the twelve-level enhancement under § 2B1.1(b)(1)(G) for each
Defendant.

## IV.    Victim Enhancement

The government requests that the Court apply a two-level enhancement under
U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved ten or more victims. Bases
PSR ¶¶ 38–40; Pacilio PSR ¶¶ 37–39. Defendants concede that, due to the nature of
their arguments, the applicability of this enhancement rises or falls with their
challenge to the loss-amount enhancement.

The Court concludes that the government has proven by a preponderance of
the evidence that Venkataraman's loss-amount calculation provides a reasonable
estimate of the loss. Venkataraman has estimated that 1,384 unique traders at 235
unique firms were affected by Defendants' placement of their Subject Orders.
Venkataraman Decl. ¶ 27. The government also has named ten specific victims who
have suffered as a result of the offense. Accordingly, the government has met its
burden, and the Court will apply the victim enhancement.

## V.    Leadership Enhancement

In addition, the government asks the Court to apply a two-level "leadership"
enhancement to Bases and Pacilio's sentences. The enhancement is found at U.S.S.G.
§ 3B1.1(c):

> If the defendant was an organizer, leader, manager, or
> supervisor in any criminal activity . . . increase [the offense
> level] by 2 levels.

In considering whether Bases or Pacilio acted as organizers, leaders, managers, or
supervisors of a criminal activity, the Court will consider the following factors:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. 4.[18] But these factors are not exhaustive, and the Court need not adhere to them exclusively; the ultimate question in determining whether the enhancement applies is simply "what relative role" the defendant played in the criminal scheme. *United States v. Mustread*, 42 F.3d 1097, 1104 n.3 (7th Cir. 1994). To answer that question, the Court must "make a commonsense judgment about the defendant's relative culpability[,] given his status in the criminal hierarchy." *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013); *see also United States v. Lovies*, 16 F.4th 493, 506 (7th Cir. 2021) ("The test for whether a defendant is a manager or supervisor in a criminal organization under § 3B1.1 is practical, not formal.").

---

[18]     The Sentencing Guidelines state that these factors are to be considered "[i]n distinguishing a leadership and organizational role from one of mere management or supervision." *Id.* The utility of this distinction is clear when an enhancement is imposed under § 3B1.1(a) or (b), as those enhancements only apply when the defendant acted as an "organizer or leader" (a) or a "manager or supervisor" (b). But under (c), where the enhancement may be imposed when the defendant exercised a leadership and organizational role *or* a managerial or supervisory role, it is not clear that the distinction matters. Nonetheless, the Seventh Circuit has stated that the factors are relevant not only in distinguishing organizers and leaders from managers and supervisors but also "in ascertaining whether an individual had a supervisory role at all," such that the enhancement under (c) would apply. *United States v. Gonzalez-Mendoza*, 584 F.3d 726, 728 n.2 (7th Cir. 2009) (quoting *United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008)). Despite recent criticism of this approach, *see United States v. McGee*, 985 F.3d 559, 562 n.2 (7th Cir. 2021), it appears to remain good law. As such, the Court will use the factors to guide its analysis, though it acknowledges that the factors are not dispositive and that the inquiry is ultimately a practical one.

As to factor 1, the exercise of decision-making authority, the government identifies only one episode in which either Defendant even arguably exercised "authority" over any other person. On one occasion, Pacilio told Lakhan over an electronic chat that he would "help" him engage in a spoof and told him not to do it himself. GX83. In context, nothing in the message clearly indicates that Pacilio was exercising any authority over Lakhan's spoofing activities; the communication just as easily could be seen as a friendly offer of assistance between two equal partners in a criminal venture. Even if the Court were to interpret Pacilio's message as an exercise of decision-making authority, it would not accord it significant weight. *United States v. Mankiewicz*, 122 F.3d 399, 406 n.4 (7th Cir. 1997) (stating that an "isolated incident of giving direction to another" does not warrant the leadership enhancement) (citing *United States v. Brown*, 944 F.2d 1377, 1380 (7th Cir. 1991)).

As to factor 2, the nature of Defendants' participation, the government makes much of the fact that Bases and Pacilio taught people, including Lakhan, how to spoof. Gov't Mem. at 33. But as the Probation Office correctly points out, the fact that Bases and Pacilio acted as teachers does not necessarily imply that they possessed any organizational or managerial authority over the individuals they taught. Bases PSR ¶ 45; Pacilio PSR ¶ 44.

