**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>     v.<br><br>GREGG SMITH, and<br>MICHAEL NOWAK<br><br>          Defendants. | Case No. 19-cr-669<br><br>Hon. Edmond E. Chang |

<u>**SENTENCING MEMORANDUM OF GREGG SMITH**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ............................................................................................. 2

I.   GREGG SMITH'S PERSONAL LIFE.............................................................................. 2

    A.  Gregg's Early Life and Career ................................................................................. 3

    B.  Gregg's Generosity and Charitable Work............................................................... 4

    C.  Gregg's Role as Mentor to His Sons....................................................................... 5

    D.  Gregg's Role as Caretaker to Aging and Ailing Parents ...................................... 6

    E.  Joanne's Recent Cancer Diagnosis and the Need for Gregg to be Her Caretaker ............. 9

II.  GREGG'S CANCER DIAGNOSIS, TREATMENT & PROGNOSIS ................................. 10

III. GREGG'S ROLE AS A TRADER IN A TRANSFORMING MARKETPLACE ................ 11

    A.  The Offense Conduct All Occurred During a Period of Transition: The Switch to Electronic Trading and the Rise of High Frequency Trading Algorithms........................ 11

    B.  Gregg Had a Well-Documented History of Reaching Out to JPMorgan's Compliance Department for Guidance to Ensure He Understood and Followed the Rules ................ 12

IV. THE OFFENSE CONDUCT ...................................................................................... 13

V.  THE PRESENTENCE REPORT.................................................................................. 14

APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS................................................. 15

I.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE OF THE OFFENSE (§ 3553(a)(1))........................................................................... 16

    A.  The Nature and Circumstances of the Offense Weigh in Favor of Lenience .................. 16

        1.  The Offense Conduct Is Limited to Only Eight Snippets of Mr. Smith's Trading..... 17

        2.  There is No Evidence to Suggest that Gregg Understood at the Time That His Trading Strategy Was Improper, Which Reduces His Culpability ......................... 28

    B.  An Individualized Assessment of Gregg's Personal Characteristics Warrants a Mitigated Sentence ......................................................................................................... 32

II.  A NON-CUSTODIAL SENTENCE PROVIDES JUST PUNISHMENT AND  ADEQUATE DETERRENCE .................................................................................................................. 36

III. THE SENTENCING RANGE UNDER THE GUIDELINES AND POLICY CONSIDERATIONS ............................................................................................................ 38

    A.  The Enhancements Sought by the Government Are Inapplicable .................................... 38

        1.  Dr. Venkataraman's Loss Calculation Should Be Rejected ....................................... 38

        2.  Probation's Loss Calculation Analysis Should Also be Rejected .............................. 45

        3.  Gregg Objects to Any Enhancement For More Than Ten Victims ............................ 47

        4.  The Court Should Adopt Probation's Recommendation Not to Apply a Sophisticated Means Enhancement .................................................................................................. 48

        5.  The Defendant Objects to a Section 3B1.1 Special Skill Enhancement ..................... 52

        6.  The Court Should Adopt Probation's Recommendation Not to Apply an Obstruction Enhancement Under § 3C1.1 .................................................................................... 55

    B.  The Sentencing Commission Has Suggested That a Downward Departure Is Warranted Under the Circumstances .................................................................................................. 56

IX. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES ......................... 57

**CONCLUSION** ............................................................................................................... **59**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Burrage v. United States,*
571 U.S. 204 (2014) ................................................................................................ 40

*CFTC v. Oystacher,*
No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ........................... 22, 23

*CP Stone Fort Holdings, LLC v. Doe,*
No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) ............................... 22

*Dean v. United States,*
581 U.S. 62 (2017) ................................................................................................ 15

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336 (2005) ........................................................................................ 40, 43

*Jones v. United States,*
574 U.S. 948 (2014) .............................................................................................. 28

*LaChance v. Erickson,*
522 U.S. 262 (1998) .............................................................................................. 56

*Tison v. Arizona,*
481 U.S. 137 (1987) .............................................................................................. 29

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ......... 33

*United States v. Adelson,*
301 F. App'x 93 (2d Cir. 2008) ............................................................................. 33

*United States v. Anobah,*
734 F.3d 733 (7th Cir. 2013) ................................................................................. 49

*United States v. Arnaout,*
431 F.3d 994 (7th Cir. 2005) ................................................................................. 47

*United States v. Artley,*
489 F.3d 813 (7th Cir. 2007) ................................................................................. 38

*United States v. Ashman,*
979 F.2d 469 (7th Cir. 1992) ........................................................................... 52, 53

*United States v. Bases,*
No. 18-cr-48, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022) ............................. passim

*United States v. Bell*,
    808 F.3d 926 (D.C. Cir. 2015) ................................................................... 27

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990) ....................................................................... 34

*United States v. Bueno*,
    549 F.3d 1176 (8th Cir. 2008) ................................................................... 35

*United States v. Catalfo*,
    No. 93-cr-514, 1994 WL 282938 (N.D. Ill. June 21, 1994) ....................... 53

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ...................................................................... 58

*United States v. Chube*,
    538 F.3d 693 (7th Cir. 2009) ..................................................... 17, 21, 24

*United States v. Chychula*,
    757 F.3d 615 (7th Cir. 2014) ..................................................................... 55

*United States v. Coscia*,
    177 F. Supp. 3d 1087 (N.D. Ill. 2016), *aff'd*, 866 F.3d 783 (7th Cir. 2017)............................. 23

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ............................................................. passim

*United States v. Davidson*,
    761 F.3d 683 (7th Cir. 2014) ..................................................................... 26

*United States v. Dempsey*,
    768 F. Supp. 1277 (N.D. Ill. 1991) ........................................................... 53

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................................................ 56

*United States v. Foley*,
    508 F.3d 627 (11th Cir. 2007) ................................................................... 48

*United States v. Ghaddar*,
    678 F.3d 600 (7th Cir. 2012) ..................................................................... 49

*United States v. Gibbs*,
    26 F.4th 760 (7th Cir. 2022) ...................................................................... 46

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012). *aff'd*, 747 F.3d 111 (2d Cir. 2014) ...................... 33, 56

*United States v. Gupta*,

747 F.3d 111 (2d Cir. 2014) ............................................................ 33

*United States v. Harper*,
33 F.3d 1143 (9th Cir. 1994) ......................................................... 54

*United States v. Hernandez*,
356 F. App'x 279 (11th Cir. 2009) ................................................. 48

*United States v. Hicks*,
217 F.3d 1038 (9th Cir. 2000) ....................................................... 40

*United States v. King*,
861 F.3d 692 (7th Cir. 2017) ......................................................... 15

*United States v. Knox*,
624 F.3d 865 (7th Cir. 2010) ......................................................... 50

*United States v. Kontny*,
238 F.3d 815 (7th Cir. 2001) ......................................................... 50

*United States v. Lam*,
20 F.3d 999 (9th Cir. 1994) ........................................................... 28

*United States v. Laurienti*,
611 F.3d 530 (9th Cir. 2010) ......................................................... 25

*United States v. McClinton*,
23 F.4th 732 (7th Cir. 2022) ......................................................... 27

*United States v. McIlrath*,
512 F.3d 421 (7th Cir. 2008) ......................................................... 56

*United States v. Montano*,
250 F.3d 709 (9th Cir. 2001) ......................................................... 50

*United States v. Nacchio*,
573 F.3d 1062 (10th Cir. 2009) ..................................................... 40

*United States v. Osmani*,
20 F.3d 266 (7th Cir. 1994) ........................................................... 59

*United States v. Roth*,
No. 05-cr-792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ........ 37

*United States v. Rutkoske*,
506 F.3d 170 (2d Cir. 2007) ......................................................... 40

*United States v. Sabillon-Umana*,
772 F.3d 1328 (10th Cir. 2014) ..................................................... 28

*United States v. Schneider*,
  930 F.2d 555 (7th Cir. 1991)............................................................... 38, 39

*United States v. Schroeder*,
  536 F.3d 746 (7th Cir. 2008)........................................................ 35, 38, 45

*United States v. Serafini*,
  233 F.3d 758 (3d Cir. 2000).................................................................. 34

*United States v. Serfling*,
  91 F.3d 147 (7th Cir. 1996).................................................................. 52

*United States v. Silver*,
  245 F.3d 1075 (7th Cir. 2001)............................................................... 43

*United States v. Soto-Piedra*,
  525 F.3d 527 (7th Cir. 2009)............................................................... 26

*United States v. Spedden*,
  917 F. Supp. 404 (E.D. Va. 1996)............................................................ 35

*United States v. Vorley*,
  No. 18-cr-35, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021),
  *aff'd*, 40 F.4th 528 (7th Cir. 2022) ..................................................... passim

*United States v. Watts*,
  519 U.S. 148 (1997)......................................................................... 28

*United States v. Pu*,
  814 F.3d 818 (7th Cir. 2016)............................................................... 39

*United States v. Young*,
  932 F.2d 1510 (D.C. Cir. 1991) ............................................................ 54

*United States v. Zatz*,
  No. 89-cr-669, 1991 WL 274442 (N.D. Ill. Dec. 4, 1991).................................... 52, 53

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007)............................................................... 40

**Statutes**

18 U.S.C. § 1623 ............................................................................ 55

18 U.S.C. § 3553 ....................................................................... passim

## PRELIMINARY STATEMENT

Gregg Smith is a 59-year-old, late-stage cancer survivor who requires close monitoring by the specialists who treat him in case the cancer returns. A few weeks ago, his wife of 26 years was herself diagnosed with breast cancer. In the coming months, she will face (as he did) surgery, radiation, and uncertainty about her future. She will need her husband's help.

In his trial last year, after eight days of deliberations and a note on the sixth day in which the jury informed the Court it was deadlocked as to each count for each defendant, the jury reached what appears to have been a compromise verdict: it acquitted Gregg of the conspiracy counts (including RICO) but convicted him of the underlying trading counts, including fraud. Usually in fraud cases, it is obvious to the defendants that the scheme in which they are engaged is criminal, or at least wrongful. This case was different. In fact, the Government's own cooperating witness, Christian Trunz, a Georgetown-educated finance professional, testified candidly that, for the entire eight years he was involved in the alleged trading scheme, he "went to sleep every single night . . . thinking [he and Gregg] had done absolutely nothing wrong." Tr. 2504:8-11. At the time, the compliance and legal departments at JPMorgan Chase Bank ("JPMorgan"), who pored over Gregg's trading data in the middle of the alleged scheme and personally watched him trade, agreed. In fact, they told Gregg his trading was proper.

Meanwhile, the Government's arguments for sentencing enhancements under the Guidelines should all be rejected. As just one example, the Government's position now is essentially that every time Gregg placed orders on both sides of the market at the same time in at least 2:1 imbalance (*e.g.*, simultaneously bidding 30 lots and offering 15 lots), he was spoofing. This position—which is a radical departure from its position at trial and ignores overwhelming evidence from its own witnesses flatly contradicting it—is frivolous. Further, as outlined below and explained in detail in the accompanying Declaration of Dr. Mukarram Attari ("Attari Decl."),

the Government's expert declaration in support of its estimate of loss amount is riddled with computational errors and other defects. Simply put, the Government has failed to carry its burden of proving estimate of loss or that any other enhancement is appropriate.

The unique circumstances of this case, combined with Gregg's personal circumstances, warrant a non-incarceratory sentence. For the reasons set forth below, such a sentence would be "sufficient but not greater than necessary" to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553.

**RELEVANT BACKGROUND**

## I.    GREGG SMITH'S PERSONAL LIFE

Gregg Smith by all accounts is a reliable, constant presence to his family, friends, and former colleagues. The letters in Exhibit A to the Cogan Declaration[1]—which were written by a former New York State Supreme Court Justice, an FBI agent, the Chief of Operations Management at the DEA, and a U.S. Marine Corps captain, among others—all speak to the quiet moments of decency, honesty, and kindness that have characterized Gregg's life. The letters describe Gregg's cornerstone role as caretaker for his family, friends and community, even while battling his own cancer: the years of caring for sick parents; the coaching, teaching, and raising of two decent and kind sons who adore their dad; the quiet gift of college financial assistance for his nieces; the generosity of his boat and knowledge of fishing to connect family and friends and give wounded veterans moments of dignity; and now, devastatingly, caretaker to his wife as she battles her recent cancer diagnosis. As summarized by his son, Jake, in the face of a serious cancer diagnosis and

---

[1] All citations to "Ex." shall refer to the Exhibits attached to the April 10, 2023, Declaration of Jonathan D. Cogan.

aging, sick parents, and now a wife battling cancer, Gregg humbly seeks to "spend his final years taking others fishing, caring for his family and leading the next generation by example."[2]

## A. **Gregg's Early Life and Career**

Gregg was born and raised in Staten Island and, from a young age, exhibited a quiet kindness and generosity that he carried through adulthood. A childhood friend, with whom Gregg has remained friends for over 52 years, recalls an early memory of Gregg carrying a bundle of extra pre-sharpened pencils around just in case any of the new students forgot theirs at home.[3] These characteristics—thoughtful, generous, and unpretentious—pervade all the letters submitted by Gregg's family and friends.

After graduating from high school in 1982, Gregg attended Fordham University, where he played varsity football until a devastating knee injury freshman year sidelined him and ended his promising athletic career. As a Fordham student-athlete, Gregg became close with the group of men from his football team, men who are still on the sidelines supporting their former teammate and friend. These friends of 40 years, who know Gregg best, describe him as "generous," "modest," and a "constant."[4] As Gregg's Fordham football teammate and lifelong friend, Robert Holdman, a former prosecutor and New York State Supreme Court judge, testified at trial, Gregg is "unflappably honest" and "annoyingly fair" and has a reputation among his friends as someone who would not hesitate to speak up when something felt unjust: "It doesn't matter where the

---

[2] Ex. A-02, Letter from Jake Smith.

[3] Ex. A-08, Letter from Michael Gray ("I remember being confused, I had 4 pencils and he had a pack of pencils held together with a rubber band. I was wondering why he had so many. The question was answered later that week when one of our classmates reached into her school bag to retrieve her pencils and realized she left them home. She was in a full-blown panic. It was then that Gregg reached over to her and gave her 2 of his pencils. That was the first of many acts of kindness and generosity I have witnessed of Gregg in our 52 years of friendship.").

[4] Ex. A-14, Letter from Robert Brisolari.

argument lies or who it lies with, Gregg always has this thing, this saying, like, wave his finger, 'It's just not right. If it's not right, it's not right.'" Tr. 3177:17-25.

