# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

v.                                                    No. 19-cr-00669

GREGG SMITH and
MICHAEL NOWAK,

                          Defendants.

**DECLARATION OF MUKARRAM ATTARI, PH.D.**
**April 10, 2023**

# Table of Contents

I.      QUALIFICATIONS .......................................................................................1

II.     ASSIGNMENT ...........................................................................................2

III.    SUMMARY OF OPINIONS .......................................................................3

IV.     BACKGROUND .........................................................................................8

        A.      Overview of Dr. Venkataraman's Methodology ...................................9

        B.      Overview of Mr. Smith's Trading Style ...............................................14

V.      DR. VENKATARAMAN'S SELECTION OF THE SPOOFING
        SEQUENCES IS FUNDAMENTALLY FLAWED ........................................15

VI.     DR. VENKATARAMAN'S METHODOLOGY FOR CALCULATING
        LOSSES IS FUNDAMENTALLY FLAWED ...............................................25

        A.      Dr. Venkataraman Assumes Causation...............................................25

        B.      Dr. Venkataraman's Adjusted But-For Methodology Produces
                Unreasonable and Unstable Results which Indicate that It Is Unreliable............34

        C.      Dr. Venkataraman's Measurement of Price Is Incorrect, Inflating His
                Loss Calculations...............................................................47

        D.      Within Sequences, Traders who Both Buy and Sell Inflate Dr.
                Venkataraman's Harm Calculations ........................................51

        E.      Dr. Venkataraman's Methodology Misstates a Benefit to the Market of
                Mr. Smith's Filled Scale Orders, Calling It "Cost" Instead...................55

        F.      Dr. Venkataraman's Rate of Spread-Crossing Adjustment Is Not
                Reliable ..............................................................................59

VII.    CONCLUSION..........................................................................................63

## I.    QUALIFICATIONS

1.  I am a Vice President and the co-Leader of the Finance practice at Charles River Associates ("CRA"), an economic consulting firm that I joined in January 2003. From 1997 to 2002, I was an Assistant Professor in the Finance Department of the Business School at the University of Wisconsin–Madison. I obtained my Ph.D. in Finance from the University of Iowa in 1997. Before that, I was a student in the graduate program in Business Administration at the Indian Institute of Management, Ahmedabad. I received an undergraduate degree in engineering from the University of Bombay.

2.  At the University of Wisconsin–Madison and at the University of Iowa, I taught undergraduate, masters and Ph.D.-level courses on investments, corporate finance, international finance, fixed income securities, derivatives and advanced asset pricing. My academic research and teaching have focused on a wide range of finance topics including market efficiency, the valuation of stocks, bonds, derivatives and structured products, credit risk and the effect of liquidity on asset prices.

3.  My research has been published in top academic journals, such as *The Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Financial and Quantitative Analysis*, and the *Journal of Economic Dynamics and Control*. My work has also been published as a chapter in the book, *Derivatives and Financial Mathematics*. I am a past or current member of the American Finance Association, the Western Finance Association, and the European Finance Association.

4.  Through my academic research and teaching, and my consulting and expert work at CRA, I have extensive experience in issues related to market microstructure and futures markets and trading, including investigations of potential market manipulation and spoofing. My clients have included government agencies, corporations (and their officers and directors), financial

institutions, auditors and institutional and individual investors.  I have drawn upon my teaching, research, and consulting experience in formulating my opinions in this matter.

5. A copy of my curriculum vitae is attached as Appendix 1, along with a list of my publications.  Appendix 1 also contains information on matters where I have filed expert reports or have testified.[1]

## II.   ASSIGNMENT

6. I have been asked by counsel for Gregg Smith to examine and comment on the analysis prepared by Dr. Kumar Venkataraman, particularly with respect to what Dr. Venkataraman claims is the calculation of "loss suffered by other market participants as a result of the Defendants' activity that follows the four-step process" (although, as detailed below, Dr. Venkataraman actually reduces his criteria to trading sequences that follow a two-step process).[2]  There are two components to Dr. Venkataraman's analysis: (1) the selection of the alleged "Spoofing Sequences" – i.e.,  the orders or groups of orders that the Government contends were placed with an unconditional intent to cancel before execution; and (2) the calculation of losses allegedly suffered by other market participants as a result of those alleged Spoofing Sequences. I refer to these two components collectively as the "Venkataraman Methodology" or the "Methodology" throughout this declaration.

7. In the course of preparing my declaration, I have been assisted by others at CRA who work under my direction and supervision.  CRA is being compensated at an hourly rate of $1,275 for my work in this matter, and the compensation is not dependent on my opinions or the outcome of this case.

---

[1] To the extent that the Court or Government wishes to receive a copy of the materials I have reviewed and/or relied on in preparing this declaration, counsel for Mr. Smith will make those available.

[2] Declaration of Kumar Venkataraman, December 22, 2022 ("Venkataraman Declaration"), ¶ 11.

8.  My work in this matter is ongoing, and I reserve the right to supplement or modify my opinions to the extent new information comes to light subsequent to the filing of this declaration.

## III.    SUMMARY OF OPINIONS

9.  As an initial matter, the criteria for selection of the Spoofing Sequences, provided by the Government to Dr. Venkataraman,[3] are fundamentally flawed.[4] The Government's criteria assumes that *whenever* Mr. Smith places a group of orders (also known as a scale) on one side of the market and a single, smaller order on the opposite side of the market, he, by definition, was spoofing or attempting to spoof—in other words, that he placed the orders with the intent to cancel them to avoid execution. This assumption, however, is not supported by and is, in fact, entirely inconsistent with indisputable evidence, including, most notably: (i) trial testimony that clearly described why a market-maker like Mr. Smith would legitimately benefit from trading in this economically rational fashion and (ii) CME rules and notices that explicitly permit this type of trading. And despite this evidence to the contrary, Dr. Venkataraman does not attempt to explain why the Government's criteria are indicative of spoofing. (See Section V)

10. Furthermore, examination of Mr. Smith's Spoofing Sequences reveals various indicia of an intent to trade, including Spoof Orders that execute by crossing the bid-ask spread, Spoof Orders that create a new best price, and Mr. Smith's orders that execute on the same side of the market as the Spoof Orders just prior to or following the Spoofing Sequence. (See Section V)

---

[3]    Venkataraman Declaration, ¶ 15.

[4]    Capitalized terms used in this summary are defined in Section IV, "Background," below.

11. Dr. Venkataraman's Methodology for the identification of Spoofing Sequences is also inconsistent with the sequences that were the basis of the jury's conviction, academic literature regarding spoofing, and Dr. Venkataraman's own trial testimony, including for example, sequences featuring Spoof Orders that rest on the market for as long as 82 seconds. (See Section V)

12. Moreover, Dr. Venkataraman's Methodology for calculating market-wide losses for each of these (misidentified) Spoofing Sequences is also fundamentally flawed. In my opinion, Dr. Venkataraman does not properly account for the complexity of the precious metals market. Specifically, in a market where traders receive real-time information from various sources – including orders placed by other traders, orders placed in correlated markets, and macroeconomic news – which arrives on a continuous basis, and where there is non-stop market activity with thousands of market participants, Dr. Venkataraman fails to disentangle the potential reactions of a broad, diverse set of market participants to any particular order or group of orders from their reactions to other relevant market information. Dr. Venkataraman's failure to account for the complexity of the precious metals futures market leads to results which are, in my opinion, unreasonable and unstable for several reasons.

13. *First,* Dr. Venkataraman makes the fatal and elementary error of assuming causation – specifically, that Mr. Smith's groups of orders have caused price movements and increased rates of transaction during the Spoofing Sequences. Dr. Venkataraman's attempt to solve for "causation" with his Control Period design is fatally flawed. Without any basis or analysis, he assumes that because his Control Periods immediately precede the placement of Spoof Orders, he has controlled for all the "idiosyncratic market conditions," even though it is common in empirical research to ensure that the control period accurately represents the but-for market dynamics during the period of interest absent the event being studied. Although

the Venkataraman Declaration cites to empirical research that explicitly constructs control groups that solve for this very issue, Dr. Venkataraman's Adjusted But-For Methodology is not designed to control for factors other than what Dr. Venkataraman has identified as Spoof Orders. As such, the design flaw of his Adjusted But-For Methodology is driving his results. The empirical research studies cited by Dr. Venkataraman also test the reasonableness of its control groups, while Dr. Venkataraman performs no such test.

14. While the patterns in the data that Dr. Venkataraman presents suggests that the placement of groups of orders may be correlated (some of the time) with prices moving away from the side of the Spoof Orders, it is well known that correlation does not imply causation. It is not clear whether Mr. Smith's groups of orders are leading to price movement, or if prices moving away from the "spoof" side leads Mr. Smith to place groups of increasingly better-priced orders. Dr. Venkataraman also fails to account for external events that could impact Mr. Smith's trading strategy; for instance, events that increase volatility in prices may cause Mr. Smith to place groups of orders and also cause transaction volume to increase, or, to the contrary, Mr. Smith may not be as eager to enter less volatile markets. (See Section VI.A)

15. *Second*, Dr. Venkataraman's Methodology produces unreasonable and unstable results which indicate that the Methodology is unreliable. A common way for economists to test a model, such as Dr. Venkataraman's Methodology, is to determine whether it produces extreme results, such as large outliers, or results that are robust to alternative assumptions. The presence of large outliers or instability suggests that the model is misspecified, and a misspecified model is unreliable. There are numerous indicators of this issue, including:

- **Control Period sensitivity.** Dr. Venkataraman's Adjusted But-For Methodology is too sensitive to the Control Period adjustments, leading to illogical situations in which activity during the Control Period is principally driving the calculation of loss.

For example, a sequence for which Dr. Venkataraman reports an Adjusted Market Loss of $1,133,490 has only $200 in Unadjusted Market Losses during the Spoofing Sequence, meaning that the vast majority of the "harm" comes from a large (109 tick) price change during the Control Period. Indeed, an examination of the sequences with the five largest harms and the sequences with the five largest benefits by Adjusted Market Loss yields only one sequence where a majority of the harm or benefit arises from market activity during the Spoofing Sequence; the other nine are primarily the result of price movements during the Control Period.

- **Market losses from unrelated activity**. Trading activity that is clearly unrelated to Mr. Smith's activity is a driver of Dr. Venkataraman's results. For example, in the Spoofing Sequence that finds the largest amount of Unadjusted Market Loss, $874,400 of the $887,570 loss was due to a large sweep downwards (triggered by a large sell order placed by convicted spoofer James Vorley) that occurred well after Mr. Smith had placed most of his so-called Spoof Orders and at a time when they were at least five price levels away from the best offer in the market.

- **Small numbers of sequences driving the overall total.** Dr. Venkataraman's Methodology results in a very small number of Spoofing Sequences (5%) accounting for more than 100% of the harm (because the remaining 95% of Sequences result in a net gain, or positive impact, to Mr. Smith's alleged victims). And a targeted review of specific Spoofing Sequences within the top 5% reveals significant implementation problems, that, if corrected, would mean that the "loss" calculated for many of these sequences either should be excluded from the total or significantly reduced, raising questions about whether Dr. Venkataraman and his team conducted any reliable quality control-testing.

- **Duration sensitivity.** Dr. Venkataraman's Methodology is highly sensitive to changes in the duration period for both Control Periods and Spoofing Periods, as Mr. Smith's Spoofing Sequences with durations longer than 5 seconds, which only constitute 23% of Mr. Smith's Spoofing Sequences, account for 84% of the harm.

- **Internally contradictory results.** One of Dr. Venkataraman's adjustment methodologies produces losses that are 70% greater than the other. In other words, Dr. Venkataraman's own results are at odds with one another and demonstrate that *neither* can be relied upon. (for a full discussion of the points above, see Section VI.B)

16. *Third,* even if Dr. Venkataraman's Methodology were to be accepted, I have found widespread implementation errors, rendering the computational results unreliable, especially among the Spoofing Sequences with the largest losses. (See Section VI.B)

17. *Fourth,* Dr. Venkataraman consistently chooses inputs that inflate the loss calculation. Instead of implementing the well-established "half bid-ask spread" convention to measure market impact (remarkably, a convention that Dr. Venkataraman employed himself in one of his published papers), he erroneously measures harm using the full width of the bid-ask spread, inflating his loss calculations. (See Section VI.C)

18. *Fifth,* Dr. Venkataraman's numbers are also inflated by traders who both buy and sell within the Spoofing Sequences. For example, the most prolific counterparty during Dr. Venkataraman's sequences (Tag50 ATS001) traded 85,537 harmed contracts, generating Unadjusted Market Loss of $2,257,415. However, ATS001 was active on both sides of the market during the Spoofing Sequences; it traded an additional 67,961 contracts that "benefitted" from Mr. Smith's activity, resulting in an aggregate benefit of $2,061,105 (or negative harm). Dr. Venkataraman only counts the "harmed" contracts towards his loss total.

Thus, the harm that Dr. Venkataraman assigns to ATS001 is inflated by *1,050%* (before considering any of the other methodological flaws discussed in this declaration). Across all counterparties that Dr. Venkataraman deems to be harmed during Mr. Smith's sequences, Dr. Venkataraman has inflated their unadjusted harm by at least 132% on this basis alone. (See Section VI.D)

19. *Sixth*, Dr. Venkataraman fails to account for the benefit that groups of visible orders, like Mr. Smith's, can have on the market as they absorb large orders that would otherwise result in sweeps or rapid price movements in the direction of the groups of orders. (See Section VI.E)

20. *Finally*, the Rate of Spread-Crossing Adjustment does not affect the results in the way that Dr. Venkataraman claims, as Dr. Venkataraman focuses on the increase in trades that cross the bid-ask spread from the Spoof Order side to the opposite side but ignores the large increase in trades that cross the bid-ask spread from the opposite side to the Spoof Order side. In addition, Dr. Venkataraman's implementation of this alternative adjustment does not actually use a measure of spread-crossing, as he claims, but merely measures the number of trades that were at less-favorable prices than his but-for price. (See Section VI.F)

## IV.    BACKGROUND

21. On August 10, 2022, Mr. Smith, along with Michael Nowak, was convicted of attempted price manipulation, wire fraud affecting a financial institution, commodities fraud, and spoofing. Mr. Smith, Mr. Nowak, and Jeffrey Ruffo were found not guilty of the RICO and conspiracy charges. The charges on which Mr. Smith was convicted related to the manner in which he placed limit orders into the precious metals futures exchange operated by CME Group, Inc. ("CME") while Mr. Smith was a precious metals trader for Bear Stearns and J.P. Morgan.

### A. Overview of Dr. Venkataraman's Methodology

22. The Venkataraman Declaration outlines a methodology for determining "market harm" or "loss."[5]

23. Dr. Venkataraman first identifies the universe of alleged Spoofing Sequences by isolating orders that meet the following criteria, which were provided to him by the Government:

24. *First*, Dr. Venkataraman identified sequences that contain the following two elements: (1) one or more groups of fully visible orders, which he calls "Spoof Orders" and (2) one or more smaller orders on the opposite side, which may be placed prior to or following the Spoof Orders, which he defines as "Opposite Orders."[6] Despite exhaustive trial testimony from Dr. Venkataraman (and other Government witnesses) that spoofing follows a four-step pattern—namely, (1) entry of a small Opposite Order; (2) entry of Spoof Orders; (3) execution of the Opposite Order; and (4) quick cancellation of Spoof Orders[7]—the Government did not instruct Dr. Venkataraman to limit the Spoofing Sequences to those where the alleged Spoof Orders are cancelled "quickly" (in fact, there is no cancellation, or Step 4, requirement at all). Nor did the Government instruct Dr. Venkataraman to isolate sequences in which the Opposite Order is executed (no Step 3).[8] Dr. Venkataraman does not provide any explanation or justification in his report for failing to consider cancellation speed (or whether an alleged Spoof Order was cancelled at all) in determining whether it was

---

[5] Dr. Venkataraman submitted "loss calculation" declarations in two other spoofing related matters in the Northern District of Illinois: *See* Declaration of Kumar Venkataraman, *United States v. Bases*, No. 18-cr-00048, (N.D. Ill. January 6, 2023) (Lee, J) ECF No. 725-1; Declaration of Kumar Venkataraman, *United States v. Vorley*, No. 18-cr-00035, (N.D. Ill. May 21, 2021) (Tharp, J) ECF No. 383-1. I have closely reviewed his declaration in *Bases* and refer to that declarations as the "Bases/Pacilio Declaration." As I describe below, his methodology in the Bases/Pacilio Declaration differs, without explanation and in critical ways, from his Methodology here.

