# EXHIBIT L

DEFENDANTS'
EXHIBIT
**606**
Case: 1:19-cr-00669

Sanjay Jhamna
Managing Director

**Strictly Private & Confidential**
Michel Simonian

25 November 2014

Redacted-Personal Information

Dear Michel,

I am writing further to your letter which you sent by email to Ann Marfy on 9 July 2014 detailing your grounds of appeal (the "Appeal Letter") and our meeting of 14 August 2014. At our meeting, Suzanne Bywater from HR was present as well as Laura Brown who took non verbatim notes of the meeting. You chose not to be accompanied. This letter confirms the outcome of your appeal against the decision to terminate your employment with immediate effect on the grounds of gross misconduct, as confirmed in Carl Norrey's letter to you dated 19 June 2014.

The purpose of the appeal process and my role in hearing your appeal is to review the original decision-making process to ascertain whether the original decision was fair and reasonable in the circumstances.

During our meeting we discussed your grounds for appeal set out in your Appeal Letter. You were given the opportunity to fully explain these grounds and to put forward any additional submissions in support of your appeal. You did provide additional representations in a document entitled "Appeal Meeting notes", which you read aloud in the meeting on 14 August. You also sent submissions in an email to Suzanne Bywater on 18 August 2014.

In summary you allege that:

1. You do not believe that "[your] explanations have been properly considered or taken into account". In particular, you have said that:

   1.1 "[You] have repeatedly explained the reason for the orders and [your] good faith belief that the reasons were adequate;
   1.2 Contrary to what is alleged, [you] did escalate [your] concerns and confusion to [your] superiors; and
   1.3 [You] did not receive adequate training that would have allowed [you] to identify that [your] trading practices could be interpreted as potentially inappropriate"; and

2. You do not believe that the termination of your employment "is justified by [your] actions or by the findings of the investigation and disciplinary process"; and

3. In your Appeal Meeting notes document, you also raised concerns about the disciplinary process and your perceived treatment since the investigation meetings took place.

**JPMorgan Chase Bank, National Association**
25 Bank Street, Canary Wharf, London, E14 5JP
Tel: +44 (0)20 7742 4000 • Fax: +44 (0)20 3493 0684
Organised under the laws of U.S.A. with limited liability. Main Office 1111 Polaris Parkway, Columbus, Ohio 43240
Registered as a branch in England & Wales branch No. BR000746. Registered Branch Office 25 Bank Street, Canary Wharf, London, E14 5JP
Authorised by the Office of the Comptroller of the Currency in the jurisdiction of the U.S.A. Authorised by the Prudential Regulation Authority. Subject to regulation by the Financial Conduct Authority and to limited regulation by the Prudential Regulation Authority. Details about the extent of our regulation by the Prudential Regulation Authority are available from us on request.

I have carefully considered your explanations as detailed in your appeal documents identified above, as well as those you raised during our meeting, along with copies of the meeting notes you provided with this email and which included your amendments. I have also undertaken some further investigation which has included speaking with Nigel Baines, Carl Norrey, Stuart Pillar and Mike Nowak.

After careful consideration of all of the matters set out above I have decided to uphold the original decision to terminate your employment for the reasons I explain below.

1.  **Your explanations were not properly considered**

**Your reasons for the orders**
In relation to your first ground of appeal, you have said that "[you] have repeatedly explained the reason for the orders and [your] good faith belief that the reasons were adequate" and:

- it is your view that trading in the way you did was entirely acceptable, appropriate and widely used at JPMorgan;
- you have always considered all of your orders as genuine tradable orders; and
- the purpose of the two way markets was to...gather information about the underlying activity in the market.

With regards to the explanations you provided to Carl Norrey during the disciplinary process, and which you further substantiated in your statement, I have found that these were carefully considered prior to Carl making his outcome decision. However, Carl did not consider that your explanations stood up to scrutiny. In particular, I consider that a combination of factors contributes to the assessment that your activity was inappropriate including:

- The asymmetry in size between the smaller orders that got executed (sometimes through iceberging) and the larger orders on the opposite side of the order book that got cancelled;
- The duration for which your larger orders were exposed to the market before being cancelled; and
- The fact that your order entry and cancellation activity formed a consistent pattern over an extended period of time.

