UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | |
| v. | : | |
| | : | No. 19 CR 669 |
| GREGG SMITH and | : | |
| MICHAEL NOWAK, | : | Hon. Edmond E. Chang |
| | : | |
| Defendants. | : | |

**United States' Reply Sentencing Memorandum**

The United States, by and through the undersigned counsel, submits this reply sentencing memorandum in response to the Sentencing Memoranda of defendants Gregg Smith (ECF No. 865) ("Smith Memo.") and Michael Nowak (ECF No. 864) ("Nowak Memo."). Because the Court granted leave to file a reply with respect to the issue of loss, the United States has limited the scope of this brief to that issue.

**I.   Both Defendants are Responsible for Losses Resulting from the Jointly Undertaken Criminal Scheme**

The defendants raise several arguments as to why the scope of relevant conduct should be narrowed. For the reasons discussed below, the Court should reject these arguments and hold both defendants responsible for losses that resulted from the criminal acts committed by the defendants and their co-schemers.

Defendant Smith contends that his loss calculation should be limited to the eight trading episodes that served as the basis for his wire fraud convictions. This argument is flawed for at least three reasons. First, even though each of the wire fraud counts was associated with a specific episode, the jury instructions made clear

that these counts still required proof beyond a reasonable doubt of a broader scheme to defraud, which, in defendant Smith's case, spanned a seven-year period from May 2008 through June 2015. *See* Revised Jury Instructions—Court Set 2 at 42, 44-45 (ECF No. 654). Second, in addition to the wire fraud counts associated with eight specific trading episodes, defendant Smith was also convicted of additional scheme offenses—including attempted price manipulation and commodities fraud—which encompassed conduct spanning a multi-year period. As a result, defendant Smith's loss amount should include all episodes of his improper trading during those years. Third, the purpose of U.S.S.G. § 1B1.3(a)(2) is to capture relevant criminal conduct that, while part of the defendant's unlawful acts, was not necessarily reflected in a specific count of conviction, *i.e.*, acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." At a minimum, therefore, each defendant should be responsible for losses that resulted from similar unlawful trading that each defendant engaged in during the entire period covered by the scheme counts on which they were convicted.

Both defendants also claim that neither should be responsible for loss resulting from unlawful trading by other members of JPMorgan's precious metals desk because the jury acquitted the defendants of the two conspiracy counts. Putting aside the Court's ability to consider the acquitted conspiracy counts as relevant conduct for purposes of sentencing (which the United States briefed in its opening sentencing memorandum), the trading at issue is also relevant conduct for each defendant because it is part of jointly undertaken criminal activity for which both defendants

were convicted. Several factors are relevant to determining the scope of jointly undertaken criminal activity, including "(1) the existence of a single scheme, (2) similarities in modus operandi, (3) coordination of activities among schemers, (4) pooling of resources or profits, (5) knowledge of the scope of the scheme, and (6) length and degree of the defendant's participation in the scheme." *United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011) (internal citations and quotations omitted). The evidence presented at trial, and discussed in the United States' sentencing memorandum, easily satisfies these factors. The traders on JPMorgan's precious metals desk engaged in a single scheme to manipulate the precious metals futures markets by employing the same modus operandi—spoofing—for the benefit of themselves and the desk. Defendants Smith and Nowak were senior members of the desk who engaged in this scheme for multiple years. More junior traders like John Edmonds and Christian Trunz learned to spoof like the defendants by watching and emulating the defendants. In particular, the trial evidence established that Edmonds and Trunz spoofed like defendant Smith because they were expected to cover for defendant Smith—and execute orders in the same manner that he would—when he was off the desk, demonstrating a level of knowledge and coordination on the desk. Even more, the trial evidence showed that the defendants lied to the CME (Smith) and CFTC (Nowak) in order to obstruct and conceal the unlawful trading on the desk, and that defendant Nowak (as the head of the desk) circled the wagons to protect himself and others on the desk from investigation by JPMorgan's compliance department and the federal government. This record provides an ample basis for the

Court to conclude that each defendant should be held accountable for the conduct of others who engaged in the jointly undertaken criminal activity. *See Salem*, 657 F.3d at 564 (finding jointly undertaken criminal activity where "there is a single scheme, similarities in modus operandi, coordination of activities among co-schemers, and sharing of resources"); *United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir. 2000) ("Cumulatively, all of these circumstances permitted the district court to find, by a preponderance of the evidence, that the [mail fraud scheme] was a joint undertaking among all three defendants.").

