# Exhibit A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GREGG SMITH and
MICHAEL NOWAK,

Defendants

No. 19 CR 669

## REPLY DECLARATION OF KUMAR VENKATARAMAN

May 8, 2023

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

A.  Assignment .......................................................................................................... 2

B.  Summary of Conclusions ..................................................................................... 3

II. RESPONSE TO DEFENDANTS' DECLARATIONS ........................................ 4

A.  Identification of Spoofing Sequences ................................................................. 5

    i.  Defendants' Experts argue my selection criteria are over-inclusive, capture legitimate trading, and are not designed to identify Spoofing .................................................... 5

    ii.  Defendant Smith's Expert argues my selection criteria do not match the Spoofing Sequences from trial ........................................................................................................ 11

    iii.  Defendants' Experts argue my selection criteria are different than the Bases matter ...... 16

B.  Market Loss Methodologies ................................................................................. 25

    i.  Defendants' Experts claim I assume causation................................................................. 27

    ii.  Defendants' Experts argue my Control Periods are flawed............................................. 29

    iii.  Defendants' Experts argue my measure of But-For Price is unreasonable ..................... 30

    iv.  Defendant Nowak's Expert argues the loss calculations should not include the full duration of the Spoofing Sequences ......................................................................... 35

    v.  Defendants' Experts argue my Spread-Crossing Methodology doesn't analyze spread-crossing ...................................................................................................................... 36

    vi.  Defendants' Experts focus on outlier Spoofing Sequences and falsely conclude my results are unstable. ..................................................................................................... 38

        a.  Distribution of the components of the market losses is reasonable............................. 38

        b.  Dr. Attari's claim that the overall findings are driven by the magnitude of the But-For Costs is incorrect ........................................................................................... 40

        c.  The Adjusted Market Losses I calculated are stable.................................................... 41

C.  Updated Market Loss Calculations in Response to Defendants Declarations ............. 43

    i.  Five Categories of Spoofing Sequences that I exclude from updated market loss calculations ......................................................................................................................... 43

    ii.  Distribution of updated market losses and stability of the results ................................... 48

D.  Mr. Cusimano's Alternative Calculations of Market Loss ................................. 51

## I.    INTRODUCTION

1.    I previously submitted a declaration in this matter on December 22, 2022, in which I provided my qualifications and calculated the amount of loss suffered by other market participants as a result of the Defendants' spoofing activity.[1] In this Declaration, I concluded that "[s]poofing distorts the visible supply and demand in the market, which can induce other market participants to raise/lower their bid/offer quotes or to cross the spread to obtain executions when they otherwise would not have absent the spoofing pressure."[2] I also concluded that "market participants who trade on the same side of the market as a spoof order while the spoof order is active, and at a price that is worse than the prevailing price immediately before the spoof order was placed, are harmed to the extent they were induced to trade by the spoofing pressure."[3]

2.    As described in my declaration, I was "asked by the DOJ to limit my analysis to the Spoofing Sequences summarized in GX 499 and then further limit my analysis to Spoofing Sequences with aggregate quantity of the large, fully displayed orders of at least 30, 15, 20, and 20 contracts for gold, silver, platinum, and palladium, respectively. I further limited the analysis to Spoofing Sequences where the duration of large, fully displayed layers of the Spoofing Sequence was within the 99th percentile (82.3 seconds) of the duration distribution."[4]

3.    Further, I provided two reasonable and reliable estimates of the loss to market participants that is attributable to the Defendants' spoofing activity. Both estimates were meant to calculate loss from the Defendants' spoofing that was distinct from typical market movements. That is, I presented two methodologies to adjust the calculated Unadjusted Market Losses associated with Spoofing Sequences to account for the fact that the best prices in the market may move or that participants may choose to cross the spread to trade

---

[1] My Declaration also provides a discussion of the relevant procedural background and certain defined terms that I use in this Reply Declaration.

[2] Declaration of Kumar Venkataraman, December 22, 2022 (hereafter "Venkataraman Declaration"), ¶13.

[3] Venkataraman Declaration, ¶13.

[4] Venkataraman Declaration, FN 12.

at a worse price even absent the pressure of Spoof Orders in the market ("Adjusted Market Losses"). Under the first methodology ("But-For Price Methodology"), this market loss was determined by comparing the observed cost of trading while the Defendants' Spoof Orders were active to the observed "but-for" cost of trading during a control period of equal length immediately before the Spoof Orders were placed. As I described in my Declaration, implementing my But-For Price Methodology across the Defendants' approximately 132,265 Spoofing Sequences resulted in a total market loss attributable to the spoofing activity of **$94,774,945**.[5]

4.  Under the second methodology ("Spread-Crossing Methodology"), this market loss was determined by comparing the rate at which market participants on the same side as the Defendants' Spoof Orders crossed the prevailing (i.e., before the Spoof Orders) bid-offer spread while the Spoof Orders were active to the rate at which market participants crossed the prevailing bid-offer spread during a control period immediately before the Spoof Orders were placed. For the purpose of this analysis, I identify trades that crossed the spread based on the prevailing bid-offer quote before the Spoof Orders to account for instances when the best bid-offer quote moves during the Spoofing Sequences. As I described in my Declaration, implementing my Spread-Crossing Methodology resulted in a total market loss attributable to the spoofing activity of **$55,544,600**.[6]

5.  Furthermore, I concluded in my Declaration that both my But-For Price Methodology and my Spread-Crossing Methodology likely understated the true harm to other market participants attributable to Defendants' spoofing activity.[7] When appropriate, I refer to my But-For Price Methodology and Spread-Crossing Methodology collectively as my "Market Loss Methodologies."

### A.   Assignment

6.  I have been asked by the DOJ to review and respond to the opinions and analyses presented in the April 10, 2023 declaration of Defendant Nowak's expert Mr. Jeremy Cusimano

---

[5] Venkataraman Declaration, ¶13.

[6] Venkataraman Declaration, ¶13.

[7] Venkataraman Declaration, ¶49.

("Cusimano Declaration") and the April 10, 2023 declaration of Defendant Smith's expert Dr. Mukarram Attari ("Attari Declaration"). I refer to these declarations collectively as the "Defendants' Declarations," and to Mr. Cusimano and Dr. Attari collectively as "Defendants' Experts."

## B. Summary of Conclusions

7. Based on my review of the opinions and analyses contained in the Defendants' Declarations, as well as my experience studying financial markets and my analysis of the CME Trading Data, I have reached the following conclusions.

8. The criteria used to identify the Spoofing Sequences in my analysis are reasonable and most importantly consistent with the evidence presented at this trial. I disagree with Mr. Cusimano's and Dr. Attari's claims that the parameters used to identify the Spoofing Sequences are overly broad and arbitrary. The Spoofing Sequences reflect a pattern specific to Defendants' trading behavior that is much narrower than standard trade surveillance algorithms. The suggestion that the Spoofing Sequences "could be" consistent with legitimate trading strategies is speculative and incorrect. Rather, the Spoofing Sequence selection criteria identify a persistent pattern of Defendants' trading activity with certain characteristics, such as large aggregate visible quantity (that results in significant changes to visible order book), short duration, and resulting low fill ratios, that are inconsistent with an economically rational trading strategy aimed at obtaining fills for the Spoof Orders.

9. The Defendants' Declarations present several criticisms—that I do not demonstrate causation or analyze the impact of the Spoof Orders, that most of the adjusted market losses are attributable to control periods, that my results are not stable, that my choice of the But-For Trade Price and spread crossing measure are incorrect—that indicate they do not understand my market loss methodology or the analysis I performed. The Defendants' Experts' focus is prone to significant misstatements because it criticizes individual parts of my Market Loss Methodologies while ignoring the overall conceptual framework.

    i. My Market Loss Methodologies are reasonable and produce stable results even after accounting for outliers.

    ii. The Control Period represents a reasonable benchmark of the trading outcomes

that would have occurred absent the placement of the Spoof Orders. The use of the But-For Price and Control Period in my Market Loss Methodologies are reasonable.

    iii.   My measure of spread-crossing, which compares the trade price during a Spoofing Sequence to the prevailing best quote when the Spoofing Sequence begins, instead of the prevailing best quote at the time of the trade, is the correct measure for the purposes of the market loss analysis.

10.    Even after over-excluding certain categories of Spoofing Sequences based on certain criticisms from the Defense Experts, I still calculate economically large market losses that are stable and consistent with what I reported in my Declaration. My calculation of adjusted market loss based on the remaining Spoofing Sequences are $55.7 million using my But-For Price Methodology and $38.9 million using my Spread-Crossing Methodology.

11.    Mr. Cusimano's alternative market loss calculation suffers from several important flaws, which results in a significantly understated estimate of market loss.

## II.    RESPONSE TO DEFENDANTS' DECLARATIONS

12.    In the following sections, I discuss my identification of the Spoofing Sequences and the Defendants' critiques of the parameters that I applied. I respond to certain claims contained in the Defendants' Declarations as they pertain to my Market Loss Methodologies for estimating the amount of loss suffered by other market participants that is attributable to Defendants' spoofing activity. I demonstrate that my Market Loss Methodologies yield reasonable market loss estimates, and that the focus on a small number of outlier observations in the Attari and Cusimano Declarations misrepresent the analysis. I then present market loss estimates that directly address certain criticisms highlighted in the Defendants' Declarations. Finally, I discuss the flaws with Mr. Cusimano's alternative calculation of market loss that leads him to significantly understate market harm.

## A.        Identification of Spoofing Sequences

*i.        Defendants' Experts argue my selection criteria are over-inclusive, capture legitimate trading, and are not designed to identify Spoofing*

13.    The Spoofing Sequences included in my analysis were based on the Spoofing Sequences summarized in GX 499 that was presented at trial. Notably, the results of GX 499 were consistent with the analysis summarized in GX 498 that was based on the DOJ Episodes presented at trial.[8] I then excluded certain Spoofing Sequences at the request of the DOJ based on the aggregate quantity and duration of the Spoofing Sequences. Both Mr. Cusimano and Dr. Attari assert that the parameters used to identify the Spoofing Sequences in my analysis of market loss are too broad.

14.    Mr. Cusimano suggests that the Spoofing Sequences could be "consistent with legitimate trading strategies," such as "placing large visible orders for price or liquidity discovery or placing orders to capture price sweeps, among others."[9] Dr. Attari makes a similar point.[10] However, this argument fails to explain why, in over one hundred thousand instances, the Defendants systematically placed and canceled their large, fully-displayed orders while an order was active on the opposite side of the market. Rather, consistent with my trial testimony and the verdict of the jury at trial, the Spoofing Sequence selection criteria identify a persistent pattern of Defendants' trading activity that exhibits certain characteristics identified at trial as indicative of spoofing, such as:

i.    Placing fully displayed orders that are, in aggregate, large (on average, 69 contracts for Defendant Smith and 67 contracts for Defendant Nowak);

ii.    Fully displayed orders create a significant change in the market imbalance (on average before a gold Spoofing Sequence is placed, the quantity in the top five levels on both sides of the market are relatively balanced, 58 contracts on the Opposite Side and 56 contracts on the Spoof Side; however, after the Spoofing Sequence is placed the quantity in the top five levels on the Spoof Side doubles,

---

[8] GX 450, GX 451, GX 453, and GX 454. *See also* GX 498 and GX 499.

[9] Cusimano Declaration, ¶¶29-30.

[10] Attari Declaration, ¶¶37-43.

from 56 to 118, while the quantity on the Opposite Side remains relatively unchanged, from 58 to 60);[11]

iii.  Fully displayed orders have a short duration (median duration of 1.5 seconds);

iv.  Fully displayed orders have low fill ratios (2.6 percent); and further,

v.  Fully displayed orders improve execution outcomes for Defendants' Opposite Side Orders (i.e., Opposite Side Orders fill at a significantly faster rate when a Spoof Order is active than when a Spoof Order is not active).[12]

These persistent patterns are inconsistent with an economically rational trading strategy that is designed to obtain fills for the identified Spoof Orders and consistent with a strategy that is designed to push the price to help fill the Defendants' Opposite Side Orders.

