**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA

    v.

GREGG SMITH, and
MICHAEL NOWAK

             Defendants.

Case No. 19-cr-669

Hon. Edmond E. Chang

# GREGG SMITH'S SENTENCING SUR-REPLY

## TABLE OF CONTENTS

I. THE GOVERNMENT CONCEDED THAT IT ASKED THIS COURT TO SENTENCE GREGG BASED ON SEQUENCES THAT DO NOT EVEN MEET ITS OWN CRITERIA FOR SPOOFING ................................................................................................................ 2

II. THE GOVERNMENT CONCEDED THAT, EVEN WHEN PROPERLY APPLIED, ITS METHODOLOGY IS RIDDLED WITH FATAL FLAWS ..................................................... 4

    A. The Government's Admitted Failure to Account for the Impact of Other Convicted Spoofers on Losses Confirms that Its Methodology for Calculating Losses Is Fatally Flawed and Should Be Rejected ........................................................................ 5

    B. The Government Has Admitted that Its Selection Criteria Are Not Based on Characteristics that Are Indicative of an Intent to Cancel Before Execution ..................... 6

III. THE GOVERNMENT'S RESPONSES TO THE ADDITIONAL CRITICISMS OF ITS METHODOLOGY ARE WITHOUT MERIT ....................................................................... 9

CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

Cases

*CFTC v. Oystacher*,
  No. 15-cv-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) .................................................. 8

*United States v. Burns*,
  843 F.3d 679 (7th Cir. 2016) .................................................................................................. 6

*United States v. Chube*,
  538 F.3d 693 (7th Cir. 2008) ............................................................................................. 4, 9

*United States v. Corey*,
  723 F.3d 366 (2d Cir. 2013) ................................................................................................... 2

*United States v. Gupta*,
  904 F. Supp. 3d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ...................... 1

*United States v. Helfand*,
  281 F. App'x 551 (7th Cir. 2008) ......................................................................................... 10

*United States v. McClinton*,
  23 F.4th 732 (7th Cir. 2022) ................................................................................................... 1

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007) ................................................................................................... 6

*United States v. Schneider*,
  930 F.2d 555 (7th Cir. 1991) ................................................................................................ 10

*United States v. Whiting*,
  471 F.3d 792 (7th Cir. 2006) .................................................................................................. 6

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007) .................................................................................................. 6

Statutes

18 U.S.C. § 3553 ........................................................................................................................... 1

Other Authority

U.S.S.G. § 2B1.1 ...................................................................................................................... 1, 6

As this Court is aware, "[i]mposing a sentence on a fellow human being is a formidable responsibility" that "requires a court to consider, with great care and sensitivity, a large complex of facts and factors" outlined in 18 U.S.C. § 3553(a). *United States v. Gupta*, 904 F. Supp. 3d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). The applicable Guidelines range is only one factor among many, and it "must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing a sentence." *Id.* at 354. Despite this clear directive, the Government's Reply ignores the overwhelming evidence and law detailed in our sentencing memorandum that supports a non-incarceratory sentence here—most notably:

- Gregg, himself a late-stage cancer survivor with a high probability of recurrence, is an indispensable caregiver for his wife, who is currently battling breast cancer, and his elderly widowed mother, who is also in poor health.

- Even respecting the jury's verdict for purposes of sentencing, Gregg is less culpable because he was explicitly told by JPMorgan that the exact trading strategy for which he was convicted was not unlawful.[1] And even the Government's star witness testified that he did not believe during the relevant period that his or Gregg's trading was improper.

- Gregg has no documented criminal history and the conduct for which he was convicted amounted to less than 5 minutes of trading over a 30-plus year career.

Instead, the Government's reply focuses solely on the loss calculation under Section 2B1.1, presumably because of the disproportionate impact it has on the Guidelines range.[2] *See United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022). Judges and scholars have almost unanimously criticized the Guidelines for placing undue weight on loss in white-collar cases, and even the Sentencing Commission has recognized that the loss table can substantially overstate the seriousness of the offense. *See* Smith Sentencing Memo at 56-57, ECF No. 865 (collecting

---

[1] As this Court has held, the crimes for which Gregg was convicted do not require him to have understood that he was committing a crime. *See* Order, ECF No. 815 (Dec. 8, 2022).

