# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGG SMITH and<br>MICHAEL NOWAK,<br><br>      Defendants. | No. 19-cr-00669 |

**SUPPLEMENTAL DECLARATION OF MUKARRAM ATTARI, PH.D.**
**May 22, 2023**

**Table of Contents**

I. ASSIGNMENT ................................................................................................................1

II. SUMMARY OF OPINIONS ...........................................................................................1

III. DR. VENKATARAMAN'S REVISED SPOOFING SEQUENCES CAN'T
BE REPLICATED USING THE INFORMATION HE HAS PROVIDED .......................3

IV. DR. VENKATARAMAN'S ADJUSTMENTS ARE INSUFFICIENT AND
HIS REVISED SPOOFING SEQUENCES STILL LEAD TO RESULTS
THAT ARE INCONSISTENT WITH INDICIA OF SPOOFING ....................................3

V. DR. VENKATARAMAN'S METHODOLOGY FOR CALCULATING
LOSSES IS STILL FUNDAMENTALLY FLAWED .......................................................7

    A. Dr. Venkataraman Reasserts His Methodology Without Providing Any
Justification .............................................................................................................7

    B. Dr. Venkataraman's Analysis Continues to Be Driven by Outliers and
Skewed Results .....................................................................................................11

## I. ASSIGNMENT

1. I submitted a declaration (the "Attari Declaration") in this matter on April 10, 2023. I have been asked by counsel for Gregg Smith to examine and comment on the Reply Declaration of Kumar Venkataraman, dated May 8, 2023 (the "Venkataraman Reply Declaration"). There are two components to Dr. Venkataraman's analysis: (1) the selection of the alleged "Spoofing Sequences" – i.e., the orders or groups of orders that the Government contends were placed with an unconditional intent to cancel before execution; and (2) the calculation of losses allegedly suffered by other market participants as a result of those alleged Spoofing Sequences. As in the Attari Declaration, I refer to these two components collectively as the "Venkataraman Methodology" or the "Methodology" throughout this declaration.[1,2]

## II. SUMMARY OF OPINIONS

2. In the Venkataraman Reply Declaration, Dr. Venkataraman has made ad hoc adjustments to his Spoofing Sequences to account for certain flaws in his Methodology. I have not been able to replicate his ad hoc adjustments; however, the ad hoc adjustments he purports to have made are not sufficient to address the problems with his Methodology. Even after removing sequences, the remaining sequences ("Revised Spoofing Sequences") still lead to results that are inconsistent with indicia of spoofing and continue to grossly inflate the loss numbers. For example:

---

[1] All defined terms in the Attari Declaration are incorporated herein.

[2] My work and CRA's support are still under the same engagement parameters as described in the Attari Declaration. My work in this matter is ongoing, and I reserve the right to supplement or modify my opinions to the extent new information comes to light subsequent to the filing of this declaration.

- While economists have reasonable debates about what constitutes a "quick" order cancellation, an order cancellation threshold of 36.165 seconds is far higher than any metric I have previously encountered in my work.
- Similarly, Dr. Venkataraman's requirement that Spoof Orders must have an aggregate quantity that is only at least twice as large as the Opposite Orders' aggregate quantity is lower than any such metric that I have previously encountered.
- Dr. Venkataraman's decision to consider orders in the top 10 levels of the order book in this matter rather than the top 5 levels he used in *Bases* grossly inflates the loss amounts. When applied to all the Revised Spoofing Sequences, using the top 10 levels, rather than the top 5 levels, allows Dr. Venkataraman to increase his Unadjusted Market Loss by 72%.

3. Dr. Venkataraman also failed to address a number of the criticisms I made in the Attari Declaration. He has not attempted to justify ignoring these criticisms beyond a mere reassertion of his Methodology. As a result, Dr. Venkataraman's Methodology remains fundamentally flawed.

4. Finally, Dr. Venkataraman's analysis continues to be driven by outliers. Dr. Venkataraman proposes various approaches to remove outliers, but these approaches do not eliminate outliers that skew the results towards large calculations of harm. The 5% of the Revised Spoofing Sequences with the highest Adjusted Market Loss account for nearly all (97%) of his total Adjusted Market Loss. The outliers alone inflate the Adjusted Market Loss for the Revised Spoofing Sequences by more than 4 times.