The government relies on two unpublished, out-of-circuit cases to bolster its contention that Defendants' role as teachers is relevant to the enhancement analysis. But in both of these cases, while the defendants did act as teachers, there were additional facts strongly supporting application of the leadership enhancement that

are simply absent here. *See United States v. Meredith*, 370 F. App'x 930, 933 (10th Cir. 2010) (affirming application of leadership enhancement where three witnesses identified the defendant as the "leader or mastermind" of a criminal scheme, the defendant provided resources and materials and recruited people to participate in the scheme, and the defendant received a cut of the profits from the scheme); *United States v. Rauso*, No. 94-126, 1995 WL 79196, at *3 (E.D. Pa. Feb. 22, 1995) (applying enhancement where defendant "was the leader of several individuals whom he educated, supervised and directed in the furtherance of his general scheme"). Unlike the defendants in *Meredith* and *Rauso*, while Bases and Pacilio may have taught some people how to spoof, there is little evidence that they actually had any hierarchical control over those people's criminal activities.

As to factor 3, the recruitment of accomplices, the government points to Bases and Pacilio's recruitment of Lakhan. Gov't Mem. at 33; *see also Bases*, 2022 WL 3586142, at *2 (recounting Lakhan's testimony that "Bases and Pacilio had taught him about the scheme and how to execute it"). The Court, while acknowledging that this factor favors the government, does not accord it significant weight, since there is little, if any, evidence that Bases or Pacilio exercised supervisory or managerial authority over Lakhan's illegal activities.

As to factor 4, the claimed right to a larger share of the fruits of the crime, the government generally argued at the sentencing hearing that Bases and Pacilio claimed a larger share of their trading desk's profits than Lakhan by virtue of their seniority. Hr'g Tr. at 95. But this larger compensation was attributable to their

legitimate positions at the company, rather than whatever control they may have had over Lakhan in effectuating the joint spoofing scheme. As such, the mere fact that Lakhan may have received smaller bonuses than Defendants based on Bank of America Merrill Lynch's incentives program does little to prove that Defendants "claimed the right" to a larger share of the proceeds from the scheme. *See United States v. Bell*, 28 F.3d 615, 618 (7th Cir. 1994) (reversing the district court's application of the leadership enhancement where there was no evidence that the defendant himself claimed the right to a larger cut of the proceeds).

As to factor 5, the degree of participation in the planning and organization of the offense, the government has provided little evidence that the scheme here involved a significant amount of "planning" or "organization." A great part of the scheme entailed Defendants and Lakhan entering separate Spoof Orders, albeit with the aid and knowledge of the other.

As to factor 6, the nature and scope of the illegal activity, this was a rather straightforward spoofing scheme involving three individuals working for the same financial institution. While the scheme involved repeated criminal activity, it was not exactly breathtaking in its scope.

As to factor 7, the degree of control and authority exercised over others, there is little to no evidence that Bases or Pacilio exercised "control and authority" over anyone in the realm of spoofing. The government points to the fact that they held senior positions over Lakhan on their trading desk. But, again, the mere fact that Bases and Pacilio were senior to Lakhan in their company's legitimate business

dealings does not support an inference that this same organizational relationship existed in their criminal scheme.

Overall, the Court finds that the government has not proven by a preponderance of the evidence that the leadership enhancement should apply for either Defendant.

### VI.    Sophisticated Means Enhancement

The government next argues that the Court should apply a two-level "sophisticated means" enhancement as to each Defendant. The Sentencing Guidelines provide that,

> [i]f (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of the fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase [the offense level] by 2 levels.

U.S.S.G. § 2B1.1(b)(10). The government contends that either § 2B1.1(b)(10)(B) or (C) justifies imposition of the enhancement in this case.

As to § 2B1.1(b)(10)(B), the government believes that a substantial part of Defendants' scheme was conducted outside the United States, because Lakhan traded from London. Gov't's Mem. at 30–31. The Court finds that Lakhan's London-based activities did not constitute a "substantial part of the fraudulent scheme" for two principal reasons.

First, all of Lakhan's spoofing activities, though performed in London, took place on an electronic exchange based in the United States (the CME). What is more,

Lakhan's communications with Bases and Pacilio occurred on the same monitored systems that Bases and Pacilio used to interact with their colleagues in the United States. Bases Mem. at 51–52. The Court agrees with Bases's observation that § 2B1.1(b)(10), as a whole, is directed toward "schemes whose sophistication or international nature help facilitate evasion of detection by law enforcement." *Id.* at 51. Here, Lakhan's presence in London was not material to Defendants' fraudulent scheme; nor did it make that scheme any more complex or difficult to detect.