In 1986, after graduating with a bachelor's degree in finance from Fordham, Gregg started his trading career. In 1988, he began trading precious metals, a position he held through several Wall Street banks until JPMorgan put him on administrative leave in 2019 following the Indictment. Former colleagues describe how Gregg focused on mentorship and inclusivity on the trading desk and fostered open connections with his peers. Indeed, his former coworkers laud his "patience and calm demeanor," as well as his "inviting and friendly and extremely inclusive" approach which allowed them to grow and excel in their own roles.[5] Gregg's friends, family, and former colleagues all describe his work as a trader as something he enjoyed and excelled at, but his job was the means to providing for and spending time with his family and friends. As put best by his sister, Gregg is a man who "values time spent with family and friends over any worldly possessions."[6]

**B.  Gregg's Generosity and Charitable Work**

Indeed, although well compensated over the years, Gregg stayed close to his modest Staten Island roots. The letters speak to a man who generously donated his time and resources to assist the community around him. He quietly financed his nieces' college tuition, not wanting to draw

---

[5] Ex. A-12, Letter from Madeleine Feldman ("The word that I and all others used to describe Gregg was and still is 'integrity'. . . . He was always open and forthright in our conversations about our work and our families, and he was very proud of the culture change he had a large part of instituting at the Bank."); *see also* Ex. A-15, Letter from Elizabeth Eggers.

[6] Ex. A-10, Letter from Jodi Parascondola ("My brother does not value material possessions. He wears jeans that are so worn they nearly have holes in them. He prefers to stay home and host casual dinners than go to fancy restaurants. He is an extremely talented cook and enjoys preparing meals for his guests in his home. He probably buys a new car every 10 years or so.").

attention to himself.[7] He arranged and paid for recreational trips to take wounded veterans and their families fishing,[8] and co-sponsored a fishing tournament to raise funds for "Warriors for Warriors," an organization supporting veteran SEALs.[9] In addition to his charitable work with veterans, Gregg also regularly volunteered in a local soup kitchen, and for the past 20 years, he has supported the Michael J. Armstrong Memorial Foundation, a charity founded in honor of a trader who passed in the attacks of 9/11.[10]

In addition, the letters describe a man who takes the time for small acts of kindness such as cooking and delivering meals to the nearby hospital staff during COVID, helping neighbors deal with unexpected losses caused by flooding, and purchasing athletic equipment for his town's Little League so everyone could participate.[11]

### C. Gregg's Role as Mentor to His Sons

Gregg instilled his own core values—honesty, integrity, responsibility, and a strong work ethic—in his two sons, Daniel and Jake, from a young age. He is described by family and friends as a loving, caring, and devoted father. In one letter, Gregg's friend recalls he wanted to coach

---

[7] Ex. A-08, Letter from Michael Gray.

[8] Ex. A-06, Letter from Louis Chiarolanza ("He even arranged and paid for various trips to take wounded veterans fishing and assisted them during those trips so they were able to feel a sense of accomplishment in being able to do something enjoyable with minimal assistance."); *see also* Ex. A-01, Letter from Joanne Salzarulo ("Every summer he arranges several fishing trips with families of veterans. Some of these veterans have permanent disabilities and without Gregg their children would never have this experience.").

[9] Ex. A-07, Letter from Joseph Andrusaitis.

[10] Ex. A-18, Letter from Catherine Nolan and Gerard, Marian, and Laura Armstrong ("Gregg and Joanne have been loyal supporters since the Foundation's inception, attending events and helping financially. What speaks volumes about their support through all these years is that neither Joanne nor Gregg knew Mike. They recognized the need and understood the impact Mike had on so many and have been gracious in helping us keep Mike's legacy moving forward."); *see also* Ex. A-13, Letter from Valerie Mastriocovo (describing Gregg's work in soup kitchens).

[11] Ex. A-10, Letter from Jodi Parascondola.

their sons' baseball team with Gregg because he admired the life lessons Gregg passed onto the players beyond the game, including "learning accountability to oneself and teammates, looking for strategies to find success, tackling problems head-on and persevering through rough times."[12]

Gregg's longtime fishing buddy similarly recollects how impressed he was watching Gregg guide Jake, then ten years old, through a fishing competition's complicated rules:

> Gregg was insistent that his son follow every rule to a T. I was thoroughly impressed at how naturally he instilled a solid moral compass in the boy. It was a life-lesson I was honored to observe firsthand. It was a mark of the man I believe, and have always known, Gregg to be. Jake broke that world record in his class. It was an enormous accomplishment and a true testament of a father's devotion to his son.[13]

Gregg's sons' letters mirror how Gregg's friends and former colleagues view him as a parent and frankly reflect what every parent hopes their grown children will recognize and believe: that they owe all of who they are today to Gregg and his wife Joanne's parenting.[14] Under their guidance, Jake and Daniel have graduated from their father's alma mater and grown into smart, kind, compassionate, capable men confidently embarking upon careers of their own.

### D. **Gregg's Role as Caretaker to Aging and Ailing Parents**

Gregg's devotion to his family extends beyond raising his sons. As his wife Joanne said in her letter, "his first emphasis has always been on his family. He has always had a very close relationship with his family and that has also proved true with my extended family."[15] Setting the

---

[12] Ex. A-09, Letter from David Chao.

[13] Ex. A-07, Letter from Joseph Andrusaitis.

[14] Ex. A-02, Letter from Jake Smith ("This community is a better place with [my dad] in it. He makes those around him happy and helps those in need. Through his actions, my father has instilled generosity, patience and most importantly, toughness, in my brother and I. Simply put, my dad is my hero."); Ex. A-03, Letter from Daniel Smith ("[My dad] is an excellent father, and I have always and will always consider him my number one role model. …He has certainly molded my brother and me into two responsible, honest, and kind men.").

[15] Ex. A-01, Letter from Joanne Smith.

ultimate example of this family-first mentality for his sons, Gregg supported his and Joanne's aging and disabled parents, not just financially, but as a loving caregiver. Even before his marriage to Joanne, Gregg helped take care of her father, who was battling terminal leukemia, by transporting him to appointments and assisting around the house. When Gregg's father was diagnosed with brain cancer in 2017, he again stepped up to assist, despite battling his own cancer. Gregg consistently made the more than 90-minute drive to his parents' home in Staten Island after work to administer medications and help with hospital visits and household chores—a "hellish" feat amplified by the fact that he lived in Scarsdale and already had a nearly hourlong daily commute to work in Manhattan.[16]

In recent years, Gregg has assumed the leading role in taking care of his mother and his mother-in-law, who are both elderly and in poor health. Along with taking his mother-in-law to medical appointments, Gregg routinely spends the night at her home, as she has dementia and cannot be left alone (he is part of a weekly rotation with other members of the family).[17]

Since the passing of Gregg's father, his mom has grown increasingly isolated and lonely, as her age and declining health make leaving the house very challenging. Gregg's visits are often the highlight of her week: whether he is bringing his sons by for a visit, sharing a meal, or challenging her to a card game.[18] She is not in good health, and Gregg's trial and conviction took a substantial toll on her. In fact, the stress of the news of his conviction led to a month-long hospital

---

[16] Ex. A-03, Letter from Daniel Smith.

[17] Ex. A-10, Letter from Jodi Parascondola; Ex. A-13, Letter from Valerie Mastriocovo.

[18] Ex. A-10, Letter from Jodi Parascondola ("If he was not able to visit my mother, it would have a tremendous negative impact on her. He is her first born, the apple of her eye and she has always been so proud of him. I can't imagine a world where she would not be able to be with her son.").

stay.[19] Since her discharge in September, Gregg and his sister—who are their mother's primary caretakers—have shared the burden of taking her to over 50 medical appointments, in addition to the other care and support they provide. His son, Jake, best describes his father's tireless marathon of support and care in his letter:

> Following his father's death, my dad has stepped up to take care of his mother. My grandmother is disabled. She can no longer drive, she is in and out of doctor's appointments weekly, and has difficulty completing simple daily tasks. My dad has been there as much as he can, multiple times a week. He takes her to appointments, helps her move around the house and assists her with her rehab following recent surgeries. Most importantly, he spends time with her when she is lonely.[20]

Even with the stress of the trial and now sentencing, Gregg continues to be a cornerstone to his family and friends, never wavering in his role as father and caretaker. As his son, Daniel, relayed in his letter:

> Throughout the last handful of years or so where he had to think and worry about what was to come in the future, he never once abandoned his duties as a father. He was supporting my brother and me during our sporting events, taking us fishing, taking us to see countless movies, and just being present and putting a smile on around the house. Someone else in his situation could have allowed this to damage their relationship with their family or grow distant, but he did not let that happen. He never took his stress or frustration, of which I am sure there was and is a lot, home with him. The amount of selflessness it takes to sacrifice your own mental health to protect your sons from having to feel it is tremendous, and I am forever grateful and lucky that he was willing to do that for us.[21]

---

[19] Ex. A-01, Letter from JoAnne Smith ("Recently, Gregg's mom has been going through health challenges, and the buildup of trial-related stress culminated in an internal infection severe enough to warrant a month-long stay in the hospital after the verdict. Currently, Gregg spends several days a week bringing her to doctor's appointments and arranging care. Without him, I don't know what his mom would do.").

[20] Ex. A-02, Letter from Jake Smith.

[21] Ex. A-03, Letter from Daniel Smith.

### E. **Joanne's Recent Cancer Diagnosis and the Need for Gregg to be Her Caretaker**

A few weeks ago, Gregg and Joanne received the shocking news that Joanne was diagnosed with invasive ductal carcinoma, a common form of breast cancer. Prior to this recent diagnosis, Joanne relied on Gregg heavily in connection with her rheumatoid arthritis, which, when she is suffering from a flare-up, significantly impairs her day-to-day functioning. Now, however, Joanne will need constant, long-term physical and emotional care and support as she undergoes treatment for her breast cancer.[22]

As Joanne was recently diagnosed, a treatment plan is still being formulated. As of the filing of this submission, she is scheduled for surgery to remove the tumor in May. A recent MRI revealed some abnormalities in her other breast, and the surgeons will also be checking that tissue during her surgery.[23] Typical protocol for this stage and type of breast cancer is a course of radiation therapy after surgery to ensure all cancer cells are destroyed and prevent recurrence. Systemic therapies, including chemotherapy, hormone therapy, and targeted therapy, may also be used. Radiation side effects can vary but typically include fatigue that can last for weeks after treatment.[24]

Joanne's exact post-surgery treatment plan is contingent on the surgical findings, and so a long-term plan for her care is not known at this time.[25] Whatever the treatment plan is, Gregg will

---

[22] Ex. A-01, Letter from Joanne Smith ("Gregg has also been incredibly supportive throughout my own recent health developments…I will rely heavily on Gregg to take care of me and our family during the months of treatment and recovery ahead. I feel so fortunate to have met and married Gregg. He has been a loving and shining light in my life. I cannot imagine life without him."); Ex. A-11, Letter from Anthony Salzarulo.

[23] Ex. A-01, Letter from Joanne Smith.

[24] *Radiation therapy for breast cancer*, Mayo Clinic, Oct. 6, 2022, *available at* https://www.mayoclinic.org/tests-procedures/radiation-therapy-for-breast-cancer/about/pac-20384940.

[25] Ex. A-01, Letter from Joanne Smith.

be the primary, if not only, caregiver to his wife as she recovers from her surgery and other treatments, as both of their sons have full-time jobs (one in Texas).

## II.    GREGG'S CANCER DIAGNOSIS, TREATMENT & PROGNOSIS

Gregg is a late-stage cancer survivor, living day to day without knowing if or when his own cancer will return. He was first diagnosed with Stage IIIB melanoma in June 2015. Gregg's cancer was serious and difficult to detect. In fact, the melanoma, which was on his leg, was initially misdiagnosed by his dermatologist. By the time it was properly diagnosed, it had spread to his lymph nodes.[26] Gregg was told that he had only a 30% chance of surviving the next five years.[27]

Surgeons removed Gregg's tumor and the cancerous lymph nodes, only for his doctors to discover another cancerous tumor in 2017. After another surgery, Gregg's medical team recommended that he join a melanoma drug trial. The type of cancer he was fighting has a high recurrence rate (more than 50%) and there was "no known therapy" that was likely to cure his melanoma or otherwise increase his survival.[28] The trial required an arduous battery of regular drug infusions over the course of about 15 months. Because Gregg's cancer is a virulent form with a high recurrence rate, he was administered body scans every three months, and now every six months.[29] Those body scans are administered at NYU Langone Hospital by the same team who has overseen Gregg's cancer treatment since he entered the trial. In addition, if Gregg or health care providers notice any lumps or suspicious bruises, Gregg must then undergo Fine Needle Aspirations to check the tissue for cancer cells immediately (in fact, this is how the second tumor was found).

---

[26] Ex. A-05, Letter from Dr. James Sayegh.

[27] Ex. A-02, Letter from Jake Smith.

[28] Ex. D, Informed Medical Consent Form, at 2.

[29] Ex. A-01, Letter from Joanne Smith.

One of the drugs used in the trial led to a serious side effect: Gregg now suffers from painful full-body muscle aches after periods of consistent sitting or resting. The drug trial medical team have recently recommended that Gregg sees a specialist in New York who has been handling the care of other trial participants suffering from similar issues.

In addition, due to his cancer and related treatment, Gregg is considered immunocompromised. As a result, Gregg is at high risk for severe COVID outcomes, among other things. Doctors have advised they will need to continue to monitor his immune system response for the rest of his life.

## III. GREGG'S ROLE AS A TRADER IN A TRANSFORMING MARKETPLACE

### A. The Offense Conduct All Occurred During a Period of Transition: The Switch to Electronic Trading and the Rise of High Frequency Trading Algorithms

Gregg came of age as a trader in the 1980s when, instead of placing orders electronically, traders had to call their orders into brokers on the floor of the exchange. As the Court knows from trial, the markets evolved with technological advancements and, by the late 2000s, were primarily traded electronically.

This switch to electronic trading platforms brought with it the rise of high-frequency-trading algorithms or "algos." These algos are computer programs that have the capacity to process and act on new information in microseconds (millionths of a second). Their speed gave them a major advantage over manual traders. One of the strategies many algos used was to identify orders placed by a manual trader and then "jump" in front of (or "front-run") that order by placing an order at the next price level closer to the mid-market, thereby gaining an advantage by winning priority for the next transaction. *See, e.g.*, Tr. 1954:25-1956:9 (Flaum). Then the algos would use the manual trader's still-resting order as a "backstop" or insurance policy of sorts, transacting with them if the market moved adversely for a loss of only one "tick," but holding on to the position if

the market moved favorably. *See* Tr. 2845:5-2846:1 (Venkataraman). This strategy, combined with advanced computing technology for speed, proved to be wildly profitable for algorithms.