[6] Venkataraman Declaration, ¶ 16.

[7] *See e.g.*, Trial Tr. 2981:5-25.

[8] Venkataraman Declaration, ¶ 15.

placed with an unconditional intent to cancel before execution. Indeed, the durations of Spoof Orders in the Methodology range from a minimum of 0.042 seconds to a maximum of 82.221 seconds.[9]

25. *Second*, Dr. Venkataraman narrowed the list of Spoofing Sequences by applying the following additional criteria:[10]

- The Spoof Orders must be comprised of individual order sizes of 7 or 10 contracts and placed within the top 10 levels of the limit order book. The Opposite Orders must also be placed in the top 10 levels of the limit order book.[11]

- Spoof Orders must have an aggregate quantity that is at least twice as large as the Opposite Orders' aggregate quantity and an aggregate size of at least 30 lots of gold futures, 15 lots of silver futures or 20 lots of platinum or palladium futures.[12]

- The duration of the Spoofing Sequence starts with the placement of the first Spoof Order and ends when the last order of the Spoof Orders is cancelled or fully executed. Dr. Venkataraman also ends the Spoofing

---

[9]   Dr. Venkataraman included only Spoofing Sequences with a duration of 82.3 seconds or less, because these were "within the 99th percentile … of the duration distribution." This restriction was imposed after his identification of Spoof Orders (at the Spoofing Sequence level) and was not a restriction on the length of the Spoof Orders themselves. Venkataraman Declaration, ¶ 15, n. 12.

[10]  Dr. Venkataraman applied these criteria not only to Mr. Smith's trade data, but also to the trade data of Mr. Nowak and cooperating witnesses John Edmonds and Christian Trunz. Where Mr. Smith has orders on both sides of the market and Mr. Nowak, Mr. Edmonds or Mr. Trunz also have orders on only one side of the market, Dr. Venkataraman classifies the sequences as Mr. Smith's Spoofing Sequences for the purpose of his loss calculation. Where Mr. Smith and one of Mr. Nowak, Mr. Edmonds or Mr. Trunz both have orders on both sides of the market, Dr. Venkataraman classifies the sequences as belonging to both Mr. Smith and the other trader. Venkataraman Declaration, ¶ 17 and ¶ 48.

[11]  Venkataraman Declaration, ¶ 16. Dr. Venkataraman used 7 and 10 contract size thresholds for gold futures and 10 contract size thresholds for silver and palladium.

[12]  Venkataraman Declaration, ¶ 16 and n. 12.

Sequence when the market price moves such that the Spoof Orders are

no longer in the visible (generally, top 10) levels of the order book.[13]  I

refer to this duration as the "Spoofing Period."

Notably, Dr. Venkataraman provides no explanation or justification for why these

parameters are indicative of an unconditional intent to cancel before execution.

26. Upon identifying the universe of Spoofing Sequences, Dr. Venkataraman then proceeds to

calculate losses.

27. His first step is to calculate what he refers to as "Unadjusted Market Loss."  In short, for any

executed trade that occurs during a Spoofing Sequence market-wide, he compares the

transaction price to the best available price on the Spoof Order side of the book just prior to

the placement of the first alleged Spoof Order in the sequence.  He calls the latter price the

"But-For Trade Price."[14]  Under the Methodology, if the executed trade price is higher than

the But-For Trade Price for buy-side Spoof Orders, or lower than the But-For Trade Price for

sell-side Spoof Orders, then Dr. Venkataraman finds positive Unadjusted Market Loss, or a

harm for market participants.  If the trade price is lower than the But-For Trade Price for buy-

side Spoof Orders, or higher than the But-For Trade Price, for sell-side Spoof Orders, then

Dr. Venkataraman finds negative Unadjusted Market Loss, or a benefit for market

participants.[15]

28. Although not noted in his Declaration, Dr. Venkataraman excludes any trades from the final

calculations in which the potentially harmed party is Mr. Smith, a co-defendant, a

---

[13]    Venkataraman Declaration, ¶ 16 and n. 21.

[14]    Venkataraman Declaration, ¶ 25.

[15]    Venkataraman Declaration, ¶ 26.

cooperating witness or one other alleged co-conspirator.[16] Thus, if one of Mr. Smith's Spoof Orders is hit during the sequence, that execution is excluded from Dr. Venkataraman's calculation; but Dr. Venkataraman does not "credit" Mr. Smith for those transactions or otherwise account for the benefit of those transactions in absorbing further price movement that may have otherwise occurred absent Mr. Smith's Spoof Orders.

29. Dr. Venkataraman's second step is to identify a corresponding period for each Spoofing Sequence, which he calls a "control period" (I refer to these periods as "Control Periods").[17] Dr. Venkataraman's assigned Control Periods are the same length of time as each Spoofing Sequence, with the Control Period ending immediately prior to the placement of the first Spoof Order in the Spoofing Sequence.[18] For example, if the Spoofing Sequence was five seconds long, the Control Period comprises the five seconds directly preceding the Spoofing Sequence. Dr. Venkataraman offers no academic support for the use of short, intraday Control Periods that immediately precede a period of interest, and, as detailed further below, his Control Periods do not achieve their intended result of controlling for external market factors. Indeed, they may even amplify the effect of external conditions.[19]

30. Dr. Venkataraman's third step is to attempt to "adjust" for typical market conduct, acknowledging that some market participants would have traded during the duration of the Spoofing Period absent Mr. Smith's Spoof Orders. In this step, Dr. Venkataraman performs

---

[16] I have confirmed based on Dr. Venkataraman's sequence-level results in this matter that he has excluded such trades.

[17] Venkataraman Declaration, ¶ 32.

[18] Venkataraman Declaration, ¶ 32. Note that when the Control Period overlaps with another Spoofing Sequence, Dr. Venkataraman shortens the Control Period to avoid this overlap and then performs a calculation intended to "scale it up," as described in Venkataraman Declaration, n. 30.

[19] In the Venkataraman Declaration at n. 28 and the Bases/Pacilio Declaration at n. 59, Dr. Venkataraman cites academic papers that are only broadly related to the analysis he performs there. I discuss these further in Section VI.A.

the same calculation during the Control Period that he performed during the Spoofing Sequence to calculate what he defines as "But-For Cost of Trading during the Control Period."[20]

31. Dr. Venkataraman's final step is to subtract his But-For Cost of Trading during the Control Period from his Unadjusted Market Loss for the corresponding Spoofing Sequence to come up with what he calls his "Adjusted Market Loss."[21]  I refer to these four steps collectively as the "Adjusted But-For Methodology."

32. Dr. Venkataraman also proposes an "Alternative Adjusted Market Loss," or a second way of adjusting his Unadjusted Market Losses.  Under this method, Dr. Venkataraman focuses on the rate of spread-crossing, which he defines as the average rate of contracts traded per second in which the trader on the Spoof Order side crosses the bid-ask spread.[22]  I refer to this as the "Rate of Spread-Crossing Adjustment."  Dr. Venkataraman finds that the average per second rate of spread-crossing during all Control Periods is roughly 2.50 contracts per second, while the same rate during the Spoofing Periods is roughly 4.67 contracts per second.[23]  From this aggregate statistic, he concludes that roughly 53.6% of transactions would have occurred but for the Spoof Orders, and he discounts the overall loss accordingly.[24]  For example, if a Spoofing Sequence yielded an Unadjusted Market Loss of $100, the Alternative Adjusted Market Loss would be $46.40, or a 53.6% discount of the

---

[20] Venkataraman Declaration, ¶ 33.

[21] Venkataraman Declaration, ¶34.

[22] Venkataraman Declaration, ¶ 40.  As described in Section VI.F below, his spread-crossing metric does not actually capture whether any trade has crossed the then-prevailing bid-ask spread or not.

[23] Venkataraman Declaration, ¶ 42.

[24] Venkataraman Declaration, ¶ 44.

original. As detailed in Section VI.F, this approach, too, has significant flaws in its assumptions and implementation.

### B.    Overview of Mr. Smith's Trading Style

33. During this time period, Mr. Smith was a prolific trader. Between January 4, 2008 (when he was still at Bear Stearns) and April 17, 2015, Mr. Smith bought or sold, i.e., *executed,* 3.26 million precious metals futures contracts, or an average of 1,990 contracts traded per day.[25] Consistent with executing a large volume of futures contracts on a daily basis, Mr. Smith placed a large number of orders: 2.56 million limit orders in precious metals futures between January 4, 2008 and April 17, 2015. This represents an average of 1,566 limit orders placed per day on which Mr. Smith traded during the period. Of the 2.56 million limit orders, 89% were fully visible and 11% were iceberg orders.[26]

34.  Mr. Smith frequently placed groups of orders (or scales) of similar sizes both with and without opposite side orders.[27] Specifically, of the 2.56 million limit orders that Mr. Smith placed, 2.11 million (82%) were placed as part of scales.[28] Mr. Smith was frequently filled on scaled orders, both with and without opposite side orders present. Of the 3.26 million precious metals futures contracts executed by Mr. Smith, 1.16 million contracts, or 36%,

---

[25]  Venkataraman Declaration, ¶ 16 states that January 4, 2008 to April 17, 2015 is the relevant time period for Mr. Smith's orders. Mr. Smith placed orders on 1,638 days during the time period. Figures in this section are based on my analysis of RAPID data.

[26]  There were 2.29 million fully visible orders and 0.28 million iceberg orders.

[27]  The scale definition I use in this section is: groups of orders that (i) have an individual order duration of less than 10 minutes, (ii) are placed within 1 second of each other, (iii) are all placed on the same side of the market, (iv) are all of the same quantity, (v) are either all visible or are all iceberg, and (vi) are not cancelled before the placement of any subsequent individual order.

[28]  88% of the groups consisted of fully visible orders and 12% consisted of iceberg orders.

were executed on orders that were part of a scale, which averages out to 709 contracts per day.[29]

35. Many of Mr. Smith's orders had short durations (5 seconds or less), and these short-duration orders were frequently partially or fully filled. Indeed, 57% of Mr. Smith's scale executions were hits of visible groups that included orders of 5 seconds or less.

## V.    DR. VENKATARAMAN'S SELECTION OF THE SPOOFING SEQUENCES IS FUNDAMENTALLY FLAWED

36. Spoofing requires that a trader places an order with an unconditional intent to cancel the order before it is filled. As Dr. Venkataraman testified at trial, to identify a Spoof Order, one must look for factors that are indicative of Mr. Smith's intent when placing his orders into the market, such as whether there were no legitimate economic rationale for the order(s) and/or whether they were designed to avoid execution.[30] Dr. Venkataraman's Declaration, however, does not discuss the rationale for the selection criteria provided to him by the Government or explain why these criteria are indicative of spoofing. Rather, he appears to assume, without any stated basis or justification, that any time Mr. Smith placed a group of orders with another order live on the opposite side of the market, he intended to cancel those orders before execution. There are several reasons to believe otherwise.

37. *First*, there is a legitimate economic rationale for trading in the two-step pattern that Dr. Venkataraman (now) concludes is spoofing (which also applies to the four-step pattern as alleged at trial).

---

[29]    This includes 831,970 contracts filled from groups of fully visible orders (or 508 per day) and 329,187 contracts filled from groups of iceberg orders (or 201 per day).

[30]    Trial Tr. 2739:10-20, 2765:6-12, and 2787:17-23.

38. One reason for a futures trader like Mr. Smith to place groups of orders in scales (i.e., Step 1 of the now two-step pattern) is that his scales provide liquidity to the market. In securities and commodities markets, there are traders who need to execute large orders at once. When these large orders are entered aggressively into the market, they can disrupt the market by trading through multiple price levels to be fully filled, resetting the market price. If Mr. Smith's (or other traders') groups of orders are resting in the market at sequential "scaled" price levels of the order book, those orders, especially those farther away from the mid-market, will fill at "good" prices for Mr. Smith. In other words, Mr. Smith benefits in these instances because his counterparties' large orders will trade across several price levels in his scaled group of orders. The resulting price movement is the result of one trader's need for liquidity, not any fundamental change in market price, so Mr. Smith can expect to unwind that position at a profit once the temporary effect of the large order dissipates. However, Mr. Smith would only want to provide such liquidity briefly, because if there were price changes for reasons other than a temporary liquidity need, he would not expect to be able to close the position at a profit.

39. Further, as I note above, Mr. Smith frequently placed fully visible orders in the pattern that Dr. Venkataraman has defined as Spoof Orders, i.e., as part of groups of orders, but without any Opposite Order. And 36% of all of Mr. Smith's executions, or an average of 709 contracts traded per day, were contained in orders that were placed as part of groups of orders. This shows that his reasons for placing orders in groups must include reasons apart from spoofing.

40. There is also a legitimate economic reason for Mr. Smith to be on both sides of the market at the same time (i.e., Step 2 of Dr. Venkataraman's now two-step pattern, as presented in the

Venkataraman Declaration).[31]  It is well-known that there are traders in the market whose algorithms infer the direction of trading and use that information to the disadvantage of other market participants who have large orders they need to execute.[32]  This is sometimes described as a form of "front-running" in the finance literature, and has been called "parasitic" trading.[33]  As a result, traders with large orders may intentionally execute trades in both directions while filling their large order in an attempt to temper the impact of front-running or prevent the front-running algorithms from deciphering their trading strategy.  In addition, traders may have orders on both sides because they have two different strategies that they are trying to execute simultaneously.

41. Further, the CME has recognized that placing limit orders on both sides of the market is a legitimate trading strategy with an economic purpose.  I have reviewed the CME's Rulebook, as well as the relevant Market Regulation Advisory Notices ("MRAN"), and I note that MRAN RA2107-5 specifically permits market participants to make "unequal markets," also

---

[31]  Venkataraman Declaration, ¶ 10.

[32]  L. Yang and H. Zhu, "Back-Running: Seeking and Hiding Fundamental Information in Order Flows," *The Review of Financial Studies* 33 (2020) 1484–1533; V. van Kervel and A.J. Menkveld, "High-frequency Trading Around Large Institutional Orders," *The Journal of Finance* 74.3 (2019): 1091-1137; L. Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003) pp. 245,251; Securities and Exchange Commission, Concept Release on Equity Market Structure, Release No. 34-61358; J.E. Stiglitz, "Tapping the Brakes: Are Less Active Markets Safer and Better for the Economy?" working paper presented at the Federal Reserve Bank of Atlanta 2014 Financial Markets Conference (2014).