My view is that this was a reasonable conclusion for Carl to reach and I do not accept that your trading was "entirely acceptable" or "appropriate" as you suggest. In particular, the data shows that, over a long period of time, you benefited from the market reaction by receiving execution on your smaller order or orders on the opposite side of the book from the larger order (which you did not trade on or which, on the one occasion that you did trade, you immediately unwound). This shows a clear pattern in your trades which indicates a deliberate intention. Additionally, I am of the view that if you had thought at the time that your trading practices were defensible, the natural and expected course of action would have been to, in good faith, bring those specific trades to the attention of Compliance either during or after the training session in December 2013. It would not have been to just stop a long held trading practice that you claim to have deemed "entirely […] appropriate" without a mention to either your manager or to Compliance.

In relation to the allegation that this practice is widely used at JP Morgan, during my investigation I raised this with Nigel Baines. He informed me that, following the concerns regarding your trading practices arising, Compliance completed a review of the trades carried out by the Bullion traders across the London trading floor (as well as sample trades for the Oil and Agricultural Products trading desks) to identify whether there were any other concerning trade patterns. Nigel confirmed that no other examples of this trading practice were found.

When I spoke to Mike Nowak he confirmed that once he had reviewed your trading data he had been concerned about the way you were trading. He also confirmed that he had not seen anyone else trading in

Confidential Treatment Requested by JPM

JPMC-PM-00005204
DOJ-0008294094

the way you had been trading. He was particularly concerned about the size and asymmetry of your orders and that there did not seem to be an intention to fill these orders.

You also highlighted as comparators two other employees who you said traded in the same way as you. To be clear, in dealing with your appeal I have reviewed the information which relates specifically to your case and, for the reasons I have set out in this letter, I have concluded that your trading behaviour was unacceptable. In relation to the two employees you named, I have discussed them with Compliance and have been advised that their activity was subjected to a review and was found to be different from yours and to be appropriate. Had inappropriate behaviour been identified then this too would have been dealt with through an appropriate disciplinary process.

With regard to your suggestion that you considered all orders were genuine tradable orders, by definition any submitted orders are susceptible to be executed for the duration that they are exposed to the market. This is the case regardless of the appropriateness or legitimacy of the intent. To that point, the record shows that you hardly ever traded on the large order side (on one occasion when you did, you immediately unwound your position). Hence, in addition to your activity pattern, which we addressed above, the resulting trades are not consistent with a bona fide attempt to achieve execution on the larger size as well as on the smaller one. As one additional point, you have said that you only traded on your small side on 48 occasions (rather than the 222 stated in Carl's letter). The total number of instances where the deliberate pattern occurred is the relevant consideration and not only the ones that traded. In any event, the data referred to related to a period between March 2013 and January 2014. A spot check conducted as part of Carl's investigation indicated similar behaviour prior to March 2013.

You have also said that the purpose of trading in this way was to gather information on the underlying activity in the market. I do not accept this explanation. First, I do not consider that your explanations as to the motivation behind your trading patterns have been consistent through the course of the investigation and disciplinary process. Second, as previously mentioned, you benefited from the market reaction by receiving execution on your smaller order or orders on the opposite side of the book from the larger order. A trader of your seniority and experience would know that your larger orders could affect the price for the duration they stayed exposed to the market. Claims of ignorance, or insufficient knowledge are not credible and I do not believe that you were not aware of the impact that your actions had on the market and on other market participants. In fact, the very explanation you provide for the larger orders (i.e. "to see if [there was] a large buyer in the market [and] that large buyers will often accept to pay […] to access liquidity") demonstrates a thorough and subtle understanding of the impact your orders had on the market.

For the reasons above, I am of the view that Carl Norrey did consider your explanations but he concluded that they were not credible and/or adequate. I am in agreement with Carl Norrey's view and I do not accept your explanation your trading practice was to "ensure that [you] can properly determine [your] initial price and therefore properly manage [your] risk".

**Escalation**
In your Appeal Letter you have stated that "[you] did escalate [your] concerns and confusion to [your] superiors". This is related to the period of time directly following a training session which was run by Compliance in December 2013 and which included the topic of the inappropriate trading practice of 'spoofing' and 'layering'. You said to me that following this training session there had been 'an informal and general discussion on the desk' that 'all of the traders who had been at the training discussed it' and that they 'were asking for guidance on what would be considered fake'.