Finally, relying on *United States v. Chube II*, 538 F.3d 693 (7th Cir. 2008), the defendants also assert that the United States must present particularized evidence as to each sequence it proposes to include in the relevant conduct. But the defect in *Chube II* was that the district court's relevant conduct determination was based on evidence that lacked precision. *See id.* at 704 ("[S]tating that '[n]umerous files' contained evidence suggesting illicit prescribing is not sufficient to sweep every pill in all 98 files into the relevant conduct calculation."). That issue is not present here. The parameters of the United States' relevant conduct analysis are well-defined, precise, supported by the trial evidence, and consistent with industry standards. *See CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *20 (N.D. Ill. July 12, 2016) (describing findings of NYMEX and COMEX Panels: "In determining that the non-iceberg orders were entered without the requisite intent to be traded, the Panel considered numerous factors, including the significant imbalance created by [the defendant's] 50-lot non-iceberg orders, the percentage of large orders cancelled, and

the exposure time of the cancelled orders."); *see also United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017) (citing the relative durations and fill ratios of the defendant's "large" and "small" orders as evidence that the large orders were spoofs). In *Bases*, Judge Lee rejected the same argument that defendants present here, explaining that the *Bases* "case stands in stark contrast to *Chube II*" and that Prof. Venkataraman's market loss analysis supported the government's position that "numerous trading sequences, in addition to those presented at trial . . . should be considered relevant conduct." Order at 8-9, *United States v. Bases*, 18 CR 48, ECF No. 734 (N.D. Ill. Mar. 6, 2023) ("*Bases* Op."). The same analysis applies equally to the defendants in this case.

The defendants' arguments as to the scope of their relevant conduct, therefore, should be rejected as contrary to the evidence and unsupported by the law.

## II. The Defendants' Critiques of the United States' Loss Analysis Lack Merit and Should Be Rejected

Defendants Smith and Nowak argue that the United States has failed to establish that any loss is attributable to their offense conduct, although defendant Nowak does acknowledge there may have been a "theoretical loss" of approximately $70,000. *See* Smith Memo. at 38-39, Nowak Memo. at 30-31, 48. As part of their argument, the defendants claim that the United States has failed to show that any victims suffered actual harm or loss from the defendants' market manipulation and fraud. *See* Smith Memo. at 39-40, Nowak Memo. at 41-42. These arguments lack merit because they ignore controlling Seventh Circuit precedent, the plain text of the

Guidelines, the evidence presented at trial, and Prof. Venkataraman's declaration submitted in connection with the defendants' sentencings in this case.

Under § 2B1.1, the offense level is increased based on the greater of the actual or intended loss resulting from an offense. *United States v. Durham*, 766 F.3d 672, 686 (7th Cir. 2014); U.S.S.G. § 2B1.1 cmt. n.3(A) (explaining that "loss is the greater of actual loss or intended loss").[1] The trial evidence—in particular, the testimony of Edmonds and Trunz that the spoofing scheme worked to the detriment of other market participants, the testimony of David Pettey that his trading was affected by the defendants' spoofing, and Prof. Venkataraman's trial testimony as to the effects of the defendants' spoofing on their genuine orders—established that actual losses *did* result from the defendants' criminal conduct. Moreover, the entire point of Prof. Venkataraman's post-trial loss analysis is to establish—just as it did in *Vorley* and *Bases*—the existence and amount of actual loss.

To the extent the defendants claim there was no actual loss because the defendants' victims may have been able to mitigate the harm created by the defendants' manipulation, this argument fails to acknowledge that "a fraud victim's effort to mitigate its losses does not lessen the wrongdoer's liability." *United States v. Helfand*, 281 F. App'x 551, 555 (7th Cir. 2008). It is legally irrelevant for loss calculation purposes that the defendants' victims may have been able to mitigate their losses by trading during times when the defendants were *not* polluting the

---

[1] In cases with multiple victims, the loss amount can include the amount of actual loss for some victims and the amount of intended loss for others. *See United States v. Lauer*, 148 F.3d 766, 767 (7th Cir. 1998).

market.² If a defendant fraudulently induces a victim to purchase an asset and the asset's value later skyrockets through no doing of the defendant, the defendant does not get the benefit of the windfall via a lower loss amount.