15.  Dr. Attari argues to exclude from my analysis of market loss Spoofing Sequences without opposite side orders that are fully-filled during the Spoofing Sequence or during a subsequent Spoofing Sequence.[13] His primary critique pertains to the fact that "[i]f the Opposite Order is not fully filled, it is not possible to measure the time between the execution of the Opposite Order and the cancellation of the Spoof Orders."[14] As I noted in my Declaration, "while the conduct described by the DOJ's witnesses at trial was focused on instances where the spoof orders directly benefited the Defendants by successfully triggering executions on their smaller orders, the Spoofing Sequences here also include spoof orders that caused harm to the rest of the market even though they did not directly benefit the Defendants' smaller orders."[15] As shown in my broader analysis at trial (GX 499),[16] the Spoof Orders that comprise these Spoofing Sequences, which include both

---

[11] Similarly, when including all ten levels in the order book, on average before a gold Spoofing Sequence is placed, the quantity in the top ten levels on both sides of the market are relatively balanced, 131 contracts on the Opposite Side and 130 contracts on the Spoof Side; however, after the Spoofing Sequence is placed the quantity in the top ten levels on the Spoof Side increases, from 130 to 201, while the quantity on the Opposite Side remains relatively unchanged, from 131 to 135.

[12] Venkataraman Declaration, ¶¶19-20.

[13] Attari Declaration, ¶46d.

[14] Attari Declaration, ¶46d.

[15] Venkataraman Declaration, ¶15.

[16] *See* GX 499.

those with and without executions on the Defendants' Opposite Orders, exhibit similar indicative characteristics as those included in the DOJ Episodes presented at trial (GX 498).[17] Therefore, it is reasonable to apply this analysis whether the orders opposite the Spoof Orders received executions or not. Further, of the $94.8 million in Adjusted Market Losses, $81.6 million is associated with "successful" Spoofing Sequences (i.e., those in which Defendants' Opposite Order received one or more fills while the Spoof Orders were active in the market).

16.  Additionally, both Dr. Attari and Mr. Cusimano focus on the fact that if there are fills, especially aggressive fills, on the Spoof Side of the market then that is "indicia of an intent to trade."[18] Mr. Cusimano further argues for excluding sequences from my market loss analysis where "Mr. Nowak was actively trading and using aggressive orders on both sides of the market." [19] Along similar lines, Dr. Attari argues that examples of Spoofing Sequences such as when a Spoof Side Order fills, or Spoofing Sequences occur before or after fills on the Spoof Order Side, should be excluded since the fills show an intent to trade. Notably, as I report in my Declaration, the fill ratio for the Spoof Orders in my analysis is 2.6 percent.[20] When I limit attention to the Spoof Orders that were part of a Spoofing Sequence with at least one fill on the Spoof Order Side, I find that 91 percent of the contracts in the Spoofing Sequence were canceled, which does not support the claim of "indicia of an intent to trade." Therefore, even when Spoof Orders obtain some fills during a Spoofing Sequence, the vast majority of the contracts associated with the Sequence were ultimately canceled. Further, there are multiple examples of DOJ Episodes presented at trial in which there are fills on the Spoof Side. For example, in **Figure 1** (Smith Episode 81), the circled fills in the first layering group filled aggressively.

---

[17] *See* GX 498.

[18] Attari Declaration, ¶¶10, 42; *See also* Cusimano Declaration, ¶¶34, 55.

[19] Cusimano Declaration, ¶34.

[20] Venkataraman Declaration, ¶20.

# Figure 1



Additionally, in **Figure 2** (Smith Episode 56), fills occurred during the second layering group. That is, right after the first layering group, there was a fill on the Spoof Side, and right before the third layering group, there was a fill on the Spoof Side.

**Figure 2**



Another example of Spoofing Sequences when we see fills occurring on the Spoof Side of the market right before the Spoofing Sequence occurs is what were referred to as "round trip" episodes at trial. As **Figure 3** (Nowak Episode 44) below shows, Defendant Nowak first places a Spoofing Sequence on the sell side of the market followed by placing and getting a full execution of a buy side Opposite Side Order. This fill on the buy side is right before Defendant Nowak places a Spoofing Sequence on the buy side of the market followed by placing and getting a full execution of a sell side Opposite Order. In this DOJ Episode, Mr. Nowak gets fills on the Spoof Side (i.e., buy side) of the market right before the buy side Spoofing Sequence occurs.

**Figure 3**



**MNOWAK July 7, 2011 − 27.434 secs − Gold**

#44a

Sell Side

[1] 22 orders to sell 220 total contracts ($33,658,800)
Orders are up to 58.4% of visible order book
Active for 7.457 seconds on average (shortest 3.764 seconds)

[4] Cancels all 220 sell contracts

[2] Order to buy 10 contracts ($1,529,200)

[3] Buys 10 contracts while sell orders active

Buy Side

○ Places Order   ● Modifies Order   ⊠ Cancels Order   ▽ Buys Contract   △ Sells Contract   (Iceberg Order)   — Mid-Price   ▨ Bid-Offer Spread

17. Mr. Cusimano further argues for excluding sequences from my market loss analysis where "Mr. Nowak was actively trading and using aggressive orders on both sides of the market."[21] **Figure 4** below shows the Spoofing Sequence Nowak_GC_B_1603 which includes aggressive orders on both sides of the market, circled in red and green. Even though there are aggressive fills on both sides of the market during this Spoofing Sequence, the Opposite Side Orders generally result in fills (33 contracts filled of 40 placed) while the Spoof Orders generally result in cancelations (412 contracts canceled of 430 placed).

---
[21] Cusimano Declaration, ¶34.

**Figure 4**



18. Finally, Mr. Cusimano states that screening criteria used for "standard trade surveillance practices for spoofing identification" are "rarely as broad as those Prof. Venkataraman applied here."[22] I disagree. The selection criteria in my Declaration reflects a pattern specific to Defendants' trading behavior presented at trial that is much narrower than standard trade surveillance algorithms, which have broader parameters and fewer criteria.

      *ii.    Defendant Smith's Expert argues my selection criteria do not match the Spoofing Sequences from trial*

19. Dr. Attari argues that the selection criteria for Spoofing Sequences should be limited to characteristics observed in the eight Spoofing Sequences for which Mr. Smith was

---

[22] Cusimano Declaration, ¶26.

convicted of wire fraud and the two Spoofing Sequences related to Mr. Smith's conviction for spoofing.[23] It is my understanding that the Government selected certain sequences to charge as individual wire fraud counts, but also included 100 Spoofing Episodes in GX 450 that were other instances of Defendant Smith spoofing during the relevant time period. Therefore, there is no reason to limit the selection criteria for Spoofing Sequences to only certain sequences and disregard the other Spoofing Episodes included in GX 450.

20. I discuss below some examples of categories of Spoofing Sequences that the Defendants' Experts argue need to be excluded from the market loss calculations. I show that many categories of Spoofing Sequences that the Defense Experts argue should be excluded from loss calculation can be seen in the DOJ Episodes that were presented at trial. Therefore, my selection criteria are consistent with the evidence presented at trial and thereby they are reasonable to include despite the Defendants' Experts arguments to the contrary.

21. For example, Dr. Attari argues that Spoofing Sequences with fewer than 50 contracts should be excluded from my market loss analysis.[24] However, this exclusion ignores DOJ Episodes presented at trial with individual layering groups with fewer than 50 contracts. Examples of such DOJ Episodes are shown in **Figure 5** (Nowak Episode 93) and **Figure 6** (the first layering group in Smith Episode 71) below.[25] Additionally, the aggregate quantity threshold selected by the DOJ is reasonable when compared to the average visible market depth in the top five levels of the visible order book. For Spoofing Sequences in gold futures included in my analysis, the average market depth in the top five levels of the order book on the Spoof Order side before the placement of the Spoof Orders is 56. In other words, the 30-lot minimum aggregate quantity threshold for gold represents a significant percent of the combined visible contracts from all other market participants before the Spoofing Sequences.[26]

---

[23] Attari Declaration, ¶¶44-46.

[24] Attari Declaration, ¶46c.

[25] For additional examples, see Defendant Smith trial episodes 2 (the first layering group) and 54 (the first layering group) and Defendant Nowak trial episodes 4 (the third layering group), 57 (the first layering group), 95, 96, 99 (the first layering group), and 100. GX 450 and GX 451.

[26] For the Spoofing Sequences included in my analysis, the average of the total visible Spoof Order contracts for gold Sequences was 68, which is larger than the average market depth (56 contracts) in the top five levels and represents a

# Figure 5

**MNOWAK October 22, 2013 − 4.793 secs − Gold**



---

significant change in average market depth (130 contracts) in the top ten levels on the Spoof Order side before the placement of the Spoofing Sequences included in my analysis.

**Figure 6**



22. Along similar lines, since the lowest ratio of Spoof Order quantities to Opposite Order quantities in the episodes for which Defendant Smith was convicted was 8 to 1, Dr. Attari argues that Spoofing Sequences where the ratio of Spoof Order quantities to Opposite Order quantities is less than 8 to 1 should be excluded from my analysis of market loss.[27] However, this exclusion also ignores evidence of other Spoofing Sequences that was presented at trial where this ratio was less than 8 to 1.[28] For example, **Figure 7** (Nowak Episode 75) and **Figure 8** (the first leg of the round trip of Smith Episode 15) below provide examples of DOJ Episodes presented at trial where the ratio of Spoof Order quantities to

---

[27] Attari Declaration, ¶46b.

[28] *See* GX 450 and GX 451.

Opposite Order quantities is less than 8 to 1.[29]

**Figure 7**



MNOWAK March 13, 2013 − 6.528 secs − Gold     #75

---

[29] For additional examples, see Defendant Smith trial episode 34 (the first layering group) and Defendant Nowak trial episodes 3 (the first layering group), 9, and 16. GX 450 and GX 451.

**Figure 8**



GSMITH March 24, 2010 − 44.381 secs − Gold

iii. *Defendants' Experts argue my selection criteria are different than the Bases matter*

23.    Further, Dr. Attari and Mr. Cusimano focus on how my selection criteria differ from the selection criteria I used in the *United States v. Bases* (18 CR 48) matter.[30] However, the Defendants' Declarations fail to recognize that the selection criteria for identification of Spoof Orders for each case are based on evidence that was presented at trial for each case. My selection criteria for this case are grounded in the trading patterns shown at trial through the 100 DOJ Episodes for both Defendant Smith and Defendant Nowak.[31] It would be improper for me to adopt the same selection criteria I used for another case when the trading

---

[30] Attari Declaration, FNs 5, 41, 47, ¶46e. *See also* Cusimano Declaration, ¶¶18-19, 23-25, 28b, 28c.

[31] GX 450 and GX 451.

patterns presented at the respective trials differed. For example,

i. In the *Bases* matter, the Opposite Side Orders were always iceberg orders. However, in this matter, the Defendants placed iceberg, non-iceberg, and aggressive Opposite Side Orders.

ii. Also, in the *Bases* matter, the Opposite Side Order was always placed before the Spoofing Sequence, but in this matter, sometimes the Opposite Side Order is placed after the Spoofing Sequence.

iii. Additionally, in the *Bases* matter, the Spoof Orders typically canceled within five seconds; however, in this matter, some of the Spoof Orders are often in the market longer than five seconds. In particular, the Spoofing Sequences in which the Opposite Side Orders are placed after the Spoof Orders are generally longer than Spoofing Sequences in which the Opposite Side Order is placed first.