[2] The Government contends that the narrow focus of its brief is "[b]ecause the Court granted leave to file a reply with respect to the issue of loss." Gov't Reply at 1, ECF No. 873. But the Court entered no such order. *See* Minute Entry, ECF No. 852 (Mar. 6, 2023).

authority); *see also, e.g.*, *United States v. Corey*, 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J., concurring) (noting the "widespread perception that the loss guideline is broken").

Regardless, the Government's attempt to maximize the loss amount to inflate the Guidelines range has resulted in errors so egregious that it was forced to concede them and reduce its loss figure by nearly 50 percent. The Government glosses over this in its memorandum, instead burying the magnitude of its conceded errors toward the end of Dr. Venkataraman's nearly 60-page reply declaration ("Venkataraman Reply," ECF No. 873-1). But as detailed below, these concessions do not "fix" the problem. Rather, they reveal the fundamental and fatal flaws in the Government's methodology for identifying Spoofing Sequences and calculating losses flowing therefrom and, accordingly, its methodology is unreasonable, unreliable, and should be rejected.

I. **THE GOVERNMENT CONCEDED THAT IT ASKED THIS COURT TO SENTENCE GREGG BASED ON SEQUENCES THAT DO NOT EVEN MEET ITS OWN CRITERIA FOR SPOOFING**

Strikingly, the Government has admitted that its initial tally of alleged Spoofing Sequences mistakenly included *thousands* of sequences that it now concedes are not instances of spoofing. Venkataraman Reply ¶¶ 69-70. This occurred because the Government did not review any of the individual alleged Spoofing Sequences. Instead, it directed its expert to design a computer code to identify them; the code essentially scanned the trading data to identify sequences that met the Government's parameters for spoofing. But the Government has now conceded that its code is broken: it incorrectly identified at least 8,000 sequences that do not meet its own criteria. The Government offers no explanation for why its computer code made these mistakes, nor does it state (let alone demonstrate) that it fixed whatever defect or bug that caused it to malfunction in the first place. Instead, the Government again used computer code to identify the mistakenly added sequences. But this does not rectify the issue.

2

*First*, the Government, perhaps recognizing that it is still using broken code to "fix" its mistakes and, thus, that additional mistakes are inevitable, refuses to turn over the data underlying its revised calculations. Without the revised data set, it is impossible to confirm how the Government revised its calculations, which specific sequences were removed, and how the loss was calculated for the remaining sequences. Cogan Supp. Decl. Ex. A, Attari Supp. Decl. ¶ 5. Despite explaining this to the Government, it twice "decline[d]" our request, stating that we could replicate the calculations based on the initial data (which did not include a copy of the faulty computer code). Cogan Supp. Decl. Ex. B. But, as the Government is aware, we are entitled to it. Judge Lee ordered the Government to turn over its data set in *Bases*, and Judge Lee's rationale applies with equal force to the Government's revised data set here. *See* Minute Entry, *United States v. Bases*, No. 18-cr-48, ECF No. 728 (N.D. Ill. Jan. 17, 2023).

Despite the Government's refusal to turn over the data, Dr. Attari attempted to replicate the Government's revised calculations. His results suggest that the Government continues to include Spoofing Sequences that it claims were removed. Attari Supp. Decl. ¶ 5 (describing the discrepancies between Dr. Venkataraman's revised figures and Dr. Attari's attempt to replicate them—most notably, Dr. Venkataraman undercounted the number of sequences that needed to be removed in response to one of the Government's conceded errors by more than 300 percent).[3] Given the magnitude of the Government's admitted errors, its unwarranted refusal to turn over the data needed to test for additional errors, and Dr. Attari's findings, the Government's analysis should be afforded no weight and rejected by this Court.

*Second*, the issues with Dr. Venkataraman's code identified by Dr. Attari in his initial

---

[3] To the extent the Court requires specific examples of such further discrepancies, we respectfully request that the Court order the Government to turn over its revised data set and underlying code and/or order a hearing, with testimony from Dr. Venkataraman, on his revised calculations.

3

declaration ("Attari Decl.") were not exhaustive. Attari Decl. ¶ 70, ECF No. 865-3. We had neither the time nor the burden in preparing our opening memorandum to review each of the 132,265 alleged Spoofing Sequences to ensure that we captured every error that resulted in sequences being erroneously included in the Government's list of relevant conduct. That burden falls on the Government. And its decision to exclude just the sequences impacted by the errors we did find, without confirming that there are no additional errors in its code, fails to carry that burden. *See United States v. Chube*, 538 F.3d 693, 705 (7th Cir. 2008) (finding that a "final determination of relevant conduct" was not possible until the government ensured that all legitimate conduct was deducted from its analysis).[4] Accordingly, the relevant conduct that the Court should consider under the Guidelines is limited to the eight sequences underlying the jury's verdict, as the Government has failed to establish by a preponderance of the evidence the illegality of any additional sequences.