### III. DR. VENKATARAMAN'S REVISED SPOOFING SEQUENCES CAN'T BE REPLICATED USING THE INFORMATION HE HAS PROVIDED

5. The Government declined requests to provide Dr. Venkataraman's list of Revised Spoofing Sequences or a list of sequences removed from Dr. Venkataraman's original list of Spoofing Sequences. I attempted to replicate the count of sequences Dr. Venkataraman claimed to remove for the five categories of exclusions.[3] I was unable to match multiple categories of exclusions, and my figures for the number of sequences to be removed is more than three times higher than Dr. Venkatraman's figures for one of these categories. Given the implementation errors documented in the Attari Declaration, which Dr. Venkataraman purports to correct here, I cannot accept on its face that Dr. Venkataraman has reliably removed the Spoofing Sequences he claims to have removed. For example, Dr. Venkataraman does not appear to have removed sequences involving certain Tag50s associated with convicted spoofers John Pacilio (CARBONPACILIO and TXLONEPACILIO) and Edward Bases (BSNEBASES), despite having claimed to remove all sequences during which these convicted spoofers were active.

### IV. DR. VENKATARAMAN'S ADJUSTMENTS ARE INSUFFICIENT AND HIS REVISED SPOOFING SEQUENCES STILL LEAD TO RESULTS THAT ARE INCONSISTENT WITH INDICIA OF SPOOFING

6. In the Venkataraman Reply Declaration, Dr. Venkataraman modified his selection of Spoofing Sequences in response to criticisms in the Attari Declaration. However, Dr. Venkataraman's attempts to mask his unreliable results with ad hoc adjustments are not sufficient to fix the fundamental flaws with his Methodology.

---

[3] I am aware of the Government's assertions that the Venkataraman Reply Declaration contains sufficient detail regarding the revised Methodology to test its results properly. This is not accurate. For example: (1) it is not clear whether the Spread Code exclusions apply to the Spoofing Period only or also apply to the Control Period, nor is it clear whether they apply to both sides of the market; and (2) it is not clear how the terms "Opposite Orders" and "Opposite Side Orders" are different or how the latter are to be identified.

7. According to Dr. Venkataraman, the new exclusions reduce Mr. Smith's Spoofing Sequences from 106,037 to 94,424 (the "Revised Spoofing Sequences"), an 11% reduction,[4] and reduce Mr. Smith's Adjusted Market Loss from $81.6 million to $46.8 million, a 43% reduction.[5] In other words, 11% of Dr. Venkataraman's original set of Spoofing Sequences – all of which are no longer categorized as Spoofing Sequences – were responsible for 43% of the "loss." The lopsided impact on the loss amount from relatively few episodes demonstrates the fundamental flaws of the Venkataraman Methodology. Moreover, a properly designed methodology would render ad hoc adjustments unnecessary. It is my opinion that it is impossible to fix the flaws of Dr. Venkataraman's Methodology through any ad hoc adjustments.

8. Even after Dr. Venkataraman has made all of his adjustments, the remaining criteria, resulting in 94,424 Revised Spoofing Sequences for Mr. Smith, continue to yield trading patterns that are not consistent with indicia of an intent to spoof; said another way, Mr. Smith's Revised Spoofing Sequences are consistent with legitimate economic reasons to trade.

9. Dr. Venkataraman claims that I failed to explain why Mr. Smith "systematically placed and canceled [his] large, fully displayed orders while an order was active on the opposite side of the market."[6] This is incorrect. This was addressed specifically in the Attari Declaration in paragraphs 38-41.

10. Dr. Venkataraman's criteria continue to deviate from widely-accepted benchmarks that economists routinely utilize in the analysis of spoofing. While economists have reasonable

---

[4] Venkataraman Declaration, ¶ 17; Venkataraman Reply Declaration, ¶ 74.
[5] Venkataraman Declaration, ¶ 48; Venkataraman Reply Declaration, Table 6.
[6] Venkataraman Reply Declaration, ¶ 14.

debates about what constitutes a "quick" order cancellation, an order cancellation threshold of 36.165 seconds is far higher than any metric I have previously encountered in my work.[7] Similarly, Dr. Venkataraman's requirement that Spoof Orders must have an aggregate quantity that is only at least twice as large as the Opposite Orders' aggregate quantity is lower than any such metric that I have previously encountered.[8]

11. Further, while Dr. Venkataraman relies on charts containing 100 episodes introduced as GX 450 for his revised cancellation speed, order quantity and market imbalance criteria on the basis that the charts were "presented at trial," the revised criteria are in fact inconsistent with what was presented at trial in these charts.[9]