Second, the government has not shown that Lakhan's involvement in the scheme was "substantial" in a purely quantitative sense. The Probation Office correctly found that the government had failed to provide sufficient data to support this conclusion. While Bases and Pacilio conducted thousands of spoofing transactions, Lakhan conducted only hundreds. *See* Gov't's Mem. at 30–31. The government argues that the fact that "one out of three co-conspirators" was located outside the United States is enough to satisfy § 2B1.1(b)(10)(B). *Id.* at 31. But the Guidelines ask what portion of a scheme was *committed* outside the United States, not how many co-conspirators were *located* outside the United States. Accordingly, the Probation Office correctly determined that § 2B1.1(b)(10)(B) does not apply to Bases or Pacilio.

Turning to § 2B1.1(b)(10)(C), offense conduct is sophisticated when it is "*especially* complex or *especially* intricate." U.S.S.G. § 2B1.1, cmt. 9(B) (emphasis added). In order for the enhancement to apply, the government must prove that the offense involved greater "planning or concealment" than a "typical fraud of its kind."

*United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021) (quoting *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015)).

Here, Defendants' offense conduct was no more sophisticated than that involved in the typical spoofing scheme. In short, Defendants placed false orders with the intent not to execute them to create the illusion of market activity to impact market prices. They canceled the false orders before they were filled. *See Bases*, 2022 WL 3586142, at *1–2. That is spoofing defined. There was no remarkable complexity in the scheme that would warrant application of the enhancement.

The government contends that the enhancement should apply because Bases and Pacilio engaged in coordinated spoofing with each other and Lakhan. Gov't's Mem. at 31. But as already discussed, direct, active coordination was more the exception than the rule here. The government also argues that the scheme was sophisticated because Defendants engaged in layered spoofing, in which they placed multiple Spoof Orders to create the illusion that multiple traders were interested in trading at a particular price point. *Id.* But the mere fact that Defendants did not engage in the most obvious form of spoofing possible (placing a single large order) does not mean that the method they chose can fairly be called "sophisticated." Defendants made no real efforts to plan or conceal their illegal conduct; indeed, they discussed it openly over their employer's monitored chat systems. Moreover, Bases and Pacilio engaged in manual spoofing, even though their industry was becoming increasingly dominated by sophisticated computer trading algorithms. These algorithms have increased the market's susceptibility to spoofing, as algorithmic

spoofing is efficient and tough to detect: algorithms can place and cancel a high volume of false orders in mere fractions of a second. *See United States v. Coscia*, 866 F.3d 782, 786–87 (7th Cir. 2017). The fact that Defendants did not employ this more sophisticated method of spoofing weighs against application of the enhancement.

The government also points to the fact that Defendants conducted their spoofing scheme "from the trading desks of major international financial institutions with all the attendant capital and resources at their disposal." Gov't's Mem. at 32. But this is surely true of many, if not most, spoofing schemes, and the government has not explained how Defendants' positions made their offense any more complex or difficult to detect than a typical fraud of its kind.

Finally, the government relies on *Lundberg*, 990 F.3d 1087. There, the Seventh Circuit held that the district court did not commit clear error in determining that a wire fraud scheme involved sophisticated means. The court reasoned that the defendant had altered tax forms and pay stubs to support a lease application, which went "above and beyond the activity inherent in wire fraud." *Id.* at 1097. *Lundberg* does not control this case for two reasons. First, the court did not actually hold that the enhancement was warranted but merely concluded that the district court's application of the enhancement was not reversible error under the highly deferential clear-error standard of review. Second, while the defendant's conduct in *Lundberg* involved sophistication and concealment that went beyond the activity inherent in

44

the charged offense, here, none of Defendants' conduct went beyond the activity inherent in spoofing.[19]

For these reasons, the Court will not apply the § 2B1.1(b)(10) enhancement as to either defendant.

## VII.    Conclusion

For the above reasons, for each Defendant Bases and Defendant Pacilio: (1) the base offense level is seven; (2) the offense is increased twelve levels for loss amount under U.S.S.G. § 2B1.1(b)(1)(G); and (3) the offense is increased two levels for involvement of ten or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(i). The total offense level is twenty-one. No other enhancement shall apply. Based upon a total offense level of twenty-one and a criminal history category of I, the Guideline imprisonment range for each Defendant is thirty-seven months to forty-six months.

**IT IS SO ORDERED.**                              **ENTERED:   3/6/23**

_____
**JOHN Z. LEE**
**United States Circuit Judge**
**(sitting by designation)**

---

[19]     The conclusion that Defendants' criminal scheme was not sophisticated for Guidelines purposes is in some tension with the sentencing court's decision in the similar case of _United States v. Vorley_, 18 CR 35 (N.D. Ill. June 21, 2021). Obviously, _Vorley_ does not bind this Court. To the extent _Vorley_ is inconsistent with this opinion, the Court respectfully disagrees with its reasoning.