The conduct for which Gregg was convicted all occurred during this period of transition: the shift to electronic trading and the rapid dominance of the market by algos that followed as well as the enactment of Dodd-Frank. As noted by the then-Commissioner of the U.S. Securities and Exchange Commission, Dodd-Frank "usher[ed] in a breathtaking amount of changes" that "touch[ed] every aspect of our financial markets" and "result[ed] in a tectonic shift in the legal, regulatory and policy landscape affecting our markets and our economic in a relatively short period of time."[30]

### B. Gregg Had a Well-Documented History of Reaching Out to JPMorgan's Compliance Department for Guidance to Ensure He Understood and Followed the Rules

With all these massive changes happening in the industry, Gregg became a regular in the offices and e-mail inboxes of JPMorgan's compliance department. JPMorgan's Head of Compliance for the Global Commodities Group, Armand Nakkab, told the Government that Gregg was in his office almost daily seeking guidance on the rules and how they applied to him. Ex. E, Nakkab May 17, 2022, FBI Report at 3-4; *see also, e.g.*, Ex. F, Proposed DX 89 (Jan. 28, 2013, email from Gregg to compliance officer seeking guidance regarding CME rules); Ex. G, Proposed DX 276 (Oct. 2010 email chain in which Gregg asks, and then twice follows up with, compliance officer about questions concerning trading rules); Ex. H, Proposed DX 281 (Dec. 2010 email chain in which Gregg emphasizes need for compliance review and approval concerning trading tool).

---

[30] Kathleen L. Casey, SEC Commissioner, The Regulatory Implementation and Implications of Dodd-Frank, Address Before the SEC Directors' Forum, Jan. 23, 2011, *available at* https://www.sec.gov/news/speech/ 2011/spch012311klc.htm.

Gregg not only sought guidance on the rules but was proactive about reporting rule violations and other misconduct. On occasions when Gregg believed he may have accidentally violated a rule, he would proactively raise it with compliance in real time. *See, e.g.*, Ex. I, Proposed DX 60 (Oct. 6, 2008, email from Gregg to compliance reporting accidental wash trade); Ex. J, Proposed DX 329 (Apr. 28, 2015, email exchange between Gregg and compliance in which he self-reports an inadvertent violation of trading rules). And he reported that his co-defendant Chris Jordan was violating the rules by front-running Gregg's client orders. In other words, Mr. Jordan (and in turn, JPMorgan) was profiting at the expense of Gregg's clients. This resulted in Mr. Jordan's termination from JPMorgan. *See, e.g.*, Tr. 2477:23-25 (Trunz); 1456:20-1457:8 (Edmonds); DX 250-254. As noted by a manager, Donald Turnbull, in his 2015 performance review, "Gregg is highly focused on risk and controls, particularly those risks that should be flagged to compliance. He regularly voices his concern to the team when he witnesses something he feels could potentially be a risk to the bank." Ex. K, Proposed DX 114.

## IV.    THE OFFENSE CONDUCT

According to the Government's cooperating witnesses, the scheme for which Gregg was convicted was designed to combat the algos' trading style described above. *See supra* pp. 11-12. According to the cooperating witnesses, Gregg would place a group of orders that he expected the algos to jump in front of on one side of the market—the so-called "spoof" orders. He would place a smaller order on the opposite side of the market—the so-called "genuine" order. The algos' front-running would then drive the price up or down into his "genuine" opposite side order. The Government repeatedly and consistently described this strategy as requiring four steps:

1. The defendant places an order that he "actually wants to trade,"

2. He then floods the opposite side of the market with "deceptive orders," "[t]heir only purpose is to push the market price towards his real order that's sitting on the other side of the market,"

3. The defendant's genuine order is executed, and

4. "[A]s soon as that [genuine] order is filled, [the] defendant immediately cancels all of [his spoof] orders."

Tr. 394:19-397:15 (Gov't Opening).

Based on this conduct, the Government charged Gregg with spoofing, commodities fraud, wire fraud, bank fraud, attempted manipulation, conspiracy, and a separate RICO conspiracy. The bank fraud count was dismissed pre-trial, and the remainder of the counts were tried before a jury in July 2022. At trial, the Government's case focused almost exclusively on the existence of the four-step pattern in Gregg's trade data. *See, e.g.*, Tr. 3907:6-12 (Gov't Closing). On August 10, 2022, the jury found Gregg guilty of spoofing, commodities fraud, wire fraud, and attempted manipulation arising out of his trading activity on eight specific instances. The jury acquitted Gregg of conspiracy and RICO conspiracy.

## V. THE PRESENTENCE REPORT

Probation disclosed its Presentence Investigation Report ("PSR") on February 15, 2023. ECF No. 842. The PSR calculates a total offense level of 31 and criminal history category of I, resulting in a Guidelines range of 108 to 135 months' imprisonment. To arrive at this result, Probation concluded that the base offense level of seven should be increased by 20 levels under Section 2B1.1(b)(1)(K), because it concluded that the loss amount was greater than $9.5 million but not more than $25 million. PSR ¶ 55. In doing so, Probation appropriately rejected the loss amount put forth by the Government's expert, Dr. Kumar Venkataraman, because it "provide[d] a wide range of possible loss figures." *Id.* Instead, Probation looked to the deferred prosecution agreement between JPMorgan and the Government in *United States v. JPMorgan Chase & Co.*, No. 20-cr-175-RNC (D. Conn.) (the "DPA"),[31] which relates in part to the conduct for which

---

[31] Agreement available at https://www.justice.gov/opa/press-release/file/1320576/download.

14

Gregg was convicted and pursuant to which, according to uncorroborated statements by the Government, the restitution paid by JPMorgan had been used to compensate 48 firms or individuals in amounts totaling approximately $23 million. *Id.* Probation has, again relying on uncorroborated statements by the Government, allocated $20 million of that to Gregg. *Id.* Probation further recommended a two-point increase pursuant to Section 2B1.1(b)(2)(A), because the offense involved ten or more victims, and another two-point increase pursuant to Section 3B1.3 because Gregg "used a special skill to commit the offense." *Id.* ¶¶ 56-57, 64. Probation correctly concluded that the following additional enhancements requested by the Government were *not* warranted: use of sophisticated means under Section 2B1.1(b)(10)(C), role as officer or director under Section 2B1.1(b)(20)(B), and obstruction of justice under Section 3C1.1. Probation ultimately recommended a sentence of 24 months.

For the reasons explained in detail below, the defense objects to Probation applying the loss enhancement, the enhancement for an offense involving ten or more victims, and the special skills enhancement. *See infra* Section III.A. The PSR also contains several errors and omissions, which are detailed in the objections attached as Exhibit C.

## <u>APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS</u>

Title 18, United States Code, Section 3553(a) requires that a sentence be "sufficient, but not greater than necessary" to satisfy the four permissible goals of sentencing: "just punishment, deterrence, the protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017); *see also United States v. King*, 861 F.3d 692, 696 (7th Cir. 2017) (the directive to impose no greater punishment than necessary "is an important and binding instruction from Congress").

When fashioning an appropriate sentence, a court must consider:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;
2. the need for the sentence imposed in light of the specified goals;
3. the kinds of sentences available;
4. the relevant Guidelines and policies promulgated by the United States Sentencing Commission;
5. the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
6. the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). These factors are to be considered in the aggregate and not in isolation. As discussed in detail below, upon consideration of these factors here, sentencing Gregg to a term of incarceration would be both unnecessary and unjust.

## I.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE OF THE OFFENSE (§ 3553(a)(1))

Neither the nature and circumstances of the offense in this case nor Gregg's history or character warrants an incarceratory sentence. 18 U.S.C. § 3553(a)(1).

### A.  __The Nature and Circumstances of the Offense Weigh in Favor of Lenience__

Without minimizing the seriousness of the offenses for which Gregg was convicted,[32] the circumstances here are not aggravating. As detailed below: (1) the offense conduct amounts to a mere 4.5 minutes of unlawful trading over the course of his decades' long career in trading and his otherwise law-abiding life; and (2) the conduct for which Gregg was convicted was specifically reviewed and approved by JPMorgan's compliance and legal departments—*i.e.*, he was told he was doing nothing wrong and so he did not intend to break the law and did not appreciate at the time that his conduct could be deemed unlawful.

---

[32] Gregg maintains his innocence and plans to appeal his conviction, and nothing herein should be construed as an admission by him to the contrary.

### 1. The Offense Conduct Is Limited to Only Eight Snippets of Mr. Smith's Trading

Gregg, who has no criminal history, was convicted of: (i) eight counts of wire fraud, based on eight snippets of his trade data, (ii) spoofing and attempted manipulation, based on only four snippets of his trade data (two of which overlapped with the wire fraud charges and one of which the Government appears to have abandoned, as it does not meet its current definition of spoofing); and (iii) commodities fraud arising out of that same conduct. In other words, the jury concluded that Gregg spoofed on eight occasions over a period of approximately four years, amounting to less than 4.5 minutes of unlawful trading over the course of his more than 30-year career. The jury found the evidence at trial *did not establish* that Gregg was engaged in a near decade-long conspiracy to spoof with other members of JPMorgan's precious metals desk. Yet the Government asks this Court to sentence Gregg as if he had been and to punish him for not only more than ***a hundred thousand additional snippets of his own trading***, but also for the trading of his co-defendant and the Government's cooperating witnesses. This is not warranted, and the Court should limit the offense conduct to only the eight snippets of Gregg's trading that the jury specifically found to be unlawful.

### a. The Government Failed to Establish Even by a Preponderance of the Evidence the Unlawfulness of Any Additional Episodes

For conduct to be relevant under Section 1B1.3 of the Guidelines, it must be unlawful. *See United States v. Chube*, 538 F.3d 693, 702 (7th Cir. 2009). And while a court may consider acquitted or uncharged conduct at sentencing, it can only do so if the Government has proven the conduct by a preponderance of the evidence. *See, e.g.*, *United States v. Rollerson*, 7 F.4th 565, 571 n.1 (7th Cir. 2021); *Chube*, 538 F.3d at 705-06 (the Government "bears the burden" to show unlawfulness as to "each" instance of asserted conduct). Here, the Government has entirely failed to do so.

The Government has failed to establish by a preponderance of the evidence that Gregg spoofed on any occasion other than the eight instances corresponding to the eight wire fraud counts for which he was convicted.[33] For the Court to consider any additional episodes, the Government is required to establish by a preponderance of the evidence that "at the time the defendant entered the bids or offers . . . he had the unconditional purpose to cancel the entire bid or offer before it was executed." Tr. 3893:4-12 (jury charge); *see also, e.g.*, *United States v. Coscia*, 866 F.3d 782, 794 (7th Cir. 2017) ("The text of the anti-spoofing provision requires that an individual place orders with 'the intent to cancel the bid or offer before execution.'" (citation omitted)).

Here, the Government asks the Court to include as relevant conduct for sentencing the 106,037 alleged instances of Gregg spoofing identified by Dr. Venkataraman in his declaration (the "Venkataraman Decl."). Dr. Venkataraman bases his conclusion that Gregg possessed the requisite unlawful intent during these sequences exclusively on trade data. Specifically, he opines that Gregg was spoofing any time he placed a group of 7-lot or 10-lot orders within the top 10 levels of the limit order book (totaling at least 30 lots for gold, 15 lots for silver, or 20 lots for palladium), that more than doubled the size of orders on the opposite side, which must also be placed within the top 10 levels of the limit order book. In other words, according to Dr. Venkataraman, the creation of an imbalanced two-sided market is always spoofing.

This is a radical departure from both his and the Government's position at trial, where they repeatedly claimed that the inference that a trader is spoofing can be drawn from the presence of ***four steps***: (1) the placement of one or more smaller limit orders; (2) the placement of a group of

---

[33] As detailed in our motion for a judgment of acquittal, the Government failed to establish that Gregg had unlawful intent on even these eight occasions, and we preserve this argument for appeal.

cumulatively larger, fully-displayed limit orders on the opposite side of the market; (3) execution of the smaller limit order(s); followed by (4) quick cancellation of the opposite side orders. Venkataraman Decl. ¶¶ 10-11; *see also* Tr. 394:19-397:22 (Gov't Opening). Now, despite the Government and Dr. Venkataraman repeating in their sentencing submissions that spoofing requires four steps, *see, e.g.*, Gov't Memo at 9, ECF No. 856, Dr. Venkataraman's criteria only capture the first two steps.

As explained in detail below, Dr. Venkataraman's newly found opinion that spoofing only requires two steps is entirely unsupportable because: (a) there is zero evidence in the record to establish that the creation of an imbalanced two-sided market is itself unlawful and, in fact, the trial record establishes the exact opposite; (b) Dr. Venkataraman fails to explain how his new criteria are indicative of an intent to avoid execution; and (c) Dr. Venkataraman's criteria capture indisputably lawful trading activity. The Court must also reject Dr. Venkataraman's conclusion that this two-step pattern, even if unlawful, appears more than 100,000 times in Gregg's trade data because (d) he has made significant implementation errors and has counted as "Spoofing Sequences"[34] snippets of trade data that do not satisfy even this new, incredibly broad definition of spoofing.

*First*, the Chicago Mercantile Exchange ("CME") has specifically said that the exact pattern that Dr. Venkataraman now opines is de facto spoofing is in fact permissible. On August 29, 2014, the CME issued a Market Regulation Advisory Notice on its rule codifying the federal spoofing prohibition that contained the following guidance:

> **Q7:** **Under this [anti-spoofing] rule, is a market participant prohibited from making a two-sided market with unequal quantities (e.g., 100 bid at ten offered)?**

---

[34] All capitalized terms not defined herein refer to the defined terms in Dr. Venkataraman's and/or Dr. Attari's Declarations.

**A7:** **No. Market participants are not precluded from making unequal markets as long as the orders are entered for the purpose of executing bona fide transactions. If either (or both) order(s) are entered with prohibited intent, including recklessness, such activity will constitute a violation of Rule 575.**

GX 409 at 5. Thus, according to the CME, not only is making an imbalanced, two-sided market a legitimate trading practice, but making a market that is five times more imbalanced than Dr. Venkataraman's criteria (of 2 to 1) is also a legitimate trading practice. The orders are only unlawful if they are entered without intent to "execut[e] bona fide transactions"—*i.e.*, if they are entered with unlawful intent. The pattern itself is not proof of unlawful intent.

Moreover, at trial, the Government's witnesses, including Dr. Venkataraman himself, testified that the ***two-step pattern*** that Dr. Venkataraman now opines is per se unlawful, can be perfectly legitimate:

- **<u>Dr. Venkataraman</u>** testified that imbalanced two-sided market-making—the conduct he now says is de facto spoofing—is permitted on the CME's exchanges. Tr. 2939:16-21.