[33]  In this context, this form of "front-running" is often called "back-running" in the modern literature.  Here I use "front-running," as it is the term used in the context of "parasitic traders" in Dr. Venkataraman's work, but for the instant purposes, the terms are interchangeable, although "back-running" is commonly used so as to avoid any insinuation of another (illegal) practice also termed "front-running," in which a trader uses private information from a client order to his own advantage. *See* L. Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003) pp. 245, 251.  See also L. Yang and H. Zhu, "Back-Running: Seeking and Hiding Fundamental Information in Order Flows," *The Review of Financial Studies* 33 (2020) 1484–1533.

defined as "a two-sided market with unequal quantities," as long as the orders are entered for the purpose of execution.[34]

42. *Second*, the Government's selection criteria are not tailored to identify trading strategies designed to avoid execution. Rather, an examination of the selected Spoofing Sequences for Mr. Smith reveals the opposite—namely, indicia of an intent to trade. Specifically:

- 5.3% of Dr. Venkataraman's Spoofing Sequences contain Spoof Orders (or orders on the same side as the Spoof Orders) that crossed the prevailing bid-ask spread, and 10.0% of the Spoofing Sequences contain orders on the Spoof Order side of the market that are fully filled. Filling one or more orders in Spoof Orders is consistent with intending to trade that group of orders.[35]

- 20.8% of Dr. Venkataraman's Spoofing Sequences contain Spoof Orders (or orders on the same side as the Spoof Orders) that were placed as the new best order in the market. Such orders are the most probable to be hit because there are no other orders with transaction priority over it and their placement is an indication that Mr. Smith intended to trade on that side.

- 6.3% of Dr. Venkataraman's Spoofing Sequences occur immediately before or after executions in which Mr. Smith traded with fully-visible scale orders

---

[34] CME Group, *Market Regulation Advisory Notice* (Aug. 2, 2021), https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2021/07/CME-Group-RA2107-5-Rule-575-07-19-2021.pdf ("CME MRAN RA2107-5").

[35] An example of this is shown in Sequence Smith_GC_B_24073, discussed in Section VI.B below. Mr. Smith places aggressive bids throughout a Spoofing Sequence that generates a substantial amount of Unadjusted and Adjusted Market Loss under Dr. Venkataraman's Methodology.

on the same side as the Spoof Orders.[36]  Active trading on the same side of the market as the Spoof Orders immediately before or after the Spoof Orders were placed undermines an inference that Mr. Smith intended to cancel the Spoof Orders to avoid execution.

43. Dr. Venkataraman's inability to identify trading strategies designed to avoid execution is illustrated by Sequence Smith_GC_S_14994, shown in Figure 1.  In this sequence, Mr. Smith placed three sell-side orders at a price of $1,000.5 that Dr. Venkataraman classified as Spoof Orders which are partially filled within two seconds of placement.  Even after the partial fill, Mr. Smith then left those sell-side orders outstanding, then added two more sell-side Spoof Orders at the same price and left all five sell-side Spoof Orders outstanding for the full duration of the Spoofing Sequence (33.218 seconds) before cancelling them.  At no time during the Spoofing Sequence was a buy-side Opposite Order hit, nor was an Opposite Order present within the top 10 levels of the visible order book.[37]  While those five sell-side Spoof Orders were outstanding, Mr. Smith also had an outstanding sell-side order at $1,000.9 that Dr. Venkataraman classified as an Opposite Order, meaning that according to Dr. Venkataraman, Mr. Smith had purported Spoof Orders and Opposite Orders simultaneously outstanding on the same (sell) side of the market.  In addition, 0.977 seconds after cancelling his sell-side Spoof Orders at $1,000.5, Mr. Smith placed two more sell-side orders at the same $1,000.5 price, which Dr. Venkataraman now classifies as Opposite Orders, suggesting that Dr. Venkataraman has determined that within one second, Mr. Smith's intent with

---

[36]    Executed scales of orders considered are limited to scales of orders with a maximum duration of 5 seconds. Includes executions in the period of the same length as the Spoofing Period immediately prior to or subsequent to the Spoofing Sequence.  Scales in this analysis defined as in Section IV.B above.

[37]    I discuss Dr. Venkataraman's identification of sequences without Opposite Orders proximate to any Spoof Order in Section VI.B below.

respect to sell orders at $1,000.5 had changed from avoiding execution to desiring execution, even though the so-called sell-side Spoof Orders had themselves been partially filled and left outstanding for over 33 seconds.

**Figure 1**: Sequence Smith_GC_S_14994



44. *Finally*, the selection criteria for the Spoofing Sequences bear little resemblance to the sequences for which Mr. Smith was actually convicted, or, in other words, the sequences where the Government alleged an intent to cancel.

45. Mr. Smith was convicted on eight counts of wire fraud (Counts 5 through 12); each count listed one trading sequence (for a total of eight wire fraud trading sequences). In addition, the Government presented two further sequences in connection with the spoofing count. I refer to these 10 sequences as the "Smith Conviction Sequences."[38]

---

[38] I reviewed Dr. Venkataraman's Spoofing Sequences that were included in the Smith Conviction Sequences. One of the Smith Conviction Sequences was not included among Dr. Venkataraman's Spoofing Sequences because it did not meet his criteria, which illustrates how disconnected his selection criteria are from Mr. Smith's conviction. Second Superseding Indictment ¶ 30q.

46. These 10 sequences have certain characteristics, such as the size of the Spoof Orders, speed of cancellation of the Spoof Orders, passive versus aggressive Spoof Orders, and the execution of the Spoof Orders as shown in Exhibit 1. Yet, as shown in Exhibit 2, 79.6% of the sequences used by Dr. Venkataraman in his Declaration for sentencing did not meet one or more thresholds of the Smith Conviction Sequences and are therefore inconsistent with inferences of intent to spoof for many of the reasons detailed above (e.g., the Spoof Order crossed the bid-ask spread and/or was fully filled; Mr. Smith was executing fully visible scale orders on the same side of the Spoof Orders either before or after the Spoofing Sequence; etc.) along with differing from the Smith Conviction Sequences for the additional following reasons:[39]

    a) **Durations of less than one second.** None of the Smith Conviction Sequences had a duration from the last order placement in a group to the first cancellation of an order in that group that was longer than one second. Spoofing requires an intent to cancel an order before it is filled; orders that are outstanding for longer periods of time are at greater risk of being hit. As alleged in the Indictment and elsewhere, once a spoofer has finished placing a Spoof Order, if he intends to avoid getting hit on those orders by an algorithm trading at "extraordinary speeds," he will want to start to cancel his Spoof Orders as quickly as possible.[40] All of the Smith Conviction Sequences had the last-placed Spoof Order cancelled within one second of order entry. Dr. Venkataraman has eliminated

---

[39]  As shown in Exhibit 2, 79.6% of Spoofing Sequences include at least one of the following inconsistencies with the Smith Conviction Sequences: Spoof Orders (or orders on the same side as the Spoof Orders) that crossed the bid-ask spread, orders on the Spoof Order side of the market that are fully filled, trading with fully visible scale orders on the same side of the Spoof Order immediately prior to or following the Spoofing Sequence, or any of the inconsistencies listed hereafter in ¶ 46(a) through ¶ 46(e).

[40]  Second Superseding Indictment, ¶ 4.

any maximum cancelation time for Mr. Smith in his analysis here.[41] Dr. Venkataraman includes 10,565 sequences where the duration from the last-placed order to the first cancellation was longer than one second, or 10.0% of his total sequences.[42,43]

b) **Ratios of less than 8 to 1.** As presented by the Government at trial, spoofing is conceptually predicated on a group of orders on one side of the market that is larger than an opposing order on the other side of the market (the Opposite Order),[44] referred to as "market imbalance" by Dr. Venkataraman. The jury was shown numerous exhibits regarding the apparent impact of market imbalance for the Smith Conviction Sequences, and Dr. Venkataraman testified about this topic as well.[45] The smallest ratio in the Smith Conviction Sequence of Spoof Orders versus Opposite Order was 8. For the Methodology here, however, Dr. Venkataraman requires only a ratio of 2 Spoof Orders versus Opposite Orders.[46] Dr. Venkataraman has thus changed his approach without updating his Methodology to account for the different level of imbalance.[47] I am not aware

---

[41] This is inconsistent with his analysis in the Bases/Pacilio Declaration. There, Dr. Venkataraman limited the cancelation time from the Spoof Order entry to within 5 seconds of the placement of Spoof Orders. Dr. Venkataraman has not explained why in analyzing loss in that matter 5 seconds was the appropriate threshold, but that no threshold is appropriate here. Bases/Pacilio Declaration, ¶ 15.

[42] First cancellation defined as the first cancellation after the final placement of Spoof Orders during the sequence.

[43] The longest total duration of the Smith Conviction Sequences (from first placement of the order that starts the scale to last cancellation of an order in that scale) was 9.766 seconds. 10,016, or 9.4%, of Dr. Venkataraman's Spoofing Sequences had durations longer than 9.766 seconds.

[44] Gov't Expert Discl., June 21, 2021, at 7-13.

[45] Gov't Expert Discl., June 21, 2021, at 7-13; Trial Tr. 2734:4-10 and 2748:11-14.

[46] Venkataraman Declaration, ¶ 16.

[47] This is also inconsistent with Dr. Venkataraman's methodology in the *Bases* matter, where he limited all Opposite Orders to iceberg orders, which will increase the ratio of Spoof Orders versus Opposite Orders, since the Opposite Order side will only show a small number of lots to the market. *See* Venkataraman Bases and Pacilio Declaration, ¶ 15. Further note that if there is also a fully visible order on the Opposite Order side that is

of any research that shows how large a group of Spoof Orders needs to be relative to the Opposite Orders in order to impact the market to a material degree; however, CME MRAN RA2107-5, as mentioned above, expressly condones a ratio of 10 to 1, five times as large as the Methodology's 2 to 1 ratio.[48]  The Smith Conviction Sequences provide the best available evidence of the jury's consideration of that threshold.  Dr. Venkataraman includes 20,003 sequences with a ratio less than 8, or 18.9% of his total sequences.

c)  **Spoof Orders fewer than 50 Contracts.** None of the Spoof Orders in the Smith Conviction Sequences were fewer than 50 contracts.  Small quantities shown to the market are inconsistent with an intent to spoof because, according to Dr. Venkataraman's "shock the market theory," they are less likely to materially impact market behavior.[49]  Dr. Venkataraman uses thresholds of 30 contracts for gold futures, 15 contracts for silver futures, and 20 contracts for each of platinum and palladium futures.  I am not aware of any research that shows how large a group of Spoof Orders needs to be in order to impact the market to a material degree.  The Smith Conviction Sequences provide the best available evidence of the jury's consideration of that threshold.  Dr. Venkataraman includes 22,439 sequences with fewer than 50 contracts, or 21.2% of his total sequences.

d)  **Opposite Order not fully filled.** All of the Smith Conviction Sequences had an opposite side order that was fully filled during the Smith Conviction Sequence or

---

within five ticks of the iceberg Opposite Order, Dr. Venkataraman excludes the sequence from his harm calculation.

[48]  CME MRAN RA2107-5 at p. 4.

[49]  Trial Tr. at 2718:7-2720:15.

during a subsequent Smith Conviction Sequence. If the Opposite Order is not fully filled, it is not possible to measure the time between the execution of the Opposite Order and the cancellation of the Spoof Orders, a metric which Dr. Venkataraman testified is important to inferring intent.[50] Dr. Venkataraman includes 63,742 sequences without opposite side orders that were fully filled during the Spoofing Sequence or during a subsequent Spoofing Sequence, or 60.1% of his total sequences.

e) **Distance between Opposite Order and Spoof Orders.** None of the Smith Conviction Sequences had an Opposite Order that was farther than eight price levels away from the best-priced Spoof Order. Opposite Orders that are far away from the Spoof Orders are unlikely to be impacted by market movements as a result of the Spoof Orders, and, accordingly, it is unlikely that the trader was intending to use the Spoof Orders to fill the Opposite Orders, but rather more likely that the trader was using the Spoof Orders for the genuine purpose of trading. Dr. Venkataraman includes 12,419 sequences without opposite side orders within 8 ticks of the best-priced Spoof Order, or 11.7% of his total sequences. In addition, in the *Bases* matter, Dr. Venkataraman had limited his identification of Spoof Orders to those that were placed within the top five levels of the order book. He also testified in the *Smith* matter that "market participants pay a lot of attention to the top five levels."[51] But he has now changed this requirement to be the top 10 levels for Mr. Smith in his Declaration. I am not

---

[50]   Trial Tr. at 2718:14-18.

[51]   Venkataraman Bases/Pacilio Declaration, ¶ 15; Trial Tr. 2714:12-15.

aware of any analysis performed by Dr. Venkataraman or research that suggests that orders placed in the 6th through 10th level of the order book are expected to have a meaningful impact on market activity. Dr. Venkataraman does not explain why he limited his analysis in *Bases* to the top five levels there but chose to increase it in his Declaration.

f) **Coordinated Spoof Orders.** Dr. Venkataraman considers 147 Spoofing Sequences involving both Mr. Smith and another trader: Michael Nowak, Christian Trunz, or John Edmonds.[52] At no point at trial was it alleged that Mr. Smith's trading was done in coordination with Mr. Nowak, Mr. Trunz, or Mr. Edmonds. Mr. Trunz and Mr. Edmonds did not allege that they ever spoofed together with Mr. Smith during their extensive trial testimony. Including these 147 sequences without regard to the trial evidence is an example of the way Dr. Venkataraman consistently chooses metrics and inputs that will increase his loss calculation with no principled basis for doing so.

47. In conclusion, Dr. Venkataraman's Methodology has deviated from well-accepted, reliable indicia of spoofing, including those that formed the basis of the Government's own theory of the mechanics of spoofing, and, in doing so, he has expanded the universe of Spoofing Sequences significantly beyond the Smith Conviction Sequences.

## VI. DR. VENKATARAMAN'S METHODOLOGY FOR CALCULATING LOSSES IS FUNDAMENTALLY FLAWED

### A. Dr. Venkataraman Assumes Causation

48. As a threshold premise, Dr. Venkataraman's Adjusted But-For Methodology assumes the Adjusted Market Losses he calculates are the direct result of Mr. Smith's orders that he has

---

[52] Venkataraman Declaration, p. 10.

identified as Spoof Orders.  However, he has failed to conduct the required analysis to show that this causal connection exists.

49. As is well known, correlation does not imply causation.  To establish causation, one needs to assess: (i) the direction of causality, i.e., establishing whether Action A causes Action B, or whether Action B causes Action A,[53] and (ii) whether other factors which impact both actions cause them to be correlated with each other without a causal relationship; for example, ice cream sales and sunscreen sales may be correlated with each other, not because one causes the other but rather because they are both the result of high temperatures.[54] Accordingly, Dr. Venkataraman needs to establish whether Mr. Smith's orders cause the actions in the market that he measures or whether those actions cause Mr. Smith to place the orders that he does, and also whether there are other factors that cause both the market reaction and Mr. Smith to place his orders.

50. Dr. Venkataraman attempts to establish that Mr. Smith's so-called Spoof Orders cause losses in the marketplace through his Adjusted But-For Methodology.  This methodology uses a Control Period in an attempt to control for certain factors, which Dr. Venkataraman defines as "idiosyncratic market conditions,"[55] to establish causality.  However, since Dr. Venkataraman's event study design is flawed and unreliable, his results continue to include the effects of those "idiosyncratic market conditions" rather than removing them.

---

[53] In his academic work, Dr. Venkataraman takes care to examine and rule out reverse causality.  *See, e.g.*, Anand, Amber, and Kumar Venkataraman. "Market Conditions, Fragility, and the Economics of Market Making." Journal of Financial Economics 121.2 (2016): 327-349.

[54] In his academic work, Dr. Venkataraman takes care to rule out unobserved factors that could affect the two variables he is studying.  *See, e.g.,* Hendershott, Terrence, et al. "Quote Competition in Corporate Bonds." Swiss Finance Institute Research Paper Series (2021) 22-70.

[55] Venkataraman Declaration, ¶ 34.