In our meeting we discussed this point for some time as I wanted to ensure I fully understood what you meant by the term 'escalation'. When I asked whether you had escalated to Compliance you nuanced your statement by saying that the matter had not been escalated 'formally' but you referred to the desk conversation. You said you believed that, as your manager Stuart Pillar was on the desk at the time when this general discussion was taking place, he had overheard the conversation and that you further believed

that he then had asked Nigel Baines from Compliance to come to the desk to provide clarification specifically on 'spoofing' and 'layering'.

I discussed this point separately with both Nigel and Stuart. Nigel said to me that he remembers walking past your teams' desk around this time and being shown 'how the algorithms are acting in the market' and he recognised that the algorithms were providing some frustration for the traders. Nigel said that he had not been specifically asked to come and talk to your desk to clarify the points raised in the training regarding 'spoofing' and 'layering', nor did you or anyone in your team ask him this directly or give him any examples of trades you were concerned about or thought may fall into this category. When I discussed this point with Stuart he said to me that he was not aware of any confusion around 'spoofing' or 'layering' being created by the training and this was, therefore, not something he had raised with or escalated to Compliance. Stuart does not recall the desk conversation that you referred to and he had confirmed that he was certainly not involved in such a conversation. Stuart also advised me that none of your colleagues asked questions or requested clarification on this point and, as I have detailed above, no other examples of this trading practice were uncovered in London as part of the Compliance review (detailed above).

In any case, as is made clear repeatedly in training and other communications, when faced with doubt or confusion employees should escalate. Escalating means clearly and transparently laying out the facts and questions to Compliance in a good faith attempt to conclusively determine whether the behaviour in question is appropriate. In such instances, the onus is on the trader to engage Compliance so that the doubts or confusion can be addressed. It is clear from the record that you did not do that. An employee of your seniority should not expect that an informal desk conversation would allow to reliably and conclusively determine, whether his or her behaviour were appropriate - this in no way constitutes escalation.

As you did almost entirely stop trading in this way following the training session which took place in December 2013, my view supports Carl Norrey's in that, at the very least, you knew then that your trading practice was likely inappropriate but you still failed to escalate this matter to Compliance in the appropriate way as was your duty at that point.

**Training**
In your Appeal Letter you have additionally stated that "[you] think it is obvious that [you were] not aware of the potential inappropriateness of [your] trading" and that this "is a direct result of the insufficient and inadequate training programme provided to [you] by JPMorgan".

From my investigation, I have formed the view which supports the conclusion reached by Carl Norrey in this regard in that "if at any point you thought that the training was unclear then you should have raised this at any time". Additionally, I would state that it was your professional responsibility as a senior level employee within the Firm, to ensure that you were at all times compliant with acceptable market practices, even if that had meant requesting additional training if you had felt the need for it. I do not accept that an employee of your seniority would not have come across the terms 'spoofing' and 'layering' and know what they mean or the effect those actions could have on a persons career.

**2. Sanction of dismissal not justified**

I am in agreement with Carl Norrey that your conduct constitutes a serious breach of the Firm's Code of Conduct. Your role was both senior and regulated, and I have found that the original decision to terminate your employment for gross misconduct was fair and reasonable in the circumstances. On this basis and for the reasons outlined in this letter, I confirm I am upholding Carl Norrey's original decision.

Confidential Treatment Requested by JPM

JPMC-PM-00005206
DOJ-0008294096

3. **The disciplinary process and your perceived treatment since the decision**

I empathise with you when you state that this time has been extremely stressful for you and your family. However, my view is that it was essential that proper time was taken to conduct a thorough investigation and enable all appropriate information to be fully considered.

I trust that my careful consideration of your appeal brings this matter to a conclusion. Please note that my decision on this matter is final.

Please find enclosed a copy of the non verbatim minutes from the appeal meeting. Please read and sign one copy returning it to Suzanne Bywater of Human Resources at 25 Bank Street, Canary Wharf, London, E14 5JP, as agreement that the content is a fair representation of the meeting. Should we not receive these signed notes back within 14 days from the date they are sent, it will be assumed that you are in agreement with the content.

Yours sincerely


**Sanjay Jhamna**
**Managing Director**

Confidential Treatment Requested by JPM

JPMC-PM-00005207
DOJ-0008294097