Moreover, for intended loss, the analysis "turns upon how much loss the defendant actually intended to impose" and not "whether the loss materialized or even whether it was economically possible to impose such a loss." *United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001); *see also United States v. Klund*, 59 F.4th 322, 327 (7th Cir. 2023) ("As a general rule, we calculate the amount of intended loss by considering the amount the defendant placed at risk with the fraudulent scheme."); *United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001) (explaining that intended loss "turns upon how much loss the defendant actually intended to impose," regardless of whether the loss materialized or was even possible).³ Either way, the defendants' conception of how to calculate loss in this case is flawed and should be rejected.

Relatedly, the defendants also argue with scant support that the Court should import the heightened loss causation requirement applicable to civil securities fraud cases. *Cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-43 (2005) (requiring a civil securities fraud plaintiff to show a causal connection between a material misrepresentation and their loss). The defendants fail to cite a Seventh Circuit case

---

² Mitigation may be relevant to restitution, which is not at issue here.

³ To the extent the defendants mistakenly claim that § 2B1.1 does not contemplate intended loss, and cite to *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) for support, they fail to explain why the Court should ignore binding Seventh Circuit precedent and rely on out-of-Circuit caselaw.

(nor is there one, to the United States' knowledge) supporting the proposition that courts are required to conduct the *Dura* loss causation analysis when determining loss for Sentencing Guidelines purposes in a criminal fraud case. And while the Seventh Circuit has not taken a position on the issue, four other Circuit Courts of Appeal have found that *Dura* was not relevant in a criminal sentencing. *See United States v. Rand*, 835 F.3d 451, 467-69 (2016); *United States v. Georgiou*, 777 F.3d 125, 146 (3d Cir. 2015); *United States v. Peppel*, 707 F.3d 627, 644-45 (6th Cir. 2013); *United States v. Berger*, 587 F.3d 1038, 1044 (9th Cir. 2009). In the two Circuits that have referenced *Dura* in connection with loss determinations in a criminal sentencing, those courts ultimately did *not* apply a strict loss causation requirement, but rather applied the Sentencing Guidelines' instruction to determine a reasonable estimate of the loss. *See United States v. Rutkoske*, 506 F.3d 170, 179-80 (2d Cir. 2007); *United States v. Olis*, 429 F.3d 540, 546-47 (5th Cir. 2005). But in any event, when considering what the loss causation requirement in *Dura* was meant to achieve—separating normal market movements from losses arising from fraud and manipulation—that is precisely what Prof. Venkataraman undertook in his analysis to calculate the market loss arising from the defendants' manipulative trading.

Finally, in further support of their flawed argument that the defendants' multi-year scheme to manipulate the precious metals futures markets resulted in no loss to market participants who traded at artificial prices, defendants Smith and Nowak each submitted affidavits from experts that purport to show why the Court should diverge from Judge Tharp in *Vorley* and Judge Lee in *Bases* and reject Prof.

Venkataraman's loss analysis. *See* Smith Memo. Ex. B, Declaration of Mukarram Attari, Ph.D.; Nowak Memo. Ex. B, Declaration of Jeremy Cusimano. Among other things, the defendants argue that the United States' proposed loss analysis fails to account for potential external factors that may have contributed to the loss amount. The defendants are wrong. Their argument ignores the process undertaken by Prof. Venkataraman to calculate loss arising from the defendants' manipulative trading apart from other market factors. Prof. Venkataraman has prepared a reply declaration, attached as Exhibit A, that explains in depth why the defendants' critiques lack merit. To assist the Court's analysis, the chart below summarizes, for certain topics of the analysis, Mr. Cusimano's and/or Dr. Attari's critiques in the left-hand column, and the United States' responses in the right-hand column.

| Critique | Response |
|---|---|
| Prof. Venkataraman's selection criteria to identify Spoofing Sequences are overbroad and could be consistent with legitimate trading activity.<br><br>(Cusimano ¶¶ 29-30; Attari ¶¶ 37-43) | The selection criteria exhibit certain characteristics identified at trial as indicative of spoofing in which the Defendants systematically placed and canceled their large, fully displayed orders while an order was active on the opposite side of the market. As Prof. Venkataraman explained at trial, this trading pattern is inconsistent with an economically rational trading strategy that is designed to obtain fills for the identified Spoof Orders and consistent with a strategy that is designed to push the price to help fill the Defendant's Opposite Orders.<br><br>(Ex. A ¶¶ 8, 14) |