While Defendants' Experts try to argue that I have diverted from criteria I have used in the past without explanation, this is unequivocally false. In fact, I am being consistent in that I am incorporating the evidence presented at each trial in the selection criteria of Spoofing Sequences.

24. Dr. Attari asserts: "[I]n the *Bases* matter, Dr. Venkataraman had limited his identification of Spoof Orders to those that were placed within the top five levels of the order book. [...] But he has now changed this requirement to be the top 10 levels for Mr. Smith in his Declaration."[32] Mr. Cusimano makes a similar point.[33] However, as discussed above, the Defendants' Declarations fail to recognize that the selection criteria for identification of Spoof Orders for each case is based on evidence that was presented at trial for each case.[34] In this case, many of the DOJ Episodes presented at trial involved Spoof Orders placed between the 6th and 10th price levels of the visible order book. **Figure 9** (Smith Episode 70,

---

[32] Attari Declaration, ¶46e.

[33] Cusimano Declaration, ¶28c.

[34] In my Declaration, I explained this reasoning in the following way: "In this declaration, I follow the same general methodology for calculating market harm that I performed in connection with the sentencings in two recent cases that involved spoofing in the precious metals futures markets, namely, *United States v. Vorley* (18 CR 35), and *United States v. Bases* (18 CR 48). **The methodology is tailored to incorporate relevant information and patterns that are particular to the Defendants' spoofing activity**." *See* Venkataraman Declaration, FN 11 (emphasis added).

for which Mr. Smith was convicted on Count 6) and **Figure 10** (Nowak Episode 57, for which Mr. Nowak was convicted on Count 16) below provide examples of episodes with Spoof Orders between six and ten price levels for Mr. Smith and Mr. Nowak, respectively.[35] The episodes for which Mr. Smith and Mr. Nowak were convicted also include examples of instances where the Opposite Orders were placed between the 6th and 10th price levels, specifically Smith Episode 85 (for which Mr. Smith was convicted on Count 8) and Nowak Episode 51 (for which Mr. Nowak was convicted on Count 13).[36]

---

[35] *See* GX 450 for Defendant Smith's trial episodes and GX 451 for Defendant Nowak's trial episodes. For more examples, see the following Defendant Smith trial episodes: 54, 56, 85, 89, and 96, and the following Defendant Nowak trial episodes: 39, 44, 46, 47, and 69.

[36] *See* GX 450 and GX 451. In fact, evidence presented at trial even shows instances where the Opposite Order was placed outside the visible order book but ended up being executed after the Spoofing Sequence was placed. *See* GX 450, Defendant Smith Episode 100. This is evidence that my selection criteria was, if anything, under-inclusive of all the different trading patterns presented at trial. Dr. Attari argued that the fact my selection criteria did not encompass this episode further "illustrates how disconnected" my criteria is from "Mr. Smith's conviction," but that is misleading. *See* Attari Declaration, FN 38.

**Figure 9**



**Figure 10**



MNOWAK March 1, 2012 − 1.110 mins − Gold

25. Mr. Cusimano further argues that Spoofing Sequences in which none of the Spoof Orders were placed in the top five levels of the order book should be excluded.[37] **Figure 11** below shows the Spoofing Sequence Nowak_GC_S_1496 included in my analysis, in which none of the orders in the Spoofing Sequence are placed within the top five levels of the order book, yet the Opposite Side Order results in a partial fill and all the Spoof Orders are canceled, which is consistent with the evidence of the Defendants' spoofing presented at trial.

[37] Cusimano Declaration, ¶55.

**Figure 11**



26.   Mr. Cusimano and Dr. Attari object to loss estimates that consider all trading activity for longer duration Spoofing Sequences.[38] For example, Mr. Cusimano argues that "[n]early half (46.8%) of the alleged spoof orders in these [Nowak] sequences had durations of five seconds or longer, which Prof. Venkataraman's criteria would not have identified as spoofing in the *Bases* case."[39] However, Mr. Cusimano and Dr. Attari fail to recognize that there were many examples of Spoofing Sequences that were presented at this trial that were five seconds or longer.  For example, **Figure 12** (Nowak Episode 55, for which Mr. Nowak was convicted on Count 15) below provides an example of one such Spoofing Sequence, with a duration of over 17 seconds. Thus, Defendants' Experts argument that criteria I used in the Bases case should be used in this analysis is not reasonable. This argument is not

---

[38] Attari Declaration, ¶¶46a, 71-73; Cusimano Declaration, ¶28b.

[39] Cusimano Declaration, ¶28b.

consistent with the trading behavior conducted by Defendants Smith and Nowak and not consistent with the evidence presented at this trial for these Defendants.[40]

**Figure 12**



27. In making these criticisms about longer duration Spoofing Sequences, Mr. Cusimano and Dr. Attari also fail to acknowledge that, in my Declaration, I report market loss calculations that limit the duration of longer Spoofing Sequences to 30, 10, and five seconds, respectively, after the placement of the first Spoof Order. This analysis in my Declaration demonstrated that even when only the first five seconds of the Spoofing Sequence are included in the calculation of Adjusted Market Loss, I still calculate economically large losses of $37 million.[41] Nonetheless, to more directly address Defendants' Experts'

---

[40] For additional examples, see Defendant Smith trial episodes 17, 18, 66, 68, and 73 and Defendant Nowak trial episodes 35, 48, 53, 76, and 78. GX 450 and GX 451.

[41] Venkataraman Declaration, ¶36.

criticisms, in Part C of this Reply Declaration, I present market loss analyses that exclude Spoofing Sequences with durations [42] that exceed the maximum duration for each Defendant's Spoof Orders included in the DOJ Episodes presented at trial. These analyses also yield results within the range of Adjusted Market Losses I presented in my Declaration when I limited the market loss calculation to the first 30, 10, and five seconds after the placement of the first Spoof Order. The maximum duration of each Defendant's Spoof Orders from the trial episodes for Mr. Smith is 36.165 seconds and for Mr. Nowak is 34.875 seconds, as shown below in **Figure 13** (Smith Episode 90) and **Figure 14** (Nowak Episode 39).

### Figure 13



---

[42] The duration of the Spoofing Sequence is the time between the placement of the first Spoof Order and the last cancelation of Spoof Orders in the Spoofing Sequence. This duration accounts for the entire time for layering groups that overlap in time.

## Figure 14



28. Mr. Cusimano further argued that Spoofing Sequences where "the first cancellation of an alleged spoof order occurred more than five seconds after the placement of the last order in the scaled group" should be excluded in order "to remove the scale orders with exceedingly long durations."[43] As discussed above, he also argued that if Mr. Nowak placed an order on the Spoof Side of the market that resulted in aggressive fills during the life of the Spoofing Sequences then those Spoofing Sequences should be excluded, because the aggressive fills suggest an intent to fill.[44] **Figure 15** below shows two Spoofing Sequences included in my analysis that Mr. Cusimano believes should both be excluded. In the first Spoofing Sequence (Nowak_GC_S_1206), the first cancellation of a Spoof

---

[43] Cusimano Declaration, ¶55.

[44] Cusimano Declaration, ¶55.

Order was 23.9 seconds after the placement of the last Spoof Order in the Spoofing Sequence. In the second Spoofing Sequence (Nowak_GC_S_1207), the circled Spoof Order received aggressive fills. Both of these Spoofing Sequences resulted in the majority of the Spoof Orders being canceled and the majority of the Opposite Side Orders being filled, which is consistent with evidence of spoofing that was presented at trial.

**Figure 15**



MNOWAK March 29, 2011 − Gold

## B. Market Loss Methodologies

29. As discussed in my Declaration, I first calculated Unadjusted Market Losses which consists of the loss incurred by market participants on the Spoof Order side of transactions during the Spoofing Sequence. I then presented two Market Loss Methodologies based on a control period to calculate Adjusted Market Losses that account for the fact that market participants may choose to cross the spread to trade at a worse price or that the best prices

in the market may move even absent the pressure of Spoof Orders in the market.[45]

30. My But-For Price Methodology determines market loss by comparing the observed cost of trading while the Defendants' Spoof Orders were active to the observed "but-for" cost of trading during a control period of equal length immediately before the Spoof Orders were placed. Under my Spread-Crossing Methodology, the market loss was determined by comparing the rate at which market participants on the same side as the Defendants' Spoof Orders crossed the prevailing bid-offer spread while the Spoof Orders were active to the rate at which market participants crossed the prevailing bid-offer spread in a control period immediately before the Spoof Orders were placed. For the purpose of this analysis, I identify trades that crossed the spread based on the prevailing bid-offer quote before the Spoof Orders to account for instances when the best bid-offer quote moves during the Spoofing Sequences.

31. As I explained in my Declaration, my Spread-Crossing Methodology presents a conservative estimate of the impact of the spoofing pressure on the trading activities of other market participants.[46] This approach accounts for the Spoof Order's impact on other traders' decision to place aggressively priced orders, in comparison to the prevailing bid-offer spread immediately before the placement of the Spoof Orders ("spread crossing"). Benchmarking to the prices before the Spoof Orders are placed is appropriate since it captures traders' willingness to accept worse prices due to the Spoof Orders. However, this approach does not fully capture the extent by which the price received by other traders is inferior during the Spoofing Sequence, relative to the control period, due to the price impact of Spoof Orders. For example, large Spoof Orders on the buy side could increase the rate at which other traders place aggressively priced orders to buy, in comparison to the prevailing bid-offer spread immediately before the placement of the Spoof Orders. In addition, the Spoof Order's price impact could move the price higher, thus causing other traders to buy at higher (i.e., inferior) prices during the Spoofing Sequence. My Spread-Crossing Methodology accounts for the Spoof Orders' impact on the increase in spread-crossing during the Spoofing Sequence relative to the control period, but not the loss effects

---

[45] Venkataraman Declaration, ¶¶29, 30, 38.

[46] Venkataraman Declaration, ¶46.

of the fills obtained at higher prices during the Spoofing Sequence relative to the control period. My But-For Price Methodology accounts for both of the effects. [47] Nonetheless, I demonstrated that the two methodologies, while presenting different approaches on how to calculate market harm, offer similar inferences and yield loss estimates that were large and substantive.

32.    Dr. Attari asserts that since the two Market Loss Methodologies yield loss estimates of different magnitudes, "the two methods do not reinforce each other and as result, they demonstrate the unreliability of Dr. Venkataraman's conclusions." [48] Dr. Attari ignores the conservative framework of my Spread-Crossing Methodology described in my Declaration, and reiterated above, that can easily explain the smaller Adjusted Market Loss estimate for the Spread-Crossing Methodology.

33.    Additionally, Dr. Attari argues that, while calculating market harm, my Market Loss Methodologies do not consider the potential harm to the Defendants from their own actions. Dr. Attari also argues that my Market Loss Methodologies do not consider that "the same trader will be both harmed and a beneficiary in the same sequence or across multiple sequences." [49] However, the scope of my assignment is to assess market harm suffered by *other* market participants that is attributable to Defendants' Spoof Orders. For this reason, my analysis does not consider the harm to the Defendants, nor whether the other victims were able to mitigate or remediate the harm, either within or outside the Spoofing Sequences, via their future offsetting transactions. [50]

### i.    *Defendants' Experts claim I assume causation*

34.    Furthermore, the Defendants' Declarations contain criticisms of my market loss methodological framework that indicate to me they misunderstand the analysis that I

---

[47] *See* Venkataraman Declaration, FN 10, ¶46.

[48] Attari Declaration, ¶74.

[49] Attari Declaration, ¶85.