## II. THE GOVERNMENT CONCEDED THAT, EVEN WHEN PROPERLY APPLIED, ITS METHODOLOGY IS RIDDLED WITH FATAL FLAWS

The Government, through its expert, admits that many of the defense's criticisms of its methodology for identifying relevant conduct and calculating losses flowing therefrom are indeed valid. As explained below, these uncontested flaws, which the Government failed to fix in its

---

[4] The Government's attempt to distinguish *Chube* is unavailing. It says that the Circuit rejected the loss calculation because it "lacked precision." Gov't Reply at 4. This appears nowhere in the decision. Rather, in *Chube*, which involved illegitimate narcotics prescriptions, the Circuit held that the trial court was required to "evaluate the facts surrounding [each] particular prescription and explain why those facts render it unlawful," stating that "[g]eneralizing" that all prescriptions were unlawful based on evidence that some were unlawful "will not suffice." *Id.* at 705. Similarly, here, it is improper to generalize that all of Gregg's orders that follow a particular pattern are unlawful simply because the jury found that some of Gregg's orders that happened to follow the same pattern were unlawful. And the Government has failed to provide the Court with the evidence needed to explain, as to each individual order, what renders it unlawful. *Id.* All the Court has is a pattern that the CME, JPMorgan, and multiple Government witnesses stated is permissible. *See* Smith Sentencing Memo at 19-21 (collecting citations to the trial record).

updated calculations, doom its analysis.

### A. The Government's Admitted Failure to Account for the Impact of Other Convicted Spoofers on Losses Confirms that Its Methodology for Calculating Losses Is Fatally Flawed and Should be Rejected

Despite the Government's repeated contention in its initial sentencing memo that its loss calculation "account[s] for the potential impact of external factors on the market loss amount," Gov't Memo at 14, ECF No. 856, the Government has now admitted that its methodology failed to account for the impact of recently convicted spoofers, John Pacilio, Edward Bases, James Vorley, and Cedric Chanu, who happened to be in the market at the same time as Gregg in a subset of the alleged Spoofing Sequences, *see* Gov't Reply at 8; Venkataraman Reply ¶ 71. To be clear, these individuals are not alleged to have been *spoofing* during the Spoofing Sequences; rather, they were simply entering orders in the market, like any other market participant. The Government has thus conceded that its methodology fails to distinguish between losses caused by Gregg's orders and losses caused by the other traders in the market while he was allegedly spoofing and instead improperly assigns all loss to Gregg.

Rather than fix its methodology, however, the Government alleges that it eliminated the impacted sequences from its calculation altogether.[5] But this does not solve the problem because most, if not all, of the remaining sequences have other traders entering orders during the Spoofing Sequence. Even worse, this is not the only external factor impacting the Government's loss calculation that its methodology ignored. Other market factors, such as activity in highly correlated markets, geopolitical news or events, or over-the-counter activity in physical metals, may also affect order activity in precious metals futures. Attari Supp. Decl. ¶ 17. These factors, too, would

---

[5] Again, without the Government's revised data, we cannot confirm with any certainty whether this was in fact done.

have to be accounted for to establish that Gregg caused the alleged loss amount.

Perhaps recognizing the implications of this fundamental error on its loss calculation, the Government now argues that it is not required to establish a causal connection between Gregg's conduct and the alleged losses—only that its loss amount is a "reasonable estimate." Gov't Reply at 7. That is wrong. The Seventh Circuit repeatedly has held that determining losses under Section 2B1.1 requires a causation analysis. *See United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006). And this causation analysis requires the Government to "[d]etermin[e] the extent to which a defendant's fraud, as distinguished from market or other forces, caused [market participants'] losses." *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *see also, e.g.*, *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (government bears burden of "disentangl[ing]" the effect of the fraud on the value of a security from "either inflation or deflation of that value due to unrelated causes").[6] The Government has not done so here, and its loss calculation therefore should be rejected entirely. *Cf.* U.S.S.G. § 2B1.1 cmt. n.F(IX)(II) (stating that whether a loss figure is reasonable will depend on the "the extent to which the amount includes significant changes in value not resulting from the offense (*e.g.*, changes caused by external market forces . . . .)").