- Dr. Venkataraman uses the trading sequences shown in his Figure 6 as justification for utilizing groups of fewer than 50 contracts in his Revised Spoofing Sequences because one of the order groups in Figure 6 contained 40 contracts.[10] However, Figure 6's text box, (i.e., what was emphasized at trial to the jury) states that Mr. Smith entered "24 orders to buy 240 total contracts." There is no mention in the text box of an order group of only 40 contracts and thus no reason to conclude that the jury considered only 40 contracts as a basis for spoofing.[11]

- Dr. Venkataraman uses his Figure 8 as support for his argument that using the Smith Conviction Sequences' minimum 8:1 ratio of aggregate Spoof Orders to aggregate

---

[7] Venkataraman Reply Declaration, ¶ 72.

[8] Venkataraman Declaration, ¶ 16.

[9] Venkataraman Reply Declaration, ¶¶ 19, 24.

[10] Venkataraman Reply Declaration, ¶ 21.

[11] In footnote 25 of the Venkataraman Reply Declaration, Dr. Venkataraman identifies two additional episodes in GX 450 for Mr. Smith, episodes 2 and 54. Like the episode he presents in his Figure 6, the text boxes shown to the jury also aggregated the orders and order book depth and, like his Figure 6, there was no evidence presented to the jury of the smallest order group as a percentage of the visible order depth.

Opposite Orders "ignores evidence of other Spoofing Sequences that was presented at trial where this ratio was less than 8 to 1."[12] However, Figure 8's two order groups feature 70 contracts (opposing 10 contracts) – a 7:1 ratio – and 90 contracts (still opposing 10 contracts) – a 9:1 ratio.[13] While 7:1 is less than 8:1, it is still far higher than the 2:1 ratio Dr. Venkataraman uses in his analysis.[14] In other words, the trial sequences that Dr. Venkataraman points to do not support the 2:1 ratio he continues to use to identify his Revised Spoofing Sequences.

12. Dr. Venkataraman continues to consider and calculate losses based on any so-called Spoof Order placed and resting in the top 10 levels of the order book.[15] Even though Dr. Venkataraman has altered the threshold from the top 5 levels that he used in the *Bases* matter to the top 10 levels he uses here, he provides no support for the idea that orders resting in levels 6 through 10 are meaningful for market participants or have any material impact on their trading. In fact, in the Venkataraman Reply Declaration, Dr. Venkataraman continues to use "the top five levels of the visible order book" as his primary metric when discussing Spoof Order quantity.[16]

13. Dr. Venkataraman's decision nonetheless to use the top 10 levels rather than the top 5 levels in calculating loss grossly inflates the loss amounts. For example, in the instance Dr. Venkataraman shows in his Figure 9 (which is used by Dr. Venkataraman to justify the 10-

---

[12] Venkataraman Reply Declaration, ¶ 22.

[13] In footnote 29 of the Venkataraman Reply Declaration, Dr. Venkataraman identifies an additional episode in GX 450 for Mr. Smith, episode 34. Like the episode he presents in Figure 8, this additional episode shows a ratio of 7:1.

[14] Venkataraman Declaration, ¶ 16.

[15] Venkataraman Reply Declaration, ¶ 24 and footnote 83.

[16] Venkataraman Reply Declaration, ¶ 21. See also Venkataraman Reply Declaration, ¶ 14(ii). See also GX 498, which was presented as the "Summary of All Smith and Nowak Orders," and which summarizes the average market depth of the top five levels of the order book.

level threshold), the Unadjusted Market Loss for the Spoofing Sequences would have been $4,080 if he used the top 5 levels, rather than $7,880 from using the top 10 levels. In other words, by using the top 10 levels, Dr. Venkataraman almost doubles his calculated loss for the sequences in his Figure 9. When applied to all the Revised Spoofing Sequences, using the top 10 levels rather than the top 5 levels allows Dr. Venkataraman to increase his Unadjusted Market Loss by 72%.

## V. DR. VENKATARAMAN'S METHODOLOGY FOR CALCULATING LOSSES IS STILL FUNDAMENTALLY FLAWED

### A. Dr. Venkataraman Reasserts His Methodology Without Providing Any Justification

14. In the Attari Declaration, I pointed out multiple flaws in Dr. Venkataraman's methodology. Dr. Venkataraman does not address most of these criticisms in the Venkataraman Reply Declaration; instead, he just reasserts that he has chosen to continue implementing the same Methodology.