- **<u>John Edmonds</u>** testified about a JPMorgan compliance training in which traders were instructed: "If you're making a 10 by 20 [10 lots on the buy side, 20 lots on the sell side] and you're willing to buy or sell, ***that is not a problem***. Now, if you're putting one lot . . . on the buy side and 500 lots on the sell side, well, maybe that's a problem." Tr. 1575:18-1578:8 (emphasis added).

- **<u>Robert Sniegowski</u>** testified that there's "absolutely nothing wrong" with placing imbalanced buy and sell orders at the same time. Tr. 674:18-23.

- **<u>Brian Wika</u>** similarly testified that there's "absolutely nothing wrong" with making an imbalanced two-sided market. Tr. 2201:12-16.

What transforms Dr. Venkataraman's pattern from a perfectly legitimate trading strategy to unlawful spoofing is the trader's subjective intent when placing the orders—*i.e.*, whether he placed the at-issue orders with an unconditional intent to cancel before execution. But even though the pattern alone "tells you nothing" about a trader's intent, Tr. 687:21-23 (Sniegowski); *see also, e.g.*, Tr. 1933:3-8 (Flaum) ("[Y]ou would need to know 100 percent of the information available" to determine if an order had a legitimate economic purpose."), Dr. Venkataraman's determination of

what is and is not a Spoofing Sequence is based exclusively on the existence of this pattern in the trade data. Venkataraman Decl. ¶ 10. That is impermissible.

The Seventh Circuit has held that where, as here, the at-issue conduct is not per se unlawful and something more is required to transform otherwise lawful conduct into a crime, the Government bears the burden of establishing the unlawfulness of each individual incident by a preponderance of the evidence. *United States v. Chube*, 538 F.3d 693, 701 (7th Cir. 2008). In *Chube*, the defendants were doctors who were convicted of unlawful distribution of controlled substances arising out of illegitimate prescriptions of OxyContin. A doctor prescribing OxyContin is not unlawful, much like a trader utilizing the Government's two-step pattern is not unlawful. The prescription only becomes unlawful if there was no legitimate medical purpose for the prescription, again much like trading that follows the Government's two-step pattern is only unlawful if there was no legitimate economic motive. At sentencing, the *Chube* trial court included as "relevant conduct" under the Guidelines every instance in which the doctors prescribed a controlled substance, even though the jury did not convict on all such instances. *Id.* at 704. The Seventh Circuit remanded for resentencing, stating that the trial court impermissibly inferred a lack of medical necessity for every narcotic prescription based on a review of only a small subset of patient files. *Id.* at 704-05 (finding that the court's conclusion that "'[n]umerous files' contained evidence suggesting illicit prescribing" and that "most" of the doctors' patients were prescribed narcotics was insufficient "to sweep every pill in all 98 files into the relevant conduct calculation").

Here, too, it would be improper to generalize that Gregg acted with unlawful intent every time his trades followed the Government's two-step pattern simply because the jury found that he acted with such intent on eight occasions (especially given that the jury found Gregg not guilty of engaging in a near-decade long conspiracy). Rather, like in *Chube*, the Government must prove

unlawful intent as to each at-issue trading sequence. Indeed, even the Government has recognized that one cannot generalize intent from a trading pattern: in selecting the episodes it presented at trial, the Government ran a broad set of selection criteria through the data set (criteria substantially narrower than Dr. Venkataraman's criteria here), conceded that trade data that satisfied the criteria were not per se unlawful—*i.e.*, the criteria captured lawful conduct—and then did an episode-by-episode review. Gov't Mot. to Exclude Selection Criteria at 4, 5, ECF No. 316. The Court cannot do this with Dr. Venkataraman's declaration.

*Second*, as courts have regularly held, a key consideration in determining whether a particular trading strategy supports an inference of unconditional intent to cancel before execution is whether the trading strategy appears to have been designed to avoid execution. *See, e.g.*, *CP Stone Fort Holdings, LLC v. Doe*, No. 16 C 4991, 2017 WL 1093166, at *3 (N.D. Ill. Mar. 22, 2017) (finding that a complaint that "identified actions taken by defendants to ensure (as much as possible) that the Deceptive Orders would not be executed" sufficiently alleged manipulative activity); *Coscia*, 866 F.3d at 796 (upholding a jury conviction for spoofing where the trading strategy was "designed to avoid large orders being filled"). As Dr. Venkataraman himself as well as other Government witnesses previously testified, cancellation speed is a critical factor in determining if a trader enters orders with an intent to cancel them to avoid execution. Tr. 2874:8-14 (Venkataraman); *see also, e.g.*, Tr. 1807:5-18 (Flaum) (spoof orders are cancelled "as quickly as possible" because "[t]he longer the order is in the marketplace, the higher the likelihood that it would ultimately trade"); *CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *22-23 (N.D. Ill. July 12, 2016) (finding the Government's expert's selection criteria for identifying spoof orders, which included the requirement that orders be entered and cancelled in less than one second, were "well supported and based on sound factual underpinnings and analysis"); *United*

*States v. Coscia*, 177 F. Supp. 3d 1087, 1091 (N.D. Ill. 2016) (denying motion to overturn spoofing conviction arising out of use of an algorithm programmed to cancel orders quickly because, among other things, the programmer of the algorithm testified that the at-issue "orders' short duration on the market was intended to reduce the risk that they would be filled"), *aff'd*, 866 F.3d 783 (7th Cir. 2017). Indeed, a quick cancellation was step four of the Government's four-step "spoofing pattern" at trial. *See, e.g.*, Tr. 398:11-16 (Gov't Opening).

Yet, Dr. Venkataraman fails even to consider cancellation speed in selecting the alleged Spoofing Sequences for his loss calculation. As a result, he counts orders that were resting on the market for ***as long as 82.2 seconds*** as "Spoof Orders." Venkataraman Decl. ¶ 15 n.12. He provides no support, nor is there any support in the trial record, for his opinion that Gregg had no intent to execute an order that was left open for that long. To the contrary, research has shown that traders are capable of reacting to changes in market conditions in ***less than one second***,[35] and, accordingly, courts have regularly used one second or less as a benchmark for potential spoofing. *See, e.g.*, *Oystacher*, 2016 WL 3693429, at *32 (average cancellation speeds of Spoof Orders for different commodities were 0.54 seconds, 0.58 seconds, 0.62 seconds, 0.66 seconds, and 0.61 seconds); *Coscia*, 866 F.3d at 796 (94.3% of the alleged Spoof Orders were cancelled in one second or less).[36] Even here, the Government used a similar benchmark at the trial: in every single one of the

---

[35] Fishe, *et al.*, *Anticipatory Traders & Trading Speed*, Journal of Financial and Quantitative Analysis, Mar. 26, 2015, at 28-29, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@economicanalysis/documents/file/oce_anticipatory_revised.pdf.

[36] Notably, Dr. Venkataraman applied a five-second maximum cancellation time to his selection criteria in *Bases*, No. 18-cr-48 (N.D. Ill.), stating that anything less than five seconds was too short for a manual human trader to make trade decisions. He has failed to explain why no similar limiting criteria are necessary here.

Even five seconds, though, is too long. Dr. Venkataraman based his five-second threshold, which was adopted by Judge Lee, on an article which found that five seconds "is too short for a human trader **to read an article**, process it and make a trading decision based on it." Order, *United States v. Bases*, No. 18-cr-48, ECF No. 734 (N.D. Ill. Mar. 6, 2023) (emphasis added). At no point in

episodes for which Gregg was convicted, he began cancelling the large-side orders within one second of the group being fully placed. Ex. B, Attari Decl. ¶ 46(a). Yet, as Dr. Venkataraman concedes in his declaration, 50% of the orders that he has deemed Spoof Orders were left resting for more than 1.5 seconds, Venkataraman Decl. ¶ 20, which is "plenty of time" for an order to be hit in markets that trade in milliseconds or less. Tr. 1600:3-5 (Edmonds) (agreeing with the proposition that "[f]or algorithms that trade in milliseconds, 2.284 seconds is plenty of time for them to reach if they so choose"). The Government has failed to establish by a preponderance of the evidence how these orders, which were not cancelled "quickly," are unlawful and, accordingly, they cannot be included within the offense conduct considered at sentencing.

*Third*, looking at Gregg's trades on an episode-by-episode basis, as required by *Chube*, it is clear that Dr. Venkataraman's new selection criteria capture conduct that is indisputably not spoofing. For example, as described in Dr. Attari's Declaration, Dr. Venkataraman includes as an alleged Spoof Order a sell order that was resting for *33 seconds* before it was cancelled. Yet less than a second after cancellation, Gregg placed two more sell orders *at the exact same price*, which Dr. Venkataraman identifies as genuine, Opposite Orders in a separate Spoofing Sequence. *See* Ex. B, Attari Decl. ¶ 43. In other words, according to the Government, Gregg did not want to sell at this price, and he thus placed this alleged Spoof Order with the unconditional intent to cancel it to avoid execution, but less than a literal second later, he not only wanted to sell at this price, but he wanted to sell so badly that he was trying to manipulate the market (by placing buy Spoof

---

time has anyone suggested that Gregg was reading the newspaper while transacting in a market that moves in milliseconds, let alone that he was making decisions on whether to cancel pending orders based on his review and digestion of "articles." Rather, as the trial record shows, Gregg was often cancelling his large-side orders in response to piggybacking by algos or other activity in the market—something that he undoubtedly could have processed and reacted to in less than five seconds. *See* Tr. 2202:15-20 (Venkataraman).

Orders) to achieve execution at this exact price. There is absolutely no justification for Dr. Venkataraman characterizing what is essentially the exact same order as both a fake Spoof Order and a genuine Opposite Order.

This is just one example of many that Dr. Attari discovered where the Government has failed to establish that Gregg was spoofing by a preponderance of the evidence. *See* Ex. B, Attari Decl. ¶¶ 42, 46. The other episodes identified by Dr. Attari are too individualized and too voluminous to detail here, but what is clear is that Dr. Venkataraman's criteria for identifying Spoofing Sequences are seriously flawed, overinclusive, and unreliable.

*Finally*, even though the sole reason Dr. Venkataraman concludes that Gregg was spoofing on more than 100,000 instances is that those episodes supposedly all meet the criteria outlined in his Declaration, there are *thousands of sequences*, if not more, that were identified by Dr. Venkataraman as Spoofing Sequences but *do not even meet his own criteria. See* Ex. B, Attari Decl. ¶ 70 (describing an example in which the Spoofing Sequence is comprised solely of a group of alleged Spoof Orders without a corresponding Opposite Order, in addition to further sequences that otherwise fail to meet Dr. Venkataraman's criteria). These implementation errors alone justify rejecting Dr. Venkataraman's conclusion that Gregg spoofed 106,037 times. *Cf. United States v. Laurienti*, 611 F.3d 530, 559 (9th Cir. 2010) (remanding for resentencing where imperfections in the Government's loss calculation methodology were "illogical" because they made it "impossible to tell whether the ultimate estimate [of loss] is reasonable or not").

Accordingly, as it is the Government's burden to establish the unlawfulness of any uncharged conduct by a preponderance of the evidence, and, for the reasons set forth above and in the accompanying Declaration of Dr. Attari, Dr. Venkataraman's analysis fails to carry that burden, these additional sequences should not be considered at sentencing.

*ii. The Government's Inclusion of Episodes Not Involving Gregg*

The Government also includes in its description of relevant conduct trading activity of Michael Nowak, John Edmonds, and Christian Trunz. *See* Gov't Memo at 5-8; Venkataraman Decl. ¶ 17. As an initial matter, Dr. Venkataraman's identification of their Spoofing Sequences suffers from the same flaws described above and in Dr. Attari's Declaration, and for the same reasons, they should be rejected. Regardless, for the Court to consider their conduct against Gregg, the Government must establish by a preponderance of the evidence that their trading activity was within "the scope of the criminal activity the particular defendant agreed to jointly undertake." U.S.S.G. § 1B1.3 cmt. n.3(B). The Government failed to meet its burden here.

The jury found that the evidence elicited at trial failed to establish the existence of a conspiracy or Gregg's membership in it, and even the existence of a conspiracy is not necessarily sufficient to establish jointly undertaken criminal conduct. *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2009) (noting that conspiracy liability "is generally much broader than jointly undertaken criminal activity"); *United States v. Davidson*, 761 F.3d 683, 686 (7th Cir. 2014) ("In effect the judge and the government equated 'jointly undertaken criminal activity' to conspiracy, and that is incorrect."). And as described in detail in Defendants' Joint Motion for a New Trial (ECF Nos. 710-711) and incorporated herein, the Government failed to elicit sufficient evidence to establish that Gregg entered into an agreement with anyone to engage in unlawful trading by even a preponderance of the evidence. Defs.' Rule 33 Mot. § 2(d). In brief, there was no evidence offered at trial that Gregg ever explained his trading strategy to anyone, let alone that he "agreed to jointly undertake" a particular strategy with anyone. In fact, Mr. Edmonds, when pressed on this issue, refused to concede that there was an agreement. Tr. 1483:11-20. Further, the Government's witnesses testified at trial that Gregg's conduct undermined their spoofing efforts. Specifically,

Mr. Edmonds and Mr. Trunz testified that their spoofing strategies involved inducing algorithms to front-run their orders and that this front-running was instrumental to the success of their scheme. Yet Gregg regularly complained to compliance about this very activity and wanted it to stop. Tr. 1499:2-1501:24 (Edmonds); Tr. 2481:10-2482:19 (Trunz). Gregg also did not tell any of his alleged co-conspirators when, five years into the alleged conspiracy, he was investigated by the CME for spoofing. Tr. 1473:6-1476:22 (Edmonds); Tr. 2491:22-2492:6 (Trunz). These are not the actions of someone who jointly agreed to engage in criminal activity with others. And Probation agreed; in arriving at a recommended loss figure for Gregg, it did not include any losses attributable to Mr. Nowak, Mr. Edmonds, or Mr. Trunz. PSR ¶ 55.

Accordingly, the Government has failed to meet its burden, and the Court should exclude the trading activity of Mr. Nowak, Mr. Edmonds, and Mr. Trunz from its consideration at sentencing.

> b. The Court Is Not Required to Consider Acquitted or Uncharged Conduct and it Should Decline to Do So

Even if the Government had met its burden here, however, the Court is not *required* to consider acquitted or uncharged conduct in determining the appropriate sentence and, in fact, the practice of doing so is considered "controversial" in the Seventh Circuit. *Rollerson*, 7 F.4th at 571 n.1 (noting that the practice is "allowed" but "controversial"); *see also, e.g.*, *United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022) ("a sentencing court *may* consider conduct underlying the acquitted charge, so long as that conduct has been found by a preponderance of the evidence" (emphasis added)); *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of the r'hrg en banc) (stating that courts retain the "power in individual cases to disclaim reliance on acquitted or uncharged conduct," and noting that "[a]llowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they

otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial"). Although the Supreme Court has found the practice constitutional, many Supreme Court justices and circuit court judges across the country have questioned the fairness and constitutionality of allowing courts to factor acquitted and uncharged conduct into sentencing calculations. *See, e.g.*, *Jones v. United States*, 574 U.S. 948, 949-50 (2014) (Scalia, J., joined by Thomas & Ginsburg, J.J., dissenting from the denial of cert.); *United States v. Watts*, 519 U.S. 148, 170 (1997) (Kennedy, J., dissenting); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J., dissenting).