51. I agree with Dr. Venkataraman that one needs to adjust for market conditions and trades that would occur absent Spoof Orders in order to measure the causal effect of Spoof Orders. In empirical studies, control periods should represent the but-for market dynamics during the period of interest to measure a reasonably accurate causal impact. Said another way, the control period should be created so that it is expected to be different than the period of interest (or the treatment period) only by the absence of the specific element being tested.

52. That Dr. Venkataraman fails to create a similarly useful control period is, in fact, well-illustrated by the papers that Dr. Venkataraman cited in his Declaration.[56] In none of these papers do the authors use a method that compares a short period of interest to an immediately preceding, same-length time window, as Dr. Venkataraman does here. For example, in one paper cited by Dr. Venkataraman, the authors compare a treatment group containing the release of certain news articles, scored as "highly relevant," to a control group that contained the release of another group of articles, scored as "low relevance."[57] These authors did not use the time period immediately before the release of the articles or time periods that did not contain the release of news articles at all. The authors carefully discussed the reasons for their control group selection and also stated that they did not study certain news articles, since those articles did not have a proper control group.[58]

53. In another paper cited by Dr. Venkataraman, the authors compare the first 15 minutes of days around news events to first 15 minutes of days with no news. Here, the authors are careful to make sure that the time of day is the same between the control and treatment groups, so that

---

[56]  Venkataraman Declaration, ¶ 31.

[57]  von Beschwitz, Bastian, Donald B. Keim, and Massimo Massa. "First to 'Read' the News: News Analytics and Algorithmic Trading." Review of Asset Pricing Studies 10.1 (2020): 122-178.

[58]  von Beschwitz, Bastian, Donald B. Keim, and Massimo Massa. "First to 'Read' the News: News Analytics and Algorithmic Trading." Review of Asset Pricing Studies 10.1 (2020): 122-178.

the difference between their samples is limited to just the presence or absence of news.[59] Finally, in a third paper cited by Dr. Venkataraman, the days around an event (from 5 days prior to the day following an event) are compared to control days before the event (from 30 days prior to 10 days prior to an event).[60] The treatment and control periods are separated in time to limit the possibility that events in the control sample impact the events in the treatment sample.

54. Although the papers cited by Dr. Venkataraman support the use of well-defined control periods, his implementation is inconsistent with these papers. Dr. Venkataraman incorrectly assumes without any basis that since "the control period immediately precedes the placement of Spoof Orders," [61] he has controlled for "idiosyncratic market conditions." But Dr. Venkataraman's Adjusted But-For Methodology does not limit the differences between his Control Period and his Spoofing Period to only the presence of Mr. Smith's Spoof Orders. For example, Dr. Venkataraman's Spoofing Periods always immediately follow the Control Periods. The change in market activity during the Spoofing Periods may very well be in response to the market activity during the Control Periods, as opposed to in response to the Spoof Orders. Thus, the effect that Dr. Venkataraman measures has at least two components: the market's response to Mr. Smith's orders <u>and</u> the market response to the activity in the Control Period.

55. Consider a Control Period where there is a sharp price movement – in fact, in 28% of Dr. Venkataraman's sequences, the Control Period has a larger change in price than the Spoofing

---

[59] Sarkar, Asani, and Robert A. Schwartz. "Market Sidedness: Insights into Motives for Trade Initiation." The Journal of Finance 64.1 (2009): 375-423.

[60] Baruch, Shmuel, Marios Panayides, and Kumar Venkataraman. "Informed Trading and Price Discovery before Corporate Events." Journal of Financial Economics 125.3 (2017): 561-588.

[61] Venkataraman Declaration, ¶ 34.

Period.[62] It is reasonable to assume that sharp market movements during Control Periods would result in subsequent market activity. Indeed, in one of the papers cited by Dr. Venkataraman, the authors observe that a market reaction to news in one direction will quickly correct itself and move in the opposite direction. It does not just continue to move in the same direction from one period to the next.[63] But Dr. Venkataraman's Adjusted But-For Methodology does not account for that. A properly constructed control period would have market movements preceding the Control Period that were similar to market movements preceding the Spoofing Period.[64] That way, Dr. Venkataraman could begin to distinguish the impact of Mr. Smith's orders from the typical reaction of the market to evolution of market conditions prior to Spoofing Periods.

56. Another factor for which Dr. Venkataraman's Control Periods do not control is the state of the order book at the start of Spoofing Periods. Dr. Venkataraman states that Spoof Orders create "a visible order book imbalance to which market participants would be expected to react."[65] The Control Periods and Spoofing Sequences should start with a similar order book imbalance as existing immediately prior to the placement of the Spoof Orders in order to separate out the effect of Spoof Orders from market participants' reaction to the pre-existing order book imbalance. The fact that Control Periods immediately precede Spoofing Periods does not guarantee that the state of the order book is similar at the start of both periods.

---

[62] Analysis limited to 64,962 sequences where the Control Period is the same duration as the Spoofing Sequence and where ARMADA data is available and recently updated prior to the start of both the sequence and Control Period (within 1 second prior to the sequence start time and Control Period start time).

[63] von Beschwitz, Bastian, Donald B. Keim, and Massimo Massa. "First to 'Read' the News: News Analytics and Algorithmic Trading." Review of Asset Pricing Studies 10.1 (2020): 122-178, at 124.

[64] Dr. Venkataraman's Adjusted But-For Methodology not only fails to control for sharp price movements in Control Periods, it also incorrectly assumes that price changes in Control Periods will continue at the same rate and direction during Spoofing Periods. I discuss this incorrect assumption and the unreasonable results it causes in Section VI.B below.

[65] Venkataraman Declaration, ¶ 22.

Again, such a control would begin to distinguish the impact of Mr. Smith's orders from the typical reaction of the market to an existing order book imbalance.

57. Dr. Venkataraman also failed to account for external factors, such as macroeconomic news or activity in correlated markets, and their impact on precious metals futures price, trading volume, and/or Mr. Smith's trading strategy. Such external factors regularly lead to the placement of groups of orders, as well as a change in prices and an increase in trading volume, which results in a correlation between these variables while there is no causation. For example, assume that Mr. Smith places groups of orders when he expects increasing volatility in gold futures prices, perhaps due to observed market behavior in silver futures.[66] That same observation by other traders closely observing the silver futures market might lead them to also place gold futures orders, leading to increasing trading volume and trades at multiple levels of the gold futures order book. In short, events that increase volatility in prices may cause Mr. Smith to place groups of orders and also cause trading volume to increase at the same time – or the contrary, that Mr. Smith may not be as eager to enter less volatile markets – and therefore result in a correlation between these variables.[67] Further, as described more fully in Section VI.E below, Mr. Smith's groups of orders themselves may create the appearance of prices moving away from those orders because Mr. Smith's orders limit price movement in the direction of those orders by creating supply for the market to

---

[66] Finance literature discusses the rational placement of two-sided orders based on expected market volatility. One article notes that "it is perfectly legitimate for a trader who believes the current market price is correct to place simultaneous limit orders to buy/sell at a certain percentage under/over the current market price; the trader hopes to benefit from market volatility, and is supplying liquidity to the market; a regulation prohibiting the placing of simultaneous buy and sell orders on the same stock would rule out many legitimate transactions that provide benefit to the market." Lee, Eun Jung, Kyong Shik Eom, and Kyung Suh Park. "Microstructure-based Manipulation: Strategic Behavior and Performance of Spoofing Traders." Journal of Financial Markets, 16.2 (2013): 227-252, at 229.

[67] *See* Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, "Price Discovery without Trading: Evidence from Limit Orders." The Journal of Finance 74.4 (2019): 1621-1658, at 1636.

trade with, while price movements away from Mr. Smith would not have the benefit of that supply. In other words, Mr. Smith would not be causing prices to rise (or fall) in such circumstances; he would be preventing prices from falling (or rising).

58. In summary, Dr. Venkataraman fails to control for market-specific factors, such as changes in market characteristics prior to the Spoofing Period and the state of the order book when the Spoofing Period starts, or external factors, such as developments in correlated markets. Without any basis, he assumes that his Control Periods control for all the "idiosyncratic market conditions" just because Control Periods immediately precede the placement of Spoof Orders, even though it is common in academic research to test whether the control period accurately represents the but-for market dynamics during the period of interest absent the event being studied.[68]

59. Dr. Venkataraman's Control Periods, by construction, cannot establish the direction of causality. The empirical pattern in the data that Dr. Venkataraman presents suggests that the placement of groups of orders may be correlated with prices moving away from the side of the group of orders, but Dr. Venkataraman's Adjusted But-For Methodology does not establish whether Mr. Smith's groups of orders are pushing the prices or if prices moving away from the group side leads Mr. Smith to place increasingly better-priced orders. In other words, Dr. Venkataraman has assumed (without any analysis) that Mr. Smith has moved the price, but it is also likely that Mr. Smith was chasing the already moving price and trying to

---

[68] See examples where authors test the validity of control group selection in different settings to make sure control group provides an appropriate counterfactual. Fonseca, Julia. "Less Mainstream Credit, More Payday Borrowing? Evidence from Debt Collection Restrictions." The Journal of Finance 78.1 (2023): 63-103; Fonseca, Julia, and Bernardus Van Doornik. "Financial Development and Labor Market Outcomes: Evidence from Brazil." Journal of Financial Economics 143.1 (2022): 550-568; Luu, Hiep N., Linh H. Nguyen, and John OS Wilson. "Organizational Culture, Competition and Bank Loan Loss Provisioning." The European Journal of Finance (2022): 1-26; Cenedese, Gino, Pasquale Della Corte, and Tianyu Wang. "Currency Mispricing and Dealer Balance Sheets." The Journal of Finance 76.6 (2021): 2763-2803.

stay at the best price to achieve a passive fill as the market moves. Because Dr. Venkataraman failed to conduct a proper causation analysis, he has no basis to opine that one caused the other.[69] In other words, correlation (of the groups of orders and price changes) may not be a result of the causal relationship claimed by Dr. Venkataraman (that the groups of orders caused the prices to move).

60. Even setting aside the inability to decipher the direction of the causation, the number of concurrent events in the market makes tying any particular market event to Mr. Smith's trading nearly impossible. The concurrent trading activity of other convicted precious metals futures spoofers – namely, John Pacilio, Edward Bases, James Vorley, and Cedric Chanu (or even any other so-called "large" or "group orders" in the market at the same time) – is only another example of relevant data that cannot feasibly be disentangled from Mr. Smith's data, and, by extension, his effect on the market. Indeed, in the Spoofing Sequence which yields the second-highest Adjusted Market Loss of any of Mr. Smith's Spoofing Sequences, shown below in Figure 2, Mr. Pacilio is trading on the side same as Mr. Smith, but with more than three times the number of visible lots on the side of the market featuring Spoof Orders. In other words, to the extent that Mr. Smith's Spoof Orders exerted pressure on the market or caused it to move (under Dr. Venkataraman's theory), Mr. Pacilio's orders were more than three times as responsible for that effect. Setting aside that Dr. Venkataraman chose not to remove episodes where other convicted spoofers were also in the market, this example demonstrates how difficult it is to isolate any one trader's conduct from the rest of the market's (legitimate or illegitimate) activity.

---

[69] In his academic work, Dr. Venkataraman notes the need to establish causality both empirically and through theoretical work. See, for example, Bhattacharya, Nilabhra, Hemang Desai, and Kumar Venkataraman. "Does Earnings Quality Affect Information Asymmetry? Evidence from Trading Costs." Contemporary Accounting Research 30.2 (2013): 482-516.

**Figure 2**: Sequence Smith_GC_S_20905



61. To the extent that some of Mr. Smith's orders may have had an effect on the market – indeed, as all orders do – Dr. Venkataraman has not done any analysis to establish the regularity or magnitude of that effect. For example, Dr. Venkataraman has not determined whether large individual orders (e.g., one order for 100 contracts) or large groups of orders (e.g., 10 orders at different prices for 10 contracts each) cause different reactions in the market, and he fails to consider (let alone account for) whether the impact of an individual order or a group of orders is a function of its size or proximity to the best price level in the orderbook. Instead, he assumes, both here and in his trial testimony, that Mr. Smith's orders always "shock" the market, reliably causing traders on the same side of the market as the Spoof Orders to cross the bid-ask spread and trade on the other side of the market.[70] But his own data does not support this. In 16.8% of Dr. Venkataraman's Spoofing Sequences, the market either does

---

[70] Trial Tr. 2719:25-2720:23.

not react at all to Mr. Smith's Spoof Orders or trades in the opposite direction of Dr. Venkataraman's theory. This shows that the market does not respond as predictably or uniformly to large orders as Dr. Venkataraman's testimony suggests.[71]

**B.** **Dr. Venkataraman's Adjusted But-For Methodology Produces Unreasonable and Unstable Results which Indicate that It Is Unreliable**

62. In this section, I focus on the computational results of the Venkataraman Adjusted But-For Methodology, or the results that use the Control Period to attempt to "adjust" for his lack of causation analysis – highlighting their unreasonable nature. A common way for economists to test a model, such as Dr. Venkataraman's Adjusted But-For Methodology, is to determine whether it produces extreme results, such as large outliers. I start with specific outlier examples which show the large impact of the flaws in Dr. Venkataraman's Methodology before analyzing the general, methodological flaws, because those flaws drive a substantial portion of his results.

63. Along with his report, Dr. Venkataraman provided a spreadsheet containing information on the sequences that he has identified and used in his computation of harm. The discussion below is based on the information in the spreadsheet.[72]

---

[71] In his testimony, Dr. Venkataraman stated that "the very large visible orders, as expected from finance theory, push the price away from the red orders. Then the defendant quickly cancels his red orders, so the red orders don't fill." Trial Tr. 2726:13-16. However, in one of his own papers, he describes two distinct reactions to placement of a visible order. "Exposing an order increases the chance that it attracts a counterparty who is sufficiently interested in trading to monitor the market, but who has not yet revealed herself ['reactive' traders, as per Harris (1996)]. On the other hand, exposing an order could cause other traders to withdraw liquidity or trade ahead of the order if they infer that the limit order submitter may have access to private information regarding security value." *See* Bessembinder, Hendrik, Marios Panayides, and Kumar Venkataraman, "Hidden Liquidity: An Analysis of Order Exposure Strategies in Electronic Stock Markets," 94 J. Fin. Econ., 361-383 (2009). Instances where market participants place orders to hit the so-called Spoof Orders of Mr. Smith are these "reactive" traders who react to a large amount of supply provided by Mr. Smith.

[72] For each sequence, Dr. Venkataraman reports the start and end time of the sequence, the start and end time of the control window that Dr. Venkataraman uses for the sequence, the Unadjusted Market Loss, the But-For Cost of Trading and the Adjusted Market Loss over the duration of the spoof. Dr. Venkataraman also reports the Unadjusted Market Loss, the But-For Cost of Trading and the Adjusted Market Loss during the first 5 seconds, 10 seconds and 30 seconds for spoofs that exceed these durations.

64. *First*, Dr. Venkataraman's Adjusted But-For Methodology is too sensitive to the Control Period adjustment. This is because Dr. Venkataraman's Adjusted But-For Methodology is based on the implicit and highly erroneous assumption that markets trade linearly and consistently; in other words, the Adjusted But-For Methodology assumes that if the market was trending down during the Control Period, it should continue to trend down for the subsequent Spoofing Period. But analysis of trading in this case, in addition to financial and economic literature, clearly rebuts this assumption. Markets do not trade in the same direction or at the same rate of change with any consistency.[73] Reviewing data in this case, I have observed many instances that could be characterized as a rapid price sweep down or up – anywhere from 20 to 100 ticks or more in less than one second – followed by relatively stable prices in the next one second. In other words, the price movement and volatility of that movement can vary from second to second, at any point, *including* during a Spoofing Period and a Control Period. Evidence suggesting that price changes are not linear also confirms that Dr. Venkataraman's Control Periods do not represent reasonably accurate but-for market dynamics during Spoofing Sequences absent Mr. Smith's orders. As a result, the Control Period adjustments lead to unreasonable and extreme results.