| Critique | Response |
|---|---|
| The fact that the Defendant had orders filled on the Spoof Order side of the market indicates that they possessed an intent to trade the Spoof Orders.<br><br>(Cusimano ¶¶ 34, 55; Attari ¶¶ 10, 42) | When analyzing the Defendants' Spoof Orders that were part of a Spoofing Sequence with at least one fill, including multiple episodes admitted at trial, the vast majority (91%) of the contracts in the Spoof Orders were canceled.<br><br>(Ex. A ¶ 16) |
| The selection criteria should be limited to the characteristics of the spoofing episodes that were the basis of Defendant Smith's wire fraud convictions in Counts 5 through 12 and that were related to his spoofing conviction.<br><br>(Attari ¶¶ 44-46) | Placing such limitations on the selection criteria would exclude many types of spoofing episodes that were admitted at trial (*see, e.g.*, GX 450 and 451), identified as spoofing by Edmonds and Trunz, and serve as the basis for the Defendants' convictions of commodities fraud, attempted price manipulation, and spoofing.<br><br>(Ex. A ¶¶ 19-22) |
| Prof. Venkataraman's criteria is different than the selection criteria he applied in the *Bases* case, which required, among other things, that a Spoof Order be placed within the top 5 levels of the order book and cancelled within 5 seconds.[4]<br><br>(Cusimano ¶¶ 23-25; Attari ¶¶ 46(a) n.41, 46(b) n.47, 46(e)) | Not every spoofer commits the crime identically. The selection criteria for identification of Spoof Orders in this case and in the *Bases* case were based on the evidence that was presented at trial in each case. Unlike in *Bases*, in this case, the Defendants' spoofing patterns included placing Spoof Orders in levels 6 through 10 of the order book and leaving Spoof Orders in the market longer than 5 seconds, among other differences.<br><br>(Ex. A ¶¶ 23-28) |

---

[4] While the defendants claim that Prof. Venkataraman departed from the parameters used in the *Bases* case—at the same time—they criticize his use of a purported "two-step" pattern. *See* Smith Memo. at 20-21; Nowak Memo. at 33. But this "two-step" pattern is the *same* pattern that Prof. Venkataraman used in *Bases*. *Compare* Venkataraman Decl. ¶ 16 *with Bases* Op. at 10. Either way, the defendants' arguments have no merit because Prof. Venkataraman has explained why certain parameters differed from *Bases*, *see* Ex. A ¶¶ 23-28, but also why the "two-step" pattern, which was also used in *Bases*, identifies trading that is consistent with spoofing and not an economically rational trading strategy, *see* Ex. A ¶¶ 8, 14.

| Critique | Response |
|---|---|
| Prof. Venkataraman's loss analysis fails to account for certain outliers, including episodes where the Spoof Orders and Opposite Order are greater than 20 price levels apart or where other convicted precious metals spoofers are trading at the same time as the Defendants.<br><br>(Cusimano ¶¶ 28(b), 28(c), 32-33, 43(d), 55; Attari ¶¶ 24, 46(e), 60, 70-73) | Even considering the criticism regarding outliers identified by the Defendants, and removing for argument's sake the outliers from the loss calculation, the result is still a significant amount of calculable harm to market participants from the Defendants' spoofing.<br><br>(Ex. A ¶¶ 67-80) |
| The vast majority of the loss attributed to the Spoof Orders is based on the Control Period and is not a result of market activity during the Spoofing Sequences.<br><br>(Attari ¶¶ 15, 66) | Dr. Attari focuses on only a small number of outlier Spoofing Sequences to make this claim. When viewing the market loss numbers in the aggregate, however, the Control Periods actually reduce—not increase—the market loss attributable to the Defendants' spoofing.<br><br>(Ex. A ¶¶ 59-61) |
| Prof. Venkataraman's But-For Methodology is unreliable because it produces unreasonable and unstable results.<br><br>(Attari ¶¶ 62-74) | Statistical analyses often generate outlier results, but their existence does not necessarily undermine the reliability of the broader analysis. After controlling for the influence of outlier Spoofing Sequences (whether through "winsorizing" or "trimming" the data to remove the effect of the outliers), the adjusted market loss calculations are still economically large and within the range of market losses reported in Prof. Venkataraman's initial Declaration.<br><br>(Ex. A ¶¶ 62-66) |