[50] Stated differently, for a buy side spoof, I calculate the market harm suffered by other participants ("victims") who bought the contracts during the Spoofing Sequences. However, I do not study whether the victims subsequently sold the contracts (partially or fully) that they bought during the Spoofing Sequence, either within or outside the Spoofing Sequences, and whether the victims were able to mitigate or remediate the harm.

performed. For example, Mr. Cusimano claims that my Market Loss Methodologies just "assumed that the alleged spoof orders caused other market participants to cross the bid-offer spread to trade or trade at worse prices" and do not "provide a basis from which one could reasonably infer causation."[51] However, my Market Loss Methodologies directly address this criticism as explained below in my Declaration regarding my But-For Price Methodology:

> *For each Spoofing Sequence, the methodology identifies a matched control period of trading and estimates a But-For cost of trading for market participants on the Spoof Order side for trades observed in the control period. The But-For cost of trading in the matched control period is deducted from the Unadjusted Market Loss I calculated above for the Spoofing Sequences. The remaining amount is the "Adjusted Market Loss" and represents the abnormal cost of trading that is attributable to the Defendants' Spoof Orders.[52]*

Similarly, as explained below in my Declaration regarding my Spread-Crossing Methodology:

> *I make an adjustment for the spread-crossing trades that would have occurred anyway by comparing the rates of spread-crossing during the Spoofing Sequence and during a similar-duration control period. This approach provides another metric by which I can adjust the Unadjusted Market Loss to remove the trading costs that market participants would have likely incurred absent the Spoof Orders.[53]*

35. To summarize, the matched control periods, which are of similar duration as the Spoofing Sequences and occur immediately prior to the placement of the Spoofing Sequences, are a reasonable benchmark of the expected trading outcomes that would have occurred absent the Spoof Orders. By using this benchmark analysis, my Market Loss Methodologies directly address Dr. Attari and Mr. Cusimano's criticism by estimating the abnormal

---

[51] Cusimano Declaration, ¶9b. *See also* Attari Declaration, ¶48 ("However, he has failed to conduct the required analysis to show that this causal connection exists.") and ¶58 ("Without any basis, he assumes that his Control Periods control for all the 'idiosyncratic market conditions' just because Control Periods immediately precede the placement of Spoof Orders.").

[52] Venkataraman Declaration, ¶31.

[53] Venkataraman Declaration, ¶39.

activity that can be attributable to the Defendants' Spoof Orders. Thus, the Defendants' Experts' speculation that there may be "alternative explanations" is baseless and unconvincing.

<ol start="ii">
<li style="list-style-type: none;"><em>Defendants' Experts argue my Control Periods are flawed</em></li>
</ol>

36.     Defendants' Experts both take issue with the Control Periods I used for calculating the But-For Cost of trading and rate of spread-crossing in my But-For Price Methodology and Spread-Crossing Methodology, respectively, asserting that because trading activity in markets fluctuates, the Control Period is not an appropriate predictor of trading during the Spoofing Sequences.[54] However, it is a standard and well-established approach to compare trading patterns before and after an event to measure the impact of an event (i.e., an event study).[55] By Mr. Cusimano and Dr. Attari's logic, event studies are unreliable ways to measure the relationship between events and asset price changes because of the inherent variation in trading behavior—an assertion that would defy decades of academic research and literature.

37.     In my Market Loss Methodologies, the Control Periods were set to a period immediately before and of equal length as the Spoofing Sequence, based on proximity in time to the Spoofing Sequences.[56] The main advantage of my approach is that time proximity helps account for the impact of idiosyncratic market conditions that vary over time. This is a reasonable, but not a perfect, assumption. Over a long sample period, with 132,265 Spoofing Sequences, it is natural that market conditions can sometimes change sharply

---

[54] Attari Declaration, ¶¶50-58; Cusimano Declaration, ¶43d.

[55] Event studies are a widely used tool in finance research to examine the impact of different events. As Lipson (2003) notes, "Event studies are probably the most commonly used tool of financial research". The application of this methodology encompasses examinations of corporate events, regulatory policies, information arrival, financial crises, and the recent covid pandemic. Measures of trading activity have been examined using event studies, for example in Barclay, Christie, Harris, Kandel and Schultz (1999), Bessembinder (2003), Ronen and Weaver (1998) and Eaton, Irvine and Liu (2021).

[56] Regarding my Spread-Crossing Methodology, Mr. Cusimano further criticizes the fact that when the Control Period overlaps with a previous Spoofing Sequence, I adjust the duration of the Control Period to remove any overlap with a previous Spoofing Sequence. He argues it is inappropriate to compare a Control Period of shorter duration with the longer duration of the Spoofing Sequence. However, Mr. Cusimano ignores the fact that I calculate the spread-crossing as a rate per second, and this measure properly accounts for some Spoofing Sequences where the duration of the Control Period is shorter than the Spoofing Sequence. Cusimano Declaration, ¶43a.

during a Control Period, leading to large But-For Costs, sometimes positive and sometimes negative.[57] In the case of such control periods, the But-For Cost can be markedly greater in magnitude than Unadjusted Market Loss for these Spoofing Sequences. As will be discussed below, the existence of some outlier outcomes when studying a large sample of sequences is to be expected and does not indicate that my Control Periods are mis-specified.

38.     Dr. Attari's criticisms in this regard focus on examples of these specific outliers to cast doubt on my use of Control Periods in my Market Loss Methodologies. However, as demonstrated below in **Table 1**, my Market Loss Methodology yields reasonable estimates across the distribution levels of the loss measures. Further, as demonstrated below in **Table 2**, Adjusted Market Losses are still significant once I account for the impact of outliers using a variety of approaches, and within the range of estimates that I reported earlier in my Declaration.

>                 *iii.     Defendants' Experts argue my measure of But-For Price is unreasonable*

39.     In the April 2023 Sentencing Memorandum on Behalf of Michael Nowak ("Nowak Sentencing Memo"),[58] Defendants criticize my market loss methodological framework, specifically the But-For Price I use in my analysis, using the following example from the real estate market:

> *In the real world, if homeowners choose to list their house for $300,000 (matching the best-priced listing in the neighborhood), they might, or might not, find a willing buyer at that price. But in Prof. Venkataraman's world, $300,000 is a done deal. In his world, to sell for anything less would be a "loss," because, according to the professor, the homeowners "would have been able to" sell for $300,000. This straightforward error contributes significantly to Mike's loss amount.[…] Prof. Venkataraman "adjusted" his unadjusted loss figure in two different ways,[…] the foundation for the loss calculation the government would like the Court to adopt – are so flawed that they are incapable of fulfilling their claimed function of*

---

[57] Dr. Attari notes, for example, that "[t]he change in market activity during the Spoofing Periods may very well be in response to the market activity during the Control Periods." Attari Declaration, ¶54.

[58] Sentencing Memorandum on Behalf of Michael Nowak, April 10, 2023 (hereafter "Nowak Sentencing Memo").

40. Setting aside the inherent flaws associated with Defendants' comparison to real estate markets,[60] suppose Homeowner A chooses to list his house in April 2022 for $300,000 (matching the best-priced listing in the neighborhood, analogous to an offer price in the futures markets). Next, suppose a Spoofing Trader floods the market with false advertisements of similar listings in this neighborhood (analogous to a sell side spoof in our context). Homeowner A lowers his reservation price in this new competitive landscape and suppose Homeowner A sells the house for $270,000. Under my Market Loss Methodologies, the But-For Price for Homeowner A is his reservation price before the Spoof (i.e., $300,000) and the Unadjusted Market Loss is $30,000. I next account for the possibility that Homeowner A may have been willing to sell the house at a lower price even in the absence of the Spoof Orders. Following the framework for selecting the Control Period in my Market Loss Methodologies, I select a Control Period here that is of similar-length (i.e., one-month) that is immediately prior to the Spoof Episode (e.g., March 2022). Suppose the best-priced listing in the same neighborhood in March 2022 was $301,000, and the average price at which homes were sold in March 2022 was $290,000. Under my But-For Price Methodology, the But-For Price during the Control Period is $301,000 and the But-For Cost of Trading during the Control Period is $11,000. I then deduct the But-For Cost of Trading (i.e., $11,000) from the Unadjusted Market Loss (i.e., $30,000), which yields $19,000 as the Adjusted Market Loss that is attributable to the Spoof Orders. In other words, the control period represents a reasonable benchmark of the trading outcomes that would have occurred absent the Spoof Orders.

41. Additionally, the Defendants' Experts have criticized my choice of But-For Price for calculating losses during the Spoofing Sequence. Mr. Cusimano argues in the case of a sell-side Spoofing Sequence the But-For Price should be the prevailing best bid price (i.e.,

---

[59] *See* Nowak Sentencing Memo, p. 45.

[60] As an initial matter, I note here that there are several key differences between residential real estate markets and the precious metals futures market that render Defendants comparisons between the two, and the inferences they draw from them, to be flawed and unreliable. One such difference is the important role negotiation between buyers and sellers plays in determining prices in real estate transactions, whereas market participants have the ability to immediately execute a trade at the best quotations in the precious metals futures market.

the best price on the opposite side of the market as the Spoof Orders),[61] while Dr. Attari argues the But-For Price should be the midpoint of the best bid price and best ask price.[62] Rather, I use the prevailing best ask price (i.e., the best price on the same side of the market as the Spoof Orders) as my choice of the But-For Price. My choice is reasonable because it is based on explicit signals from sellers (i.e., the victims in the case of a sell-side Spoofing Sequence) in the market before the Spoof, as I explain below.

42.     To illustrate the differences in my approach versus the Defendants' Experts, consider **Figure 16** (Nowak Episode 78) shown below,[63] an episode with a group of five-lot Spoof Orders placed by Mr. Nowak on the sell side. Participants from the sell side of the market who transact during the Episode at prices lower than the prevailing best ask price before the spoof are harmed in this example. Immediately before the Spoof Orders are placed, the prevailing best bid price is \$1,405.00 and the prevailing best ask price is \$1,405.20. Under my Market Loss Methodologies, in the case of a sell-side Spoofing Sequence, the But-For Price is the prevailing best ask price before the Spoof Orders (i.e., \$1,405.20). The Defendants' Experts argue that my choice overestimates the market loss. In the Cusimano Declaration, the But-For Price that is used for calculating the alternate market losses is the prevailing best bid price before the Spoof Orders (i.e., \$1,405.00).[64] Dr. Attari apparently disagrees with Mr. Cusimano, as he argues that the But-For Price should be the midpoint of the best bid price and best ask price (i.e., \$1,405.10).[65]

---

[61] Cusimano Declaration, ¶59.

[62] Attari Declaration, ¶78.

[63] *See* GX 451.

[64] Cusimano Declaration, ¶59.

[65] Attari Declaration, ¶78.

## Figure 16



MNOWAK May 31, 2013 − 14.297 secs − Gold                #78

43. To illustrate why my But-For Price is reasonable in comparison to the Defendants' Experts But-For Price, let us consider the reservation prices of the sellers (i.e., the price at which they are willing to sell) who transact during a Spoofing Sequence. The first type of sellers are those posting resting sell limit orders before the Spoof Orders. These sellers explicitly signal their reservation prices via the limit price on their resting sell limit orders. The lowest reservation price among the first seller type is the prevailing best ask price (i.e., $1,405.20). Thus, my approach of using the prevailing best ask price before the Spoof Orders for calculating the harm for all first type sellers, including those posting resting sell orders at higher limit prices than the prevailing best ask price, is largely conservative, as my approach uses the lowest reservation price among first type sellers in the market before the Spoof Orders.

44. The second type of sellers are those who are persuaded by the distortions created by the

spoof to urgently sell during the Spoofing Sequence. It is difficult to know the reservation price for the second type before the Spoof Orders. We know that the second seller type will not sell as low as the highest bid (i.e., $1,405.00) because they did not sell at the bid price, which they could have hit, before the Spoof Orders. It is also likely that the second seller type will not sell as low as the midpoint of the prevailing best quotes (i.e., $1,405.10) before the Spoof Orders because they did not choose to jump the quote by posting a resting sell limit order at the midpoint price. Thus, the prevailing best ask price (i.e., $1,405.20) before the Spoof Orders is a reasonable estimate of the reservation price of this second type of seller, because it represents the lowest price at which sellers in the market were willing to sell before the Spoof Orders.