### B. The Government Has Admitted that Its Selection Criteria Are Not Based on Characteristics that Are Indicative of an Intent to Cancel Before Execution

In response to the defense's criticism of the Government's use of different criteria to identify apparent spoofs in this action versus those applied in *Bases*—specifically, order duration and at what level an order is placed in the order book—the Government admits that its criteria here

---

[6] The Government's argument that this causation standard is only applicable to civil securities fraud cases is misplaced, as all of the above-cited cases that require the Government to back out external factors contributing to loss are criminal cases.

6

are not based on objective factors that are indicative of an intent to cancel before execution, but rather on "the trading patterns shown at trial." Venkataraman Reply ¶ 23. In other words, the Government looked to see how Gregg traded, saw that his trades frequently followed a particular pattern, and then crafted over-inclusive criteria without any analysis of whether those criteria are indicative of an intent to cancel before execution.

*First*, as to order duration, the Government was forced to concede that it erred in not limiting its Spoofing Sequences to those that were cancelled quickly. Venkataraman Reply ¶ 72. Such a concession was unavoidable: Dr. Venkataraman testified repeatedly at trial regarding the importance of a "quick" cancellation in determining whether an order was designed to avoid execution, and the Government stated as much in its opening. Trial Tr. 2765:6-12 (Venkataraman), *id.* at 398:11-16 (Gov't Opening) ("As fast as he can, he cancels his deceptive orders so that they don't get hit, so that they don't get traded.").

To "fix" this mistake, the Government excluded any alleged spoof orders that were not cancelled or filled within 36.165 seconds. But it provides no explanation for why leaving an order open for that long in a market that trades in milliseconds is indicative of an intent to avoid execution. Nor could it, particularly as it relates to Gregg. The Government's entire theory at trial was that Gregg would rapidly click on his mouse, placing and cancelling orders in lightning-fast succession, when he was spoofing. *See, e.g.*, Trial Tr. 990:11-991:2 (Edmonds); 1861:4-13 (Flaum); 2274:16-21 (Trunz); 3907:20-3908:1 (Gov't Closing). Thus, leaving an order open for more than half a minute is flatly inconsistent with the Government's contention for how Gregg spoofed.

Apparently recognizing this inconsistency, the Government dug through the trial evidence to find an outlier episode buried in GX 450—one that was never highlighted for the jury or

7

otherwise discussed at trial—in which one of Gregg's alleged spoof orders was left open for 36.165 seconds. But the Government never established that this particular episode was unlawful at trial either, even by a preponderance of the evidence. In fact, the trial evidence established that Gregg's indisputably *legitimate* orders (his opposite side "small" orders) were cancelled or filled in under 12 seconds—this is less than a third of the order duration the Government now says is indicative of spoofing. Trial Tr. 2745:18-2746:2 (Venkataraman); GX 498 at 2. And the majority of visible orders market-wide (again, indisputably legitimate orders) were cancelled or filled within 1.44 seconds. Trial Tr. 3612:4-9 (Cusimano). Indeed, the sole case that the Government cites in support of its spoofing criteria used a cancellation speed of **less than one second** to identify potential spoofing orders. Gov't Reply at 4 (citing *CFTC v. Oystacher*, No. 15-cv-9196, 2016 WL 3693429, at *22-23 (N.D. Ill. July 12, 2016)). In short, there is no support for the Government's use of a 36-second order duration.

*Second*, there is no justification for the Government's decision to include as Spoofing Sequences here orders placed in the top 10 levels of the order book.[7] At trial, Dr. Venkataraman opined that the "objective of a spoof order is to shock the market [and] move the price," Trial Tr. 2720:11-12, and he concluded that Gregg's alleged spoof orders were designed to shock the market based on his analysis of the impact that those orders had on market imbalance in the top 5 levels of the order book.[8] GX 498 at 6. He limited his analysis to the top 5 levels because that is what "market participants pay a lot of attention to." Trial Tr. 2714:12-15; *see also id.* 2950:15-20

---

[7] Notably, in *Bases*, the Government only used orders placed at the top 5 levels.

[8] Placing orders with an intent to impact price is not unlawful, *see* Gregg Rule 29 Mot., ECF No. 708, at 9, 17, so this factor is irrelevant to the existence of unlawful intent. Further, Dr. Venkataraman did not analyze whether the alleged imbalance created by Gregg's orders was sufficiently large to shock the market thus undermining the claim that Gregg's orders were designed to move prices. *See* Attari Supp. Decl. ¶ 12.