15. In the Attari Declaration, I explained why Dr. Venkataraman's Control Periods were flawed.[17] Dr. Venkataraman's defends his Control Periods by stating that "the time proximity helps account for the impact of idiosyncratic market conditions that vary over time," which he asserts is "a reasonable, but not a perfect, assumption."[18] In my opinion, this is not a reasonable assumption because, as previously explained in the Attari Declaration, "[t]he change in market activity during the Spoofing Periods may very well be in response to the market activity during the Control Periods."[19] That means the estimated "harm" may simply be a result of the activity in the Control Period, and Mr. Smith's trading activity (i.e.,

---

[17] Attari Declaration, ¶¶ 51-58.

[18] Venkataraman Reply Declaration, ¶ 37.

[19] Attari Declaration, ¶ 54 and Venkataraman Reply Declaration, fn. 57.

why he is trading during the Spoofing Period) may also be correlated with other market participants responding to that same Control Period activity. Dr. Venkataraman's Methodology does not account for this possibility, and Dr. Venkataraman does not explain how his Methodology is still reliable despite this flaw.

16. In addition, as I explained in the Attari Declaration, Dr. Venkataraman should control for factors which have an impact on loss calculation. Examples of these factors include market movements preceding the Control and Spoofing Periods, the state of the order book at the start of the Control and Spoofing Periods, and external factors such as macroeconomic news.[20] In response, Dr. Venkataraman simply reasserts – without any support – that "his matched control periods … are a reasonable benchmark" and the "speculation that there may be 'alternative explanations' is baseless and unconvincing."[21]

17. Dr. Venkataraman does not address the criticism in the Attari Declaration that his Methodology fails to account for external factors, such as macroeconomic news or activity in correlated markets, and their impact on precious metals futures prices, trading volume, and/or Mr. Smith's trading strategy.[22] However, he does acknowledge the relevance of one single external factor: the market activity of other convicted precious metals futures spoofers.[23]

18. Specifically, Dr. Venkataraman revised his Methodology to exclude sequences where four specific convicted spoofers – Mr. Vorley, Mr. Chanu, Mr. Pacilio and Mr. Bases – were active.[24] As Dr. Venkataraman is aware due to his involvement in those matters, each of

---

[20] Attari Declaration, ¶¶ 54-57.

[21] Venkataraman Reply Declaration, ¶ 35.

[22] Attari Declaration, ¶ 57.

[23] Venkataraman Reply Declaration, ¶ 71.

[24] Venkataraman Reply Declaration, ¶ 71. Note that he chooses these four traders by citing to the Attari Declaration but ignores the fact that I stated that these four were merely examples Attari Declaration, ¶ 60. And, as noted above, Dr. Venkataraman did not even exclude all Tag50s for these four convicted spoofers.

-8-

those cases involved cooperating witnesses who admitted to spoofing and Spoofing Sequences. But Spoofing Sequences during which these cooperating witnesses were active were not removed, nor were Spoofing Sequences with activity by other accused spoofers, such as traders who have settled spoofing charges with the Commodity Futures Trading Commission.

19. Moreover, Dr. Venkataraman continues to ignore the market impact that large orders unrelated to Mr. Smith's activity can have on the market. In the Attari Declaration, I explained that unrelated large orders had a significant impact on the market and that this impact was asymmetric – one cannot assume that the effect of unrelated large orders will offset in a large sample.[25] Dr. Venkataraman's failure to control for the impact of large orders unrelated to Mr. Smith's orders remains a significant flaw in his Methodology.

20. For example, in the sequence illustrated in Figure 1 below, Mr. Smith's large order group, which totals 35 lots, is joined by a 100 lot order by a trader with a Tag 50 "JBERKOWITZ", who I understand to be Joshua Berkowitz of Woodbine Capital Master Fund LP.[26] All of the Unadjusted Market Loss for this sequence occurs after Mr. Berkowitz's order is placed, but Dr Venkataraman does not attempt to account for the impact of this 100 lot order in determining the loss he assigns to Mr. Smith for this sequence.