Here, too, the Court should reject the unfair and, per the Seventh Circuit, controversial practice of usurping the role of the jury and relying on uncharged and/or acquitted conduct and instead limit its consideration at sentencing to only the eight instances of unlawful trading found by the jury beyond a reasonable doubt.

> **2. There is No Evidence to Suggest that Gregg Understood at the Time That His Trading Strategy Was Improper, Which Reduces His Culpability**

This Court has held that a fraud conviction does not require a defendant to have understood that he was engaging in illegal or improper conduct. *See* Order, ECF No. 815 (finding that the jury did not need to find that the defendant knew he was violating federal law, or even a compliance policy or CME rule, to be convicted of fraud); *cf. United States v. Vorley*, No. 18-cr-35, 2021 WL 1057903, at *14 (N.D. Ill. Mar. 18, 2021) ("Specific intent to defraud does not require knowledge that conduct is prohibited by a statute or rule . . . ."), *aff'd*, 40 F.4th 528 (7th Cir. 2022). At the sentencing phase of a criminal proceeding, however, the question of whether the defendant knew he was committing a crime or engaged in otherwise improper conduct is highly relevant to assessing his degree of culpability. *See, e.g.*, *United States v. Lam*, 20 F.3d 999, 1002-03, 1005 (9th Cir. 1994) (finding degree of culpability and unawareness he was violating the law as relevant

in assessing severity of sentence); *Tison v. Arizona*, 481 U.S. 137, 171 (1987) (Brennan, J., dissenting) (recognizing the difference between criminal liability and moral culpability and stating that "the criminal law must ensure that the punishment an individual receives conforms to the choices that individual has made").

Here, there is no evidence that Gregg understood that he was engaged in wrongful conduct. In this respect, this fraud case is highly unusual, even as compared to the recent spoofing cases in this district. For example, in *United States v. Bases*, the Government introduced chats indicating consciousness of wrongdoing. No. 18-cr-48, 2022 WL 3586142, at *7 (N.D. Ill. Aug. 22, 2022) (noting a chat in which Mr. Bases said he "f…k[s] the mkt around a lot" and that the market is "easy . . . to manipulate"). Similarly, in *United States v. Vorley*, a defendant admitted in a chat that he was "spoofing it up, ahem ahem" to explain why he was placing buy orders when he needed to sell. No. 18-cr-35, 2021 WL 1057903, at *12-13 (N.D. Ill. Mar. 18, 2021). Here, in stark contrast, there is no such evidence. To the contrary, the Government's own star witness, Mr. Trunz, testified unequivocally that he did not believe at any time during the relevant time period that his or Mr. Smith's trading technique was in any way improper:

> Q.   But you didn't regard your orders as fake from 2008 to 2016 --
>
> A.  No, I didn't.
>
> Q.  . . . You didn't regard Mr. Smith's orders as fake from 2008 until 2016, right?
>
> A.  No, I didn't.
>
> Q.   You didn't regard his orders as deceptive or spoofing from 2008 to 2016?
>
> A.  No, I didn't.
>
> Q.   In fact, at no time from 2008 until 2016 did you ever think that you were committing fraud?
>
> A.  No.
>
> Q.  That you were committing market manipulation?

A.  No.

Q.  That you were committing spoofing?

A.  No.

Q.   And at no time from 2008 to 2016 did you think those things for Mr. Smith either?

A.  No.

Q.   And, in fact, you went to sleep every single night in all those years thinking you had done absolutely nothing wrong, right?

A.  I did.

Tr. 2503:13-2504:14. This is because those trading in the precious metals markets at the time distinguished between flashing large orders, a practice they understood was illegal, and the scaling of multiple, smaller orders, which they did not. *See, e.g.*, Tr. 2502:19-12 (Trunz) (testifying that he understood at the time he was trading that the "flashing" of a large order was "deceptive" and "spoofing"); Tr. 3036:5-19 (Pettey) (distinguishing between flashing and layering). Indeed, when Gregg's colleague, Michel Simonian, was fired by JPMorgan for spoofing as a result of flashing large orders, the bank too expressed its view that flashing was unlawful but Gregg's strategy was not. *See* Ex. L, Proposed DX 606 (letter from Sanjay Jhamna, JPMorgan Managing Director, to Mr. Simonian in connection with his disciplinary proceeding, explaining that JPMorgan had reviewed Gregg's trading and found that it was "appropriate" and noting that "had inappropriate behavior been identified [by JPMorgan compliance] then this too would have been dealt with through an appropriate disciplinary process").

Further, as detailed below, every member of JPMorgan's precious metals desk, Gregg's managers, JPMorgan's compliance officers, and even the CME knew exactly how Gregg traded, and no one—not one person—*ever* told Gregg to stop until 2015 (when the CME took the position that Gregg's trading was potentially problematic—a view with which JPMorgan's Compliance and management previously and directly had disagreed in the presence of Gregg).

*First*, Gregg was incredibly forthcoming with JPMorgan and its compliance and legal departments regarding his use of the trading strategy for which he was convicted. Not only did he regularly raise with JPMorgan issues that would have caused compliance to scrutinize his trade data and necessarily uncover his frequent use of the supposedly per se unlawful pattern, such as his flagging Mr. Jordan's front-running and self-reporting his own apparent rule violations, as detailed above, *see supra* pp. 12-13, but he literally sat down with compliance officers and physically demonstrated to them his execution of this strategy. *See, e.g.*, Ex. M, Nakkab June 17, 2022, FBI Report (Mr. Nakkab telling the Government that "Ferrara watched Smith clicking to place and cancel orders at his desk and told Nakkab to come over and see for himself. Ferrara could not believe how fast Smith could place and cancel orders. . . [I]t was surreal. During the demonstrations for Ferrera and Nakkab, Smith was actually trading not just clicking around."); *see also* DX 624G (Mr. Nakkab telling the CME that he sat next to Gregg and watched him trade in the at-issue pattern). No one at JPMorgan ever raised with Gregg that his trading strategy was problematic, let alone unlawful.

*Second*, JPMorgan unequivocally told Gregg that his use of the Government's pattern was neither spoofing nor otherwise unlawful. Specifically, when JPMorgan was approached by the CME in 2013 in response to a complaint about Gregg's trading activity in gold futures, compliance, led by Mr. Nakkab together with JPMorgan's in-house counsel, conducted a thorough review of his trading. As part of that process, JPMorgan compliance and legal analyzed more than a month of Gregg's trade data—trade data that, according to Dr. Venkataraman, would have revealed thousands of instances of spoofing or attempted spoofing, and Mr. Nakkab, a former CFTC enforcement lawyer with ten years of experience as a commodities trader, questioned Gregg multiple times about his trading and whether it amounted to spoofing. *See* DX 552; DX 311; *see*

*also* Cogan Decl. in Supp. Defs.' Rule 33 Mot., Ex. F, ECF No. 711-7 (Proposed DX 305, an email chain discussing the scope of JPMorgan's review of Gregg's trading). Compliance and JPMorgan's in-house counsel knew that Gregg's trades often followed the Government's pattern: they knew that he was often on both sides of the market at the same time; they knew that his two-sided markets were often imbalanced; and (even though it is immaterial to Dr. Venkataraman) they also knew Gregg's cancellation speeds and that he often cancelled orders almost immediately after placing them. And yet they concluded that it was not spoofing or otherwise problematic. In fact, Mr. Nakkab not only defended Gregg's conduct to the CME ("he's ready, willing, and able to fill every one of the trades that he puts"), but compliance shared their conclusion that Gregg was not spoofing with the entire precious metals desk, including Gregg, during a subsequent compliance training. *See* Ex. N, Proposed GX 625 (transcript of CME interview); GX 164 (audio recording of compliance training where, in connection with a discussion about recent spoofing investigations, Mr. Ferrara stated that they "recently had a three-hour interview down at the CME where they alleged we were entering into this type of activity. We weren't.").

Nothing about Gregg's interactions with the bank, and more specifically its compliance and legal departments, would have even hinted to him that he was doing anything improper. Rather, the evidence adduced at trial demonstrates that Gregg did not believe his trading technique was improper. His sentence should reflect that the very conduct for which he was convicted was vetted and approved of by the compliance and legal departments of one of the biggest financial institutions in the world.

## B. **An Individualized Assessment of Gregg's Personal Characteristics Warrants a Mitigated Sentence**

The Government asks this Court to sentence Gregg to a custodial sentence of six years—more than any other spoofer in history—based almost exclusively on the fact that it believes

(without basis, for the reasons outlined above and in detail by Dr. Attari) that he spoofed "a lot." Putting aside the issues raised above with regard to the reasonably divergent views of the reasons underlying his trading strategy, this myopic focus on just one issue ignores the statutory requirement that federal sentencing take many factors into account, including the history and characteristics of the defendant, which the Government ignores entirely. *See* 18 U.S.C. § 3553(a); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) (noting that "the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing a sentence"), *aff'd*, 747 F.3d 111 (2d Cir. 2014). When one looks at Gregg's history and character, as reflected in the outpouring of love and support from his family and friends, it only serves to reinforce that a non-custodial sentence is appropriate here.

*First*, Gregg was not a man motivated by selfishness or greed. Despite his financial success, he did not have an extravagant lifestyle and instead used his earnings to support his family, friends, and community, without fanfare or recognition. As detailed above, the letters all describe Gregg's quiet acts of kindness dating back to his childhood, whether he was bringing extra pencils to grade school just in case anyone else forgot, preparing homecooked meals for nearby hospital workers during the peak of COVID, or devoting his time to charities supporting wounded veterans and victims of 9/11. These "good deeds were not performed to gain status or enhance [his] image," and, in fact, many, like his financing his nieces' tuition, he kept to himself. *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (imposing a below-Guidelines sentence where sentencing letters detailed the defendant's many acts of selflessness), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Id.*; *see also, e.g., United*

*States v. Serafini*, 233 F.3d 758, 775 (3d Cir. 2000) (granting a downward departure based on the defendant's action that were "acts of giving time, of giving one's self").

*Second*, Gregg has no documented criminal history: the conduct for which he was convicted is a blip, a mere 4.5 minutes of an otherwise law-abiding and honest life.[37] The letters all describe Gregg as a hardworking, honest man who was always trying to do the right thing. His long-time, forty-year friends describe Gregg as "unflappably honest" and a "constant," and the community witnessed Gregg instill those values in his sons and exemplify them in his daily life. Even at work, he reported misconduct when it saw it, as well as rule violations of his own, and would regularly seek guidance from compliance when he did not understand the rules. The offense conduct is an aberration. It does not speak to who Gregg is as a person: a man of integrity with a solid moral compass.

*Finally*, and perhaps most importantly, Gregg is a man who has always put his family above all else, including himself. His sons describe a man who, after starting his day at 4:30 a.m. and putting in a full day at work, would make the "hellish" commute to Staten Island to take care of his ailing parents, while he himself was battling cancer; a man who did not want to burden his family with the mental anguish he faced (and continues to face) while defending himself in this

_____

[37] Regardless of how many times the Government contends that Gregg traded illegally, before this Court really is only one alleged "mistake": believing that this conduct was permissible. And, in fact, the apparent pervasiveness of the conduct only reinforces the fact that Gregg did not appreciate that his conduct could be perceived as unlawful (which, as explained above, while not a defense according to this Court's prior ruling, is relevant to his culpability). According to Dr. Venkataraman's data, Gregg engaged in the two-step spoofing pattern more than 1,000 times between receiving notice that the CME was investigating him and sitting for his interview. In other words, Gregg was put on notice that he was being investigated by the CME for spoofing and continued to engage in the same exact trading pattern while JPMorgan was actively reviewing his trade data for spoofing. These are not the actions of someone who believed he was committing a crime. *Cf. United States v. Biaggi*, 909 F.2d 662, 690 (2d Cir. 1990) (actions inconsistent with guilt are admissible to show "consciousness of innocence").

action and now awaiting sentencing; a man who, if incarcerated, will leaving a gaping, unfillable hole in the lives of so many. At sentencing, courts are required to consider the impact a defendant's absence will have on his family, *see, e.g.*, *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) (vacating sentence and remanding for resentencing where court failed to consider the defendant's family circumstances), and here, that impact would be catastrophic. As described above, Gregg plays an essential role in the daily care of his sick and aging mother, sharing with his sister the heavy burden of medical appointments and constant care of a widowed parent who is otherwise alone. And the family fears that taking Gregg away from his mother at this late stage of her life will negatively affect her health: the news of his guilty verdict sent her to the hospital for a month and the additional stress of her son spending what are likely the last years of her life in prison is likely to shorten whatever time she has left.

Even more critical, with JoAnne's recent cancer diagnosis and the uncertainty surrounding the outcome of her surgery, the next steps in her treatment, and her long-term prognosis, it would be devastating to take Gregg away from her at this time. He is needed to care for her posttreatment, in addition to providing emotional support as she faces a battle with breast cancer. Gregg's critical role in caring for his elderly mother and sick wife are exactly the sorts of extraordinary family circumstances that justify a non-incarceratory sentence. *See, e.g.*, *United States v. Spedden*, 917 F. Supp. 404, 407-08 (E.D. Va. 1996) (sentencing the defendant to 12 months of home confinement because there was a "realistic possibility of the death of not one, but two immediate family members while the Defendant is incarcerated and unable to provide normal, day-to-day parental assistance"); *United States v. Bueno*, 549 F.3d 1176, 1181 (8th Cir. 2008) (finding that the defendant's wife's lupus and rheumatoid arthritis constituted extraordinary family circumstances

that warranted a downward departure, because the defendant was an "irreplaceable, indispensable part of [her] well-being and to her caregiving regime").

## II.     A NON-CUSTODIAL SENTENCE PROVIDES JUST PUNISHMENT AND ADEQUATE DETERRENCE

As the Court is aware, Section 3553(a) requires that the sentence imposed provide just punishment for the offense, adequately deter future criminal conduct, protect the public from further crimes by the defendant, and provide the defendant with, among other things, medical care in the most effective manner. 18 U.S.C. § 3553(a)(2). Here, a non-custodial sentence achieves all of these goals.