65. To demonstrate the wide range of results that can occur from Control Periods with such extreme variance, I analyzed Mr. Smith's Spoofing Sequences with the highest and lowest adjusted "loss" as examples of the Adjusted But-For Methodology's high sensitivity to Control Period events. Table 1 lists the sequences with the five largest harms and the sequences with the five largest benefits. Dr. Venkataraman's measure of loss ranges from a high of $1,133,490 (Sequence Smith_GC_B_35653) to a low of -$805,800 (Sequence

---

[73] *See e.g.,* Chordia, Tarun, Richard Roll, and Avanidhar Subrahmanyam. "Liquidity and Market Efficiency." Journal of Financial Economics 87.2 (2008): 249-268, at 267.

Smith_GC_B_26248) for the 106,037 Spoofing Sequences that are listed for Mr. Smith in the spreadsheet.[74]

**Table 1:** Spoofing Sequences with the Largest Harm and Benefit, by Adjusted Market Loss

| Spoofing Sequence | Unadjusted Market Losses during the Spoof Duration ($) | But-For Cost of Trading during the Control Period ($) | Adjusted Market Losses during the Spoof Duration ($) | % of Adjusted Market Loss (Gain) From Control Period |
|---|---|---|---|---|
| Smith_GC_B_35653 | 200 | -1,133,290 | 1,133,490 | 99.98% |
| Smith_GC_S_20905 | 23,380 | -915,170 | 938,550 | 97.51% |
| Smith_GC_S_28531 | 887,570 | 2,360 | 885,210 | -0.27% |
| Smith_GC_S_53515 | 20,010 | -738,690 | 758,700 | 97.36% |
| Smith_GC_B_7566 | 43,480 | -703,810 | 747,290 | 94.18% |
| Smith_GC_S_42934 | 21,310 | 313,520 | -292,210 | 107.29% |
| Smith_GC_S_50791 | -2,300 | 362,000 | -364,300 | 99.37% |
| Smith_GC_S_24869 | 141,880 | 513,969 | -372,089 | 138.13% |
| Smith_GC_S_37323 | 4,730 | 488,690 | -483,960 | 100.98% |
| Smith_GC_B_26248 | 13,260 | 819,060 | -805,800 | 101.65% |

66. Just those two sequences – i.e., the sequences with the single highest and lowest Adjusted Market Loss out of all 106,037 Spoofing Sequences – reveal that the vast majority of the harm (or benefit) that Dr. Venkataraman attributes to the Spoof Orders is based on the Control Period. The sequence for which Dr. Venkataraman reports a harm of $1,133,490 has $200 in Unadjusted Market Losses during the Spoofing Sequence. The sequence for which Dr. Venkataraman reports a benefit of $805,800 has $13,260 in Unadjusted Market Losses during the Spoofing Sequence. Thus, in both these instances, the vast majority of the harm or benefit is not the result of market activity during the Spoofing Period. In other words, the

---

[74] A negative "harm" means that, according to Dr. Venkataraman's Methodology, Mr. Smith's actions benefited market participants by that amount over the duration of the Spoofing Sequence. So, a harm of -$805,800 means Dr. Venkataraman's Methodology found that, despite Dr. Venkataraman's theories of causation and "shocking the market," market participants benefitted by $805,800 due to Mr. Smith's Spoof Orders during that sequence.

vast majority of the harm or benefit measured by Dr. Venkataraman was not caused by Mr. Smith.

67. Figure 3 below shows the trading for Sequence Smith_GC_B_35653, the sequence with the largest Adjusted Market Loss. As this figure shows, there is a large market drop during the Control Period of this sequence, with the traded price of gold falling from $1,730.4 at the start of the Control Period to $1,719.5 at the end of the Control Period, or 109 ticks, on a trading volume of 2,019 contracts.[75] Following the sharp price decline, the market begins to rise, and Mr. Smith places orders on the bid side. Trying to buy "low" is a very reasonable response to a rapid fall in price. While these bids are live, the market trades four contracts total, resulting in an Unadjusted Market Loss of $200 under Dr. Venkataraman's Methodology. However, because the market had moved 109 ticks towards Mr. Smith's bids during the Control Period, with significant volume, Dr. Venkataraman found that his Control Period generated $1,133,290 in "gain," which led him to conclude that there was an Adjusted Market Loss of $1,133,490. The reason for this conclusion is that Dr. Venkataraman's Adjusted But-For Methodology effectively assumes that unless the market fell *another* 109 ticks on significant volume during the Spoofing Period, generating *at least another $1,133,290 of gain to the market*, then the market suffered a loss due to Mr. Smith's purported Spoof Orders.

---

[75]     Includes 70 contracts purchased by Mr. Smith.

**Figure 3**: Sequence Smith_GC_B_35653



68. An examination of the sequences with the five largest harms and the five largest benefits (as shown in Table 1 above), as measured by Adjusted Market Losses, reveals that there is only one sequence where a majority of the harm or benefit arises from market activity during the Spoofing Sequence. In other words, for 9 of the 10 sequences, the negative or positive "loss" is derived from the trading and volume during the Control Period, and thus was caused by factors other than Mr. Smith.[76] Further, as discussed above, Dr. Venkataraman has done no analysis of the factors that contributed to such events during the Control Periods, or whether or how those factors have any possible relationship to Mr. Smith, when he does not have any Spoof Orders in the market. As such, his study does not neutralize – or even attempt to

---

[76] The Control Period adjustments create unreasonable results in sequences throughout Dr. Venkataraman's Spoofing Sequences, not just in the sequences with the largest losses or gains. For example, some Spoofing Sequences identified by Dr. Venkataraman have zero contracts traded during the Spoofing Sequence, i.e., not one market participant transacts while Mr. Smith's orders are live. Logically, there should be zero harm to the market generated by Mr. Smith's actions, as nobody traded.

assess – the most relevant "drivers" of harm even in situations with astronomically high or low assigned loss.

69. *Second*, a review of Dr. Venkataraman's Spoofing Sequences for Mr. Smith shows that a relatively small portion of the Spoofing Sequences that Dr. Venkataraman has identified account for more than 100% of the harm that he finds. Specifically, 5% of Dr. Venkataraman's Spoofing Sequences for Mr. Smith with the largest calculated harm have an aggregate $82.3 million of Adjusted Market Loss. In other words, 5% of the Spoofing Sequences account for *more than* the total loss figure. (This also means that the remaining 95% of Spoofing Sequences result in a cumulative gain.) This result demonstrates two flaws in Dr. Venkataraman's analysis: (i) the fact that the study has such a high number of true outliers, or anomalous results, strongly indicates issues in the research design; and (ii) the wide variety of results shows that the market response to large orders can vary widely, contradicting Dr. Venkataraman's theory that large visible "spoof" orders generally shock the market in one direction. Dr. Venkataraman suggests that spoofing works the same way every time, but the wide variety of results shows that the market response to large orders can vary widely.[77]

70. Moreover, I have examined a handful of the 5% of sequences with the largest Unadjusted Market Losses in detail and found significant implementation problems that, if corrected, would mean that many of these sequences either should be excluded or are significantly overstating the losses calculated by Dr. Venkataraman. Without reviewing the underlying code used by Dr. Venkataraman and his team (which he did not provide), it is not possible to

---

[77] For example, Dr. Venkataraman testified that "the very large visible orders, as expected from finance theory, push the price away from the red orders. Then the defendant quickly cancels his red orders, so the red orders don't fill." Trial Tr. at 2726:13-16.

systematically review each of the roughly 5,300 sequences that comprise the 5% of the largest Unadjusted Market Losses to determine whether they each similarly suffer from the sorts of implementation errors discussed; however, given that these errors have an outsized impact on his measurement of harm, these types of errors further demonstrate the unreliability of Dr. Venkataraman's Methodology and its implementation.  Below are some notable examples.

- Sequence Smith_GC_B_24073, generated $308,270 of Unadjusted Market Loss and $304,830 of Adjusted Market Loss.  However, as shown in Figure 4 below, inconsistent with the Methodology, during this apparent Spoofing Sequence, there are no live Opposite Orders identified by Dr. Venkataraman.  In other words, this sequence only has Step 2 and there is no Step 1. In addition, Sequence Smith_GC_B_19236 generated $3,520 of Unadjusted Market Loss and $1,560 of Adjusted Market Loss and also has no live Opposite Orders during the Spoofing Sequence that were identified by Dr. Venkataraman, as shown in Figure 5.  Upon further analysis, I found that of the Smith Spoofing Sequences, 62 sequences representing an aggregate $2.9 million of Adjusted Market Loss do not contain an Opposite Order that is live during the sequence.[78]  This was also the case for the Sequence Smith_GC_S_28531, discussed in Section VI.E below; Mr. Smith's bid opposite the sell-side Spoof Orders was not identified as an Opposite Order by Dr. Venkataraman.

---

[78]  In addition, Figure 4 shows that Mr. Smith consistently crossed the bid-ask spread during the sequence, filling 205 of the total 319 lots that he bought during the sequence by using spread-crossing orders.  This is consistent with intending to fill the orders that he placed, as discussed in Section V.

**Figure 4:** Sequence Smith_GC_B_24073



**Figure 5:** Sequence Smith_GC_B_19236



- Sequence Smith_GC_B_35653, (which is shown in Figure 3 above) generated $1,133,490 of Adjusted Market Loss. However, in this sequence, the distance between the best-priced Spoof Order and the nearest Opposite Order is 100 price increments, a distance so vast that these orders could never be on the same trading screens simultaneously. This is an error in implementing Dr. Venkataraman's Methodology, where both Spoof Orders and Opposite Orders must be placed at top 10 levels of the order book and where the sequence is supposed to end when the Spoof Orders move outside of the top 10 levels. When implementing his Methodology, Dr. Venkataraman erroneously failed to apply the same rule when Opposite Orders have moved outside of the top 10 levels of the visible order book, as this example illustrates. In addition, Sequence Smith_GC_B_7566 generated $43,480 of Unadjusted Market Loss and $747,290 of Adjusted Market Loss and also has no live Opposite Orders within the top 10 levels of the visible order book during the Spoofing Sequence, as shown in Figure 6. This sequence is also the fifth-largest sequence by Adjusted Market Loss, as shown in Table 1 above. Finally, Sequence Smith_GC_S_14994, shown in Figure 1 above, generated $15,820 of Unadjusted Market Loss and $38,260 of Adjusted Market Loss and also has no live Opposite Orders within the top 10 levels of the visible order book during the Spoofing Sequence. Upon further analysis, there are 4,204 Spoofing Sequences that do not have Opposite Orders within 20 ticks of the best-priced Spoof Order, i.e., are further apart than the 10 price levels shown on each side of the market on trading screens.

**Figure 6:** Sequence Smith_GC_B_7566



- In Sequence Smith_GC_S_46578 (shown in Figure 7 below), of the $179,140 of Unadjusted Market Loss in this sequence, almost all of it, $179,080, is due to a trade of 74 lots at an execution price that was 240 ticks below the best bid and 241 ticks away from the best offer price at the time of the trade.[79] Trading through the limit order book 240 ticks away from mid-market and 230 ticks away from the visible order book is simply not possible, given the rules of the precious metals exchange. It is thus clear that this trade was not made against orders in the limit order book and, as such, it is not consistent with Dr. Venkataraman's Methodology (and, regardless, cannot possibly have any relevance to Mr. Smith's futures activity). Including such

---

[79] In RAPID, the executions have an entry in the "Spread Code" field of "944139". A value of 944139 is not identified in any CME documentation available to me.

executions without considering the source or relevance of the execution data is an implementation error that inflates Dr. Venkataraman's results.

**Figure 7:** Sequence Smith_GC_S_46578



71. *Third*, beyond the flaws with his Control Periods, Dr. Venkataraman's Methodology is also highly sensitive to his assumptions about the duration of the Spoofing Period. As noted, economists routinely test the robustness of their results to various assumptions to establish the reliability of their models.[80] A model that varies more than expected as variables change is often considered to be less reliable than one which delivers consistent results when those assumptions change (i.e., the results are "robust"). Economists attempt to develop models

---

[80] "A now common exercise in empirical studies is a 'robustness check', where the researcher examines how certain 'core' regression coefficient estimates behave when the regression specification is modified in some way, typically by adding or removing regressors. Leamer (1983) influentially advocated investigations of this sort, arguing that 'fragility' of regression coefficient estimates is indicative of a specification error, and that sensitivity analyses (i.e., robustness checks) should be routinely conducted to help diagnose misspecification." Lu, Xun, and Halbert White. "Robustness Checks and Robustness Tests in Applied Economics." Journal of Econometrics 178 (2014): 194-206, at 194.

that are not sensitive to strong assumptions and outliers,[81] and they also check if the results

hold after excluding the outliers from data.[82]  Here, Dr. Venkataraman's harm calculation is

very sensitive to duration.  Again, this is best highlighted if we examine the sequences with

the largest harm.  The 10 sequences with the largest harm for Mr. Smith account for $7.1

million of harm out of a total harm of $81.6 million (8.7% of the total) using the entire

Spoofing Sequence duration.  These 10 sequences have an average duration of over 34

seconds, and the longest runs for more than 80 seconds.

72. If the duration is limited to the first 5 seconds of the sequence, there is a 74% reduction in

Dr. Venkataraman's harm calculation.[83]  Sequence Smith_SI_B_2747, shown in Figure 8,

illustrates the impact of Dr. Venkataraman's duration assumptions.  In this sequence, Mr.

Smith cancelled five of his six Spoof Orders within 2.334 seconds of placement.  The

remaining order, a bid for 10 silver futures contracts at $19.135, was left outstanding for an

additional 40.540 seconds before it was fully filled.  During the 40.540 seconds when the

only outstanding Spoof Order was the bid at $19.135, $3,900 of the $4,275 Unadjusted

Market Loss that Dr. Venkataraman assigns to this sequence, or 91%, was generated.

---

[81]   *See e.g.,* Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach*. Cengage learning, 2015, page 323. See also Cantoni, Eva, and Xavier de Luna. "Semiparametric inference with missing data: Robustness to outliers and model misspecification." Econometrics and Statistics 16 (2020): 108-120, and Jiao, Xiyu, and Felix Pretis. "Testing the Presence of Outliers in Regression Models." Oxford Bulletin of Economics and Statistics 84.6 (2022): 1452-1484.

[82]   *See e.g.,* Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach*. Cengage learning, 2015, page 317; Acemoglu, Daron, et al. "Democracy Does Cause Growth." Journal of Political Economy 127.1 (2019): 47-100.

[83]   In fact, for two of the sequences there is no reduction because the spoof is less than 5 seconds long.  For the remaining eight sequences, the harm is reduced from $5.4 million to $156,560 (a reduction of more than 97%).

**Figure 8**: Sequence Smith_SI_B_2747



73. Drawn out to the full universe of Mr. Smith's Spoofing Sequences, only 23% of the 106,037 sequences Dr. Venkataraman considers in his analysis are longer than 5 seconds. However, this small group of Spoofing Sequences accounts for 84% of the harm. The harm for Sequences longer than 5 seconds declines by 74% if the duration for those sequences is capped to the first 5 seconds. A methodology that produces results so sensitive to the choice of thresholds (in this case, duration) is certainly mis-specified or otherwise unreliable.