| Critique | Response |
|---|---|
| Prof. Venkataraman's methodology fails to show a causal connection between the Spoof Orders and the Adjusted Market Losses<br><br>(Cusimano ¶ 9(b); Attari ¶¶ 48, 58) | The methodologies identify matched Control Periods, which are of similar duration and occur immediately prior to the placement of the Spoofing Sequences. The Control Periods are a reasonable benchmark of the expected trading outcomes that would have occurred absent the Spoof Orders and allow the methodology to identify the abnormal cost of trading arising from the Spoof Orders.<br><br>(Ex. A ¶¶ 34-35) |
| The Control Periods are flawed because they do not appropriately predict trading that occurred during the Spoofing Sequences.<br><br>(Cusimano ¶ 43(d); Attari ¶¶ 50-58) | Using Control Periods is a standard and well-established approach to compare trading patterns before and after an event to measure the impact of an event (*i.e.*, an event study). The time proximity of the Control Periods to the Spoofing Sequences helps account for the impact of idiosyncratic market conditions that vary over time.<br><br>(Ex. A ¶¶ 36-38) |
| Using the best bid or offer prices as a But-For price is flawed and not a reasonable estimate of the trade price absent the Spoof Orders. The more appropriate price to use is either the best price on the opposite side of the Spoof Orders (Cusimano) or the midpoint of the best bid and ask price (Attari).<br><br>(Cusimano ¶ 59; Attari ¶ 78) | The prevailing best bid or offer price on the same side of the market as the Spoof Orders is the appropriate But-For price because it is based on explicit signals from market participants trading on the same side of the market as the Spoof Orders. Using the prices proposed by Cusimano or Attari would underestimate market harm from the Spoof Orders.<br><br>(Ex. A ¶¶ 41-49) |

| Critique | Response |
|---|---|
| There is no basis to include in the market loss calculation fills that are executed during the full duration of the Spoof Orders. Instead, the loss calculations should only include fills that occurred up until either (i) 3.2 seconds after the aggregate 30-lot threshold within the top 5 levels of the visible order book was met, and (ii) 0.9 seconds after the placement of the last Spoof Order in the Spoofing Sequence. (Cusimano ¶¶ 50-51) | This critique lacks merits because the But-For cost of trading adjustment in the methodologies compares the market activity during the Spoofing Sequence to the activity in a Control Period of equal duration immediately beforehand, meaning if there was no impact of Spoof Orders during the Spoofing Sequences, the methodology would have found no Adjusted Market Losses attributable to the Spoof Orders. (Ex. A ¶¶ 50, 82-87) |
| The Spread-Crossing Methodology is unreliable, does not measure spread-crossing, and should identify spread-crossing trades based on the best quotes prevailing at the time of a trade during the Spoofing Sequence. (Cusimano ¶¶ 37-39; Attari ¶¶ 99-103) | The Spread-Crossing Methodology identifies spread-crossing trades during a Spoofing Sequence by comparing the transaction price to the best quotes prevailing before the Spoofing Sequence, which considers the impact of the Spoof Orders on the bid-ask spread during a given Spoofing Sequence (thereby fully capturing the market harm arising from the Spoof Orders' price impact). Accordingly, any transaction that occurs during the Spoofing Sequence and fills at a less favorable price than the But-For price is identified as "spread-crossing." (Ex. A ¶¶ 51-54) |

Accordingly, the various criticisms asserted by Dr. Attari and Mr. Cusimano do not undermine the reasonableness of Prof. Venkataraman's loss calculation, which the United States urges the Court to adopt. *See United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) ("A court need only make a reasonable estimate of the loss, not one rendered with scientific precision."); *Bases* Op. at 12 ("All that is required is that the government establish it is more likely than not that the additional trades

were unlawful and that Venkataraman's estimate is a reasonable approximation of the loss."). Ultimately, Prof. Venkataraman demonstrates in his Reply Declaration that, even after considering the critiques from Dr. Attari and Mr. Cusimano and incorporating them into Prof. Venkataraman's loss analysis, there is *still* a reasonable basis for the Court to find a loss amount between $25 million and $65 million, which would result in a 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L).

Dated: May 8, 2023

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:  /s/ *Matthew F. Sullivan*
Avi Perry, Deputy Chief
Matthew F. Sullivan, Trial Attorney
Christopher Fenton, Trial Attorney
Lucy B. Jennings, Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
(202) 578-6583
Matthew.Sullivan2@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Matthew F. Sullivan, hereby certify that on May 8, 2023, I caused the foregoing filing to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to the parties who have entered an appearance in this case.

                                              /s/ *Matthew F. Sullivan*
                                              Matthew F. Sullivan