45.     There are multiple effects at play when a spoofer disrupts the normal functioning of the market. By distorting the supply-demand relationship, the spoofer makes it more likely for traders to change their behavior, and in this example, for the sellers to become more aggressive by dropping their offer prices and the buyers to become more conservative by not being willing to pay a higher price. These effects move bid-ask quotes lower, widen the bid-ask spreads, and increase the propensity of sellers to cross the spread and accept lower prices. To capture the sum of these effects, the But-For Price as the prevailing best ask price (i.e., $1,405.20) before the spoof is a reasonable choice for calculating the market harm for a sell-side Spoof Sequence.

46.     This example illustrates that Mr. Cusimano's choice of using the highest bid price as the But-For Price ($1,405.00) for a sell-side Spoof Sequence is unreasonable (i.e., inconsistent with explicit signals from sellers before the Spoof Orders), and for this reason, the alternate market losses that he reports in the Cusimano Declaration underestimates market harm. Using the midpoint of the prevailing quotes before the spoof (i.e., $1,405.10) for all sellers, as argued in the Attari Declaration, will also underestimate market harm since both types of sellers signal a reservation price that is higher than the midpoint price before the spoof. On the other hand, my choice of the But-For price as the prevailing best ask price for a sell-side Spoofing Sequence is reasonable for the reasons explained above.

47.     Importantly, my Market Loss Methodologies apply the same choice of But-For Price for the Spoofing Sequence and Control Period. The Control Period adjustment for a sell-side

Spoofing Sequence uses the prevailing best ask price before the Control Period as the But-For Price for calculating But-For Cost during the Control Period. Even if the But-For Price would be subject to some criticism if the Spoofing Sequences were considered in isolation, the methodology needs to be considered as a whole, where the Control Period adjustment accounts for the same effects in a period not affected by the spoof. The Defendants' Experts' focus on criticizing individual parts of my Market Loss Methodologies, while ignoring the overall conceptual framework, is prone to significant misstatements.

48.     Further, it is simply unreasonable to claim that my Market Loss Methodologies are inconsistent with some of my published work when the underlying objectives are not the same. Dr. Attari claims that my choice of the But-For Price is not consistent with some of my published work where I use the bid-ask quote midpoint as a benchmark price to estimate trading costs.[66] Stated simply, trading costs reflect the price concessions that are necessary to complete transactions quickly. Dr. Attari fails to recognize that the framework for estimating market harm suffered by other market participants as a result of the Defendants' spoofing activity differs from the framework for estimating trading costs.

49.     To summarize, for a trader interested in selling prior to a sell-side Spoof Sequence, the prevailing best ask price before the placement of the Spoof Orders, which reflects the lowest sale price among selling interest expressed in the visible order book before the spoof, is a reasonable choice of the But-For Trade Price, absent the spoof. Along similar lines, for a trader interested in buying prior to a buy-side Spoofing Sequence, the prevailing best bid price before the placement of the Spoof Orders, which reflects the highest purchase price among buying interest expressed in the visible order book before the spoof, is a reasonable estimate of the But-For Trade Price, absent the spoof.

   iv. *Defendant Nowak's Expert argues the loss calculations should not include the full duration of the Spoofing Sequences*

50.     Mr. Cusimano also states that while I calculate market harm for any fills that are executed opposite a Spoof Order during the full duration of the Spoof Order, I did not "undertake any analysis […] to assess the actual impact of the alleged spoof orders, nor [do I] attempt

---

[66] Attari Declaration, ¶83.

to assess the duration of any assumed impact."[67] Mr. Cusimano appears to again be overlooking the nature of my But-For Cost of trading adjustment. My Market Loss Methodologies directly address Mr. Cusimano's concern by comparing the activity during the Spoofing Sequence to the activity in a Control Period of equal duration immediately beforehand. If there was indeed no impact of Spoof Orders during Spoofing Sequences, my methodology would have found no Adjusted Market Loss attributable to the Spoof Orders. Thus, the significant amount of market loss that I calculate using my Market Loss Methodologies demonstrate the unreliability of Mr. Cusimano's claims.

> v. *Defendants' Experts argue my Spread-Crossing Methodology doesn't analyze spread-crossing*

51.  The Defendants' Experts have criticized my methodology for identifying spread-crossing trades during the Spoofing Sequence that is part of my Spread-Crossing Methodology described in my Declaration. In my Spread-Crossing Methodology, I identify spread-crossing trades during a Spoofing Sequence by comparing the transaction price to the best quotes prevailing *before the Spoofing Sequence*. Both Defendants' Experts argue that spread-crossing trades should be identified based on the best quotes prevailing *at the time of a trade* during the Spoofing Sequence.[68] The Defendants' Experts have misunderstood the framework that guides my "rate of spread-crossing" measure because they ignore the impact of the Spoof Orders on the bid ask quotes during a Spoofing Sequence. Stated differently, if the bid ask quotes during a Spoofing Sequence do not change, then the Defense Experts definition of "spread-crossing" will align with my definition. However, if the bid ask quotes during a Spoofing Sequence change (i.e., if Spoof Orders move bid ask quotes away from the Spoof Orders, consistent with an expected price impact), then the Defense Experts definition of "spread-crossing" differs from my definition. Specifically, my Spread-Crossing Methodology accounts for the price impact of Spoof Orders on bid ask quotes. The Defendants' Experts "spread crossing" measure ignores the price impact of Spoof Orders on the bid ask quotes thereby underestimating the impact of Spoof Orders

---

[67] *See* Cusimano Declaration, ¶51.

[68] Attari Declaration, ¶103; *See also* Cusimano Declaration, ¶¶37-39.

on the rate of "spread-crossing" (and thereby market harm).

52. To illustrate the differences in my approach versus the Defense Experts, consider the same Nowak Episode 78 discussed above and shown in **Figure 16**, where, immediately before the Spoof Orders are placed, the prevailing best bid price is $1,405.00 and the prevailing best ask price is $1,405.20. Under my Market Loss Methodologies, in the case of a sell-side Spoofing Sequence, the But-For Price is the prevailing best ask price before the Spoof Orders (i.e., $1,405.20). Next, in response to the 125 Spoof contracts on the sell side, both the prevailing best bid price and the best offer price declines to $1,404.50 on the bid side and $1,404.70 on the offer side shortly after the placement of the Spoof Orders. Under my Spread-Crossing Methodology, any transaction that occurs during the Spoofing Sequence and fills at a less favorable price than the But-For price (i.e., $1,405.20) will be identified as "spread-crossing" trade. For example, if a trade is reported at $1,404.70 when the inside quote is $1,404.50 on the bid side and $1,404.70 on the offer side, then the trade will be identified as "crossing-the-spread" in my analysis.

53. However, both Dr. Attari and Mr. Cusimano criticize my measure of spread-crossing and suggest that spread-crossing should be based on bid-ask quotes *at the time of the trade*.[69] Under their approach, using the same example if a trade is reported during a Spoofing Sequence at $1,404.70 when the inside quote is $1,404.50 on the bid side and $1,404.70 on the offer side, the trade will not count as crossing-the-spread since the seller did not "cross the spread" at the time of the trade. The obvious flaw in their approach is that, while measuring the rate of spread crossing during the Spoofing Sequence, their methodology does not account for the impact of the Spoof Orders on the bid-ask quote. The flaw in their approach can be seen in **Figure 16** above where the bid ask quotes respond to the placement of the sell-side Spoof Orders by moving lower during the Spoofing Sequence.

54. Based on this flawed measure of spread-crossing, Dr. Attari presents many statistics in Section VI.F of his report which is titled "Dr. Venkataraman's Rate of Spread-Crossing Adjustment Is Not Reliable."[70] Similarly, Mr. Cusimano ignores the impact of Spoof Orders on bid-ask quotes during the Spoofing Sequence. This flaw also permeates through

---

[69] Attari Declaration, ¶103; Cusimano Declaration, ¶¶37-39.

[70] Attari Declaration, ¶¶99-103.

the alternate market loss reported in the Cusimano Declaration, which I will discuss in more detail below in Part D.[71]

      *vi.*     *Defendants' Experts focus on outlier Spoofing Sequences and falsely conclude my results are unstable.*

55.    Dr. Attari focuses on the five Spoofing Sequences with the largest harm and the five Spoofing Sequences with the largest benefit along with a handful of other outlier Spoofing Sequences. Based on patterns he identifies in less than 20 Spoofing Sequences of a total of 132,265 Spoofing Sequences, Dr. Attari declares my analysis unstable. However, as I will demonstrate below, the distribution of loss estimates (both Unadjusted Market Loss during the Spoofing Sequence and But-For Costs during the Control Period), are reasonable, and my Methodologies capture the market harm attributable to Defendants' spoofing activity. I then show that Dr. Attari's conclusion that "the vast majority of the harm (or benefit) that Dr. Venkataraman attributes to the Spoof Orders is based on the Control Period" is flawed.[72] Finally, I demonstrate that market losses are still significant even after I account for the impact of outliers using a variety of approaches.

      *a.*   <u>*Distribution of the components of the market losses is reasonable.*</u>

56.    The focus on examples of outliers in the Attari Declaration distracts from the broader comparisons that my analysis is based on. Across the 132,265 Spoofing Sequences, the average of the Unadjusted Market Loss measure during the Spoofing Sequences is $904 while the average of the But-For Cost measure during the Control Periods is $188. Thus, on average, Unadjusted Market Loss exceeds the But-For Cost, implying that other market participants suffered harm as a result of the Defendants' spoofing activity. My conclusions are similar based on the median costs across the Spoofing Sequences. The median represents the middle of the distribution (the 50th percentile); that is, if we rank all sequences by a particular variable, the median shows the value of the sequence right in the middle of the distribution. This value is unaffected by any extreme outliers. The results show that, across the 132,265 Spoofing Sequences, the median of the Unadjusted Market

---

[71] Cusimano Declaration, ¶68.

[72] Attari Declaration, ¶66.

Loss measure is $130, while the median of the But-For Cost measure is $10. This comparison again demonstrates that Spoofing Sequences are associated with unusual activity that contributes to market harm for traders.

57.    **Table 1** below reports the distribution of the components of loss analysis under my But-For Price Methodology. This table demonstrates that my But-For Price Methodology yields reasonable estimates across all the reported distribution levels (i.e., 1st, 5th, 25th, 50th, 75th, 95th, and 99th) of the loss measures. Note that the negative values in the left tail of the distribution are not surprising. We would expect that sometimes the Defendants would be successful in moving the market through their spoofs and in other times they would not be successful. The Adjusted Market Loss Methodology is reasonable because it includes sequences when the market moved in the expected direction but also sequences when the market moves in the opposite direction. Further, across the 132,265 Spoofing Sequences, the Unadjusted Market Loss equals or exceeds the But-For Costs in over 75 percent of the Spoofing Sequences, which is consistent with the distribution shown below.[73]

**Table 1**

**Market Loss Distribution**

| | Average | Percentile | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1% | 5% | 25% | 50% (Median) | 75% | 95% | 99% |
| Unadjusted Market Loss | 904 | -490 | 0 | 20 | 130 | 480 | 3,275 | 13,610 |
| But-For Cost of Trading Matched Control | 188 | -2,825 | -200 | 0 | 10 | 130 | 1,270 | 5,970 |
| Adjusted Market Loss (But-For Price Methodology) | 717 | -3,880 | -675 | 0 | 70 | 363 | 3,110 | 14,944 |
| Adjusted Market Loss (Spread-Crossing Methodology) | 420 | -228 | 0 | 9 | 60 | 223 | 1,521 | 6,320 |

58.    Contrary to assertions contained in the Defendants' Declarations, the distribution of market loss in **Table 1** shows that my methodology yields reasonable estimates for Unadjusted

---

[73] This statistic in itself highlights the extent to which Attari mischaracterizes the reasonableness of the market loss distribution when he claims: *"Dr. Venkataraman's Methodology results in a very small number of Spoofing Sequences (5%) accounting for more than 100% of the harm (because the remaining 95% of Sequences result in a net gain, or positive impact, to Mr. Smith's alleged victims)." See* Attari Declaration, ¶15.