8

(testifying that "[f]or the imbalance," only the top 5 levels are "important"). Yet, despite this testimony, the Government admits that it has included all of Gregg's trades within the top 10 levels of the order book, supposedly because Gregg often placed orders in levels 6 through 10 of the order book. Gov't Reply at 10. Of course, there is a reason the Government insists on using the top 10 levels: using the top 10 levels rather than the top 5 levels increases the loss by 72 percent. *See* Attari Supp. Decl. ¶ 13. The Government's criteria thus are based on what Gregg did a lot, and not on what its own expert testified is relevant to determining whether an order is a spoof.

### III. THE GOVERNMENT'S RESPONSES TO THE ADDITIONAL CRITICISMS OF ITS METHODOLOGY ARE WITHOUT MERIT

The Court is respectfully referred to Dr. Attari's Supplemental Declaration for a more thorough discussion of Dr. Venkataraman's responses to the additional criticisms raised in our opening memorandum. Only two are addressed here:

*First*, as to the criticisms of its methodology for selecting Spoofing Sequences, the Government states that its two-step pattern—the sole criterion for identifying alleged Spoofing Sequences—is "inconsistent with an economically rationale trading strategy," and that Gregg has not proven otherwise. Gov't Reply at 9; Venkataraman Reply ¶ 14. This is legally and factually incorrect. The Government—not Gregg—bears the burden of establishing the unlawfulness of any supposed relevant conduct it wants the Court to consider at sentencing. *See Chube*, 583 F.3d at 705-06. And the Government's reference to the trial record, without citation, cannot carry its burden. The Government's witnesses testified that trading that meets this two-step pattern can be perfectly legitimate. *See* Smith Sentencing Memo at 18-20. In other words, more than the pattern is needed to establish that the conduct is unlawful, yet the Government asks this Court to sentence Gregg based solely on that pattern. Further, Dr. Attari provided a thorough explanation regarding the legitimate reasons for trading in this pattern, which the Government has completely ignored.

9

*See* Attari Decl. ¶¶ 37-41. Notably, the CME expressly permits the exact trading pattern that the Government has labeled as unlawful. Smith Sentencing Memo at 19-20.

*Second*, as to the criticisms of its methodology for calculating losses, the Government now, for the first time, alleges that for some unspecified number of sequences, it is calculating "intended loss," not "actual loss," therefore it need not establish that anyone actually lost money—*i.e.*, compare the price at which the trader opened the position with the price at which he closed the position.[9] Gov't Reply at 6-7. But this is false. Dr. Venkataraman explicitly stated in his original declaration that he was "asked by the DOJ to calculate the amount of loss suffered by other market participants as a result of the Defendants' activity," not, as the Government now contends, the amount of loss Gregg *intended*. Venkataraman Decl. ¶ 11, ECF No. 856-1.

## CONCLUSION

For the foregoing reasons, as well as the reasons articulated in Section A of Michael Nowak's contemporaneously filed sur-reply, which we join, the Court should reject the Government's relevant conduct and loss analyses and impose a sentence of time served.

---

[9] The Government also contends that it is not required to establish that its alleged victims actually lost money because Gregg should not get the benefit of a "windfall" if they sold for a profit. Gov't Reply at 6-7. But the case that it cites in support, *United States v. Helfand*, 281 F. App'x 551 (7th Cir. 2008), is inapposite. The Circuit held that the loss arising out of a fraudulently obtained mortgage was not the full amount of the mortgage, but the mortgage balance *less* the amount the victim recovered after selling the collateral—*i.e.*, the victim's *actual* out-of-pocket losses. *See also, e.g.*, *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (describing the loss enhancement as a "bonus" that the Government may earn, noting that a defendant "will not go scot free" (*i.e.*, will not get the benefit of a windfall) when no loss is found).

Here, the Government has failed even to account for when the same alleged victim opens and closes its position all during a Spoofing Sequence, instead counting both the buy and the sell as a loss. This flaw exaggerates the harm to some counterparties by as much as 1,050 percent. *See* Attari Decl. ¶¶ 85-91.

Dated: May 22, 2023

Respectfully submitted,

 /s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6108

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
(202) 664-1935

*Counsel for Gregg Smith*