---

[25] Attari Declaration, ¶¶ 96-97.
[26] Tag 50 registration information from DOJ-0020001045

**Figure 1**: Sequence Smith_GC_B_17480



21. Similarly, in the sequence illustrated in Figure 2 below, Mr. Smith's 60 lot large order group is bettered by a 100 lot order placed by a trader with a Tag 50 of "BOUNDAN".[27]  $400 of the $420 Unadjusted Market Loss, or more than 95%, for this sequence occurs after BOUNDAN's order is placed.  Again, Dr Venkataraman does not attempt to account for the impact of this 100 lot order in determining the loss he assigns to Mr. Smith for this sequence.

---

[27] This Tag 50 was not part of the registration information contained in DOJ-0020001045.

**Figure 2**: Sequence Smith_GC_S_25235



### B. Dr. Venkataraman's Analysis Continues to Be Driven by Outliers and Skewed Results

22. In the Attari Declaration, I noted that Dr. Venkataraman's harm computation is unreliable and pointed out some of the assumptions that cause these problems.[28] Dr. Venkataraman has either ignored these or attempted to explain them away or has otherwise made minimal changes. However, these problems persist.

23. Even after Dr. Venkataraman made all of his ad hoc adjustments, the Revised Spoofing Sequences confirm that his results are driven by the same flaws in his Control Period specification and by outliers, as described in the Attari Declaration.[29] First, the 5% of his Revised Spoofing Sequences with the highest Adjusted Market Loss account for nearly all (97%) of his total Adjusted Market Loss. Second, the 5% of his Revised Spoofing

---

28 Attari Declaration, Section VI.B.

29 Attari Declaration, Section VI.B.

Sequences with the lowest But-for Cost of Trading account for 48% of his Adjusted Market Loss. There is no reasonable explanation consistent with his theory of spoofing as to why the sequences with the lowest But-for Cost of Trading would account for disproportionately high Adjusted Market Loss.

24. In addition, Dr. Venkataraman's Control Period is fundamentally flawed. According to Dr. Venkataraman, the Control Period is supposed to be a clean period, unaffected by spoofing or other manipulative activity.[30] In such a clean period, we would expect markets to move randomly – prices should move upwards roughly 50% of the time and downwards roughly 50% of the time. As such, the distribution of But-for Cost of Trading – in other words, the positive or negative loss associated with the Control Period – should be symmetric: positive half of the time, negative the other half, and zero on average.

25. However, Table 1 in the Venkataraman Reply Declaration shows only a positive loss: with a mean of $188, and the median of $10. (Distributions are typically measured using medians and means.) This tilt towards positive loss in the median and mean reveals that there are large outliers that are skewing the results on one side of the distribution. As the Control Period is, by definition, free of Spoof Orders, there is no reason for the data to show such a large skew. Moreover, Dr. Venkataraman's ad-hoc attempts to fix the Methodology do not solve this problem, and instead exacerbate it: the updated But-for Cost of Trading distribution (in Table 3) identifies a mean of $213 and a median of $10.

26. Notably, by switching the But-For Price to use the midpoint of the bid-ask spread instead of the bid or ask price (per the Attari Declaration, the price that is most commonly used by

---

[30] Venkataraman Declaration, ¶ 34.

academic researchers including Dr. Venkataraman), the mean and median But-for Cost of Trading are much closer to $0: the mean is $11 and the median is $0.[31]

27. Finally, Dr. Venkataraman purports to control for outliers by providing alternative results after winsorizing and trimming an equal number of observations from both tails of his data.[32] However, Table 3 in Venkataraman Reply Declaration shows that the average Adjusted Market Loss for his Revised Spoofing Sequences is equal to $473, while the median is equal to $70, which shows that his data is still skewed towards results with high Adjusted Market Losses. A common trimming methodology in economics is to trim at the 20% tail, rather than at the 1% or 2.5% tail as Dr. Venkataraman does.[33] The 20% trimmed range gives an average Adjusted Market Loss of $115, which reduces the effect of outliers in the sample and is more consistent with Dr. Venkataraman's median result. Thus, the outliers alone inflate the Adjusted Market Loss for the Revised Spoofing Sequences by more than 4 times, from an average of $115 to $473.

---

[31] Attari Declaration, Section VI.C.

[32] Venkataraman Reply Declaration, Tables 3 and 4.

[33] Rice, J.A., *Mathematical Statistics and Data Analysis*, Third Edition, 2007, Cengage Learning, p. 397.

Pursuant to 28 U.S.C. § 1746, I, Mukarram Attari, certify under penalty of perjury that the foregoing is true and correct. Executed on May 22, 2023.

_____
Mukarram Attari, Ph.D.