*First*, a custodial sentence is not necessary for punishment. Gregg's career has been destroyed: he has a criminal record and the professional reputation that he spent more than 30 years building is ruined. He has forever lost the ability to make a living in his chosen profession and provide for his family, and he lost deferred compensation in addition to his benefits from JPMorgan. And he still faces an enforcement action by the CFTC and the risk of additional monetary penalties. But the punishment Gregg has already endured has been more than financial. He has spent much of the last decade under investigation—first by the CME, then by the CFTC and DOJ—or under indictment. Yet, as reflected in the letters from his family and friends, he suffered in silence, not wanting to further burden those he cared about. Under the circumstances, to incarcerate a late-stage cancer survivor, while his mother is elderly and unwell and his wife is herself fighting cancer, would be an excessive and unnecessarily harsh punishment.

*Second*, a custodial sentence is not required to deter future criminal conduct by either Gregg or society more generally, as both have already been achieved. Trading was Gregg's only professional skill. As noted by Probation, he will never be able to trade again, and so there is zero chance of recidivism. PSR Sentencing Recommendation at 2-3 ("[T]he risk of recidivism on the

part of this defendant is very low" because he "was terminated from his position at JPMorgan."). Even the Government concedes there is "little need to specifically deter these defendants from future criminal conduct." Gov't Memo at 36; *see also, e.g.*, *United States v. Roth*, No. 05-cr-792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) ("The publicity regarding [the defendant's case] has obviously caused her great embarrassment and humiliation. Furthermore, [the defendant] has lost her law license as a result of this case. Therefore, a sentence of imprisonment to deter [her] and protect the public from further criminal conduct by her is unnecessary.").

Further, the Government's argument that a "significant sentence" is needed for general deterrence is unavailing, as it ignores the fact that the markets have changed dramatically over the past ten years in response to the Government's aggressive policing of spoofing. Many of the world's largest financial institutions have entered into deferred prosecution agreements with the Government and/or settlement agreements with regulators to resolve spoofing-related charges—agreements that have resulted in the imposition of some of the largest penalties in history and have required the banks to revamp their training and surveillance measures to ensure compliance with the law. Under the terms of JPMorgan's DPA, it was required to pay a whopping $920 million dollars in criminal monetary penalty, disgorgement, and restitution. Gregg does not need to be incarcerated for the market to get the message that spoofing will not be tolerated. Further, the Government's fear that Gregg's conduct (or more generally the spoofing that was rampant in the market a decade ago) would impact market integrity and cause investors to leave the precious metals markets never came to fruition. Gov't Memo at 37.

*Finally*, given Gregg's chronic health issues, it is critical that he has unimpeded access to medical providers that are familiar with his medical history and condition. As explained above, Gregg's cancer was initially misdiagnosed by a dermatologist, and it could return at any time.

Gregg's access to such specialized care would likely be jeopardized during his time in custody, thus a downward departure or variance to time served is appropriate. In addition, as described above, Gregg is at a higher risk for a compromised immune response due to his participation in the trial immune-therapy treatment. Living in a densely-populated prison, where viruses are likely to easily spread, would put Gregg at additional, unnecessary risk.

## III. THE SENTENCING RANGE UNDER THE GUIDELINES AND POLICY CONSIDERATIONS

### A. <u>The Enhancements Sought by the Government Are Inapplicable</u>

#### 1. Dr. Venkataraman's Loss Calculation Should Be Rejected

A finding of a loss amount is not required to sentence Gregg in this case. *See United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991). Rather, "[i]t is simply that the Guidelines award bonus punishment points for different levels of proven loss . . . ." *Id.* While the amount of loss need not be determined with absolute precision (*see* U.S.S.G. § 2B1.1 cmt. n.3(C)), the loss calculation must meet the preponderance standard which requires "that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact," *Schroeder*, 536 F.3d at 753 (citation omitted). In determining whether the Government has met its burden of proof at sentencing, a court may only consider information that would not have been admissible at trial if it has "sufficient indicia of reliability to support its probable accuracy." *Id*. (citing *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007)).

As the Government has conceded in other similar cases, accurately calculating multi-year, market-wide losses in markets as complex, dynamic, and fast-paced as precious metals futures markets

is exceedingly difficult.[38] It is equally true here.[39] As detailed below, the methodology employed by Dr. Venkataraman to estimate losses is so riddled with flaws, so unreliable, and so reliant on inconsistent and erroneous assumptions that it fails to satisfy the Government's burden of establishing losses by a preponderance of the evidence. In other words, the Government "did not earn a bonus" here. *Schneider*, 930 F.2d at 559.

> a. Dr. Venkataraman's Methodology Does Not Establish But For Causation, as Is Required Under the Law

The Guidelines define "actual loss"[40] as "the reasonably foreseeable pecuniary harm that resulted from the offense." See U.S.S.G. § 2B1.1, cmt. n.3(A)(i). For the Government to establish that losses were a "reasonably foreseeable pecuniary harm that resulted from the offense," it must establish that the conduct for which Gregg was convicted was the "but for" cause of the losses. *See, e.g.*, *United States v. Pu*, 814 F.3d 818, 824 (7th Cir. 2016) ("the phrase 'result from' imposes

---

[38] *See* Sentencing Memo at 8-9, *United States v. Coscia*, No. 14-cr-551, ECF No. 157 (N.D. Ill. July 6, 2016) (conceding that losses "cannot be reasonably determined," because without analyzing each alleged victim's trading data for the days in question "it is impossible to know how their overall strategy was affected by defendant's spoofing algorithm"); Sentencing Memo at 13, *United States v. Sarao*, No. 15-cr-75, ECF No. 111 (N.D. Ill. Jan. 14, 2020) (declining to calculate losses attributable to the defendant); *cf.* Sentencing Memo at 7, *United States. v. Forbes*, No. 22-cr-97, ECF No. 17 (E.D.N.Y. July 21, 2022) (the Government, led by the same prosecutor as in this case, conceded that it was "unable at this time to calculate with precision losses to identifiable victims" due to, among other things, the volume of at-issue orders, the anonymity of the exchange, and "complex issues of fact related to the cause or amount of any victim's losses").

[39] In two other recent commodities spoofing cases in this District, the Government did attempt to calculate losses, but only further underscoring the unreliability of its work, it has not stuck to a consistent methodology. For instance, in *Bases,* the Government only considered order activity within the first five levels of the order book, while here, without any explanation for the shift, it has broadened its scope to the first *ten* levels. *See* Attari Decl. ¶ 43(e).

[40] To the extent the Government attempts to argue that it need not satisfy the requirements for "actual losses" outlined herein because it is relying instead on "intended loss," the Government's loss calculation should be rejected. As the Third Circuit has recently held, the Guidelines do not contemplate any enhancements for intended losses. *United States v. Banks*, 55 F.4th 246, 256-58 (3d Cir. 2022).

a requirement of but-for causation" with respect to pecuniary losses); *see also United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) (sentences vacated by appellate court where Government failed to establish "but-for" causation in its loss calculation), *as amended on denial of reh'g* (July 31, 2000); *cf. Burrage v. United States*, 571 U.S. 204, 212 (2014) (establishing that "courts regularly read phrases like 'results from' to require but-for causality"). As the Application Notes to the Guidelines make clear, "but for" causation is particularly important in the context of securities and commodities cases, where there is a heightened risk of extrinsic or conflating variables contributing to losses. *See* U.S.S.G. § 2B1.1 cmt. n.F(ix)(II) (directing that Courts consider "the extent to which the [loss] amount so determined includes significant changes in value not resulting from the offense," including "changes cause by external market forces"). And it is well-established law that courts have an obligation to parse apart the "tangle" of alternate sources of market information from fraudulent information when analyzing causation in a securities or commodities context. *See, e.g.*, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (finding an inflated purchase price insufficient to establish losses because it failed to account for "the tangle of [additional] factors affecting price"). Indeed, several circuits have rejected proposed loss calculations in criminal fraud cases for failing to account for external factors contributing to the loss amount. *See, e.g.*, *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (sentence vacated because, the court did not "disentangle" the effect of the fraud on the value of a security from "either inflation or deflation of that value due to unrelated causes"); *United States v. Rutkoske*, 506 F.3d 170, 178-79 (2d Cir. 2007) (holding that losses caused by factors other than the fraud must be excluded from the loss calculation); *cf. United States v. Nacchio*, 573 F.3d 1062, 1077 (10th Cir. 2009) ("It is axiomatic that a critical objective of federal sentencing is the imposition of

punishment on the defendant that reflects his or her culpability for the criminal offense (rather than for the unrelated gyrations of the market).").

The Government does not dispute that it must establish "but for" causation and, thus, disentangle the impact of both traders who would have transacted regardless of Gregg's allegedly unlawful conduct and external market forces that may have caused prices to move. Dr. Venkataraman attempts to accomplish this through the use of what he calls a "Control Period"— *i.e.*, the period of time immediately preceding each of his alleged Spoofing Sequences. Venkataraman Decl. ¶¶ 31-34. But as detailed in Paragraphs 50-58 of Dr. Attari's Declaration and summarized below, Dr. Venkataraman's attempt to back out external factors contributing to losses through the use of his Control Period is misguided and based on a fatal underlying premise. As such, the Government has failed to establish by a preponderance of the evidence that Dr. Venkataraman's loss figure was caused by Gregg, and, accordingly, it must be rejected.

*First*, Dr. Venkataraman's use of Control Periods to back out external factors impacting loss is based on an erroneous and unsupportable assumption of how markets work. To calculate losses that were specifically caused by Gregg, Dr. Venkataraman: *first*, calculates all losses incurred by market participants while Gregg was allegedly spoofing; *second*, calculates all losses incurred by market participants in the immediately preceding Control Period; and *then finally*, subtracts the Control Period losses from the losses incurred while Gregg was in the market. Dr. Venkataraman asserts that this "subtraction" backs out all external factors, thereby establishing that Gregg is the but for cause of these losses. But this methodology erroneously assumes that markets trade linearly and consistently—*i.e.*, if the market was trending down during the Control Period, it will continue to trend down at the same rate of change for the subsequent Spoofing Period. But the precious metals markets do not work this way and instead are prone to large, quick

41

sweeps in either direction. *See* Ex. B, Attari Decl. ¶ 64; Meister Decl. in Support of Nowak Sentencing Memo, Ex. B, Cusimano Decl. ¶ 43(d). In other words, where the losses that were supposedly incurred while Gregg was in the market are relatively low (or sometimes zero)—meaning the price did not move or there was only a small amount of trading during the Spoofing Sequence—but gains (what Dr. Venkataraman calls negative losses) were high in the Control Period, Dr. Venkataraman's methodology assumes that those market participants should have continued to gain, at the exact same rate, during the Spoof Period. And, if they do not, he assigns those losses to Gregg. *See* Ex. B, Attari Decl. ¶ 67 (describing a Spoofing Sequence in which more than $1 million in losses are attributable to Greg because the market moved 109 ticks in the Control Period but only five ticks in the Spoofing Period). Thus, for a large number of Dr. Venkataraman's Spoofing Sequences, market activity during the Control Periods—*not* Gregg's conduct—are principally driving the calculation of losses.

*Second*, Dr. Venkataraman entirely ignores any factors other than Gregg's alleged Spoof Orders that could have impacted how market participants behaved during the Spoofing Sequences. These factors, as detailed by Dr. Attari, include[41]:

- <u>External market factors</u>, such as price movements in correlated markets or news events. Ex. B, Attari Decl. ¶ 57.

- <u>Other participants in the market</u>: Notably, in the Spoofing Sequence with the second highest loss amount in the case, *another convicted spoofer*, John Pacilio, is active on the same side of the market at the same time as Gregg but with more than three times the number of resting visible lots. Yet, all losses are attributed to Gregg. Ex. B, Attari Decl. ¶ 60.

---

[41] The Court is respectfully referred to Sections VI.A and VI.B of Dr. Attari's Declaration for a complete discussion of all of the errors with Dr. Venkataraman's use of his Control Periods. To avoid a full rehash of Dr. Attari's work herein, we are only including a few examples.

So all Dr. Venkataraman has established is a weak correlation, not causation. In other words, he has not answered whether Gregg's orders caused prices to move and his alleged victims to enter the market or market activity or whether some other external factor caused Gregg and his alleged victims to enter orders. Ex. B, Attari Decl. ¶¶ 48-61.

*Finally*, as explained by Dr. Attari, Dr. Venkataraman's "alternative," more "conservative" Rate of Spread Crossing Methodology, in addition to suffering from many of the same flaws outlined above, is so poorly implemented that it suffers from computational mistakes in roughly 73% of instances. Ex. B, Attari Decl. ¶ 103.

> b. Dr. Venkataraman's Methodology Has Myriad Errors, Both in Design and in Implementation

Even setting aside Dr. Venkataraman's failure to accurately account for external contributors to loss, Dr. Venkataraman's methodology for calculating losses does not have sufficient indicia of reliability to support a finding of any particular loss amount by a preponderance of the evidence. It is flawed and riddled with errors—both in its research design and in its computational implementation, and accordingly, it must be rejected.

*First*, the Government is required to prove that an *actual* loss occurred. As courts have held, "the moment the transaction takes place, the [alleged victim] has suffered no loss because the inflated purchase price is offset by ownership of a share that possesses equivalent value at that instant." *Dura*, 544 U.S. at 336. Accordingly, to calculate actual losses, Dr. Venkataraman needed to account for the difference between the price at which a trader opened a position and the price at which he closed that position. *See id.*; *see also United States v. Silver*, 245 F.3d 1075, 1080 (7th Cir. 2001) (loss calculation rejected because "the district court should have deducted the value of any products resold . . . from the actual loss calculation"). But Dr. Venkataraman wholly failed to conduct this

analysis and, instead, just assumes that losses occurred because a victim bought or sold at a price allegedly caused by Gregg—exactly what the Supreme Court has held to be insufficient.[42]

*Second*, as detailed in the Attari Declaration, there are serious problems that pervade every step of Dr. Venkataraman's methodology. These include:[43]

- <u>Spoofing Sequences longer than 5 seconds account for 84% of his total loss.</u> Only 23% of Gregg's alleged spoofing sequences have durations longer than 5 seconds, but that small group of sequences accounts for 84% of the loss total. *See* Ex. B, Attari Decl. ¶ 73. As explained above, there is no basis to conclude that an order open for 5 seconds or longer was designed to avoid execution, and thus these sequences were included by Dr. Venkataraman just to inflate losses.