74. *Fourth*, Dr. Venkataraman's results differ materially between his two adjustment Methodologies: the Adjusted But For Methodology and the Rate of Spread-Crossing Methodology. Dr. Venkataraman asserts that both adjusted methodologies are intended to calculate trading costs absent the Spoof Orders, in other words to remove the cost of trading that market participants would have incurred absent the Spoof Orders. If both adjustments are meant to measure the same metric—the cost of trading absent spoofing—then both

methodologies should have similar results. However, the Adjusted But-For Methodology yields results of $81.6 million for Mr. Smith's Spoofing Sequences, which is more than $33 million (or 70%) greater than the Rate of Spread-Crossing Methodology's result of $48.0 million.[84] These inconsistent results show that the two methods do not reinforce each other and as a result, they demonstrate the unreliability of Dr. Venkataraman's conclusions.

### C. Dr. Venkataraman's Measurement of Price Is Incorrect, Inflating His Loss Calculations

75. There are several further faulty premises underlying Dr. Venkataraman's Methodology.

76. First, Dr. Venkataraman's Methodology assumes all traders passively wait for other aggressive traders to fill them, an incorrect and illogical assumption in a market where every execution necessarily involves one trader with a passive order and another trader who has aggressed. This assumption inflates the price at which he measures "loss."

77. Dr. Venkataraman's Methodology measures price using what he calls "But-For Trade Prices." He measures this using "the last observed [not traded] bid price" and the "last observed offer price, immediately before the placement of the [S]poof [O]rders."[85] Dr. Venkataraman claims that this reflects the highest (or lowest) purchase price among buying (or selling) interest expressed in the visible book. He states, without any support, that this "is a reasonable estimate of the But-For Trade Price for the trader, absent the spoof."[86]

---

[84]  The differences are even more apparent at the sequence level, where 18,473 Spoofing Sequences (17.4% of all of the Spoofing Sequences) result in losses under the one methodology but gains under the second methodology. In other words, more than 17% of the Spoofing Sequences show opposite results between the two methodologies. The average difference in Adjusted Market Loss per sequence between the two methods is $317, which is statistically significant at the 1% significance level using a paired sample t-test. The average difference between the two methods is also statistically significant for the 30 second, 10 second, and 5 second versions of Dr. Venkataraman's calculations.

[85]  Venkataraman Declaration, n. 23.

[86]  Venkataraman Declaration, n. 23.

78. However, according to well-accepted economic literature, this But-For Trade Price is not a reasonable estimate of the trade price for the trader absent a spoof.  Instead, where the bid-ask spread is considered to be a transaction cost, non-market making traders are assumed to incur half of the bid-ask spread or the "midpoint" each time they trade by crossing the spread.[87]  Said another way, an aggressive fill incurs a cost of 5 cents per ounce for every 10 cent price increment of bid-ask spread in gold futures, and a passive fill will earn 5 cents per ounce.  This standard convention is a more reasonable assumption for a But-For Trade Price. Instead, Dr. Venkataraman chose to use a metric unsupported by any academic study, including his own published paper, as discussed below.

79. A trader who wants to buy at the current market price has a choice between placing an order at the best bid (which would be Dr. Venkataraman's But-For Trade Price) and waiting until it is filled, or hitting the best offer and getting an immediate fill at a higher price.  Traders who are patient will "earn" the bid-ask spread, or the difference between the best bid and the best offer price.  Merely earning the bid-ask spread is a profitable trading strategy that may be used by traders often referred to as "market-makers."  Traders who are more impatient will pay the bid-ask spread.  These traders are willing to pay for immediate execution because they don't want to take on the risk of price movements.  Dr. Venkataraman's Methodology assumes that but for the Spoof Orders, all traders would passively wait for the market to "come to them."  But this is not consistent with reality.  In fact, it is not possible, as it

---

[87] "Many traders estimate the cost of trading by the signed difference between the trade price and a quotation midpoint. The quotation midpoint is the average of the bid and ask prices in a quotation.… For example, if a trader buys at the ask and then sells the same quantity at the bid, the trader will have done nothing but trade. His per unit loss for the two-trade round-trip is the bid/ask spread. The cost of trading per trade therefore is half of the bid/ask spread.  The quotation midpoint benchmark gives us this result: The cost of the purchase is the ask minus the quotation midpoint, or half of the spread.  Likewise, the cost of the sale is the quotation midpoint minus the bid, which is also half of the spread."  Larry Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003), pp. 423-425.

assumes all traders would solely place passive orders but for the Spoof Orders; in that case, there would be no trading at all.

80. Indeed, there are ample examples of traders in Dr. Venkataraman's analysis who trade almost exclusively by crossing the bid-ask spread, irrespective of the existence of a Spoof Order. For example, a trader with the Tag50 identifier "GSAGERKTK" filled 18,502 contracts by crossing the spread and hitting the side opposite Mr. Smith's Spoof Orders during the Spoofing Periods. This trader also frequently aggressively crossed the spread in the direction of Mr. Smith's Spoof Orders during the Spoofing Periods, filling 10,542 contracts. Not once did GSAGERKTK fill a passive order during Mr. Smith's sequences. That was simply not the form of trading that this counterparty engaged in; indeed, across all RAPID data, this Tag50 traded 100% of the time by aggressively crossing the spread. GSAGERKTK was far from the only such trader. There were 5,662 counterparties that *only* traded aggressively on both sides of Mr. Smith's Spoofing Sequences.

81. Further, of the 30 counterparties to Mr. Smith's Spoofing Sequences with the most contracts traded under Dr. Venkataraman's Unadjusted Market Loss calculation, all 30 also traded in the opposite direction during Mr. Smith's sequences, i.e., hit the side of the market on which the Spoof Orders were placed. Of those opposite direction trades, 62.0% were placed aggressively, crossing the bid-ask spread to trade on the Spoof Order side. 20 of the 30 counterparties filled more than 50% of their opposite direction trades with aggressive orders on the Spoof Order side. In other words, while Dr. Venkataraman assumes that but for spoofing, traders will trade passively, in fact these traders usually trade aggressively.

82. By assuming that the appropriate But-For Trade Price is the best order on the spoofing side, Dr. Venkataraman implicitly incorporates the expected profit from the bid-ask spread into his analysis, which is incorrect. Indeed, by assuming that a trader has lost a "full tick" every

-49-

time he crosses the spread, rather than "half a tick" (from the "midpoint" price), the cost of each transaction is *doubled* when the market is one tick wide. Imagine a scenario where the best bid in the gold futures market is $999.0 and best offer price is $999.1 throughout the entirety of two consecutive trading sequences. In the first sequence, there is a buy-side spoof, and the trader crosses the spread and buys one gold futures contract at $999.1. In the second sequence, there is a sell-side spoof, and the same trader crosses the spread and receives $999.0 for his gold futures contract. By buying one contract at $999.1 and selling at $990.0, under these two transactions, the trader has lost $999.1 - $999.0 = $0.1 per ounce on each of the contracts, or $10. However, under Dr. Venkataraman's Methodology, the trader has lost $0.1, or $10, when he buys, and another $0.1, or $10, when he sells, for a total loss of $20, even though he only actually lost $10. Under a correct framework, the trader would lose half of the spread on each of those contracts, or $0.05 per ounce, for a total of $10. In other words, Dr. Venkataraman's Methodology doubles the loss due to crossing the spread for every contract traded.

83. Remarkably, Dr. Venkataraman uses the quote "midpoint" as the but-for price to calculate execution costs in a published paper he co-authored. There, to measure execution costs, the paper uses the "quote midpoint," not the best bid or offer, as the measuring price, and cites academic research in support. For example, the paper states: "The price impact is the appropriately signed difference between the fill price and *the quote midpoint* at the time of order submission .... It is expected to be positive for orders that demand liquidity ... and is expected to be negative for orders that supply liquidity .... [T]he opportunity cost is the

appropriately signed difference between the closing price on the order expiration or cancellation date and *the quote midpoint* at the time of order submission."[88]

84. By building his Methodology around his incorrect But-For Trade Price, Dr. Venkataraman has significantly inflated the harm he calculates. This is another (obvious) example of Dr. Venkataraman choosing an input that would give him the highest amount of loss.[89]

### D. Within Sequences, Traders who Both Buy and Sell Inflate Dr. Venkataraman's Harm Calculations

85. Dr. Venkataraman measures what he purports to be harm to the various counterparties to trades during his sequences. However, that means that the traders taking the opposite side of those trades are beneficiaries during those sequences. Frequently, under Dr. Venkataraman's assumptions, the same trader will be both harmed and a beneficiary in the same sequence or across multiple sequences. Only counting the transactions that "hurt" that trader creates another substantial inflation of Dr. Venkataraman's harm calculations.

86. Consider a sequence where Mr. Smith places a buy-side group of gold futures orders that meet Dr. Venkataraman's criteria for spoofing. Further assume that Dr. Venkataraman's But-For Trade Price is $1,000.0. While that group of orders is live, Counterparty A crosses the bid-ask spread and hits the best offer, buying one contract at $1,000.1. Dr. Venkataraman would consider that harm of $0.1 per contract, or $10. Assume that the same Counterparty A

---

[88] Bessembinder, Hendrik, Marios Panayides, and Kumar Venkataraman. "Hidden Liquidity: an Analysis of Order Exposure Strategies in Electronic Stock Markets." Journal of Financial Economics 94.3 (2009): 361-383, at 371. Emphasis added. Dr. Venkataraman and his co-authors cite to another paper which also uses the midpoint price as the correct measurement. *See* Griffiths, Mark D., et al. "The Costs and Determinants of Order Aggressiveness." *Journal of Financial Economics* 56.1 (2000): 65-88 at 71 ("measure the price impact of an order as the percentage increase from the pre-trade midquote to the average realized price, as in Chan and Lakonishok (1997). The pre-trade midquote is the mean of the best bid and ask prices immediately prior to the order. The average realized price is the weighted average of the prices of the shares filling the order.").

[89] Note that the Control Period adjustment does not help fix this error. Because the Control Periods generally have fewer trades than the Spoofing Periods, the impact of this error creates a upwards bias that inflates both Unadjusted Market Loss and Adjusted Market Loss.

then places an offer to sell one contract at $1,000.1, which Counterparty B then hits. Dr. Venkataraman would calculate additional harm of $0.1 per contract, or $10 for Counterparty B. He would conclude that on an unadjusted basis, there was $20 of harm, i.e., $10 for Counterparty A and $10 for Counterparty B. However, even under Dr. Venkataraman's Methodology, in total, Counterparty A did not "lose" any money from this sequence. It bought at $1,000.1 and sold at $1,000.1.

87. An example of this is shown in Figure 9 below. In this example, which contains sell-side Spoof Orders, a counterparty with the Tag50 identifier of "BCK7" sells 1 lot during the sequence at $1,315.4 which generates an Unadjusted Market Loss of $10 because Dr. Venkataraman's But-For Trade Price is $1,315.5. Later, during the same sequence, BCK7 buys 1 lot at $1,315.1, generating an unadjusted gain of $40, for a net profit of $30. However, that $40 is not netted against BCK7's "loss" and so Dr. Venkataraman only counts the $10 of loss.

**Figure 9:** Sequence Smith_GC_S_51198



88. The most prolific counterparty during Dr. Venkataraman's sequences is the Tag50 ATS001. During the sequences, ATS001 traded 85,537 harmed contracts and generated unadjusted harm of $2,257,415. However, ATS001 was active on both sides of the market during the Spoofing Sequences; it traded an additional 67,961 contracts that "benefitted" from Mr. Smith's activity, resulting in an aggregated benefit of $2,061,105 (or negative harm). Thus, the harm assigned to ATS001 is inflated by about 1,050% before considering any of the other methodological flaws discussed in this declaration.[90]

89. The 30 counterparties that traded the most contracts that Dr. Venkataraman deems to be harmed during Mr. Smith's sequences collectively traded 861,235 contracts that generated unadjusted harm of $25.3 million. However, they also traded an additional 495,642 contracts during Mr. Smith's sequences that benefitted from what Dr. Venkataraman would attribute to Mr. Smith's Spoof Orders, generating a "benefit" of $13.7 million.[91] Dr. Venkataraman *only* measures the market impact for the trader on the Spoof Order, or "losing," side of each transaction. Thus, even without accounting for any of the other errors in his Methodology, for these 30 counterparties, Dr. Venkataraman has inflated their unadjusted harm by 118%.[92] Across all counterparties, I find that Dr. Venkataraman has inflated unadjusted harm by 132%. If Dr. Venkataraman is attributing harm solely due to Mr. Smith's Spoof Orders, there is no justification for ignoring the benefit to the same parties for trading that occurred while Mr. Smith's Spoof Orders were open.

---

[90]  10.5 = $2,257,415 / ($2,257,415 - $2,061,105) - 1.

[91]  Note that for the purposes of this analysis, I cap the "benefit" to any counterparty at their Unadjusted Market Loss amount, as I understand that overall gains by one counterparty would not be considered to offset losses by a different counterparty in this matter. To the extent that any trader trades through multiple Tag50s, these should be treated as a single trader for the purposes of calculating harm. However, there is insufficient information available to do so. As a result, my results in this paragraph underestimate the full benefit.

[92]  1.18 = $25.294 million / $11.629 million - 1.

90. The above just considers situations where the counterparty trades during a sequence, but there are also scenarios where counterparties generated a position during the Spoofing Sequence and then closed out that position after the sequence ended.  Because algorithmic traders, in particular, typically place relatively small orders and have relatively small position limits, they typically close out positions shortly after opening them.  Considering such subsequent activity could have a material impact on quantifying harm.  For example, "QT18", a Tag50 identification used by Anand Twells,[93] generated $1,304,185 of Unadjusted Market Loss during Mr. Smith's Spoofing Sequences.  However, QT18 hit the side of the market opposite Mr. Smith's Spoof Orders on 839 days and generated an average daily profit on those days of $5,196, and had a positive profit on 66.2% of those days.[94]  On the 238 days where QT18 did not trade on the side of the market opposite Mr. Smith's Spoof Orders during one of Mr. Smith's Spoofing Sequences, QT18's average daily profit was $3,123, and it had a positive profit on 61.8% of those days.  In other words, because QT18's overall trading activity shows a higher average profit and a higher proportion of profitable days when it hit the side of the market opposite Mr. Smith's Spoof Orders, it is not clear that any of the $1.3 million in losses assigned to it by Dr. Venkataraman were actually "lost" by QT18.

91. Finally, Dr. Venkataraman's analysis also excludes the harm to the trader that suffers the largest amount of harm under his Methodology: Mr. Smith himself.  Mr. Smith's two Tag 50s, GSMITH and BSNGSMITH, account for $5.4 million of Unadjusted Market Loss on

---

[93]  DOJ-0020001045.

[94]  Analysis considers 1,077 days where QT18's quantity of gold and silver futures contracts bought matches its quantity of gold and silver futures contracts sold.  There are 11 days excluded where QT18's buys do not match sells for either gold or silver futures contracts.  Profit calculated as total trade quantity sold times sale prices less total trade quantity bought times purchase prices.

313,070 total contracts traded. This reflects the trading volume that Mr. Smith's orders on the side of the Spoof Orders absorbed during the Spoofing Periods, which prevented prices from falling farther – and prices falling farther would have, ironically, reduced the Unadjusted Market Loss that Dr. Venkataraman calculates.

###    E.    Dr. Venkataraman's Methodology Misstates a Benefit to the Market of Mr. Smith's Filled Scale Orders, Calling It "Cost" Instead

92. Dr. Venkataraman fails to account for the benefit that groups of visible orders can have on the market as they can absorb large orders and prevent sweeps, or rapid price movements, caused by other traders, contingent orders or volatile market events.

93. One of the characteristics of futures markets are events often referred to as "sweeps." A sweep is when the market trades through multiple price levels as the result of a single aggressive order. These aggressive orders, also called "marketable" orders, are generally large and are placed at prices that are better than the best order in the limit order book. For example, the marketable order may be an order to buy that is placed at a higher price than the best offer resting in the market, or an order to sell that is placed at a lower price than the best bid resting in the market. When such an order enters the market, if it is for a larger quantity than the aggregate quantity of the orders at the best price level in the market, it will execute against those orders and then proceed to the next best price level in the market, and so on, until the order is completely filled or the price level specified in the order is reached.