Market Loss and But-For Costs. Further, a comparison of the two distributions shows that changes in market losses (i.e., during the Spoofing Sequence versus the Control Period) are consistent with harmful impact of Spoof Orders in most sequences.

### b. *Dr. Attari's claim that the overall findings are driven by the magnitude of the But-For Costs is incorrect*

59.     Dr. Attari claims that, "the vast majority of the harm (or benefit) that Dr. Venkataraman attributes to the Spoof Orders is based on the Control Period."[74] In the Attari Declaration, Dr. Attari highlights a small number of outlier sequences to claim that the overall findings are driven by the magnitude of the But-For Costs calculated during the Control Periods. These claims are incorrect.

60.     Regarding these claims, I have noted that, under my But-For Price Methodology, in the aggregate, the total Unadjusted Market Loss is $119.6 million, the total But-For Costs are $24.8 million, and the Adjusted Market Loss is $94.8 million (i.e., $119.6 million - $24.8 million). This implies that, in the aggregate, the Control Periods effectively and appropriately *reduce the market loss* that is attributable to the Defendants' spoofing activity. If the overall findings in my Declaration are driven by the magnitude of the But-For Cost during the Control Period, as claimed in the Attari Declaration, the pattern would be the opposite; that is, in the aggregate, the Adjusted Market Loss of $94.8 million will be largely driven by a large, *negative* value of the But-For Costs (i.e., not the *positive* $24.8 million that I estimate), which is not the case in my analysis.

61.     Recall that a positive But-For Cost reduces the Adjusted Market Loss while a negative But-For Cost increases the Adjusted Market Loss. Contrary to the narrative contained in Defendants' Declarations, the But-For Cost is less than zero in only approximately 12% of the sequences (15,747 out of 132,265) (i.e., these are the Spoofing Sequences where the But-For Cost increases the Adjusted Market Loss). To further demonstrate the mischaracterization in the Attari Declaration, I set the But-For Cost to zero when But-For Cost for a Spoofing Sequence is less than zero. That is, in this calculation, if the But-For Costs adjustment increases the market loss, I set the But-For Costs for the sequence to zero,

---

[74] Attari Declaration, ¶66.

but if the But-For Costs adjustment reduces the market loss, I make no change to But-For Costs. I find that the Adjusted Market Loss using this calculation is $66 million. These analyses demonstrate that Spoofing Sequences cause substantial losses for traders in the markets under my But-For Price Methodology, even after the most generous adjustments for But-For Cost.

### c. *The Adjusted Market Losses I calculated are stable*

62.     As I described above and in detail in my Declaration, my But-For Price Methodology uses Control Periods to adjust the Unadjusted Market Losses to account for the But-For Costs of trading. Defense Experts focus on select Spoofing Sequences with outlier results to suggest that my calculations of Adjusted Market Losses are unstable. For example, Section VI.B of the Attari Declaration is titled: "Dr. Venkataraman's Adjusted But-For Methodology Produces Unreasonable and Unstable Results which Indicate that It Is Unreliable."[75] I have shown the overall reasonableness of the methodology based on the distribution of the market losses in **Table 1** above. Below I address Dr. Attari's criticisms about the stability of my estimates.

63.     A common way to assess the stability of an analysis such as mine is to see if the inferences of an analysis change as outliers are accounted for. That is, unlike the suggestion in the Attari Declaration, which seems to argue that outliers should not exist, economic analyses examine the effect of outliers by the practices of either "winsorizing" or "trimming" the data to remove the effect of outliers. Note, it is not uncommon nor unexpected that statistical analyses can, and often, generate outlier results, and by no means do the existence of outliers necessarily undermine the reliability of the results of the analysis. In fact, in my Declaration, as one way to account for such results, I limit the market loss calculation for both my Market Loss Methodologies to trades that occurred in the first 5, 10, and 30 seconds of the placement of the first Spoof Order.[76] This analysis from my Declaration shows results that are consistent with the additional approaches I report in this declaration that specifically account for the outliers that were the focus of Defendants' Experts.

---

[75] Attari Declaration, ¶¶62-74. Dr. Attari also references stability in ¶¶12, 15, and 105 of the Attari Declaration.

[76] Venkataraman Declaration, ¶¶28, 36, 45, 48.

64.    Winsorizing the data involves replacing the extreme observations by the winsorized level. For example, data winsorized at the 1st and 99th percentile would replace all values lower than the 1st percentile with the 1st percentile value and all values higher than the 99th percentile with the 99th percentile value. In this analysis of outliers, each variable is winsorized separately. For example, under my But-For Price Methodology, the 1st percentile value of But-For Costs is -$2,825; thus, I apply But-For Costs of -$2,825 to all Spoofing Sequences with But-For Costs lower than -$2,825. And equivalently, the 99th percentile value for But-For Costs is $5,970; thus, I apply But-For Costs of $5,970 to all Spoofing Sequences with But-For Costs higher than $5,970. As shown in **Table 2**[77] below, applying a 1% and 99% winsorization, the Unadjusted and Adjusted Market losses decline, but notably, the But-For Costs are largely unchanged. **Table 2** also includes the results after applying a 2.5% and 97.5% winsorization.

65.    Trimming is an approach which drops entirely the extreme outlier values from the analysis; that is, a 1st and 99th percentile trimming process would only keep Spoofing Sequences within those bounds of the distribution for the loss calculations. Given the claim in the Attari Declaration that outliers in the magnitude of the But-For Costs calculated during the Control Periods drive the overall findings of my Declaration, I trim the data based on the distribution of But-For Costs.[78] For example, when applying a 1% and 99% trimming, I drop all Spoofing Sequences with But-For Costs lower than the 1st percentile value for But-For Costs of -$2,825 and higher than the 99th percentile value for But-For Costs of $5,970.

---

[77] Note that, since each variable is winsorized separately, Unadjusted Market Loss – But-For Cost of Trading Matched Control will not equal Adjusted Market Loss (Updated But-For Price Methodology) for the winsorization approach in **Table 2**.

[78] For my Spread-Crossing Methodology, I trim based on Unadjusted Market Losses.

**Table 2**

**Market Loss Outlier Analysis**

| | Venkatarman Declaration | Winsorize | | Trim | |
|---|---|---|---|---|---|
| | | **1% and 99%** | **2.5% and 97.5%** | **1% and 99%** | **2.5% and 97.5%** |
| Unadjusted Market Loss | $119,609,715 | $92,536,230 | $78,262,525 | $91,659,925 | $76,302,725 |
| But-For Cost of Trading Matched Control | $24,834,770 | $25,775,724 | $23,011,420 | $21,618,297 | $16,864,860 |
| Adjusted Market Loss (But-For Price Methodology) | $94,774,945 | $70,367,397 | $57,568,300 | $70,041,628 | $59,437,865 |
| Adjusted Market Loss (Spread-Crossing Methodology) | $55,544,600 | $42,972,161 | $36,343,709 | $34,917,622 | $26,686,955 |

66.     **Table 2** demonstrates that Adjusted Market Losses are still economically large when I control for the influence of the "outlier" Spoofing Sequences applying both a winsorization and a trimming approach to the distribution of both my But-For Price and Spread-Crossing Methodology. In fact, the range of Adjusted Market Losses shown in **Table 2** are still substantially within the range of the Adjusted Market Losses I reported in my Declaration of between $37 million, when I limited the calculation to the trades that occurred within 5 seconds of the placement of the first Spoof Order, and $95 million, which included all trades during the Spoofing Sequence.[79] Thus, I disagree with Dr. Attari's claim that my "[m]ethodology [p]roduces [u]nreasonable and [u]nstable [r]esults which [i]ndicate that [i]t [i]s [u]nreliable."[80]

### C.     Updated Market Loss Calculations in Response to Defendants Declarations

*i.     Five Categories of Spoofing Sequences that I exclude from updated market loss calculations*

67.     In Exhibit 2 of the Attari Declaration, Dr. Attari proceeds to exclude the vast majority of the Spoofing Sequences for a variety of reasons.[81] Above, I reviewed several categories of Spoofing Sequences that the Defense Experts argued should be excluded. For many categories, I provided specific examples and explain why I do not make any adjustments

---

[79] Venkataraman Declaration, ¶36.

[80] Attari Declaration, ¶¶62-74.

[81] Attari Declaration, Exhibit 2.

to the Spoofing Sequences. To summarize, based on my review, the vast majority of the Spoofing Sequences that Dr. Attari excluded exhibited patterns that are consistent with the evidence of the Defendants' spoofing that was presented at trial.

68.    However, based on my review of the Defendants' Declarations, it is my opinion that there are a handful of criticisms regarding my selection of Spoofing Sequences that I believe are worth discussion. Therefore, I have performed updated calculations of Adjusted Market Loss for both my Market Loss Methodologies ("Updated But-For Price Methodology" and "Updated Spread-Crossing Methodology," and collectively "Updated Market Loss Methodologies") that take these criticisms of my Spoofing Sequence selection criteria into account. Below, I describe five categories of Spoofing Sequences that I exclude from these Updated Market Loss Methodologies in response to these particular criticisms raised in the Defendants' Declarations. It should be noted that the underlying methodologies used in the calculation of these market losses remain unchanged from my Declaration; I simply exclude certain sequences from the calculation.

69.    Dr. Attari argued for the exclusion of Spoofing Sequences where the Opposite Side Order was resting more than 20 price levels away from the Spoof Orders.[82] To account for this, I exclude Spoofing Sequences when the order resting opposite the Spoof Orders is outside the top ten levels of the visible order book during the time that the Spoof Orders were active in the visible order book.[83] Dr. Attari identified 4,204 sequences that he thought should be excluded based on the requirement that the Opposite Order was within 20 ticks of the best-priced Spoof Order.[84] However, based on my criteria described above, I identify 7,949 such Sequences, which represent 6 percent of total Spoofing Sequences, (7,257 for Defendant Smith and 104 for Defendant Nowak), which I excluded from my Updated Market Loss

---

[82] Attari Declaration, ¶¶46e, 70. *See also* Cusimano Declaration, ¶¶28c, 32-33.

[83] My market loss analysis requires Spoof Orders to be placed within the top ten levels of the order book and only calculates losses for the time that the Spoofing Sequence remains active in the top ten levels of the order book. I describe in FN 21 of my Declaration how I determined if Spoof Orders were active in the visible order book. To determine if the order resting opposite the Spoof Orders was outside the top ten levels of the order book, I determined the lowest 10th best bid price and the highest 10th best ask price in the market during the time the Spoof Orders were active in the visible order book. If the price of the order resting opposite the Spoof Orders did not fall within this range of prices, then I excluded that sequence. If multiple orders were opposite the Spoof Orders, as long as one of the Opposite Orders was visible in the order book while the Spoof Orders were active in the visible order book, then the sequence was kept.

[84] Attari Declaration, ¶70 at p. 42.

Methodologies.