- <u>Dr. Venkataraman uses a benchmark price to measure loss that is not supported in academic literature.</u> Despite utilizing the "midpoint"—a well-accepted standard benchmark for studying price impact among economists—in his academic work,[44] Dr. Venkataraman has inexplicably chosen to compare trade prices to the "best" bid or offer ("BBO"). In addition to being inconsistent with the economic literature, this decision makes an erroneous assumption about the nature of markets—namely, that all spread crossings are only in response to Gregg's orders and are to the "loss" of the aggressor. Dr. Venkataraman's decision to use the BBO instead of the mid-market inflates the overall total loss by adding one half-tick of extra loss for *every* contract included in the calculation. For example, it adds five dollars per gold contract to the total loss amount for every one of the **millions** of gold contracts that were traded market-wide during Spoofing Sequences. Ex. B, Attari Decl. ¶¶ 77-78, 82-84.

- <u>Roughly 5% of the Spoofing Sequences account for more than 100% of the harm</u>, because the remaining 95% of Gregg's alleged Spoofing Sequences result in a net gain, or positive impact, to the alleged victims. And, as detailed above, *see supra* pp. 25, a great number of these

---

[42] For example, per the loss calculation, a trader from Citadel sustained a loss of around $1.3 million during Gregg's Spoofing Sequences; however, that same trader had an average daily profit on those same days. There was no attempt by Dr. Venkataraman to analyze the profit (or loss) of this trader—or, for that matter, any other alleged victim—when they closed out trading positions opened during Spoofing Sequences. *See* Ex. B, Attari Decl. ¶ 90. It is therefore unclear whether he suffered any losses at all as defined by *Dura*.

[43] The Court is respectfully referred to the Declaration of Dr. Attari for a more comprehensive discussion of all of the errors in Dr. Venkataraman's methodology.

[44] Bessembinder, *et al., Hidden liquidity: An analysis of order exposure strategies in electronic stock markets*, Aug. 13, 2009, at 371, available at https://cpb-us-w2.wpmucdn.com/people.smu.edu/dist/6/414/files/2020/07/Hidden-liquidity-An-analysis-of-order-exposure-strategies-in-electronic-stock-markets-2009.pdf.

sequences with the largest percentage of overall losses do not even satisfy Dr. Venkataraman's criteria and, thus, were improperly included in the loss calculation. Ex. B, Attari Decl. ¶ 69.

Individually, each of the issues detailed in Dr. Attari's Declaration would be enough to raise serious concerns regarding the reliability of Dr. Venkataraman's methodology for calculating losses; the weight of these taken together topples the use of the Venkataraman Declaration to support the Government's proffered loss amount. The Government has simply not met its burden of proving that the enormous loss attributed to Mr. Smith is "more probable than not." *Schroeder*, 536 F.3d at 753.

### 2. Probation's Loss Calculation Analysis Should Also Be Rejected

We join in the Government's objection to Probation's loss calculation, albeit for entirely different reasons. Gov't Memo at 20-21. As discussed above, Probation's estimated losses in this case are based on the amounts reimbursed to victims under JPMorgan's DPA, noting that it believed that the DPA was a "more direct and tangible metric for the actual losses inflicted on other market participants." PSR ¶ 55. However, we have been unable to find a single case in the 7th Circuit or in any other federal court in the country in which losses were calculated in this way. This would be a completely novel approach to calculating losses that, for the reasons articulated below, is entirely unsupported by both the law and the facts of this case.

As an initial matter, all of the information on which Probation relies was provided orally by the Government without any evidence or underlying proof. The PSR recommends a 20-point enhancement because "***per the government***, JPMorgan monies have been utilized to reimburse approximately 48 firms or individuals in amounts totaling approximately $23 million," PSR ¶ 55 (emphasis added); *see also* PSR ¶ 24 ("*Mr. Sullivan related* that as a result of 71,304 spoofing sequences attributable to Gregg Smith, JPMorgan has compensated victim traders a total of

$20,403,620." (emphasis added)).[45] But, as the Seventh Circuit has held, the uncorroborated statement of a government attorney "falls short of proof." *United States v. Gibbs*, 26 F.4th 760, 766 (7th Cir. 2022) (finding the Government failed to meet its burden of proving uncharged conduct at sentencing by a preponderance of the evidence because "the only thing in the record was counsel's statement"). Thus, as there is zero evidence to establish the loss amount recommended by Probation by a preponderance of the evidence, the Court should reject it.

Further, even if the Government did come forward with proof that money was in fact paid to these purported victims in these purported amounts, it would still fail to meet the Government's burden of proving losses that are specifically attributable to Gregg's unlawful conduct. To be reimbursed, victims are required to submit a "Victim Impact Statement," in which they list "actual financial losses from this crime" and provide details regarding the trading activity related to those losses (including date, quantity, Tag50s, etc.).[46] But this market is anonymous; victims have no way of knowing when Gregg was in the market, let alone that Gregg's spoofing (rather than lawful market activity) was the but for cause for their own losses. So, the Court would be left again with nothing more than the uncorroborated analysis of the Government's lawyers, which, if ever disclosed, at best suffers from the same flaws as Dr. Venkataraman's analysis, as described above, and at worse is just an arbitrary assignment of losses.

*Finally*, even the Government urges the Court to reject this calculation of losses as unreliable. Accordingly, this Court, too, should reject Probation's estimate of losses.

---

[45] The Government, in its objections to the PSR, has attempted to amend the figures it provided to Probation. But the actual figures alleged by the Government are irrelevant to this discussion.

[46] The form is available at justice.gov/criminal-vns/file/1320701/download.

### 3. Gregg Objects to Any Enhancement For More Than Ten Victims

The Government seeks an adjustment for "10 or more victims" under U.S.S.G. § 2B1.1(b)(2)(A)(i) but fails to include any support for the inclusion of this enhancement. Presumably, the Government is relying on its assertion that "53,338 unique traders trading through 808 unique firms" account for "all transactions observed while the Spoof Orders are active." *See* Gov't Memo at 14. As discussed above and in the Attari Declaration, this number is wildly inflated, given the numerous issues with the selection criteria and Dr. Venkataraman's Methodology, along with the basic computational errors. In addition, there was no attempt to determine which alleged victims would have traded or incurred losses regardless of Gregg's alleged Spoof Orders—and instead the Government seeks to consider a "victim" every person in the market during an alleged Spoofing Sequence.

In any event, the Government has the burden to prove the number of victims by a preponderance of the evidence. *See United States v. Arnaout*, 431 F.3d 994, 999 (7th Cir. 2005) (enhancement held inapplicable where the Government failed to demonstrate by a preponderance of the evidence that requisite number of victims accounted for loss attributable to the defendant). And the number-of-victims enhancement also cannot be established by merely estimating the number of victims under the Guidelines. In *Arnaout*, a case involving a conspiracy to commit fraud through a false charity, the Seventh Circuit refused to apply a similar enhancement for offenses resulting in losses to 50 or more victims due to insufficient proof that the stolen donations attributable to the defendant could be traced to the requisite number of persons. While the overarching offense involved $17 million worth of stolen donations from over 17,000 donors, the evidence failed to demonstrate that at least 50 donors accounted for the amount attributed to the defendant. *See Arnaout*, 431 F.3d at 999. Arnaout's reasoning applies with even greater force here,

where the Government seeks a two-level enhancement based principally on the fact that certain firms traded while Gregg's orders were open, and nothing more.

Indeed, as described above, the Guidelines ascribe "victim" status only to persons "who sustained any part of the *actual loss*." U.S.S.G. § 2B1.1 cmt. n.1 (emphasis added). Dr. Venkataraman has done no analysis to see whether those firms *actually* lost money when closing the positions that were opened during Spoofing Sequences. To the contrary, as noted above, many of the alleged victims exited their positions while Gregg's orders were open, sustaining no loss during the episodes; and moreover, the record suggests that algorithmic trading firms made money on days in which they suffered losses according to Dr. Venkataraman. *See, e.g.*, Ex. B, Attari Decl. ¶ 90 (explaining that, although $1.3 million in losses were assigned to a specific trader by Dr. Venkataraman, this trader generated an average daily provide of $5,196 on days the Government now alleges he suffered losses). The Government's failure to submit proof of any actual loss to any purported victim caused by Mr. Smith's trading thus renders inapplicable a two-level enhancement tied to the number of victims. *See, e.g.*, *United States v. Foley*, 508 F.3d 627, 634 (11th Cir. 2007) (holding the district court erred in calculating the number of victims because it did not make an independent finding of the loss amount and did not connect the number of victims to the loss calculation); *United States v. Hernandez*, 356 F. App'x 279, 284 (11th Cir. 2009) (holding that the court failed to connect the number of victims to the $58,917 loss calculation).

### 4. The Court Should Adopt Probation's Recommendation Not to Apply a Sophisticated Means Enhancement

Contrary to both Probation's recommendation and the recent decision by Judge Lee in *Bases* finding that a sophisticated means enhancement is not warranted, the Government argues that the offense level should be increased by 2 levels under Section 2B1.1(b)(10) of the Sentencing Guidelines.

The Government, while recognizing that it is a "close call," nonetheless argues that the enhancement should apply because Mr. Smith "layered" his spoofs, which was "complex" and "especially intricate." Moreover, the Government states—for the first time in the sentencing proceeding and contrary to the trial testimony of its own witnesses—that adding volume at different price points was "designed to trick other traders, including sophisticated algorithmic traders, into reacting to the apparent volume in the market" and "concealed from the market the fact that one trader . . . had placed all of these orders." Gov't Memo at 21.

*First*, there is no evidence that Mr. Smith engaged in any such "elaborate efforts" or in any other type of conduct that the Seventh Circuit has found to trigger the sophisticated means enhancement. *See, e.g.*, *United States v. Anobah*, 734 F.3d 733, 738-39 (7th Cir. 2013) (involvement of properties in multiple states, use of straw purchasers, creation of additional false documents to bolster false information on fraudulent loan applications); *United States v. Ghaddar*, 678 F.3d 600, 602-03 (7th Cir. 2012) ("exchanging currency for cashier's checks to carry overseas," "directing his accountant to illegally structure currency deposits," and "washing money through third party bank accounts").

Indeed, what the Government describes as "layering" is not even a criminal technique, let alone an "atypical" trading technique. "Layering" is nothing more than the Government's term for the practice of placing simultaneous orders at multiple price levels, often referred to as "scaling." No fewer than three Government witnesses testified that this practice is legitimate and commonplace. Messrs. Scheerer and Sniegowski, who testified regarding the CME's operations and rules, both testified that the CME permitted traders to place simultaneous orders at multiple price levels (Tr. 626:20-23, 681:1-5), while Dr. Venkataraman admitted that scaling orders is a rational way to manage the risk associated with a rapid price movement (or "sweep") (Tr. 2957:21-

2959:11). The CFTC likewise recognizes scaling as a legitimate strategy, offering an official definition of the term "Scale Down or Up" in its online glossary.[47]

*Second*, "layering" is certainly not an "atypical" form of spoofing, nor does it include "concealment" that goes beyond the concealment of a typical spoofing case, where the Government has alleged that two defendants and two cooperators in this case, and the defendants and cooperators in other spoofing cases in this court used the same "layering" techniques.[48] Indeed, the Seventh Circuit has instructed that the enhancement under Section 2B1.1(b)(9) considers whether there was "a greater level of planning or concealment than a *typical fraud of its kind.*" *United States v. Knox*, 624 F.3d 865, 870-71 (7th Cir. 2010) (quotation omitted and emphasis added); *see also, e.g.*, *United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (reversing a sophisticated means enhancement because the factors that the lower court relied on were "common [for that type of offense], not especially sophisticated, and were employed, not to conceal, but simply to carry out the smuggling scheme"); *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) ("[W]e think 'sophistication' must refer . . . to the presence of efforts at concealment that go beyond . . . the concealment inherent in tax fraud.").

As for the Government's new theory that the "layering" technique, specifically, allowed Gregg to conceal his trading from regulators, JPMorgan compliance, and the market, the facts of this case (and the facts and cases cited in the Government's submission)[49] are inapposite. Here,

---

[47] "Scale Up or Down," CFTC Glossary, accessed on Apr. 10, 2023, *available at* https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[48] S*ee* Indictment, *Vorley*, No. 18-cr-35, ECF No. 127 (N.D. Ill. Nov. 26, 2019); Indictment, *Bases*, No. 18-cr-48, ECF No. 372 (N.D. Ill. Nov. 12, 2020).

[49] In stark contrast to the facts here, the cases cited by the Government (Gov't Memo at 21, 23, 24) largely feature defendants whose actions to commit and conceal their crimes were unusually complex or imaginative, requiring premeditated planning to avoid detection. *See, e.g.*, *Kontny*, 238 F.3d at 820 (defendants reprogrammed their computer, among other machinations, specifically to avoid detection); *United States v. Bickart,* 825 F.3d 832, 838 (7th Cir. 2016) (defendants created

Gregg was *flagged* for trading that contained layering in 2013 by the CME. This flag then triggered an internal investigation into Gregg's trading technique. As for the market, the layering technique was apparently not difficult to detect; as the Government explains in its submission, Gregg's trading was noticed by an algorithmic market participant who then complained to CME. *See* Gov't Memo at 14. Finally, Mr. Flaum, whom the Government asked the jury to believe, did not think layering was designed to conceal the trading. To the contrary, he reported to the FBI that he did not utilize a layering technique when he intended to spoof his orders because that method was "blatantly obvious." Ex. O, Flaum May 30, 2019, FBI Report.

*Finally*, the conduct in this case is not comparable to the two other spoofing cases in which courts in the Northern District of Illinois have applied the sophisticated means enhancement. In *United States v. Coscia*, the defendant was convicted for programming and deploying a complex algorithm that, according to the Government, was specifically designed to withdraw his spoof orders before other market participants could execute on them; Mr. Smith, by contrast, traded manually and at speeds at which other market participants could easily—indeed, frequently did—transact. And unlike the defendants in *United States v. Vorley*, where the two defendants allegedly coordinated their trading with one another and with a third co-conspirator so that no one individual's trading activity would raise suspicion, there is no evidence, or even allegation, that Mr. Smith ever coordinated his trading with others to conceal his or others' alleged spoofing.

---

counterfeit tax forms that were designed to appear as if they originated from nine different major financial institutions); *United States v. Redman*, 887 F.3d 789, 790-791 (7th Cir. 2018) (defendant created, fake documents, including a fake diploma and fake medical license to gain employment); *United States v. Rettenberger*, 344 F.3d 702, 708-09 (7th Cir. 2003) (defendant faked symptoms of brain injury in appointments with multiple doctors in order to obtain disability benefits).