94. Sweeps can cause prices to move dramatically in an instant. The impact of a sweep can be seen clearly in Figure 10, a chart which depicts the Spoofing Sequence with the single largest Unadjusted Market Loss measured by Dr. Venkataraman, Sequence Smith_GC_S_28531. The 55 price-level decline that started with Mr. Vorley's order – which then started a daisy chain of stop loss orders that were triggered by the rapidly dropping traded prices – generated

$874,400 of the $887,570 Unadjusted Market Loss calculated under Dr. Venkataraman's Methodology.[95]

**Figure 10:** Sequence Smith_GC_S_28531



95. Sweeps and other sharp market moves like these are part of the reason that a trader may be willing to place the groups of visible orders (the scales) that are the focus of Dr. Venkataraman's analysis. Had Mr. Smith had scales live on the bid side of the market at the time of Mr. Vorley's 100 lot order, those scales would have provided much of the liquidity that Mr. Vorley was seeking. If he had orders for at least 47 contracts in the top 7 levels of the bid side order book, Mr. Smith would have been able to prevent entirely the daisy chain of stop loss orders that caused the market to drop another 48 price levels.

---

[95] Stop loss orders are contingent orders that place orders to buy once prices rise to a certain level or sell once prices fall to a certain level. These orders are commonly used to close out a trader's position when the market moves sharply in an adverse direction in order to prevent additional loss.

96. Sweeps *away* from Mr. Smith's group of orders, therefore, can have a significant, undue influence on overall loss calculation for two reasons. One, the price movement, as in the example with Mr. Vorley above, can drastically impact the harm total, despite Mr. Smith's Spoof Orders having minimal plausible impact on the market at the moment of Mr. Vorley's sweep order. And two, a price movement as large as this one was far less likely to have occurred in the direction of the Spoof Orders because Mr. Smith would have helped fill the sweep orders. This means that there is an asymmetric bias in Dr. Venkataraman's Methodology. This asymmetric effect is not the result of Mr. Smith's orders being deceptive, but is instead the result of Mr. Smith's orders providing legitimate liquidity to the market.[96] The implication of such an asymmetric effect is that if Mr. Smith's orders had no impact at all on how frequently or in what direction market participants decided to place their order, Dr. Venkataraman's Methodology would still find that there was an "Adjusted Market Loss" because of the bias in his Methodology. He would find harm because sweeps had a larger impact on traded prices and, because of stop loss orders, on traded volume when they went away from Mr. Smith's orders rather than towards them.

97. Consider the following example, which is illustrated in Figure 11. While Mr. Smith had a group of so-called Spoof Orders outstanding, a 200 lot marketable buy order was placed at a price of $1,718.4, when the best offer in the market was $1,717.7, by a manual trader with the Tag 50 "TTUICORM1ME", who I understand to be Michael Corbi, a trader at HSBC.[97]

---

[96] As noted by Dr. Venkataraman in his research paper, "[e]xposing an order increases the chance that it attracts a counterparty who is sufficiently interested in trading to monitor the market, but who has not yet revealed herself ['reactive' traders, as per Harris (1996)]." Bessembinder, Hendrik, Marios Panayides, and Kumar Venkataraman. "Hidden Liquidity: an Analysis of Order Exposure Strategies in Electronic Stock Markets." Journal of Financial Economics 94.3 (2009): 361-383, at 362. Dr. Venkataraman's loss calculation Methodology excludes trades which occur when "reactive" traders are drawn into the market by the liquidity provided by Mr. Smith and hit Mr. Smith's large orders.

[97] Tag 50 registration information from DOJ-0020001045.

This order filled all 200 lots at prices from $1,717.7 to $1,718.1, including 90 lots executed against Mr. Smith's alleged spoof offers.  Under Dr. Venkataraman's Methodology, this sweep resulted in an Unadjusted Market Loss of $350.  Had Mr. Smith's orders not been in the market when that order was placed, it would have only filled 152 lots against the available supply and would have done so at prices up to $1,718.4.  This would have resulted in a <u>gain</u> attributable to the sweep under Dr. Venkataraman's Methodology of $710.  In other words, Dr. Venkataraman's Methodology fails to capture a $1,060 benefit to the market because Mr. Smith's Spoof Orders prevent it from doing so.  He measures losses during Spoofing Sequences when the sweeps hit the Opposite Order side of the market, but his sample fails to measure fully the offsetting benefit provided to the market when sweeps hit the Spoof Order side of the market (and Mr. Smith's orders halt or minimize the impact of the sweep).  This asymmetry incorrectly inflates Dr. Venkataraman's measurement of harm.

**Figure 11:** Sequence Smith_GC_S_41853



98. It is also important to note that the large marketable orders here are not placed by algorithmic traders, such as Mr. Pettey, who testified at trial.[98]  Algorithms typically place small orders and have relatively small position limits.  Large marketable orders are typically placed by manual traders, like Mr. Vorley or Mr. Corbi, and may be the result of needing to build or unwind a large futures position in order to hedge a position in another market, such as the physical gold market.  The idea that this type of trade would be caused by spoofing activity is hard to square with the type of trading seen here.

### F. Dr. Venkataraman's Rate of Spread-Crossing Adjustment Is Not Reliable

99. Finally, as described above, as an alternative to his primary approach, Dr. Venkataraman uses the Rate of Spread-Crossing Adjustment to adjust his Unadjusted Market Loss.  Under this method, Dr. Venkataraman focuses on the rate of spread-crossing during the Control Period as compared to the rate during the Spoofing Period and reduces the Unadjusted Market Loss by that percentage.  His motivation for using this method is that "[m]arket participants incur trading costs primarily when they cross the bid-offer spread to trade. For example, a market participant who intends to buy gold futures contracts could place a resting limit order at the best bid. By crossing the spread to trade at the best offer, which is at a higher price, this market participant incurs a cost. As explained earlier, spoofing, and the misleading appearance of supply/demand it introduces, can induce market participants to cross the spread and incur the associated costs."[99]

100.　One would assume that in order to measure the rate of spread-crossing, Dr. Venkataraman would identify, for each trade, the side of the spread crosser—i.e., did the trader aggress from the buy side or aggress from the sell side, and then use that as a basis for

---

[98]　Trial Tr. at 2988:5-3069:6.

[99]　Venkataraman Declaration, ¶ 38.

his adjustment. Dr. Venkataraman claims that this alternative method is a "conservative estimate" of the Adjusted Market Loss "because the method only accounts for other traders' decisions to cross the spread at a higher rate during the Spoofing Sequence."[100]

101.   This adjustment does not do what Dr. Venkataraman claims. *First*, as I explain in Section VI.A above, a properly constructed adjustment would focus only on the impact of Mr. Smith's orders and would remove the impact of unrelated volume increases in the market, which may be related to activity in the period immediately prior to Mr. Smith's orders, to activity in correlated markets, or to other market events unrelated to Mr. Smith's orders. Instead, Dr. Venkataraman focuses on the increase in trades that cross the bid-ask spread from the spoof side to the opposite side but ignores the nearly equivalently large increase in trades that cross the bid-ask spread from the opposite side to the spoof side. Specifically, during his Control Period, 50.0% of trades cross the bid-ask spread *from* the Spoof Order side *to* the opposite side. During the Spoofing Sequences, that percentage only increases to 53.5%.[101] Thus, since there is no cogent theory of spoofing that attributes transactions in which the aggressor is on the opposite side to the existence of the supposed spoof orders, at most 3.5% of the trading volume during the Spoofing Sequences can be attributed to Mr. Smith rationally – that is, volume in which the aggressor is on the side of the Spoof Orders. Had Dr. Venkataraman focused on the increase in spread-crossing after controlling for volume, his method would have reduced his Unadjusted Market Losses by 93.4% (or 50.0% / 53.5%).

---

[100]   Venkataraman Declaration, ¶ 46.

[101]   Cited figures reflect the percent of trades crossing the spread rather than Dr. Venkataraman's flawed measure, discussed more fully below. Includes Defendant trades.

102.    In addition, Dr. Venkataraman's adjustment is applied to an Unadjusted Market Loss measure that captures more than just the impact of spread-crossing. Dr. Venkataraman's Methodology for generating the Unadjusted Market Loss captures the impact of changing prices, changing volume, and changing bid-ask spread widths, in addition to the rate of spread-crossing. Using an adjustment to this broad measure that is only relevant to one of the multiple components of the harm – here, spread-crossing – is unreasonable and generates arbitrary results. If Dr. Venkataraman's intent with this method was to measure the harm caused only by spread crossing, he should have created a method for the Unadjusted Market Loss that was focused on that single effect before then "adjusting" for that one single effect. For example, as noted above, at most 3.5% of the trading volume during the Spoofing Sequences can be attributed to Mr. Smith. Given the total volume of trading during the Spoofing Sequences that Dr. Venkataraman has identified, the additional volume crossing the spread would be only 131,704 contracts.[102] Thus, the additional cost of crossing the spread, at most, would be $1,448,909, assuming the one tick futures bid-ask spread. This number would need to be further modified if it were to be considered as a harm calculation to fully account for the other criticisms I raise in the prior sections.

103.    *Finally*, Dr. Venkataraman's implementation of this alternative adjustment does not actually measure spread-crossing. In fact, his "rate of spread-crossing" measures whether a trade is at a less-favorable price than the but-for price he establishes at the start of a Spoofing Sequence (or Control Period) regardless of whether that trade crosses the bid-ask spread at

---

[102]   (1,930,492-50.1%*3,608,467) + (62,954-47.0%*115,796) + (387-47.7%*576). Calculation accounts for differences in gold, silver, and palladium sequences.

the time of the trade.[103] This is inconsistent with Dr. Venkataraman's stated motivation for his Rate of Spread-Crossing Adjustment, which was to measure whether Mr. Smith's orders "induce[d] market participants to cross the spread and incur the associated costs."[104] Instead, he merely measures whether market prices have changed from his but-for price. The impact of this measure is substantial. For example, in Sequence Smith_GC_B_44146, there were 1,424 total lots executed by traders other than Mr. Smith. Dr. Venkataraman's production reports that all 1,424 of these executed lots crossed the spread. However, it was not the case that all of the executions in this sequence were aggressive. In fact, 617 of the 1,424 are explicitly flagged in the RAPID data as being passive (and the counterparty is explicitly flagged as aggressive). An additional 33 have the aggressor field blank because they are executions between legs of spread orders, which is trading two different contracts simultaneously. Overall, I find that Dr. Venkataraman appears to have misidentified the number of aggressive lots executed in 73% of Spoofing Sequences and has overcounted the number of aggressive lots in 86% of those Spoofing Sequences where he has misidentified the number of aggressive lots.[105] As a result, Dr. Venkataraman inflates the rate of spread-crossing during his Spoofing Period, which is an essential input to his calculation. In short, Dr. Venkataraman's implementation of his Rate of Spread-Crossing Adjustment is so fraught with errors that it cannot be relied upon.

---

[103] Dr. Venkataraman explains his calculation with reference to a figure on page 26 of his Declaration, stating that "Market participants V, W, X and Y cross the prevailing bid-offer spread to buy one contract, ten contracts, one contract, and one contract, respectively." Inspection of the figure shows that Market participant X executed their trade passively, not by crossing the bid-ask spread away from the Spoof Orders. In other words, Dr. Venkataraman has not measured spread-crossing at all, he has measured whether an execution is higher than his but-for price.

[104] Venkataraman Declaration, ¶ 38.

[105] These results are for the period starting January 13, 2013, when the RAPID data incorporates an indicator clearly identifying which side of a trade was the aggressive side. I did a spot-check for the period prior and found similar results.

## VII.    CONCLUSION

104.    Measuring the impact of a single trader's orders on a market as complex as the precious metals futures markets is a very difficult, if not impossible, task.  Futures market participants include a broad set of traders, including both manual and algorithmic traders, each placing orders in response to a myriad of factors in the precious metals futures market itself, in other precious metals futures and non-futures markets, in markets other than precious metals, and in response to factors that may be separate from developments in markets.  How any individual trader or group of traders may respond to a single order or to a group of orders is nearly impossible to predict with a high degree of certainty.

105.    It is my opinion that determining harm <u>caused</u> by Mr. Smith's Spoof Orders, given the complexity of precious metals futures markets, is not something that can be done reliably.  As explained in prior sections of this declaration, Dr. Venkataraman's Methodology fails to properly account for this complexity, produces unreasonable and unstable results, relies on unsupported assumptions, and is fundamentally flawed.

Pursuant to 28 U.S.C. § 1746, I, Mukarram Attari, certify under penalty of perjury that the foregoing is true and correct. Executed on April 10, 2023.

Mukarram Attari, Ph.D.

Appendix 1

# MUKARRAM ATTARI

## EXPERIENCE

| | |
|---|---|
| 2003 Onwards | Charles River Associates, Boston, MA and Oakland, CA |
| | 2017 Onwards *Co-Leader of Finance Practice* |
| | 2008 Onwards *Vice President* |
| | 2005 – 2007 *Principal* |
| | 2004 *Associate Principal* |
| | 2003 *Senior Associate* |
| | |
| 1997–2002 | University of Wisconsin–Madison |
| | *Assistant Professor*, Business School |
| | |
| 1992 | Arthur Andersen & Co. (Andersen Consulting), Bombay, India |
| | *Staff Consultant* |
| | |
| 1991 | Reserve Bank of India, Bombay, India |
| | *Summer Intern* |

## EDUCATION

| | |
|---|---|
| 1992-1997 | University of Iowa, Iowa City, Iowa. |
| | *Doctor of Philosophy* |
| | |
| 1990-1992 | Indian Institute of Management, Ahmedabad. |
| | *Post-Graduate Diploma in Management* |
| | |
| 1986-1990 | University of Bombay, India. |
| | *Bachelor of Engineering* |

## PUBLICATIONS AND WORKING PAPERS

"Crushed by a Rational Stampede: Strategic Share Dumping and Shareholder Insurrections."  With Suman Banerjee and Tom Noe.  *Journal of Financial Economics*, 2006.

"Financially Constrained Arbitrage in Illiquid Markets."  With Antonio Mello.  *Journal of Economic Dynamics and Control*, 2006.

"Arbitraging Arbitrageurs."  With Antonio Mello and Martin Ruckes.  *Journal of Finance*, 2005.

"Discontinuous Interest Rate Processes: An Equilibrium Model for Bond Option Prices." *Journal of Financial and Quantitative Analysis*, 1999.

"Models of the Term Structure of Interest Rates: A Survey." *Derivatives and Financial Mathematics*, John Price (ed.), Nova Science Publishers, 1997.

"Strategic Under-Investment, Managerial Entrenchment and Ownership Structure of a Firm." With Suman Banerjee.

"Option Pricing Using Fourier Transforms: A Numerically Efficient Simplification"

"Testing Interest Rate Models: What Do Futures and Options Data Tell Us?"

"Hedging in the Presence of Transactions Costs: Portfolios."

## CRA INSIGHTS

"Layered orders and spoofing allegations." With Sam Lynch, Swati Kanori, and Fatih Fazilet. *CRA Insights*, September 2022.

"Exchange traded crypto assets." With Sam Lynch, Swati Kanoria, and Kyle Calder. *CRA Insights*, August 2022.

"Factors affecting variations in securities class action claims rates." With Aaron Dolgoff and Assen Koev. *CRA Insights*, October 2020.

"Primer on futures markets and spoofing allegations." With Sam Lynch, Rahul Chhabra, and Fatih Fazilet. *CRA Insights*, September 2020.

"Navinder Sarao's alleged Flash Crash trading strategies and CFTC spoofing allegations." With Sam Lynch. *Insights: Financial Markets*, November 2015.