70.     Dr. Attari identified one example where a trade executed at a price 240 ticks below the best bid, which Dr. Attari indicates as meaning "this trade was not made against orders in the limit order book."[85] As Dr. Attari mentions, the observation associated with this trade in the RAPID data had a non-standard value[86] for the field "Spread Code."[87] Therefore, as part of my Updated Market Loss Methodologies, I identified a total of 60 Spoofing Sequences, 0.05 percent of total Spoofing Sequences, (46 for Defendant Smith and 8 for Defendant Nowak), which also included a trade associated with a non-standard value for the field "Spread Code." In some instances, the trades associated with these non-standard trades resulted in a loss and others resulted in a gain. Additionally, some of these trades were several ticks away from the best prices in the visible order book while others were at prices within the visible order book. However, to be conservative, I have excluded all of these 60 Spoofing Sequences in my Updated Market Loss Methodologies, and not just the losses associated with these non-standard trades.

71.     Dr. Attari identified one example where John Pacilio, a convicted precious metals futures spoofer, was trading on the same side as Mr. Smith during the Spoofing Sequence.[88] Dr. Attari then asserts: "Dr. Venkataraman chose not to remove episodes where other convicted spoofers were also in the market."[89] Therefore, as part of my Updated Market Loss Methodologies, I identified 2,956 Sequences, two percent of total Spoofing Sequences, (2,392 for Defendant Smith and 301 for Defendant Nowak)[90] with concurrent trading activity by the other convicted precious metals futures spoofers identified by Dr. Attari[91] – namely, John Pacilio, Edward Bases, James Vorley, and Cedric Chanu – during the time

---

[85] Attari Declaration, ¶70 at p. 43.

[86] Typically, this field contains the instruments associated with each leg of the spread separated by a hyphen (e.g., GCF0-GCG0); however, in the example identified by Dr. Attari the value is 944139. Therefore, we identified any value that did not meet the standard format of two instruments separated by a hyphen.

[87] Attari Declaration, FN 79.

[88] Attari Declaration, ¶60.

[89] Attari Declaration, ¶60. *See also* Cusimano Declaration, ¶43d.

[90] An additional 3 Spoofing Sequences in which both Defendant Smith and Defendant Nowak were Spoofing in the market at the same time were excluded.

[91] Attari Declaration, ¶60.

while the Spoof Orders were active in the visible order book and/or the Control Period. I then excluded these Sequences from my Updated Market Loss Methodologies. To be conservative, I identified any sequence for which any of the other convicted precious metals futures spoofers place even a single order on either side of the market during either the time while the Spoof Orders were active in the visible order book or during the control period. That is, I did not limit my exclusions to trading sequences where the other convicted precious metals futures spoofers were also spoofing on the same side as the Defendants. Implicitly, by excluding these Spoofing Sequences, my Updated Market Loss Methodologies are conservative, as my analysis attributes no market harm from the Defendants' conduct during these Spoofing Sequences.

72.     Both Dr. Attari and Mr. Cusimano criticize my selection criteria of 82.3 seconds as the maximum duration of layering sequences.[92] I describe their criticisms and my responses in paragraphs 26-28 of Part A.iii of this Reply Declaration.  Based on evidence presented at trial, the maximum duration of the Spoof Orders presented at trial for Mr. Smith is 36.165 seconds, see **Figure 13** (Smith Episode 90), and for Mr. Nowak is 34.875 seconds, see **Figure 14** (Nowak Episode 39) above.[93] I identified 3,009 Spoofing Sequences, 2 percent of total Spoofing Sequences, (1,543 for Defendant Smith and 590 for Defendant Nowak) with durations[94] that exceed the maximum duration of all Spoof Orders for each Defendant or cooperating witness based on the episodes presented at trial and excluded these Sequences from my Updated Market Loss Methodologies.[95]

73.     Mr. Cusimano criticizes the inclusion of Spoofing Sequences with large non-iceberg Opposite Side Orders. Therefore, I identified 1,157 Spoofing Sequences, 0.87 percent of

---

[92] Attari Declaration, ¶¶24, 71-73; Cusimano Declaration, ¶¶28b, 55.

[93] GX 450 and GX 451. Note, the maximum duration for all Spoof Orders presented at trial for Christian Trunz is 16.525 and for John Edmonds is 7.921. *See,* GX 453 and GX 454.

[94] These durations represent the time from the first Spoof Order placement to the time that the last Spoof Order is canceled; therefore, if multiple layering groups overlap in time, then this duration encompasses the entire time that the overlapping layering groups were in the market.

[95] For Spoofing Sequences that have multiple traders with visible Spoof Orders in the market, I exclude Spoofing Sequences that are longer than the maximum Spoof Order associated with both traders based on the episodes presented at trial.  That is, for Spoofing Sequences associated with both Gregg Smith and Michael Nowak, I exclude any Spoofing Sequence that exceeds 36.165 seconds. An additional 19 Spoofing Sequences in which both Defendant Smith and Defendant Nowak were Spoofing in the market at the same time were excluded.

total Sequences, (734 for Defendant Smith and 30 for Defendant Nowak) in which there was a resting Opposite Side Order in the visible order book during the time of the Spoofing Sequence that was greater than the maximum of either half the aggregate quantity threshold imposed on the Spoof Order Side[96] or the largest non-iceberg Opposite Side Order placed by a trader for a given metal in the DOJ Episodes presented at trial.[97] I then excluded these Sequences. This is conservative because I drop the entire Sequence even if the aggregate quantity on the Spoof Side is much larger than the aggregate quantity on the Opposite Side. As can be seen in **Figure 17** for Spoofing Sequence Smith_GC_B_46010 below, Defendant Smith placed a fully displayed resting order of 30 lots on the Opposite Side of the market. Since 30 lots is greater than half the aggregate quantity threshold placed on the Spoof Order Side for gold, I drop this Sequence. This example illustrates that my approach is conservative since this Sequence clearly shows patterns consistent with Spoofing.

---

[96] Specifically, half the aggregate quantity threshold is 15 contracts for gold, 7 for silver, and 10 for platinum and palladium.

[97] The largest non-iceberg Opposite Side Order placed during the DOJ Episodes presented at trial by trader and metal are as follows: for Defendant Smith was 10 for gold and silver, and 3 for palladium, for Defendant Nowak was 10 for gold, for Christian Trunz was 20 for gold, 10 for silver, and 4 for platinum, and for John Edmonds was 19 for gold, 12 for silver, 10 for palladium, and 2 for platinum.

**Figure 17**



74. Collectively, as part of my calculations under my Updated Market Loss Methodologies in response to certain critiques in the Defendants' Declarations, which constitutes a highly conservative approach, I excluded 14,594 Spoofing Sequences based on the five categories discussed above, which yields a final sample of 117,671 Spoofing Sequences. Of these remaining Spoofing Sequences, Mr. Smith has 94,352 and Mr. Nowak has 5,023 Spoofing Sequences. There are 72 additional Spoofing Sequences where Defendant Smith's and Defendant Nowak's spoofing activity overlap.

*ii. Distribution of updated market losses and stability of the results*

75. I exclude the five categories of Spoofing Sequences based on the criticisms in Defendants' Declarations that I believe are worth discussion (i.e., my Updated Market Loss Methodologies). Similar to the analysis above and also reported in my Declaration, I first

demonstrate that the distribution of loss estimates based on my Updated Market Loss Methodologies is reasonable, and that the patterns support that my Updated Market Loss Methodologies capture the market losses due to Defendants' spoofing activity. Then, I show that the market losses calculated under my Updated Market Loss Methodologies are still significant when we drop certain "outlier" sequences using a variety of approaches. I describe the results of this updated analysis below.

76.     Regarding my Updated But-For Price Methodology, across the Spoofing Sequences, the average of the Unadjusted Market Loss is $686, while the average of the But-For Cost based on Control Periods is $213. I also find that Unadjusted Market Loss exceeds the But-For Cost based on the median, which is unaffected by any extreme values across the Spoofing Sequences. The median of the Unadjusted Market Loss is $125, while the median of the But-For Cost is $10.  For the updated Adjusted Market Loss, the average is $473 and the median is $70 across the Spoofing Sequences. This comparison again shows that under my Updated But-For Price Methodology Spoofing Sequences are associated with unusual activity that contributes to market harm for traders.

77.     **Table 3** below reports the distribution for components of the Updated But-For Price Methodology. **Table 3** shows that the magnitudes of the updated loss estimates are reasonable across all the reported levels of the distribution of loss estimates. Across the 117,671 Episodes, the Unadjusted Market Loss equals or exceeds the But-For Costs in over 75 percent of the sequences. In aggregate, the total updated Unadjusted Market Loss is $80.7 million while the updated Adjusted Market Loss is $55.7 million. Therefore, even after excluding Spoofing Sequences based on these five categories identified in the Defendants Declarations, and notably erring on the side of over-exclusion to be conservative, I still calculate Adjusted Market Losses substantially within the range of losses that were reported in my Declaration of between $37 million and $95 million.

**Table 3**

**Updated Market Loss Distribution**

| | Average | Percentile | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1% | 5% | 25% | 50% (Median) | 75% | 95% | 99% |
| Unadjusted Market Loss | 686 | -400 | 0 | 20 | 125 | 450 | 2,690 | 9,850 |
| But-For Cost of Trading Matched Control | 213 | -1,740 | -150 | 0 | 10 | 120 | 1,090 | 4,730 |
| Adjusted Market Loss (Updated But-For Price Methodology) | 473 | -3,140 | -600 | 0 | 70 | 340 | 2,520 | 10,140 |
| Adjusted Market Loss (Updated Spread-Crossing Methodology) | 330 | -193 | 0 | 10 | 60 | 217 | 1,296 | 4,744 |

78.  I next present the market loss calculations under my Updated But-For Price Methodology after winsorizing and trimming the data. As noted earlier in this Reply Declaration, each variable is winsorized separately while I trim the sample based on the But-For Costs.[98] The results of this outlier analysis are reported in **Table 4** below.

**Table 4**

**Updated Market Loss Outlier Analysis**

| | Market Loss | Winsorize | | Trim | |
|---|---|---|---|---|---|
| | | 1% and 99% | 2.5% and 97.5% | 1% and 99% | 2.5% and 97.5% |
| Unadjusted Market Loss | $80,699,600 | $67,357,895 | $58,706,180 | $66,084,960 | $57,400,090 |
| But-For Cost of Trading Matched Control | $25,008,678 | $20,933,828 | $18,440,568 | $17,417,588 | $13,607,571 |
| Adjusted Market Loss (Updated But-For Price Methodology) | $55,690,922 | $48,281,212 | $41,629,821 | $48,667,372 | $43,792,519 |
| Adjusted Market Loss (Updated Spread-Crossing Methodology) | $38,870,589 | $32,444,288 | $28,277,015 | $27,091,198 | $21,505,619 |

79.  **Table 4** demonstrates that the Updated Adjusted Market Losses are still economically large when I reduce the influence of the "outlier" sequences using a variety of approaches under my Updated But-For Price Methodology. Further, even under my highly conservative approach of over-excluding Spoofing Sequences based on the criteria discussed above and accounting for outliers in this reduced set of Sequences, I still calculate Adjusted Market Losses under my Updated But-For Price Methodology approximately within the range that

---

[98] For my Spread-Crossing Methodology, I trimmed based on the Unadjusted Market Losses.

I presented in my Declaration of between $37 million and $95 million.