### 5.  The Defendant Objects to a Section 3B1.1 Special Skill Enhancement

The Government's half-hearted support of Probation's recommendation for a special skill enhancement should also be rejected. Section 3B1.3 applies, in part, where the defendant used a "special skill" to commit or conceal the offense. The Application Notes to Section 3B1.3 indicate that a special skill is "not possessed by members of the general public and usually requiring substantial education, training or licensing." *See* U.S.S.G. § 3B1.3 cmt. n.4. While Mr. Smith was a talented and successful precious metals trader, there is nothing about his background or his occupation that would warrant application of this enhancement. Put simply, trading in these markets requires no specialized training or licensure. An individual can trade successfully in the commodity futures markets from his or her own living room, similar to the way day traders are able to use E*Trade and other applications to trade in U.S.-listed stocks, exchange-traded funds, mutual funds, and options. Indeed, the Government interviewed multiple individuals in this case who traded gold and silver futures for their own personal accounts through a brokerage firm in exactly the same way as Mr. Smith—by using an electronic interface and a mouse to enter, execute and cancel orders. The fact that Mr. Smith did this professionally and was successful no more justifies a "special skill" enhancement than it would for someone who was a successful amateur trader using E*Trade.

Those courts that have applied an enhancement under Section 3B1.3 to commodities traders have done so only in cases factually distinct from this one. Typically, where it has been applied, the defendant—unlike Mr. Smith—was a licensed floor broker of an exchange and/or represented himself to clients as such. *See United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992); *United States v. Serfling*, 91 F.3d 147 (7th Cir. 1996) (unpublished opinion); *United States v. Zatz*, No. 89-cr-669, 1991 WL 274442 (N.D. Ill. Dec. 4, 1991). In those cases, the courts focused on the extensive training, examinations, and licensing required to be a floor broker in finding a "special

skill" enhancement warranted. *See, e.g.*, *United States v. Dempsey*, 768 F. Supp. 1277, 1283 (N.D. Ill. 1991), ("None of these defendants traded in the soybean pit simply because they submitted a job application and were hired. They had to take extensive preparatory classes and pass various exams before they could even be considered for the privilege of trading in the pits, a privilege which the public investor does not have."), *aff'd in part sub nom.*, *Ashman supra*; *Zatz*, 1991 WL 274442, at *4 ("Zatz was a licensed trader, and was instructed in the art and ethics of futures trading."); *United States v. Catalfo*, No. 93-cr-514, 1994 WL 282938, at *4 (N.D. Ill. June 21, 1994) (Traders on the Chicago Board of Trade "were subject to both training and testing, including a three-day set of seminars complete with examination and registration by the National Futures Association."). Unlike the defendants in those cases, Mr. Smith did not have to take any preparatory classes, pass any exams, or acquire a license to trade futures.[50] Each of the occupations identified in the Application Notes as potentially warranting application of the "special skill" enhancement (*i.e.,* pilots, lawyers, doctors, accountants, chemists, and demolition experts) require not only specialized training but also licenses, extensive education, and/or certifications from government authorities in order for an individual to engage in such a profession. There is no such analogue to Mr. Smith's profession, let alone for Mr. Smith himself. Instead, as Mr. Edmonds testified at the trial, traders on the desk, including Mr. Smith, learned on the job by observing other more senior traders and through trial and error. *See* Tr. 1717:25-1718:6. Finally, Mr. Smith was

---

[50] Indeed, the only spoofing prosecution in this District of which we are aware where Section 3B1.3's "special skill" enhancement was applied to an unlicensed futures trader involved a defendant who was alleged to have designed and used two novel complex, algorithmic computer programs specifically to effectuate his spoofing scheme. *See* Sentencing Hearing at Tr. 17:14-18:19, *Coscia*, No. 14-cr-551, ECF No. 162 (N.D. Ill. July 15, 2016). Unlike in *Coscia*, Mr. Smith did not use a complex algorithm to trade, let alone to engage in criminal conduct.

not required to (and did not) hold a license to trade futures and was never required to attend continuing education or other courses by the futures exchanges or his employer.

Probation recommended (and the Government appears to adopt)[51] the special skill enhancement on the basis that Gregg was "educated in finance and was employed for years as a precious metals trader for a global financial institution . . . and that the defendant's skills in affecting market prices through layering and spoofing constitute special skills not possessed by members of the general public." PSR ¶ 64. However, Courts have explicitly rejected the argument that knowledge gained from employment was sufficient to meet the special skills enhancement because then anyone who uses their employment-based knowledge to commit a crime would be eligible for the enhancement. *See United States v. Harper*, 33 F.3d 1143, 1152 (9th Cir. 1994) (holding that if "knowledge, gained from . . . employment, were sufficient to sustain the adjustment for special skills, then almost any insider who uses her special knowledge of her own institution and its procedures to commit a crime would be eligible for the enhancement). Similarly, courts have rejected the enhancement on the basis that the defendant had knowledge not possessed by the general public. *See United States v. Young*, 932 F.2d 1510, 1512-1513 (D.C. Cir. 1991) (rejecting application of special skill on basis that because most people in the general public do not possess the skill, as otherwise the "§ 3B1.3 enhancement is due whenever an offense involves some skill that the general public does not possess").

---

[51] Tacitly acknowledging that futures traders at banks are not required to be formally trained or licensed, the Government did not seek a "special skill" enhancement in *Bases* or *Vorley* who, like Mr. Smith, worked at banks and traded futures through an electronic interface. *See* Sentencing Memo, *Vorley*, No. 18-cr-35, ECF No. 383 (N.D. Ill. May 21, 2021); Sentencing Memo, *Bases*, No. 18-cr-48, ECF No. 725 (N.D. Ill. Jan. 6, 2023). Indeed, further underscoring the impropriety of such an enhancement in these types of cases, Judge Tharp did not include it in his pronouncement of his Guidelines calculation. *See* Sentencing Hearing Tr., *Vorley*, No. 18-cr-o35 (ECF No. 403) (N.D. Ill. June 30, 2021). Applying such an enhancement in this case, when it was not applied in those cases, would be unwarranted and improper.

### 6. The Court Should Adopt Probation's Recommendation Not to Apply an Obstruction Enhancement Under § 3C1.1

The Government seeks a further two-level increase to Gregg's offense level under Section 3C1.1 of the Sentencing Guidelines. The Court should adopt Probation's recommendation *not* to apply this enhancement because Gregg was not "under oath" and thus—even if he was untruthful, which he was not—he did not commit perjury.

According to the Government, Mr. Smith "obstructed and impeded the CME's investigation," when, in an interview with the CME, he stated that he "absolutely" intended to trade certain orders placed on June 26, 2013. Specifically, the Government submits that Mr. Smith's statements made to CME employees is "covered conduct" under Application Note 4(B) of this Section. *See* U.S.S.G. § 3C1.1 cmt. n.4(B) ("committing, suborning, or attempting to suborn ***perjury***, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction" (emphasis added)). The Government is wrong, however, and the enhancement for obstruction of justice is inapplicable.

The Government's asserted basis for applying Section 3C1.1—committing, suborning, or attempting to suborn perjury—is meritless because Mr. Smith was not under oath during the interview. "When applying the obstruction enhancement based on perjury, the district court should make a finding as to all the factual predicates necessary for a finding of perjury . . . ." *United States v. Chychula*, 757 F.3d 615, 619 (7th Cir. 2014) (internal citations and quotations omitted). Perjury is defined as "under oath . . . making any false material declaration" before a federal grand jury or court. *See* 18 U.S.C. § 1623. In other words, for the enhancement to apply this Court must make a specific factual finding of a "declaration while under oath." The Government acknowledges that Gregg was not under oath during his CME interview, but nevertheless argues that because Gregg was required to provide truthful answers under the "CME rules," the enhancement should apply.

However, that a private organization's rules were violated is simply not the same as being "under oath." *See LaChance v. Erickson,* 522 U.S. 262, 267 (1998) (where the defendants were accused of making false statements during an agency investigation, the Supreme Court noted that "[t]he fact that [a defendant was] not under oath, of course, negates a charge of perjury"). Therefore, the obstruction enhancement under Note 4B cannot apply. Because there is no evidence that Mr. Smith perjured himself during the CME interview (which was not relevant to any then-pending Government investigation), the obstruction of justice enhancement is not appropriate.

### B. <u>The Sentencing Commission Has Suggested That a Downward Departure Is Warranted Under the Circumstances</u>

A "judge is not required—or indeed permitted—to 'presume' that a sentence within the guidelines range is the correct sentence and if he wants to depart give a reason why it's not correct. All he has to do is consider the guidelines and make sure that the sentence is within the statutory range and consistent with the sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. McIlrath*, 512 F.3d 421, 426 (7th Cir. 2008).

In addition to the other mitigating factors noted above, the Sentencing Commission itself has observed that downward departures are likely warranted in cases like Gregg's, where a Guidelines range is overwhelmingly influenced by a loss calculation which aggregates losses that are "substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims." U.S.S.G. § 2B1.1 cmt. n.21(C); *see also Gupta,* 904 F. Supp. 2d at 351 (noting that the Guidelines "focus largely" on the "single factor" of monetary loss and that the loss table in white-collar cases "effectively guarantees that many [Guidelines] sentences would be irrational on their face"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud."). This is just such a case: even if the Court accepts the Government's contention that Gregg's conduct resulted in "an

aggregate loss amount that is substantial," the anonymous, highly liquid nature of the market in which Gregg traded indicates that those losses were—indeed, must have been—"diffuse[d]" across a large number of victims. Under these circumstances, the Sentencing Commission has acknowledged that an unyielding application of the ordinary loss-calculation framework risks "substantially overstat[ing] the seriousness of the offense," thus warranting a downward departure. *See* U.S.S.G. § 2B1.1 cmt. n.21(C).

## IX. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

The Court should also reject the Government's request for a multiyear prison sentence because such a sentence would create an "unwarranted sentence disparit[y] among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6).

To date, only five other traders have proceeded to trial, been convicted, and received sentences for spoofing—the conduct which forms the basis for all counts on which Gregg was convicted. Of those five, four (James Vorley, Cedric Chanu, Edward Bases, and John Pacilio) were sentenced to 12 months and one day in prison.[52] The Government contends that Gregg's conduct merits a sentence of imprisonment six times longer because of his relative culpability—apparently based solely on the relative "loss[es] attributable to the defendants" and the alleged "volume of spoof orders." Gov't Memo at 40. As noted above, the figures the Government has offered to support these claims are indefensibly inflated and unsupported by evidence. More telling, though, is the Government's gross mischaracterization of the alleged conduct at issue in each of these cases.

---

[52] Judgment, *United States v. Bases*, No. 18-cr-48, ECF Nos. 742, 744 (N.D. Ill. Mar. 13, 2023); Judgment, *United States v. Vorley*, No. 18-cr-35, ECF Nos. 404, 406 (N.D. Ill. June 30, 20210.

To begin with, the Government fails altogether to acknowledge that the defendants in *Bases* were both convicted of conspiracy to commit wire fraud affecting a financial institution—an offense of which Gregg, by contrast, was acquitted. Moreover, there was evidence in both *Bases* and *Vorley* on which the Government relied to argue that those defendants understood they were engaged in improper trading. As set forth in Section I.A.2 of the Application of the 18 U.S.C. § 3553(a) Factors above, there is no such evidence in this case. And while the Government asserts that Gregg's "know[ledge] of the CFTC's and the CME's investigations" somehow makes his conduct more flagrant (*id.* at 40), the opposite is true: the fact that Gregg's trading—with the blessing of the JPMorgan compliance department—remained essentially unchanged despite his awareness of regulatory scrutiny is a powerful indicator that Gregg never believed his trading was wrongful, much less fraudulent.[53] The Court cannot properly account for Gregg's relative culpability without imposing a sentence materially lower than the 12 months and one day meted out in the *Vorley*, *Chanu*, *Bases*, and *Pacilio* cases.

The alleged conduct of Michael Coscia, the other defendant tried and convicted for spoofing-related offenses, stands in even starker contrast to Gregg's. Unlike Gregg, Mr. Coscia was convicted of trading using an algorithm specifically designed to place and withdraw his spoof orders at speeds that made it literally impossible for prospective counterparties to trade on them. According to the Government, in just over two months, this algorithm netted Mr. Coscia personal profits north of $1 million. Mr. Coscia was also found to have testified falsely at trial. Under those circumstances, the district court imposed a prison sentence of 36 months.[54] The Government's

---

[53] The Government's reliance on the CFTC investigation for its impact on Gregg's state of mind is misplaced for an additional reason: Gregg cannot have "know[n] of" that investigation while engaging in any of the conduct at issue, because that investigation did not even begin until well after the period covered by the Indictment.

[54] Judgment, *United States v. Coscia*, No. 14-cr-551, ECF No. 159 (N.D. Ill. July 14, 2016).

request that Gregg be sentenced to double the jail time—despite his lack of personal gains and the total absence of any evidence that he attempted to obstruct the Government's investigation or prosecution—is precisely the sort of "unwarranted sentence disparit[y]" that 18 U.S.C. § 3553(a)(6) requires the Court to avoid.

Finally, many other defendants who pleaded guilty to spoofing-related offenses based on conduct as or more culpable than Gregg's were sentenced to probation or time served.[55] These defendants' acceptance of responsibility and the benefit to the Government of avoiding trial cannot, standing alone, justify a disproportionately greater sentence for Gregg without imposing a *de facto* trial penalty. *See United States v. Osmani*, 20 F.3d 266, 269 (7th Cir. 1994) ("Thus a sentencing judge may not impose a harsher sentence on a defendant who chooses to exercise his constitutional right to trial . . . .").

A noncustodial sentence would best account for Gregg's culpability relative to other defendants who have been convicted of similar offenses. In no case, however, should the Court impose the lengthy prison term requested by the Government, which cannot be squared with the requirement under 18 U.S.C. § 3553(a)(6) to impose a sentence that avoids "unwarranted . . . disparities among defendants with similar records who have been found guilty of similar conduct."

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of time served and a term of supervised release with conditions.

---

[55] Judgment, *United States v. Wang*, No. 22-cr-10123, ECF No. 125 (D. Mass. Nov. 30, 2022); Judgment, *United States v. Forbes*, No. 22-cr-97, ECF No. 19 (E.D.N.Y. Aug. 2, 2022); Judgment, *United States v. Milrud*, No. 15-cr-455, ECF No. 45 (D.N.J. Apr. 24, 2022); Judgment, *United States v. Liew*, No. 17-cr-1, ECF No. 95, (N.D. Ill. Nov. 17, 2021); Judgment, *United States v. Mohan*, No. 18-cr-610, ECF No. 56 (S.D. Tex. July 19, 2021); Am. Judgment, *United States v. Zhao*, No. 18-cr-24, ECF No. 78 (N.D. Ill. Feb. 4, 2020); Judgment, *United States v. Sarao*, No. 15-cr-75, ECF No. 119 (N.D. Ill. Jan. 29, 2020).

Dated: April 10, 2023

Respectfully submitted,

/s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6108

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
(202) 664-1935

*Counsel for Gregg Smith*