"Securities litigation settlement costs if large shareholders opt out." With Aaron Dolgoff and Tiago Duarte-Silva. *CRA Insights*, June 2013.

"Economic issues in ETF litigation." With Assen Koev. *CRA Insights*, December 2009.

"Discovering shareholder value in terra incognita." With Christopher Ross. *CRA Insights*, December 2008.

"Litigation implications of the Auction Rate Security market freeze." With Aaron Dolgoff. *CRA Insights*, May 2008.

Subprime mortgages: A primer on economic issues in litigation." With Jim Fricano. *CRA* Insights, July 2007.

## COURSES TAUGHT

Continuous Time Asset Pricing (Ph.D. students, Wisconsin)

Fixed Income (M.B.A. students, Wisconsin)

Futures and Options (Undergraduates and M.B.A. students, Wisconsin)

International Finance (Undergraduates, Wisconsin)

Corporate Finance (Undergraduates, Iowa)

Investments (Undergraduates, Iowa)

## DISSERTATION COMMITTEES

RuthAnn Melbourne (Finance, Wisconsin)

Clemens Mulluer (Finance, Wisconsin)

Miguel Ferreira (Finance, Wisconsin)

James Basney (Computer Science, Wisconsin)

## RESEARCH GRANTS, FELLOWSHIPS AND AWARDS

| 2001–2002 | University of Wisconsin - Madison Graduate School Research Grant |
| 1997 | Outstanding Teaching Assistant Award, University of Iowa. |
| 1995–1996 | Ponder Fellowship, University of Iowa |
| 1992–1993 | Ponder Fellowship, University of Iowa. |

## PRESENTATIONS

Bar Association of San Francisco, "Derivatives and Insolvency" (2009) (with Suzzanne Uhland from O'Melveny & Myers LLP).

IQPC's "3rd Securities Litigation Conference," panel on Subprime Credit Crisis (2007).

Federal Reserve Bank of Atlanta's "Modern Financial Institutions, Financial Markets, and Systemic Risk Conference" (2006).

## EXPERT ASSIGNMENTS

In re Ripple Labs Inc. Litigation, Northern District of California, 18-6753, Expert Report filed February 3, 2023; Deposition March 8, 2023.

Fairholme Funds, Inc., et al, v. The Federal Housing Finance Agency, et al, District of Columbia, 13-1053 and In re Fannie Mae / Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations, District of Columbia, 13-1288, Expert Report filed February 1, 2022; Deposition February 14-15, 2022; Testimony at Jury Trial October 27-28, 2022.

State of New York, *et al*, v. Deutsche Telecom AG, *et al*, Southern District of New York, 19-5434, Expert Report filed November 4, 2019; Deposition November 20, 2019.

Lewis Cosby, *et al*, v. KPMG LLP, Eastern District of Tennessee, 16-121, Expert Report filed May 13, 2019; Deposition June 4, 2019; Rebuttal Report filed July 19, 2019.

Ambac Assurance Corporation v. EMC Mortgage Corporation, et al, Supreme Court of the State of New York, 650421/2011, Expert Report filed December 23, 2014; Rebuttal Report filed November 20, 2015; Deposition January 15, 2016.

Dalton Petrie, *et al*, v Electronic Game Card, Inc., *et al*, and Penny Pace, *et al*, v. Timothy Quintanilla, *et al*, Central District of California, 10-0252 and 14-2067, Expert Report filed June 1, 2015; Deposition June 15, 2015.

Wells Fargo Bank, N.A. v. Homebanc Corporation, District of Delaware, 07-51740, Affidavit filed June 16, 2014; Deposition August 6, 2014; Trial Testimony January 27, 2015.

Syncora Guarantee Inc. v. EMC Mortgage Corporation, Southern District of New York, 09-3106, Expert Report filed December 10, 2013.

In the Matter of the Rate Application of Mercury Casualty Company, Applicant, File Number PA-2009-00009, Expert Report filed March 20, 2012; Hearing Testimony April 2, 2012.

**Exhibit 1: Characteristics of Smith Conviction Sequences**

| | Sequence ID [a] | Second Superseding Indictment Paragraph [b] | Instrument [c] | Date [d] | Start [e] | End [f] | Duration (Seconds) [g] | Spoof Side [h] | Spoof Order Quantity [i] | Duration Last Place to First Cancel (Seconds) [j] | Imbalance Ratio [k] | Fully Filled Opposite Side Order [l] | Distance Between Innermost Spoof Order and Innermost Opposite Side Order (Ticks) [m] | Spoof Side Orders that Cross the Spread [n] | Spoof Side Orders Fully Filled [o] | Scale Trades on Spoof Side Before/After Sequence [p] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Smith_SI_B_1083 | 30(d) | SIZ1 | 09/13/2011 | 09:37:30.257 | 09:37:32.524 | 2.267 | B | 80 | 0.30 | 80 | 1 | 2 | 0 | 0 | 0 |
| [2] | Smith_SI_S_1433 | 30(d) | SIZ1 | 09/13/2011 | 09:37:50.054 | 09:37:52.445 | 2.391 | S | 60 | 0.58 | 60 | 1 | 4 | 0 | 0 | 0 |
| [3] | Smith_SI_S_1434 | 30(d) | SIZ1 | 09/13/2011 | 09:37:53.023 | 09:37:56.008 | 2.985 | S | 90 | 0.58 | 90 | 1 | 2 | 0 | 0 | 0 |
| [4] | Smith_GC_B_35696 | 30(g) | GCZ2 | 09/14/2012 | 09:03:26.835 | 09:03:35.882 | 9.047 | B | 340 | 0.39 | 340 | 1 | 1 | 0 | 0 | 0 |
| [5] | Smith_GC_B_35697 | 30(g) | GCZ2 | 09/14/2012 | 09:03:36.820 | 09:03:38.367 | 1.547 | B | 50 | 0.42 | 50 | 1 | 6 | 0 | 0 | 0 |
| [6] | Smith_GC_B_35698 | 30(g) | GCZ2 | 09/14/2012 | 09:03:39.258 | 09:03:48.148 | 8.890 | B | 250 | 0.46 | 250 | 1 | 2 | 0 | 0 | 0 |
| [7] | Smith_GC_B_35699 | 30(g) | GCZ2 | 09/14/2012 | 09:03:52.336 | 09:04:02.102 | 9.766 | B | 270 | 0.45 | 270 | 1 | 3 | 0 | 0 | 0 |
| [8] | Smith_GC_S_42723 | 30(h) | GCJ3 | 02/06/2013 | 07:48:36.147 | 07:48:42.077 | 5.930 | S | 230 | 0.62 | 230 | 1 | 4 | 0 | 0 | 0 |
| [9] | Smith_GC_B_41437 | 30(i) | GCM3 | 04/26/2013 | 07:48:47.611 | 07:48:52.660 | 5.049 | B | 140 | 0.31 | 28 | 1 | 5 | 0 | 0 | 0 |
| [10] | Smith_GC_B_41438 | 30(i) | GCM3 | 04/26/2013 | 07:48:55.009 | 07:48:58.307 | 3.298 | B | 90 | 0.33 | 18 | 1 | 7 | 0 | 0 | 0 |
| [11] | Smith_GC_B_41439 | 30(i) | GCM3 | 04/26/2013 | 07:49:01.944 | 07:49:06.647 | 4.703 | B | 110 | 0.41 | 22 | 1 | 4 | 0 | 0 | 0 |
| [12] | Smith_GC_B_41440 | 30(i) | GCM3 | 04/26/2013 | 07:49:09.522 | 07:49:14.619 | 5.097 | B | 110 | 0.36 | 22 | 1 | 6 | 0 | 0 | 0 |
| [13] | Smith_GC_B_41441 | 30(i) | GCM3 | 04/26/2013 | 07:49:19.365 | 07:49:24.488 | 5.123 | B | 130 | 0.28 | 26 | 1 | 1 | 0 | 0 | 0 |
| [14] | Smith_GC_B_41442 | 30(i) | GCM3 | 04/26/2013 | 07:49:28.662 | 07:49:32.732 | 4.070 | B | 150 | 0.20 | 30 | 1 | 2 | 0 | 0 | 0 |
| [15] | Smith_GC_B_46108 | 30(i) | GCZ3 | 09/04/2013 | 08:41:07.067 | 08:41:09.227 | 2.160 | B | 80 | 0.24 | 8 | 1 | 1 | 0 | 0 | 0 |
| [16] | Smith_GC_B_48658 | 30(i) | GCZ3 | 09/04/2013 | 08:41:17.638 | 08:41:21.789 | 4.151 | S | 150 | 0.53 | 150 | 1 | 1 | 0 | 0 | 0 |
| [17] | Smith_GC_S_49647 | 30(m) | GCZ3 | 10/25/2013 | 14:26:24.290 | 14:26:28.494 | 4.204 | S | 170 | 0.99 | 85 | 1 | 1 | 0 | 0 | 0 |
| [18] | Smith_SI_S_2562 | 30(n) | SIK4 | 03/07/2014 | 08:30:07.485 | 08:30:10.312 | 2.827 | S | 60 | 0.65 | 12 | 1 | 3 | 0 | 0 | 0 |
| [19] | Smith_GC_B_49875 | 30(o) | GCZ4 | 10/15/2014 | 08:38:12.938 | 08:38:18.519 | 5.581 | B | 180 | 0.43 | 18 | 1 | 4 | 0 | 0 | 0 |
| [20] | Smith_GC_S_54791 | 30(p) | GCJ5 | 02/23/2015 | 07:43:02.015 | 07:43:03.520 | 1.505 | S | 50 | 0.45 | 25 | 1 | 1 | 0 | 0 | 0 |
| [21] | na | 30(q) | GCM5 | 04/17/2015 | 07:34:44.056 | 07:34:46.104 | 2.048 | S | 50 | 0.65 | 20 | 1 | 8 | 0 | 0 | 0 |
| [22] | Minimum | | | | | | 1.505 | | 50 | 0.20 | 8 | 1 | 1 | 0 | 0 | 0 |
| [23] | Maximum | | | | | | 9.766 | | 340 | 0.99 | 340 | 1 | 8 | 0 | 0 | 0 |

Notes and Sources:
RAPID data, Second Superseding Indictment, and Dr. Venkataraman's "Spoofing Sequence Losses List.xlsx."
Spoof Orders explicitly identified by Dr. Venkataraman are referred to here as "flagged spoof orders."
Any order placed on the Spoof Order side during a Spoofing Sequence is referred to here as a "spoof side order" (includes both orders identified by Dr. Venkataraman and orders not identified).

[1] to [20]   Smith sequences flagged by Dr. Venkataraman that overlap with Second Superseding Indictment Incidents in [b].
[21]   Sequence based on Second Superseding Indictment paragraph 30(q) incident, using Dr. Venkataraman's identification methodology without the constraint of requiring an Opposite Order placed in the top 10 levels of the order book. All spoof side orders in this sequence are considered flagged spoof orders.
[22]   =min([1]:[21]).
[23]   =max([1]:[21]).

[a]   Smith sequences flagged by Dr. Venkataraman that overlap with Second Superseding Indictment Incidents in [b].
[b]   Eight counts of wire fraud from the Second Superseding Indictment that Smith was convicted of, plus two additional sequences (30(n) and 30(q)) in connection with the spoofing count.
[c] to [h]   Data from Dr. Venkataraman's "Spoofing Sequence Losses List.xlsx," except for [21].
[i]   Total number of contracts placed as part of flagged spoof orders.
[j]   Duration between the first flagged spoof order cancellation and the last flagged spoof order cancellation during the sequence. "First cancel" defined here as first flagged spoof order cancel following the last flagged spoof order placement in the sequence and "last cancel" defined as the last flagged spoof order cancellation in the sequence.
[k]   Imbalance ratio is calculated by dividing the quantity in [i] by the innermost opposite side order's visible quantity. If there are multiple opposite side orders at the innermost price, the one with earliest placement time is used.
[l]   1 if an opposite side order outstanding during the sequence is fully filled during the sequence or a subsequent sequence with the same spoof side, 0 otherwise.
[m]   The distance between the innermost flagged spoof order and innermost opposite side order (ticks).
[n]   Count of a spoof side orders that cross the bid-ask spread during the sequence.
[o]   Count of spoof side orders that fully fill during the sequence.
[p]   Count of scale order fills in the period of the same length as the duration in [g] immediately prior to or subsequent to the sequence. Scale orders defined as <= 5 second duration orders that are part of scales. Scales defined as groups of orders with duration less than 600 seconds, placed within 1 second of each other, and placed on the same side and for the same quantity.

**Exhibit 2: Smith Sequence Counts Based on Various Criteria**

|  |  | # of Sequences [a] | % of Total [b] |
|---|---|---|---|
| [1] | Total Sequences | 106,037 |  |
| [2] | < 50 spoof order contracts | 22,439 | 21.2% |
| [3] | Last place to first cancel > 1 sec | 10,565 | 10.0% |
| [4] | Imbalance ratio < 8 | 20,003 | 18.9% |
| [5] | No fully filled opposite side order | 63,742 | 60.1% |
| [6] | Distance between innermost spoof order and innermost opposite side order > 8 ticks | 12,419 | 11.7% |
| [7] | Spoof side order crosses the spread | 5,632 | 5.3% |
| [8] | Spoof side order fully filled | 10,573 | 10.0% |
| [9] | Scale trades on spoof side before/after sequence | 6,636 | 6.3% |
| [10] | Sequences meeting any criteria from [2]-[9] | 84,441 | 79.6% |
| [11] | Duration > 9.766 sec | 10,016 | 9.4% |

Notes and Sources:

RAPID data, Dr. Venkataraman's "Spoofing Sequence Losses List.xlsx" and "Spoof Orders.csv".

Spoof Orders explicitly identified by Dr. Venkataraman are referred to here as "flagged spoof orders." Any order placed on the spoof side during a sequence is referred to here as a "spoof side order" (includes both orders identified by Dr. Venkatarakan and orders not identified).

[1] All Smith sequences flagged by Dr. Venkataraman, including 147 Smith sequences overlapping Edmonds/Trunz/Nowak sequences.

[2] Subset of [1]: total number of contracts placed as part of flagged spoof orders is strictly less than 50.

[3] Subset of [1]: duration from the last flagged spoof order placement to the first flagged spoof order cancellation is greater than 1 second. "First cancel" defined here as first cancel following the last placement in the sequence.

[4] Subset of [1]: imbalance ratio is less than 8. Imbalance ratio is calculated by dividing the sum of quantity placed in flagged spoof orders by the innermost opposite side order visible quantity. If there are multiple opposite side orders at the innermost price, the visible quantity of the order with the earliest placement time is used. Considering the quantity of all opposite side orders in aggregate, as opposed to just the innermost order quantity, would generate smaller imbalance ratios and would increase the count of sequences that fall below the threshold of 8 used here.

[5] Subset of [1]: opposite side order is not fully filled during the sequence or subsequent sequences with matching spoof side.

[6] Subset of [1]: distance between the innermost flagged spoof order and innermost opposite side order is greater than 8 ticks.

[7] Subset of [1]: spoof side order crosses the bid-ask spread during the sequence.

[8] Subset of [1]: spoof side order fully fills during the sequence.

[9] Subset of [1]: with at least one scale order fill in the period of the same length as the Spoofing Period immediately prior to or subsequent to the Spoofing Sequence. Scale orders defined as <= 5 second duration orders that are part of scales. Scales defined as groups of orders with duration less than 600 seconds, placed within 1 second of each other, and placed on the same side and for the same quantity.

[10] Subset of [1]: sequences meeting at least one of the criteria shown in [2]-[9].

[11] Subset of [1]: sequence duration is strictly greater than 9.766 seconds.