80. **Table 5** below summarizes my updated calculations of market loss for the Spoofing Sequences using both my Updated But-For Price and Updated Spread-Crossing Methodology. I have also provided a breakdown of market loss attributable for each Defendant in **Table 6** below:

**Table 5**

**Updated Market Loss by Trader**

| Trader | Unadjusted Market Loss | Adjusted Market Loss (Updated But-For Price Methodology) | Adjusted Market Loss (Updated Spread-Crossing Methodology) |
|---|---|---|---|
| Gregg Smith | $69,001,500 | $46,471,728 | $33,235,963 |
| Christian Trunz | $6,206,230 | $4,925,418 | $2,989,356 |
| Michael Nowak | $4,815,750 | $3,716,001 | $2,319,603 |
| John Edmonds | $351,625 | $224,972 | $169,367 |
| Gregg Smith & Michael Nowak | $269,210 | $216,134 | $129,670 |
| Gregg Smith & Christian Trunz | $29,135 | $116,616 | $14,033 |
| Michael Nowak & Christian Trunz | $19,450 | $21,983 | $9,368 |
| Gregg Smith & John Edmonds | $3,730 | $3,158 | $1,797 |
| Michael Nowak & John Edmonds | $2,020 | -$5,240 | $973 |
| John Edmonds & Christian Trunz | $950 | $150 | $458 |
| **Total** | **$80,699,600** | **$55,690,922** | **$38,870,589** |

**Table 6**

**Updated Market Loss by Defendant**

| Trader | Unadjusted Market Loss | Adjusted Market Loss (Updated But-For Price Methodology) | Adjusted Market Loss (Updated Spread-Crossing Methodology) |
|---|---|---|---|
| Smith | $69,034,365 | $46,591,503 | $33,251,793 |
| Nowak | $4,837,220 | $3,732,744 | $2,329,944 |
| Smith & Nowak | $269,210 | $216,134 | $129,670 |

### D. Mr. Cusimano's Alternative Calculations of Market Loss

81. In the Cusimano Declaration, Mr. Cusimano offers an alternative calculation of market

harm for Mr. Nowak.[99] I reviewed his approach, and it is my opinion that it suffers from several important flaws that result in an understated estimate of market loss. It is important to note that Mr. Cusimano's focus is on my Spread-Crossing Methodology for calculating Adjusted Market Loss, and not on my But-For Price Methodology.

82.   First, Mr. Cusimano limits the duration during which he measures the market harm associated with Spoofing Sequences. He first starts counting fills at the time when Mr. Nowak's Spoofing Sequence had an aggregate quantity of 30 lots in the top five levels of the visible order book, instead of at the time of the first Spoof Order placement in the Spoofing Sequence, as I did in my analysis. Then, instead of counting fills that occurred while the Spoofing Sequence was visible in the order book, as I did, Mr. Cusimano only counts fills up until two different times: (1) 3.2 seconds after the aggregate 30 lot threshold within the top 5 levels of the visible order book was met, and (2) 0.9 seconds after the placement of the last Spoof Order in the Spoofing Sequence ("3.2-Second Methodology" and "0.9-Second Methodology," respectively). The duration thresholds that he estimates are based on the speed with which the "excess spread-crossing dissipated (i.e., the market returned to 50% spread-crossing in each direction)."[100] Specifically, his duration threshold is based on the market response to the initiation of an "order book imbalance" in the top five levels of the order book, where imbalances are defined as instances where the top five levels of the order book are imbalanced by over one standard deviation more than the average imbalance.[101] Mr. Cusimano finds that after an initial increase in the percentage of spread-crossers from the "imbalanced" side, the market returns to having the "[e]xpected" 50% split within two seconds.[102] However, this approach is flawed because even the entry of a small order can initiate an "order book imbalance" if the book is sufficiently imbalanced prior to the placement of a small order.[103]

---

[99] Cusimano Declaration, Section VI, ¶¶55-71.

[100] Cusimano Declaration, ¶50.

[101] Cusimano Declaration, ¶58, FN 35, and Appendix B. Mr. Cusimano calculates one-standard-deviation thresholds ranging from 27 to 94 lots depending on the futures contract, and typically are approximately 40 lots.

[102] Cusimano Declaration, ¶49, Figure 5.

[103] For example, if Mr. Cusimano's imbalance threshold for a given contract is 30 lots, and the market is currently imbalanced 29 lots on the sell side, the placement of a 2-lot sell order would increase the imbalance to 31 lots and trigger Mr. Cusimano's initiation of an "order book imbalance" threshold.

83.    To further illustrate the issues with both of Mr. Cusimano's duration criteria, **Figure 18** below depicts Nowak Episode 76, with shading to show the two time periods which Mr. Cusimano includes in his analyses along with showing when the spread-crossing fills occurred during this Spoofing Sequence. A total of 46 contracts were filled during the life of this Spoofing Sequence. While my approach includes all 46 fills, both of Mr. Cusimano's approaches only considers a fraction of them. Under Mr. Cusimano's 3.2-Second Methodology, eleven contracts, five of which were bought from Mr. Nowak, occurred *before* Mr. Cusimano starts counting fills in his analysis. That is, under Mr. Cusimano's approach, the losses associated with these eleven contracts, five of which resulted in a *gain* for Mr. Nowak, would not be included. During the 3.2 seconds considered by Mr. Cusimano, ten contracts filled. After Mr. Cusimano stops counting fills, an additional 25 contracts, five of which also resulted in a *gain* for Mr. Nowak, were filled. Therefore, under this methodology, Mr. Cusimano improperly excludes a total of 36 of the 46 contracts filled during the life of this Spoofing Sequence. Under Mr. Cusimano's slightly expanded 0.9-Second Methodology, 25 of the 46 contracts filled during the life of this Spoofing Sequence would be improperly excluded in his analysis.

**Figure 18**



84. To reiterate, in Mr. Cusimano's 3.2-Second Methodology, the fills associated with both of Mr. Nowak's orders, which resulted in a *gain* for Mr. Nowak, were *excluded* from his analysis. Further, in his 0.9-Second Methodology, the fills associated with one of Mr. Nowak's orders, which resulted in a *gain* for Mr. Nowak, were *excluded* from his analysis.

85. The other main flaw in Mr. Cusimano's methodology to calculate market loss is that he simply ignores the possibility of price distortions induced by the Spoof Orders. His choice of the But-For Price is flawed, and his measure of rate of spread crossing is flawed. Furthermore, as a methodological point, Mr. Cusimano liberally excludes several categories of Spoofing Sequences and imposes numerous constraints on his analysis, with no articulation of how many Spoofing Sequences he is left with and how his arbitrary decisions affect the sample. Below, I highlight several problems with his framework for alternative calculation of market loss.

86. The flaw in Mr. Cusimano's alternative methodology can be seen in **Figure 19** (Nowak Episode 76) below. Immediately before the Spoof Orders are placed, the prevailing best bid price is $1,602.00 and the prevailing best ask price is $1,602.20. As Mr. Nowak places Spoof Orders on the buy side of the market, the bid-ask quotes move higher (the prevailing best bid price increases to $1,602.40 and the prevailing best ask price is $1,602.50) in response to the false signals of buying interest. Participants from the buy side of the market who transact during the Spoofing Sequence at prices higher than the prevailing best bid price before the spoof are harmed in this example; however, not all of these participants would be included under Mr. Cusimano's methodology.

**Figure 19**



87. Let us re-consider the reservation prices of the two types of buyers who transact during a Spoofing Sequence, which is based on my earlier discussions in Section B.iii. The first type of buyers are those posting resting buy limit orders before the Spoof Orders. The highest

reservation price among the first buyer type is the prevailing best bid price (i.e., $1,602.00). Under my Market Loss Methodologies, in the case of a buy side Spoofing Sequence, the But-For price is the prevailing best bid price before the Spoof Orders (i.e., $1,602.00). Thus, my approach of using the prevailing best bid price for calculating the harm for all first type buyers, including those posting resting buy orders at lower limit prices than the prevailing best bid, is largely conservative. The second type of buyers are those who are persuaded by the distortions created by the spoof to urgently buy during the Spoofing Sequence. It is difficult to know the reservation price for this type before the Spoof Orders. However, we know that the second buyer type would not buy as high as the lowest offer price (i.e., $1,602.20) because they did not buy at the offer price (which they could have hit) before the spoof. It is also likely that the second buyer type will not buy as high as the midpoint of the prevailing best quotes (i.e., $1,602.10) before the spoof because they did not choose to jump the quote by posting a resting buy limit order at the midpoint price. This example illustrates that Mr. Cusimano's choice of the But-For price ($1,602.20) for all buyers before the spoof is too high (i.e., inconsistent with explicit reservation prices of buyers observed before the spoof), and for this reason, the alternate market losses that he reports in the Cusimano Declaration underestimates market harm.

88. Further, Mr. Cusimano's measure of spread-crossing for the purpose of estimating market harm is flawed. As Mr. Nowak places Spoof Orders on the buy side of the market, the bid-ask spreads move higher in response to the false signals of buying interest. When calculating the rate of spread-crossing, Mr. Cusimano's "spread-crossing" methodology ignores the changes in bid ask quotes due to the price impact of the Spoof Orders. In his methodology, the rate of spread crossing is based on trades that aggressively fill during the Spoofing Sequence based on the bid ask quote at the time of the trade. Since the Spoof Orders can move the bid ask quote that he uses at the time of the trade, his rate of spread crossing significantly under-identifies the buyers who are harmed due to Spoof Orders. I discuss this flaw in greater detail in paragraphs 51-54 of Part B of this Reply Declaration. By underestimating the rate of spread-crossing during Spoofing Sequences, his methodology significantly underestimates the market loss attributable to spoofing activity.

89. Mr. Cusimano's alternative approach also fails to recognize that the Spoof Orders induce a large increase in the rate of spread-crossing contracts traded per second, as I demonstrated

in my Declaration.[104] Mr. Cusimano's assumption that 50% of these contracts would have crossed the spread anyway completely ignores the effect of the Spoof Orders and the primary driver of market harm. To illustrate the implausibility of Mr. Cusimano's approach, **Figure 20** below depicts the number of spread-crossing trades during the Control Period and during the Spoofing Sequence I identified as Nowak_GC_B_3335 (a buy-side Sequence in the gold futures market on March 18, 2013 that also corresponds to Nowak Episode 76). As shown, in the 16.537 seconds before the Spoofing Sequence begins,[105] zero buy-side spread crossing contracts were traded in total. However, during the Spoofing Sequence, a total of 46 buy-side spread-crossing contracts traded in the gold futures market.

**Figure 20: Spoofing Sequence Nowak_GC_B_3335**

**Spread-Crossing Trades during the Control Period and the Spoofing Sequence**



---

[104] Venkataraman Declaration, ¶42.

[105] I note here that this is the same time period used as the Control Period for this Spoofing Sequence in my analysis.

90.     As discussed above an additional issue with Mr. Cusimano's approach is the limited duration during the Spoofing Sequence that he even considers in his analysis. In one of his methodologies with respect to this sequence, Mr. Cusimano only looks at the 3.2 seconds after Mr. Nowak's Spoof Orders reach an aggregate quantity of 30 in the top five levels of the order book. Therefore, his approach fully ignores the eleven and 25 buy-side spread-crossing contracts traded before and after the time period he considers. Then, during that limited time period that he considers for calculating market harm, he further assumes that the benchmark level of spread crossing is 50%, absent the Spoof Orders. In other words, this approach assumes that only a portion of the ten contracts have crossed the spread from the buy side that can be attributed to Mr. Nowak's spoofing activity, even though during the 16.537 seconds prior to the Spoofing Sequence there were no buy-side spread-crossing contracts traded and during the 16.537 seconds during the Spoofing Sequence, a total of 46 buy-side spread-crossing contracts traded. My Market Loss Methodologies, on the other hand, properly account for, and reasonably estimate, the increase in trading systematically induced by the Spoof Orders across the Spoofing Sequences relative to the Control Period.

91.     In sum, for the reasons described above, I find Mr. Cusimano's alternative market loss calculations to be unreasonable and unreliable.


Pursuant to 28 U.S.C. § 1746, I, Kumar Venkataraman, certify under penalty of perjury that the foregoing is true and correct.


_____

Kumar Venkataraman, PhD